UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X    Docket#
BELFIORE,                      :    14-cv-4090-JBW-RML
                Plaintiff,     :
                               :
      - versus -               :
                               :
THE PROCTOR & GAMBLE COMPANY,  :    February 9, 2015
                Defendant.     :
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

A  P  P  E  A  R  A  N  C  E  S:


**For Plaintiff**
**Belfiore:**              **Lester L. Levy, Esq.**
                           **Matthew Insley-Pruitt, Esq.**
                           **Robert Plotsky, Esq.**
                           Wolf, Popper, LLP



**For Defendant P&G:**     **Emily Henn, Esq.**
                           **Claire Dean, Esq.**
                           Covington & Burling









**Transcription Service**: **Transcriptions Plus II, Inc.**
                           rl.transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1       THE COURT:  We're here on docket number 14-cv-

2  4090, Belfiore v. Proctor & Gamble Company.

3       Will counsel please state their appearances for

4  the record.

5       MR. LEVY:  For the plaintiff, it's Lester Levy

6  from the Wolf, Popper firm and on the phone is Matt

7  Insley-Pruitt and Robert Plotsky.

8       MS. HENN:  Good afternoon, your Honor.

9       For the defendant Proctor & Gamble Company is

10  Emily Henn from Covington & Burling and with me is my

11  colleague Claire Dean.

12       THE COURT:  Great.  Okay.  So, Ms. Henn, were

13  you in the middle of brining up other issues when I had

14  to adjourn for a guilty plea?

15       MS. HENN:  I think that we had finished talking

16  about the first issue that Mr. Levy had raised and I

17  don't recall that I was in the middle of talking about an

18  issue but I think that what might make sense is in that

19  next step is for Mr. Levy to tee up the next issue that

20  he wanted to discuss, if that's all right with your

21  Honor.

22       THE COURT:  Sure.  And I should I be referring

23  to your joint letter at this point?

24       MR. LEVY:  Yeah, the letter of January 2, your

25  Honor.

3

Proceedings

1          THE COURT:  Yes, I have it.  Okay.  Please go

2     ahead.

3          MR. LEVY:  All right.  So this is Lester Levy.

4          The first issue is raised on page 9 of that

5     letter.

6          THE COURT:  Uh-hum.

7          MR. LEVY:  It's at the bottom of the page.  It

8     deals with document request number 16.

9          THE COURT:  Got it.

10          MR. LEVY:  And what we're seeking is any

11     government inquiry or investigation concerning the

12     ability of Freshmate to pass through plumbing, sewers and

13     septic tanks, which obviously goes to the heart of this

14     case.

15          P&G is taking the position that they'll give us

16     any inquiries or investigations having to do with New

17     York State but nothing outside New York State.  Now,

18     since the product they sell, this Freshmates, is uniform,

19     they sell it throughout the United States, obviously if

20     there's a federal investigation or if there's an

21     investigation in any other state about the flushability

22     of this product, it's relevant to this case whether it's

23     a New York State investigation or a New Jersey

24     investigation or a California investigation or a federal

25     one.  So we don't believe Proctor & Gamble's objection

4

Proceedings

1   has merit.

2          THE COURT:  All right.  So are you -- Ms. Henn,

3   what's your position?  I'm reading it here but why do you

4   think it's not relevant or reasonably calculated to lead

5   to the discovery of admissible evidence?

6          MS. HENN:  Your Honor, our position is just

7   that, you know, on this expedited schedule, we have

8   already produced over 17,000 documents and, you know, in

9   the other case,  my understanding from publicly filed

10  letters is that the other defendants have produced, you

11  know, just a fraction of that many documents and we've

12  tried to impose reasonable limitations.  This is a case

13  in which plaintiff is seeking to certify a class of New

14  York consumers.  So this was a limitation that we thought

15  was reasonable to help reduce the burden and the cost of

16  discovery.

17         THE COURT:  Do we know how extensive the

18  discovery is and where there have been investigations

19  outside of New York?

20         MS. HENN:  I am not versed in any sort of

21  investigations that may have been conducted by state

22  municipalities, other than, you know, outside of New

23  York.  And aside from that, I think there may be a

24  federal agency investigation or at least an inquiry into

25  related issues.

5

                              Proceedings

1          THE COURT:  All right.  It appears to me that

2    this is clearly relevant and if the question is is it too

3    burdensome for an expedited schedule, I would want to

4    know what the burden really is.  It's difficult for me to

5    evaluate a claim of burdensomeness if (a) I don't know

6    how extensive the other state and federal investigations

7    are and (b) how easy they are to produce.

8          MR. LEVY:  Sure.  And, your Honor, the document

9    requests were served months ago.  So if they had done it

10   correctly the first time, they wouldn't be faced with a

11   problem with that timing.

12         MS. HENN:  Well, just to respond to your

13   question, your Honor, I think what's burdensome is sort

14   of the searching and having to look for any documents,

15   you know, as plaintiffs has requested that relate to

16   these investigations.  I think if we were to confine it

17   to the federal inquiry, that would not impose undue

18   burden and we would be prepared to produce documents

19   related to the federal inquiry and insofar as it relates

20   to Freshmates, that would be something that we would be

21   prepared to do as a way to meet in the middle here.

22         THE COURT:  Mr. Levy?

23         MR. LEVY:  Well, your Honor, I would assume

24   that a company like Proctor & Gamble, the legal office

25   would have files on all these investigations.  They would

6

                    Proceedings

1   be in one place to make a search for it.  And obviously

2   an investigation by the State of California, or the State

3   of New Jersey that sheds evidence on whether these

4   products are flushable or not is highly relevant.

5           So obviously, we would welcome the federal

6   investigation information but anything else that they

7   have that's accessible should be produced.

8           THE COURT:  Yeah, I agree.  Unless there's some

9   demonstration that these aren't easily accessible

10  documents which I find unlikely, I think these documents

11  should be produced, absent some showing of extensive

12  burden.

13          MS. HENN:  Understood, your Honor, thank you.

14          MR. LEVY:  Your Honor, is there any way we can

15  know when they'll be produced because we are running into

16  deadlines for filing the class motion.

17          THE COURT:  Right.  Ms. Henn?

18          MR. LEVY:  Could we get ten days on that?

19          THE COURT:  Ms. Henn, will that work for you?

20          MS. HENN:  I think we can try to work with that

21  and as we said on Friday, with respect to the pricing and

22  attribute information, if we run into any difficulty, we

23  would be happy to raise that first with opposing counsel

24  and see if we can work out an agreement and if we're

25  unable to, we could come back to your Honor.  But we're

7

Proceedings

1   happy to target ten days in the first instance.  I don't

2   know for sure we'll be able to do that but we'll do our

3   best.

4              THE COURT:  Okay.  Thank you.

5              MR. LEVY:  Your Honor, the next issue would be

6   on page 11, the middle of the page.  This is document

7   request 21, which seeks documents concerning reviews,

8   limitations, field studies, reports, memoranda conducted

9   by Proctor & Gamble as to the ability of Freshmate to

10   pass through plumbing, sewer and septic tanks.

11             They put an artificial date -- time frame from

12   which they're going to look for these documents and our

13   concern is no matter what the time frame is, if a report

14   exists that Proctor & Gamble -- was produced to Proctor &

15   Gamble dated a day before the time frame they're putting

16   on it that shows that this product is not flushable, is

17   highly relevant and should be produced.

18             So, we're a little leery about the time frame

19   that they want to assert on such a search.  So it seems

20   to me if they have in their files, any document that

21   deals with any investigation or testing by Proctor &

22   Gamble on the flushability aspect, it should be produced

23   no matter when that testing took place.

24             MS. HENN:  Your Honor, if I could respond?  I

25   didn't want to preempt any questions the Court has.

8

Proceedings

1     THE COURT:  No, please.  Thank you.

2     MS. HENN:  Okay.  So this dispute that

3  plaintiff has raised really gets into the time period for

4  electronically stored information and as I am sure your

5  Honor is familiar, any time you do a search broadly for

6  electronically stored information, you specifically do a

7  collection, you impose a time frame so that you can

8  reduce a collection, then you use targeted search terms

9  and review the material you end up with.

10        As plaintiffs have known since we served our

11  responses, our written response to the discovery request,

12  we imposed a very generous time frame which is actually

13  the same time frame Mr. Levy himself proposed on Friday

14  when we were discussing with your Honor the pricing data.

15  It's January 1st of 2011, which is almost six months

16  before the class period in this case, up until the date

17  of the collection, I believe.

18        So our view is that if you're going to go back

19  -- if the plaintiff wants us to go back and expand that

20  date range and, in fact, hasn't even suggested a proper

21  date they want all documents regardless of dates, that

22  that really gets to imposing tremendous costs on Proctor

23  & Gamble in part because we would have to redo this

24  enormous process that we've already been through and

25  expand it and recull the documents and reassemble an

Proceedings

1   attorney review team.  Plaintiff is not really pointing

2   to anything in particular.  Our time period is quite, we

3   think, reasonable and by the time plaintiff's raised this

4   issue with us, we had already locked down our documents

5   for production on the expedited schedule by December 22nd

6   which we -- it took extraordinary efforts to meet that

7   deadline.  So we would really face, we think, tremendous

8   and unwarranted costs if we were at this late date to

9   expand the period.

10          The one other point I would mention is of

11  course there are going to be documents in that collection

12  that do predate January 1st, 2011, you know, for example,

13  because they've been e-mailed at a later date and so

14  they're pulled out in the e-mail that's dated during the

15  period.  It's not as if we've artificially pulled

16  responsive documents out of the ESI we searched on the

17  ground that they were predated January 1st, 2011 but

18  really a process like this requires reasonable

19  limitations.  We think we've been very reasonable.

20          This ESI date question comes up not only on

21  page 11 but also on page 6 of the letter to your Honor

22  and we would just ask that, you know, at this late date

23  we be allowed to stand on the very reasonable period we

24  began with.

25          MR. LEVY:  Your Honor, should I respond to

Proceedings

1    that?

2            THE COURT:  Yes.

3            MR. LEVY:  Okay.  Well, the late date is kind

4    of a red herring because this document request was served

5    I think months ago.  If they have a study on whether this

6    product is flushable, again I would think that it's

7    probably located in one place in Proctor & Gamble.

8            If the study came out in December 2009, for

9    example, they say this product is not flushable.  You

10   know, it shouldn't be labeled as such or whatever.  We

11   won't get it, you know, unless she says that well, maybe

12   it's referred to in a later e-mail or it's referred to

13   late.

14           So there's nothing more highly relevant than

15   this document request to this case.  And I said, there is

16   a concern when they put an artificial date on it and if

17   this search -- they don't have to reassemble thousands of

18   people and thousands of searches.  We're looking for the

19   studies of the flushability and again, they're probably

20   located in one area at Proctor & Gamble.  So it's highly

21   relevant and I think we should get it.

22           MS. HENN:  And if I may respond just to those

23   limited points, your Honor.

24           THE COURT:  Yes.

25           MS. HENN:  These aren't -- I mean, Mr. Levy

Proceedings

1   speculates that we have a file with studies.  That's not
2   true.  In fact, as I've mentioned, this is an issue of
3   ESI and electronically stored information and being able
4   to pull this.
5          I'm also not sure what Mr. Levy even means by a
6   study.  This product has been on the market for, I
7   believe, at least a decade.  Ms. Dean can correct me if I
8   am wrong about that.  But of course it's been tested
9   throughout its life and has always met the testing that
10   was imposed by Proctor & Gamble to make sure that it was
11   flushable.
12          So I just think that essentially Mr. Levy is
13   arguing for unlimited ESI collection which is tens of
14   thousands of dollars that we're talking about imposing on
15   P&G at a very late date when we are hopeful that, you
16   know, we can stick to the schedule that's already been
17   extended once.
18          THE COURT:  The tens of thousands of dollars
19   come from what specific operations?
20          MS. HENN:  Sure.  I'm happy to explain that.
21   It comes from the processing of data.  So the data after
22   it's collected from custodians, has to be stored
23   somewhere and then if you want to bring it into a format
24   that can be searched, it has to be loaded into a system
25   and the vendor that handles the data charges a lot for

Proceedings

1   that.  And then the running of the search terms is

2   another cost that the vendor would charge.  And then the

3   resassembling of the attorney review team, you know, I

4   think that's sort of an hourly contract attorney.  And

5   then you get the attorneys at our firm who would look at

6   things to make sure, you know, they're relevant before

7   they are produced.

8           And then even just the production, they have to

9   be converted into a TIF format.  So tens of thousands of

10  dollars is probably a modest estimate of the costs we're

11  talking about.

12          THE COURT:  Mr. Levy, if you were to try to

13  devise a way to limit the costs but at least find some

14  way to identify relevant materials, how would you do

15  that?

16          MR. LEVY:  Well, the search term would be very

17  limited.  It's not like a set -- another set of document

18  requests.  We're talking about any studies or analysis of

19  the flushability conducted by Proctor & Gamble.  So

20  that's a very targeted search term and they probably do

21  have a testing facility or a division that deals with

22  testing of these products or even in the Freshmates

23  division.

24          So I can't imagine, you know, we're talking

25  about a lot of money.  And effectively, if should have

13

Proceedings

1   been -- there's nothing more relevant than that and it

2   should have been done months ago.

3          MS. HENN:  Well, I'd like to point out that

4   plaintiff's initial document request read as follows:

5   "Unless otherwise specified, each request shall be deemed

6   to include documents prepared, written, received...from

7   May 23rd, 2011 to the present."  So that's the class

8   period defined as "relevant period."

9          And then it goes on to say, "This shall be

10  construed to include documents concerning events or

11  circumstances during such relevant period even though

12  dated...prior to the relevant period."

13         So we felt in reviewing these requests that

14  plaintiff had appropriately focused on the class period

15  but we recognized that there could be things that were

16  dated just before that might be relevant and we went back

17  almost six months to January 1st.  And instead of

18  contacting us right after getting our responses and

19  saying wait, we think it should be extended a month or so

20  earlier, plaintiff waited until our production was locked

21  down.  So it's quite prejudicial.

22         And I can tell you because we've been through

23  this process once, the word flushable as a search term

24  turns up thousands and thousands and thousands of hits

25  because, of course, people e-mail and use that word.

14

Proceedings

1    It's not a targeted -- it's not possible to just pull
2    out, you know, the kinds of documents Mr. Levy is talking
3    about.
4                  They've got all of these documents for a very
5    long period of time, over four years and we think that we
6    were, in fact, more generous in their definition and
7    their instructions than their request would have
8    suggested.
9                  MR. LEVY:  I don't believe that specific
10   request had that time limitation on it, request number
11   23.
12                 MS. HENN:  Well it says, "unless otherwise
13   specified, each request" --
14                 MR. LEVY:  Right.
15                 MS. HENN:  -- "shall be" --
16                 MR. LEVY:  And what does that request say?
17                 MS. HENN:  I don't have it right in front of
18   me.  Claire, do you have it?
19                 MR. LEVY:  I would doubt that --
20                 MS. HENN:  This is request number 8.
21                 MR. LEVY:  23.
22                 THE COURT:  I have it.
23                 MS. DEAN:  I can try to pull it up now.
24                 THE COURT:  I have it in front of me.  I don't
25   see a date.

Proceedings

1              MR. LEVY:  Request 23.

2              THE COURT:  Yeah, I don't see a date for

3    request 23.

4              MS. HENN:  So that would default to the

5    relevant period which was May 23rd, 2011 to the present.

6    And as I mentioned, we went all the way back to January

7    1st of that year.

8              THE COURT:  Let me ask while you're looking,

9    when we talk about testing, is this internal testing by

10   P&G?  Is this external testing by some outside vendor or

11   agency?  Do we know who, if anyone, conducted such tests?

12

13             MS. HENN:  Typically it was internal to Proctor

14   & Gamble, that they would test their products.

15             THE COURT:  Is there a division that does that?

16   Is there a particular individual whose name might be

17   associated with such tests?

18             MS. HENN:  There are people who do those tests

19   and they were chosen as custodians.  And then some of the

20   test results that we colleted would have been from a sort

21   of central repository, sort of the files of that person

22   but it was -- so we pulled it from both places, from the

23   ESI through the custodians and the search terms and then

24   from, you know, if there were a central repository.

25             And, of course, all this testing that was done

16

Proceedings

1   back to January 1st of 2011 is the relevant testing for

2   the market -- for the product that was on the market

3   during the class period that the potential class members

4   would have purchased.

5         THE COURT:  Did that product change?

6         MS. HENN:  Yes, there have been changes.  I'm

7   trying to think if there were any changes in the 2011

8   time frame and I'm not sure.

9         THE COURT:  That might be one way to target

10  this would be if the product changed and there was some

11  testing done immediately prior to that time period, that

12  might be another way to collect it or --

13        MS. HENN:  Yes.

14        THE COURT:  Go ahead.

15        MS. HENN:  My understanding is that the product

16  as it initially launched around -- approximately a decade

17  ago, would have been basically the product that was for

18  sale until somewhat recently, certainly during the class

19  period and I don't have the date at hand but when they

20  began testing potentially a new -- called a substraight

21  and I don't want to get too much into confidential

22  information but that's -- that would have happened, I

23  believe, during the class period.  So everything they

24  have should apply to that.

25            And, in fact, I'm not sure that's on the market

17

Proceedings

1  yet, so it's probably not of central relevance but

2  plaintiffs would have that information.

3        THE COURT:  So is there a testing division at

4  P&G or an individual that you mentioned who is or several

5  individuals who would be the repositories for test

6  results or would review them?

7        MS. HENN:  As I mentioned, yes, there would be

8  I think a few different people who are responsible for

9  this.  They're in a larger division that does other

10  things as well and they would be -- that would be sort of

11  the most logical place I think to look for testing

12  information either in their ESI, their electronically

13  stored information or their -- directly in their files.

14        THE COURT:  Would they know whether such tests

15  had been conducted and when they were conducted, if you

16  would ask them?

17        MS. HENN:  They might, yes, yes.  They probably

18  would.  But I think it's been, you know -- there's been

19  testing going on since the product was launched.  So I'm

20  not sure exactly what we're looking for.  You know, I do

21  think that the cutoff we've imposed, particularly when

22  they define the relevant period to be the class period

23  was specifically designed to make sure to give plaintiffs

24  the testing that would be relevant to this case.

25        THE COURT:  Well, I'm not sure about that.  If

Proceedings

1   there was relevant testing done, you know, a few years

2   before the class period that was applicable to the

3   product that was being marketed during the class period,

4   my guess is is that would be relevant under the

5   definitions of Rule 26.

6           And my concern is with your argument and I'm

7   trying to see if there's a way through either some kind

8   of discussions with the individuals involved who would be

9   intimately familiar with what testing was conducted over

10  a reasonable period of time and that would limit your

11  burden.  Perhaps they might even be able to identify

12  those documents so you wouldn't have to spend a lot of

13  time, you know, with ESI.  Again, I don't know -- that

14  might be a reasonable compromise but again, I'm not sure

15  what kind of testing was conducted and what it would look

16  like.

17          MS. HENN:  I mean, I think we could go back --

18  if we're limiting it to testing, I think that would help

19  with the burden because then we wouldn't have to look

20  through e-mail, for example, so if we just went straight

21  to a central repository of just testing and test results

22  but I think we would still need the guidance from the

23  Court of how far back to go because it's been the same

24  product, as far as I'm aware and I can confirm that to be

25  sure but if it's been the same product on the market for

Proceedings

1  a decade I think we are likely to run into a dispute

2  about how far back we have to go.

3          But we appreciate your Honor's willingness to

4  try to work with us to come up with something that would

5  not be as burdensome as to repeat the ESI search term

6  process and if we're just going to go to the central

7  repository for test results, we would appreciate guidance

8  from the Court as to how far back you think it would be

9  reasonable to go.  The class period starts May 23rd of

10 2011 and we've given them back to January 1st, 2011.

11         THE COURT:  Well, without seeing how the tests

12 are conducted, my instinct would be that at the time that

13 the product first came out on the market, there probably

14 was more extensive testing than was conducted during the

15 later period.  I could be wrong about that.  I don't know

16 if either counsel has a view on that.  So it may be that

17 the initial testing would be what's most critical to what

18 plaintiff is looking for and then any subsequent, you

19 know, major re-examination of flushability issues.

20         MR. LEVY:  I think that is correct.

21         MS. HENN:  You know, I really do think it's

22 been going on without stop.  You may be correct that

23 there's more at the beginning but I think that there has

24 been continual testing to really understand the state of

25 the art and the various technology and different methods

Proceedings

1   of testing.

2          So I think we're looking at a really large

3   quantity of testing if we're going back all the way to

4   the product launch.

5          THE COURT:  Well, I would think at the launch

6   you would probably have the most comprehensive test

7   results and if you cut off the discovery before the -- or

8   after the launch, then you might miss the most important

9   documents.

10          MS. HENN:  Okay.  So I just want to make sure I

11   understand the Court's ruling.  It sounds like you would

12   like us to get testing from the launch and then are you

13   suggesting the entire decade or something else?  I'm not

14   sure I understand.

15          THE COURT:  Well, I haven't gotten to that yet

16   and I'm actually  looking for your guidance on that, as

17   well.  Do you think in talking to the people who were

18   involved with the testing, you would be able to find a

19   way to reasonably narrow it, so that it would provide

20   what the plaintiff's are reasonably entitled to without

21   an extensive burden?  In other words, do you think that

22   your people --

23          MS. HENN:  Yes.

24          THE COURT:  -- would be able to identify the

25   documents that they're looking for?

Proceedings

1          MS. HENN:  I think it would be -- I think that

2    would be a helpful next step and I think we could focus

3    on testing for the launch.  You know, sort of the

4    substantiation of the flushability or flushable claim

5    from the beginning and we can explore what we're looking

6    at after that and whether there's a reasonable way to

7    narrow it.

8          And I would also welcome from plaintiff since

9    they have the testing-types of documents, if there's a

10   particular kind of document that they have found

11   particularly relevant, to please share that with us

12   because that will help us target the search, as well.

13         You know, a lot of these things are quite

14   technical, so I don't know what plaintiff's use is of

15   these documents and which ones they think are

16   interesting.

17         THE COURT:  Mr. Levy, what do you say?

18         MR. LEVY:  I -- well, I don't know how to

19   explain to Proctor & Gamble what testing result document

20   they should be producing to us.  Obviously, what we care

21   about is the conclusions reached and the support to the

22   conclusions but not down to the -- you know, every detail

23   as to whether this product is flushable or not flushable.

24   So I --

25

22

Proceedings

1          MS. HENN:  I was just suggesting --

2          MR. LEVY:  I would think if there's a

3    testing --

4          MS. HENN:   -- that since you have a lot of

5    these --

6          MR. LEVY:  -- I would think if there's a

7    testing facility, they would have these documents handy

8    and your Honor's correct that there's -- I think the most

9    extensive testing would be at the launch of the product

10   but periodically, you know, they may be subject to

11   additional testing and we should get the results.

12         Obviously, there maybe a damaging document is

13   something there that says hey we're marketing this as

14   flushable and it's really not breaking down and

15   plateauing through pipes.  So I don't want to miss that

16   document by finding something that I -- I am doing in the

17   dark essentially.

18         THE COURT:  Would a quick telephone deposition

19   help you both or is it better just for counsel to go

20   through the P&G people?

21         MR. LEVY:  Maybe we should speak to the person

22   on the phone.  I don't now if we have to take a

23   deposition under oath but may be, you know, direct

24   contact with Ms. Henn on the line might suffice.

25         MS. HENN:  I think we would be much more

Proceedings

1   comfortable proceeding with counsel involved and, you

2   know, in the normal course. These people may well be

3   deposed but I think we feel that -- I was just suggesting

4   that since counsel already has four years of these types

5   of documents, that if there was a particular type of

6   document that was helpful or not helpful, it would be

7   helpful to know that but I hear Mr. Levy to say that

8   that's difficult for him and so, I would just propose

9   that I talk to our flushability testing experts and try

10  to come up with a proposal for -- and I hear, you know,

11  an interest in the launch, testing before the launch or

12  around the time of the launch, so we'll focus on that and

13  then for the remainder of the decade, a period, we will

14  try to come up with a narrower sort of way to get the

15  relevant documents to plaintiff. You know, as I

16  mentioned, I think they already have a lot of this

17  material and -- to work with but we can get them more.

18          THE COURT: Within the ten days?

19          MS. HENN: This will probably take longer but

20  we'll do it as quickly as we can. I'll have to consult

21  with the same person to see how quickly we can do it.

22          THE COURT: Okay.

23          MS. HENN: Is this material by the way,

24  important -- is this something that needs to be done for

25  class certification or are you focused on this issue in

24

Proceedings

1   particular or is this something that more goes to the

2   merits because I don't know if there -- it would be

3   helpful to prioritize sort of what you need for your

4   motion.

5          MR. LEVY:  I think this is relevant to both

6   class certification and the merits.

7          MS. HENN:  Okay.

8          THE COURT:  Okay.  Next?

9          MR. LEVY:  The next issue, your Honor, is

10  similar except it's not testing.  It's basically

11  marketing and market research.  So we're talking about

12  now on page 6, the plaintiff's position on the top of the

13  page.  This has to do with any studies that Proctor &

14  Gamble has conducted as to whether a reasonable consumer

15  would understand the word flushable to mean.  They put

16  the word flushable on their package.  They market it as

17  flushable but the question is what does that mean to a

18  reasonable consumer?  Does it mean you could flush it

19  down the toilet?  Does it mean it goes through the pipes

20  without causing a problem?  Does it mean it could go

21  through a septic tank without screwing it up?

22          So does Proctor & Gamble have such marketing

23  research?  And again, there shouldn't be a time frame on

24  this because it's as relevant as the testing to this case

25  and it's probably located in one area, so we think it's

25

Proceedings

1   relevant and we should get it.

2           THE COURT:  Just -- I might have missed this

3   but which request are you talking about now, so I can be

4   sure we're on the same number?

5           MR. LEVY:  This is request number 8.  It's on

6   page 6.

7           THE COURT:  Page 6, okay.  And the last one,

8   did we identify the last one as number 23?

9           MR. LEVY:  Uhm.

10          THE COURT:  Document request 23?

11          MS. HENN:  I believe it's 21, your Honor.

12          THE COURT:  It's 21?

13          MS. HENN:  Yeah, the testing.

14          THE COURT:  21.

15          MR. LEVY:  That's 21 and 23, I think.

16          THE COURT:  So both?  You know, because 23

17  talks about testing, as well.  I wasn't sure which one.

18          MR. LEVY:  I think they both cover it.  One

19  is --

20          THE COURT:  Okay.

21          MR. LEVY:  -- reviews, investigations, field

22  studies, assessments.

23          THE COURT:  Okay.

24          MR. LEVY:  So I think they overlap, 21 and 23.

25          THE COURT:  Okay.  But this one is on page 6

26

Proceedings

1    number 8, correct?

2              MR. LEVY:  Right, this one is 8.

3              THE COURT:  Okay, go ahead.

4              MS. HENN:  Judge, just to respond to Mr. Levy,

5    I think again we've given them -- we've responded to this

6    request.  They have a lot of -- they have these documents

7    going all the way back to January 1st of 2011, almost six

8    months before the class period begins.

9              This one in particular where this is focused on

10   what consumers, you know -- any market research.

11   Unfortunately, these aren't located in any central place.

12   They're all over the place and we were able to locate

13   them using the same techniques I described and again, you

14   know, we think again where plaintiff has requested

15   documents for the relevant period, which plaintiff

16   defined as May 23rd, 2011 to the present, our having gone

17   back to January 1st, 2011, was a reasonable way to

18   capture the relevant documents and it's extremely

19   expensive to repeat this process, particularly when

20   plaintiffs themselves pointed us towards the relevant

21   period and we expanded it.

22             This case is like lots of class actions,

23   discovery is all one-sided.  There's no downside to Mr.

24   Levy to just ask for more and put more and more costs on

25   my client and they have these documents.  We gave them

27

Proceedings

1   these documents and they go all the way back almost six

2   months before the class period.

3           So I mean it feels almost like Mr. Levy is

4   trying to just reopen discovery yet again when we were

5   under the impression that what Judge Weinstein had

6   ordered was that we should be expedited and try to

7   accomplish this quickly and without undue burden on

8   either side.

9           MR. LEVY:  Your Honor, if I can respond?

10          THE COURT:  Yes.

11          MR. LEVY:  It's hardly a one-sided deposition.

12   I mean, our client, his wife, his plumber, were all

13   deposed.  There were inspectors coming into his house

14   going through his toilet and his pipes.  So it's not one-

15   sided discovery in this case.

16          As your Honor pointed out, it was at the

17   inception that this marketing research probably took

18   place because somebody had the idea of marketing this

19   product as flushable, putting it all over their product

20   covers and packages.

21          So I would guess, a reasonable guess, that they

22   do have these studies at the inception of the product and

23   when they decided to market it as flushable.  So those

24   are the studies that we would like, if there would be a

25   study of what a reasonable consumer would consider being

Proceedings

1    flushable and would be willing to pay for a flushable

2    product.  So limiting it to years later doesn't get us

3    the information at is the most relevant to this case.

4              THE COURT:  Again, I'm wondering if there isn't

5    some either division or individual who would have

6    institutional knowledge of which reports there were.

7    Maybe there is a report that is considered the bible and,

8    you know, it's supplemented a few years later and that

9    would be fairly discoverable or locatable.

10             Ms. Henn, do you have an idea whether that's

11   correct?

12             MS. HENN:  Unfortunately, not.  It's -- you

13   know, people change jobs and where the -- we have had to

14   do basically searches of electronically stored

15   information, using search terms.

16             For the person currently in the job who manages

17   research, market research, she has some limited

18   understanding of what exists but not back before the

19   class period.  So I don't know of a targeted way to find

20   this.

21             And I just would repeat, I mean if plaintiff

22   wanted data back -- wanted these studies back to the

23   beginning of when this product was launched, I don't know

24   why plaintiff didn't request that.  Plaintiff requested

25   documents from the relevant period.

29

Proceedings

1       THE COURT:  Uh-hum.

2       MS. HENN:  And doing it this way, having us

3  respond by, in fact, expanding the period and then

4  plaintiff coming back and asking now for going back to

5  the launch, if he had asked for that in the beginning, we

6  would have met and conferred and likely held off

7  producing until we could get the Court's guidance because

8  it's extremely expensive to do this twice.

9       MR. LEVY:  Well, we met and conferred on this

10 in December.  So what is (indiscernible) --

11      MS. HENN:  Yeah, after our production was

12 launched -- was all locked down.  I think we served our

13 responses to you in early December and we didn't talk

14 about this, you didn't raise this issue with us until

15 December 19th, I believe, when the substantial completion

16 deadline was the 22nd.

17      But again, just going back to the initial

18 request, you didn't request things back to the launch.

19 You requested them back to the beginning of the class

20 period and we went almost six months earlier.

21      MR. LEVY:  But the broad definition was

22 anything that relates to events that took place during

23 the class period which is marketing and this is -- is

24 flushing.  So the studies you have on whether that

25 marketing, you know -- how that would be understood by

30

Proceedings

1  the consumer would be called for.  Any of this is highly

2  relevant and again, you should talk to somebody there to

3  see what exists.

4          MS. HENN:  I have, Mr. Levy.  That's what I was

5  just repeating.

6          THE COURT:  All right.  So that's unfortunate.

7  So I do understand, Ms. Henn, your position that had you

8  known earlier that the request was for a period of time

9  that predated the class period, you wouldn't have had to

10  do a second search or an expanded search.

11          So what -- assuming that the plaintiff does

12  really have an interest in finding out what these

13  original market research documents said, and your

14  difficulties in trying to find if there's someone with

15  any institutional memory who would have them or someone

16  who has some kind of an easily accessible file, what do

17  you suggest?  What would be the best way to try to

18  approach this?

19          MS. HENN:  Well, I would be happy to go back to

20  the person focused on the launch period and see what we

21  can find.  And I think that would be a more productive

22  way to go about it than going back to the electronically

23  stored information which gets into the really, you know,

24  expensive processes we would have to invoke.

25          So I think the best thing I can suggest is that

Proceedings

1    we attempt a targeted search where we go back to the

2    person who has responsibility for this, see what she

3    knows about her predecessor.  Plaintiffs have deposed

4    her, so they had the opportunity to ask her these

5    questions to (indiscernible) but we can go back and ask

6    them and see what we can find in sort of a targeted way.

7              And I can't guarantee that we will have stuff

8    back from the launch because it's a long time ago but we

9    will certainly look for what is there and through a

10   targeted search, we would be willing to produce what we

11   can find.

12             THE COURT:  Uh-hum.

13             MS. HENN:  And we think that would probably be

14   a better way to go at this then going back to the

15   electronically stored information with the keyword

16   searches which are somewhat imprecise as they are.

17             THE COURT:  Is there an individual who could be

18   identified who was employed at the time who might have

19   been either the custodian or the originator of a request

20   for these marketing surveys?  Would that be --

21             MS. HENN:  It's possible, your Honor.  I just

22   don't know the answer to that but I can -- you know, what

23   I'm focused on is what the person who we've been working

24   with has but I can certainly ask her to identify to me

25   who that other person was and we can see if we can find

Proceedings

1    them or if they're still at the company.

2         THE COURT:  Okay.  And perhaps that person has

3    files and can easily access these documents, one might

4    hope.

5         MS. HENN:  All right.

6         THE COURT:  Okay.  What else?

7         MR. LEVY:  Okay.  Next is a grouping of issues

8    dealing with New York customers.  These would be class

9    members who have contacted Proctor & Gamble and

10   complained about the fact that this product is not

11   flushable and has caused them problems.

12        We asked a series of questions.  We asked for

13   interrogatories to identify those New York customers who

14   have contacted Proctor & Gamble, complained about the

15   product.  And we also want their communications and

16   Proctor & Gamble's response.

17        Proctor & Gamble refuses to identify their

18   customers saying that they're concerned about the privacy

19   of the customers which makes little sense because there's

20   nothing in that information that's private.  We're not

21   talking about Social Security numbers or income or

22   anything like that.  We're just talking about complaints

23   about the product.

24        And Proctor & Gamble's own Web site says they

25   can use that information to defend Proctor & Gamble but

Proceedings

1   obviously, they don't want to give it to the plaintiff

2   who is trying to collect money for these individuals.  So

3   we want to identify those people.  They will be witnesses

4   -- potential witnesses in this case.

5           Secondly, the communications back and forth

6   with Proctor & Gamble from these customers, we asked for

7   those and Proctor & Gamble says we'll give you our

8   summaries of those communications but we won't give you

9   the communications.

10          Well, the problem with that is that the

11  communications, especially from Proctor & Gamble back to

12  the consumers may contain admissions against interest

13  which would not be in their summaries.  And also we've

14  taken the deposition as to whether there may be errors in

15  these summaries when you compare them to the original

16  communication and there have been, you know, at least an

17  instance or more that the person could remember off the

18  top of their head of errors.

19          So the communications are the best evidence of

20  what the consumers complaints are about this product and

21  of Proctor & Gamble's response and the identification of

22  the -- who these customers are would lead to potential

23  witnesses in the case.  So we're entitled to that.

24          THE COURT:  Ms. Henn?

25          MS. HENN:  WELL, if I could respond, your

34

Proceedings

1    Honor.

2              THE COURT:  Yes.

3              MS. HENN:  I think out of these three issues

4    Mr. Levy has identified, I can take one off the table

5    because we've already produced Proctor & Gamble's

6    responses to consumers.  So plaintiff has that, where

7    there was a letter that went to the plaintiffs.

8              The spreadsheet that we produced to plaintiff

9    from our system of record which is not a self-summary,

10   it's actually where we track all of the calls that come

11   in, that spreadsheet indicates whether a response was

12   sent and for the cases that had responses, we went back

13   and pulled the letter and produced that.  So I think that

14   one's not an issue.  It should be a moot issue.

15             So that leaves two things Mr. Levy raised.

16   First, about identifying New York customers who had

17   called or e-mailed or wrote letters to complain about the

18   product and then the second is communications back, I

19   gather.  So -- or no, identifying the customers and then

20   the actual communications.

21             So what we did in response to the request to

22   get complaint information was we went to our system of

23   record.  Proctor & Gamble has a very robust system for

24   tracking calls and e-mails and letters.  We produced from

25   that system a summary of calls that came about -- you

35

Proceedings

1   know, that raised an issue about flushability from New

2   York.  And then when plaintiffs asked that we give them

3   more than just New York, we went back and we produced,

4   you know, similar information nationwide.

5           As plaintiffs learned at the deposition, if a

6   person e-mails Proctor & Gamble, the text of the e-mail

7   is -- it goes into this system.  So when we produced the

8   summary of the call or the complaint, in the case of

9   e-mails, plaintiff already has the exact text of that

10  e-mail.  So I think e-mails really aren't an issue.

11          I think when somebody calls, the person -- and

12  it's usually at a vendor who takes the call, summaries

13  what was -- what the issue was and the summaries are

14  incredibly detailed and they explain what was happening.

15  Similarly, when letters come in, so they're not

16  electronic, a summary will be created and, you know, you

17  often even see the grammar errors that might have been in

18  the letter, actually in the summary.  So these are highly

19  detailed records and they come from the system that

20  Proctor & Gamble uses to track these things.

21          What plaintiff wants in addition is the

22  original copy of the letter, I gather and they've gone so

23  far as to ask for audio recordings of phone calls that

24  came in and again, we're getting into territory of great

25  expense and a lot of time for Proctor & Gamble to have to

36

                        Proceedings

1  go to its vendor to find out if the audio recordings even

2  exist and pull them and track exactly the case number to

3  the audio recording.

4           And I really -- plaintiffs have not explained

5  why an audio recording gives them more information than

6  the summary.  Mr. Levy mentioned something about errors

7  in the system.  The error that was talked about in the

8  deposition had to do with an entry in a spreadsheet where

9  apparently an agent had used the wrong product code.  So

10 the response that went back to the customer had to do

11 with the Fabreeze Air Freshener product instead of the

12 Proctor & Gamble Freshmates product.  It's not an error

13 that has anything to do with this case or really

14 restricts in any way, plaintiff's ability to use this

15 information.

16          We think that the way we did this and the

17 records that we gave them, they're the exact records

18 Proctor & Gamble relies on.  They have great detail

19 about, you know, what happened.

20          And so, you know, we would ask the Court to

21 hold what we have done as reasonable and not require us

22 to go to the expense and, you know, taking the time to

23 try to find original communication.

24          The last issue that Mr. Levy raised is the

25 identity information.  Plaintiff is seeking information

37

Proceedings

1   that P&G may have about a consumer's name, address, e-

2   mail.  We think this is precisely information that

3   consumers consider confidential.  When they write into

4   Proctor & Gamble, you know, they're not expecting that

5   that data is going to be shared, unless compelled by law,

6   which is what our policy -- our privacy policy and

7   promises that we make to consumers on our Web site

8   states.

9            You know, we just think that what -- the

10  information that plaintiff wanted about, you know, who

11  calls and how many calls, and there aren't a lot of them,

12  about flushability issues in New York is what they've got

13  and we don't think there's a reason for us to provide

14  people's names and e-mail and addresses, you know, for

15  purposes of a class action litigation.

16           THE COURT:  So --

17           MR. LEVY:  Your Honor, if I might respond?

18           THE COURT:  Yeah, let me just ask a clarifying

19  question.  So in the documents that have been provided,

20  have the names and identifying information of the

21  complainants been redacted?

22           MS. HENN:  It has not been provided.  When we

23  were exporting the information from the database, we did

24  not export that field.  We didn't redact it but we just

25  -- we created this spreadsheet for plaintiff pulling --

Proceedings

1    you know, it's got the case number, the contact country,

2    the contact date, the item, you know, that's being called

3    about, the date that the record was created --

4              THE COURT:  Uh-hum.

5              MS. HENN:  -- a description of the issue, you

6    know, the status of the issue, whether P&G responded.

7    And then it's got this fulsome summary of what the person

8    was calling about.  So that's more or less the

9    information that was provided.

10             THE COURT:  So the numbers of complaints -- so

11   everything having to do with the complaint has been

12   provided except for the identifying information of the

13   complainant?

14             MS. HENN:  I believe that's correct, although I

15   don't want to misstate.  It's possible there are other

16   fields that might have been -- seemed to us irrelevant or

17   for internal purposes.  I'm not aware that there are any

18   fields like that but I don't want to exclude the

19   possibility.

20             THE COURT:  Mr. Levy, for class certification

21   purposes, why do you need identifying information?

22             MS. HENN:  For the class certification, I don't

23   need to name -- I don't need the contact and identifying

24   information, so that (indiscernible) we don't.

25             But obviously, for the merits it's going to be

39

Proceedings

1   very important.  They're going to be witnesses in the

2   case.

3             THE COURT:  WELL, is there any reason -- and

4   again, I may be forgetting some of the case management

5   order, but is there any reason why we can't defer that

6   until after the class certification issue and we see how

7   the class has been certified and define, if at all, by

8   Judge Weinstein?

9             MR. LEVY:  No, we can do that.

10            THE COURT:  Okay.  So that's how I would like

11  to deal with this at this point and then we can -- as to

12  the original documents, I don't think it's -- Mr. Levy,

13  did you want to say anything more about the original

14  documents or --

15            MR. LEVY:  Well, the original -- I won't press

16  for the e-mails or the recordings at this stge.  As far

17  as the letters, again all we have is their summaries of

18  what's in the letter.  That's not the best evidence of

19  what these customers said.  But again, I'm willing to

20  defer that too, if --

21            THE COURT:  Okay.  Yes, I think that makes

22  sense at this point.  So I just want to be sure that I'm

23  noting this down right.  That was number 8 --

24            MS. HENN:  Uhm.

25            THE COURT:  -- request number 8?  Well, there

40

Proceedings

1   were several.  There were 8 and --

2          MR. LEVY:  Yeah, it was an interrogatory and it

3   was a few document requests.

4          MS. HENN:  Okay. I believe it is document

5   request number 12.

6          THE COURT:  Okay.

7          MS. HENN:  Document request number 13.

8          MS. DEAN:  13, yes.

9          MS. HENN:  And inter -- let's see.

10         MS. DEAN:  I believe it's interrogatory number

11  13.

12         MS. HENN:  Here it is, interrogatory 13, yes.

13         THE COURT:  Okay.  I just want to be sure we're

14  clear on the record.

15         MS. HENN:  Thank you, your Honor.

16         THE COURT:  Okay.  So the objections will be

17  deferred until after the class certification.

18         MR. LEVY:  Your Honor, I think there's just two

19  more that we want to bring up.  One would be on page 14

20  of the letter.

21         THE COURT:  Okay.

22         MR. LEVY:  This is responding to INDA (ph.).

23  This is on the bottom of page 14.

24         THE COURT:  I'm there.

25         MR. LEVY:  Okay.  Now INDA is a trade

41

Proceedings

1   organization of manufacturers of these products and

2   Proctor & Gamble I think has a member who sits on the

3   board and supports INDA and funds INDA.

4         They're using INDA's testing results and

5   qualifications to defend, you know, the flushability of

6   this product.  We would like to show that INDA's not only

7   not an independent agency but is -- how much it's

8   beholden to Proctor & Gamble and how much Proctor &

9   Gamble funds it and causes its existence to even exist.

10        So we asked for how much Proctor & Gamble has

11  given to INDA to support it.  What they've given in

12  return is one year's membership fee which hardly responds

13  to the question or the thrust of the question.  So you'll

14  see that on page 14 and page 15.

15        THE COURT:  Yes.

16        MR. LEVY:  So this is just a matter of giving

17  us, you know -- they can give us a document saying how

18  much money they've given over the years to INDA if they

19  want to.

20        MS. HENN:  And just a couple of points in

21  response, Mr. Levy may have misspoken but he said that

22  Proctor & Gamble relies on testing results and

23  qualifications of INDA.  INDA is an industry-membership

24  organization that promulgates standards for what is

25  considered flushable and sort of testing protocol but P&G

Proceedings

1    does not rely on INDA to test its wipes.  P&G tests them

2    internally as we have discussed earlier in this

3    teleconference.

4              We have, as Mr. Levy reported, we provided the

5    most recent year's membership fee.  We would be happy to

6    try to find prior year's membership fees.  I don't know

7    that we still have that information within P&G but I will

8    try to find out and I would be happy to provide what we

9    can locate and we would ask just that that be confined

10   again to the class period because I think -- frankly, I

11   think with one year's membership fee, Mr. Levy can

12   probably make the point that he's trying to make but if

13   he needs -- you know, it's probably reduced amounts and

14   prior years.  If the fee is similar to other things, they

15   tend to go up over time but I can certainly find out if

16   we have any further information.  I'm not sure we will be

17   able to find out what was paid in prior years but I can

18   try.

19             MR. LEVY:  And funding goes beyond membership

20   fees.  I know that, you know, if you joined a country

21   club, you've got a membership fee but you also give other

22   monies to the country club.  So funding is a broader

23   term.  It's how much money Proctor & Gamble has given to

24   this trade association.

25             MS. HENN:  Yeah, I just don't know how to go

43

Proceedings

1  about -- I think that it's possible that there have been

2  studies conducted that I don't know if you consider that

3  to be funding, if a study was done in conjunction with

4  INDA and P&G provided funding for that study.  That -- I

5  don't know if -- of any other type of funding that might

6  have happened though.  I think it's all encompassed in

7  the membership fee other than that.

8           THE COURT:  So how do you want to leave that?

9  Will you -- Ms. Henn, will you attempt to find out any

10 other funds that were provided to INDA during the class

11 period?

12          MR. LEVY:  Well, your Honor --

13          MS. HENN:  I will --

14          MR. LEVY:  -- it's beyond the class period,

15 your Honor.  It's if, you know, they've given millions of

16 dollars to INDA, I'd like to know that and not restrict

17 that to what they gave them during the class period.

18          THE COURT:  I'm sorry.  Let me just --

19          MS. HENN:  Your Honor?

20          THE COURT:  I've got the interrogatory.

21          MS. HENN:  Yes.

22          THE COURT:  I'm on page 18.  It says, "State

23 P&G's relationship with INDA, including," et cetera, et

24 cetera, et cetera, "whether P&G has provided funding to

25 INDA and if so, in what amounts."  I don't see a date

44

Proceedings

1   specified there.  Does that mean that it's -- it reverts

2   back to the default position?

3           MS. HENN:  The relevant period.

4           THE COURT:  Yes.

5           MS. HENN:  (Indiscernible).

6           THE COURT:  The default position class period.

7           MR. LEVY:  (Indiscernible) considered it, your

8   Honor.  I would consider it to how much funding can be

9   given to INDA over the --

10          MS. HENN:  Well, except --

11          MR. LEVY:  -- since its inception.

12          MS. HENN:  -- that the document itself, I

13  believe says -- and Claire, I hope you'll correct me if I

14  am wrong, but I believe the document says, "Unless

15  otherwise specified, each request shall," --

16          THE COURT:  Yes.

17          MS. HENN:  -- "cover this relevant period, May

18  23rd, 2011 to the present."

19          But the bigger point, I think, your Honor, is

20  that if we can limit this to a reasonable period like the

21  class period, I think Mr. Levy will be able to make

22  whatever arguments he had.  It will be representative, of

23  course, of what might have happened in the past but the

24  relevant period is the class period and it will give him

25  information to make whatever arguments he would like to

45

Proceedings

1  make.

2          MR. LEVY:  Your Honor, I think that's too

3  restricted.  I mean I don't think it's going to be a big

4  burden to find out how much money Proctor & Gamble has

5  given to INDA, which is basically one inquiry.

6          THE COURT:  But over what period of time?  It's

7  unclear what period of time you're requesting?

8          MR. LEVY:  Well, since INDA was formed because

9  it was formed, I believe by the -- as the trade

10 association, formed by Proctor & Gamble and other

11 manufacturers, you know.

12         THE COURT:  When was it formed?  Does anyone

13 know?

14         MS. HENN:  I don't know but I don't think

15 Proctor & Gamble formed it.  It's an association of non-

16 woven fabrics, so it's -- P&G played a role but it's not

17 the driving -- you know, there are lots of other

18 companies; Kimberly-Clark, for example, in the other

19 case.

20         THE COURT:  Uh-hum.

21         MS. HENN:  And then also manufacturers of the

22 material.  There are lots of -- lots of members.  I don't

23 know how far back it goes.

24         Might I make a proposal that we make a

25         THE COURT:  Sure.

Proceedings

1      MS. HENN:  -- search and provide information

2  for the class period and if Mr. Levy, you know, once he

3  has that information, feels that there's, you know -- has

4  more information about the founding or anything else that

5  suggests to him that there's relevant information going

6  back further, he could come back and make that case.

7          THE COURT:  I'm looking at --

8          MS. DEAN:  I'll just note that INDA was founded

9  in 1968, so quite a considerable amount of time ago.

10         MR. LEVY:  Well, how about starting when

11 Proctor & Gamble was involved then.

12         THE COURT:  Right, and the response --

13 interrogatory response says, "Proctor & Gamble's been

14 involved since 1999," I believe -- "at least 1999.  In

15 the past, P&G has also contributed to the cost of

16 specific INDA-sponsored projects, et cetera, related to

17 flushable wipes including field studies, et cetera."

18         MS. HENN:  Right.

19         THE COURT:  But you weren't able to specify and

20 perhaps that -- if those were in the class period,

21 perhaps that would be a sufficient note.  It's just hard

22 to know when those projects took place.

23         MS. HENN:  Uh-hum.

24         THE COURT:  Would a five-year or a seven-year

25 period capture what we're looking for?

47

Proceedings

1    MS. HENN:  I think a five-year period would be,

2  you know, the class period plus and again, you know, if

3  there's something highly interesting to plaintiff in that

4  the data that we're -- whatever data we're able to find,

5  we would be happy to talk to them about something more

6  but we think that's sort of a good start.  I think what

7  it will show is sort of a typical, annual fee that

8  probably, you know, assuming we can track it down will

9  change but not a lot over the years and plaintiff will

10  get an idea of the sort of type of -- assuming there was

11  a field study in that five-year period, and assuming

12  we're able to figure out how much, if anything, P&G

13  contributed, plaintiff can decide whether that's highly

14  interesting and wants to go much further back or whether

15  that's enough to make the arguments he wants to make.

16    THE COURT:  You know, let me suggest this.

17  What about five years plus the three studies that were

18  discussed or the two studies discussed, the California

19  field study and the New Jersey study and the consumer

20  education campaign in Maine?  If those took place during

21  the five-year period, that's fine.  If not, then just

22  provide that information.

23    MS. HENN:  Thank you, your Honor, for that

24  guidance.  We'll be happy to try to pull that data.

25    MR. LEVY:  Okay.  One more, your Honor.

48

Proceedings

1           THE COURT:  Okay.

2           MR. LEVY:  Page 5, document request number 7.

3           THE COURT:  Uh-hum.

4           MR. LEVY:  What this calls for is whether

5    Proctor & Gamble has assembled in their PR department or

6    the media relations department or any other department,

7    the press clippings, the articles, the press releases

8    that deal with whether Freshmates is indeed flushable or

9    not.

10          So we asked them to search and see if they have

11   these and produce them.  Their response is well, Mr.

12   Belfiore should do his own search and go on Google or

13   something and try and track these down.  Obviously, he

14   doesn't have the resources that Proctor & Gamble has and

15   Proctor & Gamble, you know, we believe probably has

16   assembled all this in one place.  They probably collect

17   their -- any public articles about flushability or

18   Freshmates.  So we asked them to find it and produce it.

19          MS. HENN:  And just if I may respond, your

20   Honor.  This is a request for publicly available

21   documents and we think it's not really an appropriate

22   topic for discovery from a party in litigation.  We are

23   not aware of any central repository of press clippings

24   and, you know, we don't think that exists.  The place

25   that we would look for those types of things is in -- you

49

Proceedings

1   know, if people e-mailed articles around or found things

2   interesting.

3          We have produced information about

4   flushability, so to the extent articles or e-mails and

5   prompted a discussion about the topic, plaintiffs already

6   have that, as far as we were able to find in the

7   documents.  I don't think this dispute is really terribly

8   important, given that this information is available to

9   plaintiffs and the public domain.  But, you know, we

10  think that the request that we responded to are

11  sufficiently broad to have pulled any kind of relevant

12  discussion of flushability that might have been prompted

13  by publicly available documents but to ask us to sort of

14  go further and find any publicly available articles

15  within P&G's possession, just strikes us as, you know, an

16  unwarranted imposition and cost on P&G.

17         THE COURT:  Which number are you on in which

18  page?

19         MS. HENN:  This is number -- document --

20         MR. LEVY:  Page 5, document number 7.

21         MS. HENN:  Number 7.

22         THE COURT:  Okay.  All right.  So P&G's

23  position is that there is no easy way to gather this

24  information together?

25         MS. HENN:  That we don't know of any place that

50

Proceedings

1    -- correct, that P&G doesn't, to our knowledge, save

2    these types of articles in one place and we cited some

3    cases observing that discovery need not be required of

4    documents of public record which are equally accessible

5    to all parties.

6            THE COURT:  Right, I saw that.  But I think the

7    question really is whether or not there's a marketing

8    department or another department that might have this

9    information or not and if it's burdensome to produce,

10   then I think the fact that it's easy -- that it's no more

11   -- it's no easier for P&G to obtain than it is for

12   plaintiff would bear -- would carry some weight.  And

13   that's what I am trying to understand.

14           MS. HENN:  Right.  And I guess to respond to

15   your question, your Honor, this is a small product.  It

16   doesn't get a lot of attention within Proctor & Gamble

17   and I'm not aware of anyone who sort of tracks this and

18   has it easily available.

19           So I also think conversely that the search we

20   already did for documents about flushability, to the

21   extent those types of things were interesting to people

22   and they e-mailed around, plaintiff would have had that.

23   So, you know, requiring us to go back and try -- I don't

24   even know exactly where we would search but to do more

25   when these documents are equally available to plaintiff,

51

Proceedings

1  in fact, probably more available.  I think a more

2  targeted way to find these is Google than looking at an

3  enormous corporation like Proctor & Gamble just because

4  we don't have a single place where these are all

5  collected.

6          THE COURT:  And again, this doesn't go to the

7  class allegations, as much as it does to the merits.  Is

8  that right?

9          MR. LEVY:  This probably goes to both but if I

10 am hearing a representation from Ms. Henn that she knows

11 that there's no place at the Freshmates division or

12 whatever, where they have assembled these --

13         THE COURT:  Right.

14         MR. LEVY:  -- type of press releases and press

15 clippings, then I would accept that.  But I don't know if

16 I've heard that or not.

17         THE COURT:  I've heard that.

18         MS. HENN:  Yeah, I'm not aware of any place

19 like that.  I mean, I think people might have seen an

20 article and e-mailed it to their colleague and I think

21 the search that we already did would have pulled that up

22 to the extent it's there.

23         THE COURT:  What I am hearing is that there's a

24 -- that it appears that a diligent search has been made

25 or if it hasn't, that it will be and there's no central

52

Proceedings

1    repository.

2            That to the extent this is necessary for class

3    certification, I think plaintiff is -- it's less

4    necessary, I think to class certification, than it is to

5    the merits.  And my guess is that once the class issue is

6    resolved, depending on where we go from that, plaintiff

7    can ask, you know, at depositions, can pursue this more

8    if it is an issue, although it sounds to me as though

9    we've heard a fairly definitive answer from Ms. Henn.

10           MS. HENN:  Yeah, and I can go back again just

11   to ask that very targeted question but I do not expect

12   the answer to be different and if it is, I will agree to

13   let Mr. Levy know.

14           THE COURT:  Okay.  I think that resolves it.

15           I have some people waiting for a search warrant

16   but I don't want to put you off anymore.  Do we have any

17   other issues?

18           MR. LEVY:  No, I think that's it, your Honor.

19           MS. HENN:  Yeah, nothing from defendant, your

20   Honor.

21           THE COURT:  Okay, good.  Do we need to set up

22   another conference date or you basically just kicking

23   along now and don't need me until you tell me you do?

24           MR. LEVY:  Well, we have some ten-day limits,

25   so if we could set one up beyond that ten-day limit, just

53

Proceedings

1    to see where we are, that would probably be good.

2              MS. HENN:  And we'd be happy to do that or we'd

3    be happy to wait and see if there are any issues that

4    crop up and reach out, if so.

5              THE COURT:  I think I would wait.

6              MS. HENN:  That's fine, your Honor.

7              THE COURT:  Because where my schedule is right

8    now, it's going to be hard to squeeze you in but I think

9    some things will probably open up between, you know, now

10   and then and I'll know who to bump if you tell me you're

11   having a serious problem.  In other words, I --

12             MS. HENN:  Thank you very much, your Honor.  We

13   appreciate your Honor's time in helping us work through

14   these issues.

15             THE COURT:  Okay, good luck.

16             MR. LEVY:  Thank you, your Honor.

17             THE COURT:  All right.

18             MS. HENN:  Thank you.

19                  (Matter concluded)

20                      -o0o-

21

22

23

24

25

54

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **11th** day of **February**, 2015.

*Linda Ferrara*

Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.