

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
(212) 839 5300
(212) 839 5599 FAX

ejoyce@sidley.com
(212) 839 8555

BEIJING
BOSTON
BRUSSELS
CHICAGO
DALLAS
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
WASHINGTON, D.C.

FOUNDED 1866

June 17, 2015

**Submitted Via ECF**

The Honorable Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

The Honorable Robert M. Levy
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *Kurtz v. Kimberly-Clark Corp., et al.*, No. 1:14-cv-1142-JBW-RML;
*Belfiore v. The Proctor & Gamble Co.*, 2:14-cv-04090-JBW-RML

Dear Judge Weinstein and Magistrate Judge Levy:

On behalf of all Defendants in the above-captioned matters, I write to apprise the Court that Plaintiffs and Defendants have been unable to reach agreement on whether Plaintiffs should present their witness, Dr. Daniel Zitomer, before or after Defendants' witnesses on the "science day" scheduled for this Friday, June 19, 2015. Accordingly, to assist the parties in finalizing their science day preparations, Defendants would appreciate the Court's guidance in advance of science day about whether it prefers Dr. Zitomer or Defendants' witnesses to go first. Defendants met and conferred with Plaintiffs about this issue and were unable to reach agreement. After meeting and conferring, the parties initially agreed to submit a joint letter setting forth their respective positions, but, after receiving Defendants' position today, Plaintiffs informed Defendants that they would not agree to a joint letter.

Plaintiffs should present Dr. Zitomer before Defendants call their respective witnesses, because (1) the stated purpose of science day is to present evidence potentially relevant to class certification, for which plaintiffs bear the burden of proof; (2) this order will be more efficient, especially given that Dr. Zitomer admitted during his deposition that he has no knowledge regarding the technology used in Defendants' flushable wipes; and (3) it would be more equitable.

*First*, not only do Plaintiffs bear the burden of establishing their substantive claims, but they also bear the burden of demonstrating that class certification is appropriate. Your Honors

Sidley Austin (NY) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.



requested the upcoming science day to assist in assessing whether Plaintiffs could demonstrate the propriety of certification. *See, e.g.*, Hr'g Tr. (D.E. 109) at 9:13-16 ("Well, to the extent that class certification requires some analysis of the merits, it's hard to analyze the merits without fully understanding the technology."), 12:10-12 ("educating the Court on the technology is helpful for certification and other issues"), 19:22-20:2 ("We've got this science tutorial, . . . and to educate the Court on the technology — which [I] think is the purpose since the class certification and the merits bleed into each other a little bit"). Consistent with this purpose and Plaintiffs' burden under Rule 23, they should first present their evidence at science day, after which Defendants can offer any necessary responsive evidence through their respective witnesses.

*Second*, having Dr. Zitomer testify first will be more efficient than the alternative. During his deposition, Dr. Zitomer revealed that he has no knowledge or expertise regarding the technology used in any of the three Defendants' products, nor their flushability. *See, e.g.*, Zitomer Dep. (attached as Ex. A) at 25:16-26:7 (admitting that he does not "know the difference in technology between" any of Defendants' products), 26:25-27:15 (admitting that he is unaware of differences in, and has never tested, the flushability of Defendants' wipes), 85:25-86:16 (admitting that he has never seen results of industry flushability tests for Defendants' products, toilet paper, or non-flushable products), 86:17-21, 102:15-103:1, 135:6-11, 141:5-20 (admitting that he is unaware of the technology used in Defendants' wipes); *see also id.* at 83:18-84:14, 85:9-24 (admitting that he cannot offer opinions about "testing alternatives" to the methods Defendants use to assess the flushability of their products); *id.* at 67:12-18 (testifying that he first reviewed the industry testing guidelines during the week of his deposition). Instead, Dr. Zitomer plans to testify generally about "the wastewater industry and operation standards." *Id.* at 127:10-17; *compare, e.g.*, Hr'g Tr. (Mar. 31, 2015) (D.E. 109) at 7:3 (Judge Weinstein: "Municipality is out of the case, never been in it."). Defendants' witnesses, by contrast, have been designated to testify regarding, *inter alia*, the technologies used in Defendants' flushable wipes and why their wipes at issue are properly labeled as flushable. *See* Ex. B (Defendants' science day witness disclosures). Accordingly, Dr. Zitomer's testimony either will not be germane to the issues about which Defendants' witnesses testify (in which case there is no reason for it to be presented after Defendants' witnesses testify) or, to the extent Dr. Zitomer's testimony does relate to Defendants' products, having Dr. Zitomer testify first likely will help minimize irrelevant discussions and redundancy in Defendants' presentations.

If Defendants need to guess how Dr. Zitomer's testimony on science day theoretically might relate to the topics that the Court stated were relevant, Defendants' attempts to preemptively address those issues could prove to be a waste of the Court's and the parties' time and energies. It will be more efficient for Defendants to respond to Dr. Zitomer's presentation, to the extent that it is relevant to the issues the Court scheduled science day to learn about.

*Finally*, the equities favor having Dr. Zitomer testify first. Plaintiffs will have the opportunity to address issues raised by Defendants during the science day-related proceedings

when their other witness, Robert Villee, testifies more than a month after Defendants' witnesses. *See* Minute Entry (May 29, 2015).

Accordingly, Defendants respectfully request the Court's guidance on its preferred order of witnesses in advance of June 19, 2015.

Respectfully submitted,

*/s/ Eamon P. Joyce*
Eamon P. Joyce

# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---

D. JOSEPH KURTZ,

Plaintiff,

v.

Civil Action No. 1:14-cv-01142-JBW-RML

KIMBERLY CLARK CORPORATION, et al,

Defendant.

---

ANTHONY BELFIORE,

Plaintiff,

v.

Civil Action No. 1:14-cv-04090

THE PROCTOR & GAMBLE COMPANY,

Defendant.

---

Oral sworn deposition of DANIEL H. ZITOMER, Ph.D., P.E., taken at the instance of the defendants, held at Peterson, Johnson & Murray, 788 North Jefferson Street, Suite 500, Milwaukee, Wisconsin, commencing at 9:47 a.m. and concluding at 1:21 p.m., on the 10th day of June, 2015, before Sarah A. Hart, RPR, RMR, Certified Realtime Reporter.

A P P E A R A N C E S:

FOR THE PLAINTIFF DR. D. JOSEPH KURTZ:
ROBBINS, GELLER, RUDMAN & DOWD, LLP
BY: MARK S. REICH, ESQUIRE
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100
mreich@rgrdlaw.com

FOR THE PLAINTIFF ANTHONY BELFIORE:
WOLF POPPER, LLP
BY: ROBERT S. PLOSKY, ESQUIRE
845 Third Avenue
New York, New York 10022
(212) 451-9633
rplosky@wolfpopper.com

FOR THE DEFENDANT KIMBERLY-CLARK CORPORATION:
SIDLEY AUSTIN, LLP
BY: JAMES W. MIZGALA, ESQUIRE
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
jmizgala@sidley.com

FOR THE DEFENDANT COSTCO WHOLESALE CORPORATION:
MORRISON & FOERSTER, LLP
BY: KAYVAN B. SADEGHI, ESQUIRE
250 West 55th Street
New York, New York 10019
(212) 468-8000
ksadeghi@mofo.com

FOR THE DEFENDANT PROCTOR & GAMBLE COMPANY:
COVINGTON & BURLING, LLP
BY: EMILY JOHNSON HENN, ESQUIRE
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California 94065
(650) 632-4715
ehenn@cov.com

I N D E X

E X A M I N A T I O N

| | |
|---|---|
| BY MR. MIZGALA: | 4 |
| BY MR. SADEGHI: | 101 |
| BY MS. HENN: | 132 |
| BY MR. MIZGALA: | 141 |

E X H I B I T S

| EXHIBIT NO. | PAGE IDENTIFIED |
|---|---|
| Exhibit 1 Curriculum Vitae | 13 |
| Exhibit 2 Documents produced by plaintiffs' counsel, Zitomer001 - Zitomer078 | 28 |
| Exhibit 3 Subpoena to Dr. Zitomer in the Kurtz action | 64 |
| Exhibit 4 Subpoena to Dr. Zitomer in the Belfiore action | 64 |
| Exhibit 5 5/18/15 Email from Mark Reich re: what Dr. Zitomer will testify to on science day | 72 |
| Exhibit 6 List of material that may be reviewed as of 6/3/15 | 86 |
| Exhibit 7 Guidelines for Assessing the Flushability of Disposable Nonwoven Products, Third Edition, June 2013 | 88 |

R E Q U E S T S

| ITEM REQUESTED | PAGE |
|---|---|
| Updated CV | 14 |
| Log of time spent on case | 37 |
| Invoices for time spent on case | 69 |

TRANSCRIPT OF PROCEEDINGS

DANIEL H. ZITOMER, Ph.D., P.E., called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. MIZGALA:

Q Doctor, could you please state your name for the record.

A My name is Daniel H. Zitomer. It's Z-I-T-O-M-E-R.

Q And what do you do for a living, sir?

A I'm a professor of civil construction and environmental engineering at Marquette University and also an engineering consultant, professional engineer.

Q And how long have you been at Marquette?

A Twenty years.

Q Okay. Who is David Kurtz?

A David Kurtz is one of the people that filed the complaint.

Q Have you ever met him?

A No, I haven't.

Q Have you ever talked to him?

A No, never.

Q Ever read his deposition?

A No.

MR. REICH: Objection.

BY MR. MIZGALA:

Q Do you know anything about his use of flushable moist wipes?

A Yes, from -- I read the complaint.

Q Okay. So what is your understanding of his use of flushable moist wipes?

MR. REICH: Objection.

THE WITNESS: That Mr. --

BY MR. MIZGALA:

Q He's going to say that from time to time, but unless he tells you not to answer, then just go ahead.

A Mr. Kurtz purchased flushable -- so-called flushable wipes and says that they clogged his system, both at his one home in New York and his other home that he was renting in New Jersey.

Q And why did you say "so-called flushable wipes"?

A Because I think it's up to determine if they're flushable or not. I think they're labeled "flushable."

Q And how do you define the term "flushable," Doctor?
A So flushable is a material or product that, when used properly and flushed down the toilet, causes no impairment to the function or damage to the plumbing, the sewerage system, or the treatment system.
Q Okay. And when you say "no damage to the plumbing," are you referring to the plumbing in a person's residence?
A Yes, and -- it depends. The lateral to the street is owned by the homeowner. So whatever the homeowner owns.
Q Okay. And then you also mentioned that the sewage system --
A I would call it sewerage, S-E-W-E-R-A-G-E, sewerage system, which is the sewers and the pertinences.
Q And that's owned or operated by a municipality typically, correct?
A Typically.
Q And then you also mentioned treatment?
A Yes.
Q And what is that?
A Treatment is any physical, biological, or

chemical operations so that an effluent can be discharged to a receiving stream.
Q Okay. The sewerage systems, are they -- throughout the United States, are they the same everywhere?
MR. REICH: Objection.
THE WITNESS: In the United States?
BY MR. MIZGALA:
Q Yeah.
A No.
Q How can they vary?
A Different regions have different topographies. Different municipalities have different standards of construction.
Q And when you mean "different standards of construction," what do you mean by that?
A Different standard specifications for lateral hookups; sewer sizes; amount -- in the design flow amount, in terms of full flow, half flow, three-quarters flow.
Q Okay. So in some situations, the pipes can be different sizes, correct?
A Yes.
Q And that can be not only from one municipality to another, but within a municipality, right?

A Yes.
Q Okay. And do you consider pumps to be part of the sewerage system?
A Yes.
Q And not all municipalities have pumps, correct?
A Correct.
Q And pumps can vary from one municipality to another, right?
A Yes.
Q Treatment systems, are they the same across the United States?
A No.
Q And how do they differ?
A There's many different ways to treat wastewater. There's none --
Q And that's something you have particular expertise in, right?
A Right. The important thing is knowing the influent characteristics and the effluent characteristics that you need to achieve. Then you design the system, and there's many different types of systems.
Q Can you give us some examples of the different types of systems?

A Yeah, there's -- some systems have primary treatment followed by activated sludge; some systems just have activated sludge; some systems have primary treatment followed by trickling filters; and there's many other different types.
Q Are flushable wipes going to behave identically in these different types of treatment systems?
MR. REICH: Objection.
THE WITNESS: There's a lot of different types of flushable wipes, so I can't say.
BY MR. MIZGALA:
Q Okay. How about in the sewerage systems? Are the flushable wipes going to behave identically in those different sewerage systems?
MR. REICH: Objection.
THE WITNESS: There's many different types of flushable wipes. If you maybe specified a certain characteristic, I could answer it, but it's hard to answer for every so-called flushable wipe.

BY MR. MIZGALA:
Q Okay. Well, let's just pick -- focus on one given wipe, say a Cottonelle wipe. Is that -- in the different sewerage systems across the United States, is that going to behave identically in every sewerage system?
A No.
Q How about the treatment systems?
A No.
Q Okay. Do you know anything -- going back to David Kurtz, do you know anything about his family's use of baby wipes?
A No.
Q Do you know anything about his family's use of other nonflushable wipes?
A No.
Q Have you ever visited his home in Brooklyn?
A No.
Q Have you ever visited the home he rented in he Elberon, New Jersey?
A No.
Q Do you know anything about the state of repair of the plumbing in either of those two places?
A No.
Q Do you know about his history of clogs at

either location?
A I know what's written in the complaint.
Q Okay. Have you inspected the plumbing in either of those locations?
A No.
Q Do you know if the plumbing in either location has been recently inspected?
A No.
Q So you didn't review the reports of any recent inspections?
MR. REICH: Objection.
THE WITNESS: Correct.
BY MR. MIZGALA:
Q And you haven't seen the video of the pipes from those inspections?
A Correct.
Q Okay. Now let's go to Anthony Belfiore. Do you know who he is?
A Yes.
Q And who is he, in your understanding?
A He's the other plaintiff.
Q Okay. Have you ever met him?
A No.
Q Have you ever talked to him?
A No.

Q Read his deposition?
A No.
Q Okay. Do you know anything about his use of flushable moist wipes?
A Only what's in the complaint.
Q Okay. Do you know anything about his family's use of baby wipes?
A No.
Q Do you know anything about his family's use of other nonflushable wipes?
A No.
Q Have you ever visited his home in Great Neck, New York?
A No.
Q Do you know anything about the state of repair of the plumbing in that house?
A No.
Q Do you know about his history of clogs?
A Only what's in the complaint.
Q And you have not inspected the plumbing at his house in Great Neck, New York?
A Correct.
Q You have not seen the video taken of the inside of his household pipes and drain line?
A Correct.

Q And you haven't -- do you know if the plumbing there has been recently inspected?
A I don't know.
Q Okay. So you haven't seen that report?
A Correct.
(Exhibit 1 marked for identification.)
BY MR. MIZGALA:
Q Doctor, can you please identify Exhibit No. 1 for the record.
A Yeah, it's my academic curriculum vitae.
Q Okay. And is that current, sir?
A There's some recent updates.
Q And what are those?
A There's a few more publications.
Q Okay.
A I just became chair of the Wisconsin section of Water Environment Federation. I just received an award from Central States Water Environment Association.
Q What was that award for?
A For education, water education.
Q And have you updated your CV recently with those --
A Yes.
Q -- items? Okay.

Page 14

A Yes, in the last week.
Q Okay. Would it be possible to get a copy of that before the deposition is over or...
A No, but I can send it tomorrow when I get back to my office.
Q Okay. And, Doctor, what is your current -- what is your area of expertise?
A Environmental engineering.
Q Okay. And how do you define "environmental engineering"?
A Environmental engineering is the management, design of systems to treat or manage contaminated water, soil, and air.
Q Okay. So that was the -- when we were talking about flushable wipes, that was the third thing that you mentioned. You mentioned the plumbing in a residence, sewerage systems, and then treatment, correct?
MR. REICH: Objection.
THE WITNESS: Can you -- I don't understand the question. Can you repeat it?
BY MR. MIZGALA:
Q Well, earlier when we were talking about flushable wipes, you mentioned that you didn't want to cause damage to three areas: The

Page 15

plumbing in a residence, in the laterals that go out to the municipal system --
A Right.
Q -- the sewerage system and then the treatment --
A Right.
Q -- right? And your expertise lies in that last area?
A It covers all three. So in my training and in my teaching and work, we do sewer design, sewerage system design and management.
Q Okay.
A And also we have to be cognizant of physical, chemical, and biological constituents in waters that interact or may damage plumbing. So although -- I'm not a plumber, but some of my work extends into wastewater behavior in plumbing systems.
Q Earlier when you defined the word "flushable" for us, what was your definition based on?
A Well, it was based on, as a professional engineer, to protect the safety and health of the public, number one. So you have to come up with a definition so that -- you know, sewerage containing potentially pathogenic

Page 16

organisms. And the other thing is that toilet paper is accepted by the wastewater industry as flushable. So as a standard, we know that toilet paper is flushable.
So considering those two things, I thought a lot about what the definition of "flushable" is, and that was the definition I told you.
Interestingly, then, when I read the flushability guidelines of INDA, there are a few different definitions in there of flushability, but they are very similar to that definition that I developed independently.
Q Okay. So the definition you gave me earlier was one you developed independently?
A Yes.
MR. REICH: Objection.
BY MR. MIZGALA:
Q Has that -- have you published that anywhere?
A No.
Q Okay. And we'll get to the INDA guidelines in a little bit, but "flushable," in the -- as according to your definition, is that any different than -- in meaning than the word

Page 17

"dispersible"?
A Yes.
Q In what way?
A In -- so something can be dispersible, but it could still clog a toilet. There's kinetics. It takes time to disperse. So it would have to disperse in a reasonable amount of time to be flushable.
Q And, Doctor, would you agree that toilet paper could clog a toilet?
A Yes.
Q Okay. You used toilet paper as sort of a -- the exemplar for flushability, right?
A Correct.
Q Okay. Are there other things that you believe are flushable?
A Yes.
Q What?
A Human feces and urine.
Q Any of the wipes that are currently marketed as flushable, do you agree that any of them are flushable?
A It appears, from my observations -- and I haven't observed every wipe, but out of the wipes that I saw, there was one that I asked

what the name of was, because it dispersed as quickly or quicker than toilet paper, and that was a Haso product. And I believe that's flushable.
Q Okay. Well, Doctor, you told me that "dispersible" and "flushable" meant two different things.
A Yes.
Q And then there, when you -- when I asked you if there were wipes that were flushable, you referred to a dispersible wipe.
A Yeah.
Q So is that your major criteria or -- I'm just trying to understand.
A Yeah, I understand. Yeah, it's one criteria.
Q What are others?
A Well, it shouldn't -- when flushed -- when used appropriately and flushed, it shouldn't cause any impairment of the function or damage the plumbing system, the sewerage system, or the treatment system.
Q Have you tested the flushable wipes that are currently available or which have been available in the past for those properties?
A No.

Q Now, Doctor, when I looked at your CV, I didn't see the word "flushable" or "wipes" anywhere.
Would you agree that they're not on your CV?
A Yes.
Q Okay. Do you have any professional experience with flushable wipes?
A Yes.
Q And what is that?
A I did some work for a client that had some questions about flushability of wipes.
Q Okay. Can you tell us who the client is?
A No, it was a -- it was private work for a client. And when I talked to them previous to taking on this work, they informed me that was their opinion that that work was confidential.
Q Okay. Have you ever done any work, consulting work, with Kimberly-Clark?
A No.
Q With Costco?
A No.
Q With Nice-Pak?
A No.
Q With Proctor & Gamble?

A No.
Q Okay. Besides the work you did for this unnamed client -- and when you -- can you describe the nature of -- generally of the flushability consulting that you did?
MR. REICH: Objection.
THE WITNESS: When I had discussions with the client, they informed me that it was their -- that it was confidential.
BY MR. MIZGALA:
Q Okay. So this is something you can't talk about in court either?
A I would have to look into it further, and I would have to have -- you know, we would have to have a discussion with that client.
Q Okay. But today you're not at liberty to discuss this, right?
A Correct.
Q Doctor, have you ever published on flushable moist wipes?
A Your previous question was -- I'm sorry, going back to your previous question --
Q Right.
A -- as to whether I did any professional work with wipes.

Q Right.
A As -- I'm chair of the Wisconsin Industrial Waste Committee in the Water Environment Federation. We put on an annual seminar, and we review issues for pretreatment of waste that go into sewers. In that we've had frequent discussions about so-called flushable wipes and their impact on the wastewater industry. And so I have been involved in those professional discussions through that organization.
Q Okay. When did you become the chair?
A The chair of that committee? I became chair this year, and I was associate chair last year, but I've been on the committee for four years.
Q Okay. So in those four years, you've had discussions about flushable moist wipes with some colleagues in Wisconsin?
A Yes.
Q Okay. And I noticed that every once in a while that organization puts on conferences, right --
A Yes.
Q -- and people give presentations. You've

given presentations, right?
A Correct.
Q Have you ever given a presentation either there or anywhere else on flushable moist wipes?
A No, not yet.
Q And going back, I don't know if you answered this question: Have you ever published on flushable moist wipes?
MR. REICH: Objection.
THE WITNESS: I have not.
BY MR. MIZGALA:
Q Okay. And I notice you teach a number of classes over at Marquette. Do you ever discuss flushable moist wipes in any of the classes you teach?
A No, I have not.
Q Okay. Your discussions with the folks in Wisconsin about flushable moist wipes on this committee you're on, what has been sort of the general nature of those discussions?
A It's a concern to the industry that it's causing clogging of pumps, and it's costing extra operational funds; it's costing money. And it's a topic that we want to cover in our

seminar because many municipalities are having concerns about them.
Q Okay. And when you said it was "a concern to the industry," who were you referring to?
A Wastewater industry.
Q Okay. And when you mentioned pumps, whose pumps?
A Those pumps were municipal utility pumps, sewerage pumps.
Q Okay. Not consumers?
A Correct. Consumers aren't typically members of this organization.
Q Okay. Doctor, do you use flushable moist wipes?
A No.
Q Does anyone in your household use them?
A No.
Q Have you ever used them?
A No.
Q So you have no experience with use with the wipes?
A Correct. I wouldn't --
Q Pardon?
A I was afraid they would clog things, and that's why I don't want to use them.

Q Okay. But you're aware there are lots of people who use these wipes, right?
A Yes.
Q And lots of people don't get clogs, right?
MR. REICH: Objection.
THE WITNESS: I would assume, yeah.
BY MR. MIZGALA:
Q Okay. Doctor, do you have any personal experience with either Kimberly -- let's say Kimberly-Clark's flushable moist wipes, personal or professional?
A No, no personal.
Q Any professional experience with Kimberly-Clark's flushable moist wipes?
A I did witness testing at Plainfield, New Jersey, of Kimberly-Clark products.
Q Okay. And we'll get to that in a little bit.
Do you have any professional experience with Kirkland Signature flushable moist wipes?
A No.
Q Do you have any professional experience with Proctor & Gamble's flushable moist products -- wipes?
A No.
Q Do you know who manufactures Kirkland

Signature flushable moist wipes for Costco?
A No.
Q Do you know how flushable moist wipes are manufactured?
A No.
Q Do you know how they differ from nonflushable wipes, such as baby wipes?
MR. REICH: Objection.
THE WITNESS: I've read a patent. They're very interesting that they are designed to hopefully disperse more. So the chemistry is interesting, but I'm not an expert in paper product manufacturing or chemistry of paper products.
BY MR. MIZGALA:
Q Okay. So do you know the differences in technology between Kimberly-Clark flushable wipes and those sold by Costco, the Kirkland Signature wipes?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q How about the differences in technology between Kimberly-Clark wipes and Proctor & Gamble wipes?

MR. REICH: Same objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q How about between Kirkland wipes and Proctor & Gamble wipes?
MR. REICH: Same objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q Doctor, are there differences in flushability between different flushable wipes?
MR. REICH: Objection.
THE WITNESS: Yes.
BY MR. MIZGALA:
Q In what way?
A Well, from what I saw from witnessing tests, some are more dispersible than others.
Q And can you give me examples of the some that are more dispersible than the others?
A Yeah, the Haso product was much more readily dispersible than the others.
Q And I guess you would agree that there are differences in dispersibility between different flushable moist wipes?
A Yes.
Q Are you aware of differences in flushability

between wipes manufactured by Kimberly-Clark and wipes sold under the Kirkland Signature brand?
A No.
Q Are you aware of differences between wipes manufactured by Kimberly-Clark and those manufactured by Proctor & Gamble?
A No.
Q Doctor, you mentioned you observed some tests.
Have you ever done any tests yourself to measure the flushability or assess the flushability or dispersibility of flushable wipes?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q Doctor, when were you first approached by the plaintiffs' counsel to assist you in this matter?
A Oh, in May. I don't recall. I would have to look back in my records. It wasn't too long ago. Good.
Q I can jog your memory, doc.
A That first email.
Q Let's go ahead and mark this as Exhibit 2.

MR. MIZGALA: These are just the documents he produced. I only have three copies. I'm sorry.
MR. REICH: We can share.
(Exhibit 2 marked for identification.)
BY MR. MIZGALA:
Q So, Doctor, these are the documents that were produced to us by plaintiffs' counsel as your production. And for purposes of the question I just asked --
A Yeah.
Q -- if you look down and look in the bottom right, do you see over here it say Zitomer --
A Right.
Q -- and then there's a number?
A Okay.
Q Hopefully you can read that.
A Combined production in Kurtz and Belfiore actions.
Q Just the number.
A Oh, 007.
Q So if you go to 007.
A Um-hmm.
Q And actually flip to page 8, you'll see that on page 8 --

A Oh, yeah, okay.
Q -- that's that carryover email --
A Right.
Q -- dated April 2nd, 2015. It looks like that was the first email sent to you.
Is that consistent with your recollection?
A April 7th here?
Q April 2nd.
A Oh, there it is, yes, April 2nd.
Q And that was from Mr. Reich, who's sitting to your right, right?
A Correct.
Q And he asked you if there was a convenient time for you to speak today or tomorrow. And he said he "left you a voicemail and NACWA suggested" -- N-A-C-W-A -- "I reach out to you."
A Correct.
Q So let's start with did you speak to Mr. Reich either that day or the next?
A Yes.
Q And what did you two discuss?
A Very generally, had I worked -- had I done any work with so-called disposable wipes and what

was my background.
Q Disposable wipes or flushable wipes?
A Excuse me. Flushable.
Q Okay. And what did you tell him when he asked you that question?
A That I had done work previously for that client on flushable wipes.
Q Um-hmm. And did you tell him you couldn't discuss the nature of it, though?
A Yes.
Q Okay. So he knows as little as we do; is that correct?
A Correct.
Q Okay. And he also left you a voicemail. Did you listen to the voicemail?
A Yes.
Q And what did that say?
A Can we talk. I don't know exactly, but can we talk about your background.
Q Okay. NACWA suggested that Mr. Reich reach out to you.
What is your relationship to NACWA?
A Do you mean why did NACWA -- is your question why did NACWA --
Q I just want to know are you a member, or are

you -- what's your relationship with NACWA?
A Okay. So NACWA is National Association of Clean Water Agencies. It's made up of the larger sewerage utilities in the country.
I serve in the Milwaukee Metropolitan Sewerage District, and they're a member of NACWA, and I do work for Milwaukee Metropolitan Sewerage District. Chicago Sanitary District is a member of NACWA; I do work for them. Green Bay Sewerage District is a member of NACWA, and I do work with them and keep up with NACWA information.
When I did the previous work on flushable wipes, I had discussions with NACWA about their position on flushable wipes, with Cynthia Finley. And I believe that's who recommended that they get in touch with me.
Q Ms. Finley?
A Yes.
Q Okay. The discussions you had with Cynthia Finley about NACWA's position on flushable moist wipes -- or flushable wipes, what was their position?
A That --
MR. REICH: Objection. Go ahead.

THE WITNESS: That their concerns that these so-called flushable wipes are not truly flushable, and some -- some -- and that they are causing extra costs and problems in sewerage systems.
BY MR. MIZGALA:
Q I just want to make sure I understand. When you used "some," are you saying that some are not flushable?
A Correct.
Q And some are?
A Well, let's just say we don't know if all wipes marketed in the United States as flushable are flushable or not. There may be some that are.
Q Is that your opinion or Ms. Finley's opinion that was communicated to you?
A That's my interpretation of Ms. Finley's opinion. I think NACWA wants to respect the nonwoven industry and not make a blanket statement, because they haven't tested every wipe. So she can't say that every wipe causes problems.
Q Does NACWA test wipes itself?
MR. REICH: Objection.

THE WITNESS: Not to my knowledge.
BY MR. MIZGALA:
Q Are there consumers represented in NACWA? I mean, are they members of NACWA?
A Through the municipalities, they are. So I am serviced by Milwaukee Metropolitan Sewerage District. The sewerage district's a member of NACWA. I feel like NACWA represents me in some way as a consumer, as a sewerage system consumer.
Q Okay. But just like, you know, when we talked about your Wisconsin group earlier, there aren't consumers as individual members of that group. Is that true for NACWA?
A Yeah, so in the Wisconsin group, as you mentioned -- just to the extent that the municipal workers, engineers are consumers themselves, there's a consumer opinion there.
Q But they're there as representatives of municipalities, right?
A Correct.
Q Okay. And that's the same for NACWA?
A Correct.
Q Okay. The work that you mentioned that you do for Milwaukee, for Chicago, and for Green Bay,

Page 34

does that involve flushable moist wipes?
A Through Central States Water Environment Association, we discuss flushable wipes and problems with them.
Q With whom?
A With the utility operators you just mentioned.
Q Okay. And have you been involved personally in those discussions?
A Yes.
Q And what have been the nature of those discussions?
A That they are a problem for the wastewater industry; that they're causing sewerage and pump station clogging; that they're causing extra costs and extra man time and extra maintenance; and that we need to address this issue.
Q And do they all have the same problems or experiences, or do they vary?
MR. REICH: Objection.
THE WITNESS: They vary.
BY MR. MIZGALA:
Q In what way?
A Most of the utilities I talked with have problems -- they say they have problems from

Page 35

so-called flushable wipes. Some don't.
Q And when you say they don't, what do you mean?
A They haven't observed or recorded any problems with flushable wipes.
Q Okay. Now, Doctor, you would agree that flushable wipes aren't the only things that get flushed in this country, right?
A Yes.
Q There are lots of things that get flushed down the toilets across the United States, right?
A Yes.
Q And actually, have you seen sorting studies that have looked at the component of flushable wipes in a -- you know, a collection plant's -- you know, in -- what's -- the stuff that comes in, the influent?
A Influent.
MR. REICH: Objection.
THE WITNESS: No. I've seen sorting studies from clogs in Maine.
BY MR. MIZGALA:
Q Okay. And flushable wipes were a small proportion of what was there, correct?
MS. MADDEN: Objection.
THE WITNESS: I don't recall a

Page 36

proportion, but there were other things and including flushable wipes.
BY MR. MIZGALA:
Q Okay. And there was paper, right?
A I don't recall if there was paper. There were paper products. If you mean -- do you mean -- what kind of paper, like writing paper?
Q No, no, the paper -- say the wipes -- or the hand wipes in a bathroom, the brown paper. They found that in --
A Oh, I don't recall that.
Q You don't recall that?
A No, I don't recall the brown paper wipe -- hand towels being found.
Q Feminine hygiene products were found?
A Yes, that, I recall.
Q And nonflushable wipes, like cleaning wipes and baby wipes, right?
A Yes.
Q Okay. So you talked to Mr. Reich around this time, and then it looks like -- if you go back to page 7, and if you go up, there's an email from Mr. Reich that says, "Any chance we can talk briefly tomorrow?" And this is dated April 7th, 2015, right?

Page 37

A Yes.
Q Okay. By the way, how do you keep track of your time for this case?
A I have a log.
Q Okay. And do you have that with you?
A No.
Q Where is it?
A It's at my office.
Q We would like a copy of the log.
MR. REICH: It's noted.
BY MR. MIZGALA:
Q Can we get it before the end of this deposition?
A No.
Q There's no one in your office that could fax it over?
A No.
Q Okay. How much time have you spent to date on this case?
A I don't recall. I haven't added it up.
Q Give me a ballpark. 10, 12 hours? More?
A Six hours.
Q Six hours?
A Ballpark.
Q Okay. And that's before this deposition,

right?
A Correct.
Q Okay. And you're billing plaintiffs' counsel $200 an hour; is that right?
A Correct.
Q Okay. I noticed in your retention agreement it says that you're supposed to break up your time between the cases if you can.
Do you recall that?
A I'm supposed to break up the time between my two cases, period, yes.
Q Okay. Have you billed different -- have you just split it down the middle, or have you said, "These tasks are related to the Kurtz case; these tasks are related to the Belfiore case"?
A Yes. It's not split down the middle. It depends. If I have a phone conversation with attorneys from only one firm, then that time is billed to just that firm.
Q Okay. And have you had conversations with the attorneys -- with only the attorneys for Mr. Kurtz?
A I don't recall. I would have to look.
Q Okay. We would need your log to know that; is

that correct?
A Or I can look and tell you.
Q Look at what?
A My log.
Q Right. But we -- you would need your log -- we would need your log to know how that breaks out, right?
A Correct.
Q Okay. Do you recall having conversations with only the attorneys in the Belfiore case?
A I don't recall. I would have to look.
Q Okay. And you have had calls when attorneys from both cases have been on the line, right?
A Yes.
Q Okay. So besides billing for calls, what else have you billed for?
A Some time to read complaints; some time to review some things about sewerage systems; some time to review the NACWA web page on flushability; some time to read the INDA web page on flushability; time to review the flushability guidelines, version 3.
And there may be some other things, but those are the main things I can remember.
Q Okay. Did you do anything specific to prepare

for today's deposition?
A I met with Mark and Rob last night.
Q And for how long?
A Approximately two hours.
Q And where did you meet?
A We met at Louise's Restaurant.
Q And where is that?
A It's across the street from here. It's on Jefferson.
Q Any good?
A It's okay if you like Italian.
Q Not your first choice?
A If I want Italian food, it is.
Q Okay. What did you discuss?
A The general format of the deposition and the expected length of time.
Q Did you discuss specific areas of testimony that you might give today?
A No. Just the general format of questions, who would be here, generally how long it would take.
Q Did you discuss any specifics as to flushable wipes?
A I believe I was asked my definition of "flushable wipe." We talked about that. And

it was the same definition I gave you and I had formulated a few days before.
Q When you say -- so that your definition that you gave us earlier, you said you formulated that a few days before you met last night?
MR. REICH: Objection.
THE WITNESS: Correct.
BY MR. MIZGALA:
Q Okay, Doctor, it looks like the call that Mark tried to set up on the 7th or the 8th never really got set up till the 9th. And if you'll turn with me to Zitomer 11 through -- and if you look at -- start at 13 and go to 11, you'll see that it finally looks like you were able to get a call set for April 9th.
A Okay.
Q Okay. Do you recall having a call on April 9th?
A Yes.
Q And who was on that call?
A It was -- I believe that was the call -- and I'd have to check my log. I believe that's the call where Mark Reich was on the call, and I believe Lester Levy was on the call, and some other people. But they were the main --

the two main people.
Q Okay. And what was discussed on that call?
A To the best of my recollection, we just discussed my background, my experience, and very briefly the case.
Q Okay.
A And I -- yeah, I don't think it lasted more than 30 minutes.
Q Okay. And with respect to your background, what was brought out?
A What was my expertise that we talked about here, environmental engineering.
Q And your experience was that working with the one nameless client, right?
A Correct. That was one piece that we talked about.
Q That work you did for that one client, how extensive was it? I mean, can you give us -- did you work for them for a year, two years?
A No, it was over a month, and it was -- it was about a month.
Q About a month. And when was that?
A About a year ago.
Q And do you know how many hours you worked in that month on that project?

A I don't recall.
Q Did you get compensated for your work?
A Yes.
Q At the same rate, $200 an hour?
A Yes.
Q And do you remember how much you got paid total?
A I don't recall that.
Q Do you have a record of that?
A Yes.
Q Okay. And where would that be?
A In my office.
Q Okay. And then on page 11, it looks like they're trying to set up another call? Is that -- do you see that email from Sean -- is that Masson?
MR. REICH: Masson.
MR. MIZGALA: Masson.
MR. REICH: Sounds the same on the transcript.
BY MR. MIZGALA:
Q Good for me. Do you see at the end, "Please let us know if you're available to speak with us"?
A Yes.

Q Okay. And it looks, if you go to page 10, that that call took place probably on May 1st.
Do you agree?
A Yes.
Q Okay. Did that call happen?
A I believe -- yes, I believe so.
Q Okay. Who was on that call?
A Matt. Matt Insley-Pruitt. And I would have to check my records for who else.
Q And what was discussed on that call?
A I believe that call was just logistics, timing and agreement.
Q What were the outstanding issues related to your retention agreement?
A I received a draft agreement, just had to fill in an hourly rate.
Q Okay. And that was $200 an hour, right?
A Correct. And then -- and then defined payment schedule.
Q Okay. If you turn to page 20 now.
A (Witness complies.)
Q Oh, this is just -- I'm sorry, this was just you discussing availability.
Let's go to 41.
A (Witness complies.)

Q Okay. It looks like that on -- you had another call with some of the plaintiffs' counsel on Friday, May 15th; is that correct?
A Yes.
Q Okay. Who was on that call?
A Vince Serra and some others. I would have to check my records.
Q Okay. And you keep track of that in your records, who's on these calls?
A Yes.
Q Okay. What was discussed?
A Some information on science day. I think that's all, because we already had the agreement finalized, so I don't think we had any discussion on the agreement, so...
Q If you look down at the very bottom, there's an email from Vince that carries over to the next page, and it talks about the subpoena that you received, right?
A Yes. Okay. So we talked about that, the subpoena.
Q And what did you discuss with respect to the subpoena?
A Did I receive the subpoena.
Q And did -- you were served a subpoena, right?

A Correct.
Q Actually, two subpoenas, right?
MR. REICH: Objection.
THE WITNESS: At that time it was the one, but then I got the second one, yes.
BY MR. MIZGALA:
Q Okay. And we're going to mark those in a little bit.
Did you discuss what to do in response to those?
A Just they indicated they would represent me, the two firms, at the subpoena.
Q Did you discuss what documents you had to collect or produce in response to the subpoena?
A No.
Q Did you ever discuss that with plaintiffs' counsel?
A No, actually.
Q How did you know what documents to collect and produce?
A I read the subpoena, and it outlined what to produce.
Q Okay. Well, we'll go through that in a little bit. Anything else that was discussed on this

call?
A Not that I recall.
Q Okay. Now, you mentioned earlier that you visited Plainfield, New Jersey, recently, correct?
A Correct.
Q And that organization is called PARSA that you visited, right?
A Right.
Q P-A-R-S-A, all caps?
A Correct.
Q And that was on June 2nd, correct?
A Last week, correct.
Q Who was there?
A Bob Villee, Rob Plosky, Matthew Insley-Pruitt, and Mr. Serra.
Q Okay. Mr. Villee, had you met him before?
A Not in person.
Q Okay. Then how had you met him if not in person?
A I had spoken to him on the phone.
Q And when had you spoken to him on the phone?
A Approximately last year.
Q And what did you discuss with Mr. Villee?
A Testing of -- for so-called flushable wipes.

Q And why were you discussing that with Mr. Villee?
A That was in association with the other work I did for the anonymous client.
Q Okay. And what did Mr. Villee tell you?
A That he had done some testing, and he was very engaged in the subject; that he was on the committee, joint committee, to hopefully revise flushability guidelines; and that it was -- that so-called flushable wipes were causing problems for the Plainfield sewerage system.
Q Now, Mr. Villee also believes that all flushable wipes are not created equal, correct.
A I assume so.
Q You've never discussed that with him?
A Not directly asked him: "Do you think all flushable wipes are problems?" But it was my understanding, from my conversation with him, that that's his opinion.
Q The conversation you had about a year ago over the phone, do you have any reason to disagree with or dispute anything that he told you?
MR. REICH: Objection.

THE WITNESS: No.
BY MR. MIZGALA:
Q What problems did Villee say PARSA was experiencing when he talked to you?
MR. REICH: Objection.
THE WITNESS: I believe he mentioned clogging of pump stations, clogging upon pumps.
BY MR. MIZGALA:
Q Okay. Anything else?
A Not that I recall.
Q And he attributed that solely to flushable wipes?
A It wasn't clear. You would have to ask him.
Q I think we're going to get that chance. Do you know he's also been designated as somebody who's going to participate in science day?
A I didn't know.
Q You didn't discuss that when you were out in Plainfield?
A Correct.
Q Okay. Was that your first visit to PARSA?
A Yes.
Q Did he show you like any of the pumps and say, "This is where we get the clogs"?

A No.
Q Did he show you any of the facilities?
A No. We were just in his garage facility and a testing apparatus.
Q Did you view the treatment facilities there?
A No.
Q Do they have treatment facilities there?
A Not at the facility we were at.
Q Okay.
A And I believe they're just a collection of -- sewerage collection system, and then the wastewater flows to a regional treatment plant.
Q Okay. And that's where the pumps come into play?
A No.
Q Where do the pumps come into play?
A In the sewerage collection system.
Q Okay. That leads to this facility?
A Correct.
Q Okay. So you mentioned you observed some tests, correct?
A Yes.
Q Did you play any role in the performance of those tests?

A No.
Q Did any of the lawyers who were with you play any role in the performance of those tests?
A Yes.
Q What did they do?
A I believe they may have -- for the videotaping of it, held up some -- prepared some products, laying them out, to help Mr. Villee. They assisted Mr. Villee.
Q These tests were videoed?
A Correct.
Q Okay. Who was taking the video?
A I don't know the gentleman's name.
Q But it was someone in addition to who you identified earlier?
A Correct.
Q Okay. Was there anyone else there besides the five of you and the videographer?
A I don't believe so. If anyone stopped in for a minute or not, I don't -- I don't recall.
Q Have you reviewed those videos?
A No, I haven't.
Q At one point in a video, they stop recording sound. What's your understanding of why that was done?

A Just to make the video more clear. Because there were groups of people in this big room, and there was no reason to have the sound. And there was discussion going on, so just to make it easier, they turned the sound off.
Q Okay. What tests were run that day?
A The toilet and plumbing clearance test from the flushability guidelines. Partial testing based on that and partial testing based on the slosh box test.
Q Okay. When you say "partial testing based on that," what did you mean?
A The guidelines weren't followed 100 percent, but portions of the guidelines were followed.
Q And when you say "the guidelines," to what are you referring?
A The flushability guidelines.
Q The third edition?
A Correct.
Q The INDA, I-N-D-A, slash, EDANA, E-D-A-N-A, all caps, right?
A Correct.
Q In what way were the guidelines not followed?
A At the end of the test, they were to quantify the masses of materials and particle sizes,

and that wasn't done.
Q And you think that's -- that you're supposed to do those for both the tests, the toilet and drain line clearance and the slosh box?
MR. REICH: Objection.
THE WITNESS: Just for the slosh box test.
BY MR. MIZGALA:
Q Okay. Did the toilet and drain line clearance test -- and Mr. Villee refers to that as the PARSA potty test, correct?
A Correct.
Q Do you know whether or not that is -- follows the third edition guidelines?
MR. REICH: Objection.
THE WITNESS: The test that I witnessed did not.
BY MR. MIZGALA:
Q In what way did it not?
A The -- we didn't measure the locations of the flushable wipes in the clear sewer pipe; we didn't add the wipes at the same rate as in the guidelines; we didn't calculate the centroid of the mass of the flushable wipes.
Q Okay. Could that affect the results of those

Page 54

tests, not doing those things?
A Well, for our purposes, we weren't -- we didn't set out to do the tests according to the guidelines.
Q Why not?
A Because the guidelines are somewhat arbitrary, in some of our opinions, so we just wanted to get a visual understanding.
Q And what did you hope to show by videotaping the PARSA potty test?
A To show if the materials cleared the toilet and exited the sewer pipe and if there was any dispersion of the material in the sewer.
Q And the materials in the video, they all cleared the toilet, correct?
MR. REICH: Objection.
THE WITNESS: I would have to review the tape. There was one that got hung up in the toilet, but I would say in general, they all cleared the toilet, yes.
BY MR. MIZGALA:
Q And did they all clear the pipe?
A Eventually. Depends on how many flushes.
Q And that's true even in a residence, in your home, right? Just because you flush once,

Page 55

doesn't mean everything gets right out to the municipal sewer treatment -- the municipal sewerage collection system, right?
MR. REICH: Objection.
THE WITNESS: Correct.
BY MR. MIZGALA:
Q And had you ever seen these sorts of tests run before in your experience?
A No.
Q Was there anything done to -- well, with respect to following the guidelines, the toilet bowl, the toilet drain line and clearance test, how many times are you supposed to run that in order to be consistent with the guidelines?
A I don't recall. I would have to look at the guidelines. But it's more than one.
Q Did you do any of those tests more than once?
A I would have to review the tape. For the same wipe?
Q Yeah.
A Yes, but we might not have -- we did preliminary tests -- it might not be on the tape -- to make sure that the camera was in the right spot, but -- so we did that one

Page 56

probably twice.
Q When you said at the end of the PARSA potty test you assessed dispersibility, how was that done?
A Mr. Villee would catch the product at the end of the pipe and hold it up for display to see if there was any -- you know, what condition it was in visually, if there was any shredding or deterioration.
Q Was it quantified in any way?
A No.
Q Okay. Were there differences between the wipes as he caught them and held them up?
A I don't recall.
Q I asked you earlier for your -- if dispersibility and flushability to you were different, and you said they were.
How do you measure dispersibility?
A Well, there's no accepted method, but one way you could do it is through agitation and then measure particle size after some standard agitation amount.
Q Is there a generally accepted definition of "flushable" in the sewer community?
A If -- yeah, a product that, when used

Page 57

appropriately and flushed down the sewer, causes no impairment of function or damage to the plumbing, sewerage system, or treatment system.
Q Okay. That's your definition?
A Correct.
Q Is there -- and you said that's not published anywhere, right?
A The only published definition I've seen so far is in the INDA flushability guidelines.
Q Okay. And that's similar but different from what you just articulated, right?
A It's essentially the same.
Q Is that generally accepted among the -- you know, the folks who deal with wastewater?
A For the people I've talked to, yes.
Q Did you have any discussions with Mr. Villee about -- when you were in Plainfield?
A Yes.
Q And what did you discuss with Mr. Villee?
A I don't know if it was a discussion or more that Mr. Villee saying that he was on this -- some committees and doing some presentations at different events on flushability guidelines testing.

Q Have you ever attended one of Mr. Villee's presentations?
A No.
Q This committee he's on related to the flushability guidelines, are you on that committee?
A No.
Q Were you invited to be on that committee?
A No.
Q Do you know who else is on that committee?
A Not individually. I know that it's a committee made up of WEF, Water Environment Federation; and NACWA, National Association of Clean Water Agencies; and APWA, American Public Works Association; and INDA; and some wastewater professionals like Mr. Villee.
Q And what's your understanding of what that committee's going to be doing?
A It's my understanding that they're looking at revisions to the third version of the flushability guidelines.
Q Okay. Do you know what the timeline for that is?
A I do not.
Q Okay. Did you discuss with Mr. Villee any of

his opinions on -- or the results of the PARSA potty test?
A Did -- yeah. He offered some opinion. I wouldn't say it was a back and forth discussion.
Q Okay. And what did he offer?
A When he looked at the materials from the PARSA potty test and held them up, it was his opinion that there was very little to no dispersion and that they were intact at the end of the pipe.
Q And did he offer what, if anything, that meant?
A No.
Q Okay. With respect to the slosh box test, was that done in accordance with the INDA 3 guidelines?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q How did it deviate?
A There were no measurements of particle size or particle size fraction masses, and it wasn't run for three hours.
Q Did it use the amount of water/liquid in the

slosh box recommended by the guidelines?
MR. REICH: Objection.
THE WITNESS: By version 3, yes.
BY MR. MIZGALA:
Q Okay. How long was the test run?
A Five minutes.
Q Whose decision was it to run it for five minutes?
A I think it was Mr. Insley-Pruitt.
Q Okay. Did Mr. Villee discuss or express any sort of opinion as to time constraint?
A He concurred and thought that was -- that was fine with him.
Q For what purpose?
A To determine -- to visually observe the possible dispersibility of some products.
Q Of what products?
A There were a number of so-called flushable wipes that were marketed as flushable. And I don't recall exactly which ones except -- the only one I recall was the wipe by Haso. And then there was another baby wipe that was nonflushable.
Q Okay. Have you corresponded with Mr. Villee since your visit out there?

A Yes.
Q And about what?
A I -- he offered, while I was there, that he could provide the flushability guidelines, and I emailed him if he would do that.
Q And did he do so?
A No, he did not.
Q Do you know why not?
A No.
Q Besides making that request of him, was there any other correspondence with him?
A Yes.
Q And what was that?
A He sent me some information that I didn't ask for in an email.
Q What information?
A I don't know. I didn't read it, actually, through. I think I provided it here in the packet. It's the last thing.
Q Yeah, let's go -- let's knock that out. I think you're referring to maybe what's on the end of the document, Zitomer 68.
Is this the information you were referring to?
A Yes.

Q Okay. And it goes through the very end of the -- through Zitomer 78; is that correct?
A Correct.
Q So you haven't read this stuff?
A Correct. I glanced at it. I didn't read the whole thing.
Q And the pictures that are on 77 and 78, do you know what they are?
A No.
Q Okay. So you're not relying on this material for -- from Zitomer 68 to 78 for your opinions in this case, right?
MR. REICH: Objection.
THE WITNESS: Right now. I may read it later. I don't know. I didn't request it.
BY MR. MIZGALA:
Q Do you have any understanding of what's in these pages?
A No.
Q Okay. Before you went to PARSA to view the testing, had you read the version 3 guidelines?
A Just the introduction. I didn't read, you know, the -- the version that's accessible online. I didn't read the exact methodology

of the tests.
Q Then how did you know that some of the tests -- or the two tests that were performed weren't in accordance with the guidelines?
MR. REICH: I objection.
THE WITNESS: I received the guidelines yesterday and read through them.
BY MR. MIZGALA:
Q Okay. I have to go feed my meter, so let's take a short break.
(A break was taken at 11:03 a.m.)
(Back on the record at 11:14 a.m.)
BY MR. MIZGALA:
Q Doctor, the consulting work that you did, was it -- for this unnamed company, was it with respect to a flushable wipe --
A Yes.
Q -- that the company manufactures or sells?
A I don't -- I don't know if it's on the market or not.
Q Okay. Did it have to deal with whether or not the wipe was, in fact, flushable?
A No.
Q Okay. Did it have to deal with anaerobic degradation?

A No.
Q Okay. Can you tell us what it had to deal with?
A Flushable wipes.
Q But not the flushability of the wipe, per se?
A Correct. It's a gray area. Did it have to do with flushability of the wipes. Let me change that and say yes, it did in a way have to deal with the flushability of the wipes.
Q In what way?
A I'm going to not comment on that, because it was confidential.
Q Did it have to deal with dispersibility?
A I'm not going to comment on that.
Q Did it have to deal with whether or not there was compliance or passing of the INDA third guidelines?
A I'm not going to comment on that.
Q Okay. Okay. Let's go ahead and mark this as Exhibit 3.
(Exhibits 3-4 marked for identification.)
BY MR. MIZGALA:
Q Okay. Doctor, Exhibits 3 and 4 are two subpoenas. Do you recognize these documents?
A Yes.

Q Okay. And we can just look at Exhibit 3, because I believe the request for documents are the same in both. Is that your understanding?
A Yes.
Q Okay. So look at No. 3.
MR. REICH: Sorry to interrupt you. Do you have another copy of 4? I just got two copies of the Kurtz one.
BY MR. MIZGALA:
Q I believe you said earlier that you read these yourself and decided what would be responsive, correct?
A Yes.
Q No one -- did anyone from plaintiffs' counsel provide you any guidance on what to provide?
A No.
Q Okay. What we received and what I marked as Exhibit 2 is 78 pages.
Is that the sum total of what you provided to plaintiffs' counsel?
A I believe so, yes.
Q Is there anything missing?
A Not to my knowledge.
Q Okay. Let's just go through these requests.

Page 66

Request No. 1 in Exhibit 3 asks for "All documents concerning the litigation, including but not limited to, any contracts entered into by you in connection with the litigation."

Is Exhibit 2 --

A Can I ask where you are?

Q Page -- they didn't number the pages.

A In the top in parentheses?

Q Go toward the back. It says, "Request for Production."

A Okay.

Q Do you see that?

A Yes.

Q Okay. We're on No. 1, Request No. 1. "All documents concerning the litigation" -- and that's both the cases -- "including, but not limited to, any contracts entered into by you in connection with the litigation."

So we have your retention agreement as part of Exhibit 2. Are those all of the documents you have in Exhibit 2 concerning these cases?

A To my knowledge, yes.

Q You mentioned the complaints. Where are those?

Page 67

A Those are electronic, and I received them after submitting this.

Q Okay.

A And what one was -- one was online, so I didn't have it. I just read it online. The other one was electronic, and I just -- I got it after producing this.

Q Okay. And when did you get those?

A Well, I read the one online probably last week, and I received the electronic one this week.

Q Okay. When you say "this week" -- it's now Wednesday -- was that Monday or Tuesday?

A Yes.

Q Okay. Do you know which day it was?

A I don't recall.

Q And you got that in an email from counsel?

A Yes.

Q Okay. And I'm assuming you have that email, right?

A Yes.

Q Okay. So you had -- and do you know whether that was the Kurtz or Belfiore complaint?

A That was the Belfiore complaint.

Q Okay. So you just got the Belfiore complaint

Page 68

this week, and you read the Kurtz complaint last week?

A Correct.

Q Okay. Any other documents that you've received from counsel subsequent to your production of these materials as Exhibit 2?

A Yes. When I received the -- before I received the Belfiore complaint, I had to read and sign a confidentiality agreement.

Q Okay. Any other materials you received?

A Not that I recall.

Q The INDY -- INDA/EDANA guidelines that you recently received, did you receive those from counsel, or did you go online to get them?

A I received them from counsel.

Q And when was that?

A This week. I forgot to mention those. You're correct. I received that too.

Q Anything else?

A Not that I recall.

Q Okay. No. 2, Request No. 2: "Documents sufficient to identify all compensation received by you and the basis for such compensation."

Do you have any bills or invoices for

Page 69

your work in this case?

A Yes, I submitted one bill to each of the firms.

Q And when was that?

A I believe it was in the last few days. It was after I produced the documents for the subpoena.

MR. MIZGALA: Okay. So in addition to the log, we would like to see the invoices for his time.

BY MR. MIZGALA:

Q "All documents concerning any communications between you and any interested party." And for purposes here, that's plaintiffs' counsel.

All documents concerning any communications between you and plaintiffs' counsel.

So you mentioned you received a couple emails recently; one transmitting -- or forwarding the guidelines; one, the Belfiore complaint.

Have there been any other communications, written communications?

A Not that I recall.

Q Okay. "All documents" -- this is Request

No. 4: "All documents, physical materials, or apparatus you will use in connection with your testimony in this litigation or in connection with preparing for such testimony, including, but not limited to, any presentations, videos, or other audio or visual materials."
Do you have anything that falls in that category?
A No.
Q You haven't made a PowerPoint to present at science day?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q Okay. Do you expect to do so?
A I may or may not.
Q Okay. You know, science day is next Friday in Brooklyn, right?
A Yes.
Q Okay. Do you plan on being there?
A Yes.
Q Okay. And you do plan on testifying before the Court, correct?
A Yes.
Q And we're going to get into what we've been

told that testimony entails in just a moment.
And then it says in Request No. 5: "All documents you considered in forming the opinions or conclusions about which you may testify, including, but not limited to" -- and then there's an A through E.
Do we have all those materials?
A Yes, as of the time that this was submitted.
Q Okay. And I guess we'll get into the specifics that we were provided.
And then it says in Request No. 6: "All reports, deposition, or trial testimony, or summaries of testimony given by you in any case for which you have testified or been retained to testify since May 8, 2011."
Do you have any of that?
A No.
Q And were you -- have you given a deposition between today and going back to May 8, 2011?
A No.
Q Okay. Have you been retained as an expert in litigation in that period of time, May 8 to present?
A May -- I'm sorry, what was the --
Q May 8, 2011, to present.

A 2011 I was in a -- retained in a private arbitration.
Q And what was that about?
A It was a private arbitration, and I'm not going to comment on it.
Q Did it have anything to do with flushable moist wipes?
A No.
(Exhibit 5 marked for identification.)
BY MR. MIZGALA:
Q Okay, Doctor, Exhibit 5 is an email we received from plaintiffs' counsel providing a framework of what your expected testimony would be on science day.
Do you see that?
A Yes.
Q Do you see the language 1 through 6 under there?
A Yes.
Q Did you see that language before at any time?
A No.
Q No? The reason I'm asking is, if you go back to Exhibit 2, Zitomer 41, and there's a couple emails there on Friday, May 15th, the one from you to Vince Serra, do you see that?

A Yes.
Q And it says, "I'm available today at the times I previously emailed to you. I've read and have no comments or revisions to the draft scope of work."
What's your understanding of what you were referring to at that time?
A To my agreement. It's an error. It should say the agreement.
Q Okay. So that's the retention agreement?
A Correct.
Q Okay. So the language that's in Exhibit 5, have you ever seen that language before?
A I have not.
Q Okay. Well, it says that you will be prepared to address the Court regarding -- let's start with No. l -- "Whether the current GD3 testing guidelines" -- and what are the GD3 testing guidelines?
A They're the INDA flushability guidelines.
Q Okay. Whether they "adequately replicate conditions experienced by nonwoven wipe products ('Wipes') when passing through toilets, lateral connections to wastewater conveyance systems, wastewater conveyance

systems, and septic tanks."
Did I read that correctly?
A Yes.
Q So what are you going to tell the Court about No. 1?
MR. REICH: Objection.
THE WITNESS: It's my understanding that they don't -- the GD3 testing guidelines don't adequately replicate conditions.
BY MR. MIZGALA:
Q And what's your understanding based upon?
A Reviewing the testing guidelines, discussion with wastewater industry representatives, position of NACWA.
Q Okay. You first mentioned your review of the guidelines. What is it about your review of the guidelines that you use to support your opinion that "they don't adequately replicate conditions experienced by nonwoven wipe products"?
A So it's the position of the wastewater industry and on observation of problems that toilet paper, human waste, and urine can be -- are flushable, and the guidelines don't adequately replicate conditions to determine

what, compared to toilet paper, is flushable.
Q Okay. Well, how do the guide -- you said your review of the guidelines informed you as to how the guidelines did not adequately replicate conditions experienced by wipes.
How did that happen? What was it about your review of the guidelines?
A The guidelines require -- one example is the guidelines require three hours of exposure in a slosh box. And that doesn't adequately replicate conditions experienced to judge flushability based on particle size after three hours.
Q Why not?
A Because toilet paper breaks up within -- in the slosh box test within two or three minutes, and a wipe could pass the slosh box test or not after three hours.
Q So that's dispersibility. But how does a slosh box not adequately replicate conditions experienced by wipes when passing through toilets, lateral connections, et cetera?
MR. REICH: Objection.
THE WITNESS: It doesn't because to represent adequately what happens in a sewer

to judge flushability, the dispersion should occur similarly to toilet paper, and the test doesn't test that.
BY MR. MIZGALA:
Q Is it designed to test that?
MR. REICH: Objection.
THE WITNESS: The guidelines are not accepted by wastewater industry. I don't -- I don't know if it really is relevant what they test or don't test.
BY MR. MIZGALA:
Q Well, then why are you going to talk about it, then?
A Because it's one place to start to think about flushability, yeah.
Q And why is that?
A I think the major points of the flush test and as they clear the plumbing is an important parameter. I think the dispersibility in the slosh box test is an important parameter. I think the anaerobic degradability is an important parameter. I think the aerobic degradability is an important parameter. I think the settleability is an important parameter. And I think the pump clogging are

important parameters.
Whether or not the test adequately addresses those, I'm not sure, but they start to -- they were, I think, intended to do that, and I think they serve as a starting point to think about acceptable methods to test those parameters.
Q Okay. When you said that wastewater hasn't accepted them, to whom are you referring?
A The wastewater industry.
Q The entire wastewater industry hasn't accepted them?
A Yeah, the consensus, I think, NACWA and most utilities.
Q When you said that the various tests -- and you identified six of them that are part of the --
A There are seven.
Q Right. You just identified six.
A There are two pump tests, a home test, and a municipal test.
Q Okay. And you said they were important parameters, correct?
A Correct.
Q To whom?

Page 78

A To any professional or anyone trying to judge whether something should be flushed down a toilet.
Q And then No. 2 you have "Whether the current GD3 testing guidelines sufficiently determine whether wipes are flushable, safe for sewer systems, and septic tanks."
Is that -- is No. 2 just sort of, you know, a corollary to No. 1, or is that somehow different?
A I haven't seen these before. We can talk about No. 2 if you want.
Q Well, this is what we're being told that you're going to address with the Court.
What would you say to the Court?
A I would say the current GD3 test guidelines are insufficient to determine whether wipes are flushable, safe for sewer systems, or septic tanks.
Q And why is that?
A Because through, you know, conversations in the industry and the standing of the wastewater industry, I'm looking and observing the results at PARSA. Only urine, feces, and typical toilet paper are flushable. And in

Page 79

these tests, material that's different from those would pass.
So really I use it as a standard is, does it behave similarly to toilet paper for a nonwoven wipe. And I don't believe that the current GD3 testing guidelines are sufficient, because some things passed that I think could cause clogs much -- relative to toilet paper is what I think is a reasonable -- is decided as a reasonable, flushable material or product.
Q Are all toilet papers the same?
A No.
Q And how do they differ?
A Well, there's a lot of differences, I guess. And I'm not an expert on toilet paper, although I do use a lot of it. So one ply, two ply, three ply, but I would say a typical toilet paper -- would be reasonably judged as a typical toilet paper, like a one or two ply.
Q Is a three ply not flushable?
A I don't know. That's a good question.
Q And you agreed earlier that even toilet paper can clog --
A Correct.

Page 80

Q -- toilets and plumbing, correct?
MR. REICH: Objection.
THE WITNESS: Yes.
BY MR. MIZGALA:
Q Have you done any studies to determine whether or not -- or are you aware of any studies that have looked at whether or not the use of flushable wipes causes more relative clogs than toilet paper --
MR. REICH: Objection.
BY MR. MIZGALA:
Q -- in residences?
A By "studies," can you be more specific?
Q Yes. You know, you -- either in the peer-reviewed published literature or something that, you know, you've seen presented, like the Maine study, the collection study, have you seen any data on that?
A So peer-reviewed literature I have not seen any data on that.
Q Have you seen anything that was not peer-reviewed?
A Not that I recall.
Q Okay. Have you done anything to assess -- or

Page 81

seen anything published that assesses whether the differences among the various flushable wipes that are out on the market affect whether or not they clog toilets or pipes, plumbing, in residences?
A No.
MR. REICH: Objection.
BY MR. MIZGALA:
Q And, Doctor, going back up to No. 1, when you say they don't adequately replicate the conditions, what specifically are you referring to?
A In the test, the three-hour -- specifically, one of the points is that in the slosh box test, dispersion -- giving three hours to measure so-called dispersion is too long.
Q Okay. That's one. Anything else about the conditions experienced in the real world versus the guidelines that you think is inadequate?
A Yeah, right now I'm still reviewing the guidelines, so there may be other things. But at this time, that's the only thing. That's the main thing.
Q Okay. Is there -- and then with respect to

Page 82

No. 2, is that just sort of a -- is that specific to any of the specific tests involved in the guidelines, or is that just a general statement?
A Right now it's specific to the slosh box test, but I'm still reviewing the guidelines and the test methods. And there may be others -- other reasons in the future why the current testing guidelines are insufficient.
Q The toilet bowl, drain line clearance test, do you think that adequately replicates conditions experienced by wipes in the real world?
A No.
Q Why not?
A It's a plastic pipe, it's a clear pipe; the flush is 5 liters for U.S., approximately 5 liters; the slope of the pipe may or may not be accurate; the length of the pipe may or may not be accurate; the drop length of the pipe under the toilet may or may not be accurate; the number of elbows in the -- and 90-degree bends may or may not reflect the overall applications.
Those are the main things that come to

Page 83

mind.
Q And how would those -- what in the real world, with respect to those variables, would impact flushability?
A Potentially all of them.
Q In what way?
A In how the wipe would pass through the sewer system.
Q Okay. And those variables that you just mentioned, they can vary from house to house, right?
A Correct.
Q So one person using a flushable moist wipe in house A, his or her experience isn't necessarily going to be the same as what you see in house B, right?
A Correct.
Q Doctor, No. 3 says, "Whether certain adjustments to the current GD3 testing guidelines (the 'Testing Alternatives') are more or less likely to: A, replicate conditions experienced by the wipes; and B, determine whether the wipes are flushable, safe for septic tanks and sewers."
What would be your testimony in this

Page 84

regard?
A I'm still reviewing information. And "certain adjustments" is vague. If you would provide maybe a more exact -- you know, define what adjustments, maybe we could talk about it. That's a very vague statement.
Q Well, I agree with you, Doctor, but I didn't write this either.
A Yeah, I didn't write this, and I haven't seen it before.
Q Okay. Do you understand -- do you have any understanding of what "testing alternatives" refers to?
A No.
Q No. 4, "The conditions found in household toilets, household plumbing, lateral connections, wastewater conveyance systems, and septic tanks. For example, this information might include the generally required slopes of conveyance systems; the turbulence and shearing forces found in lateral connections and wastewater conveyance systems, and the rate of flow through these systems."
What testimony would you provide in that

Page 85

regard, Doctor?
A I would provide testimony on the typical conditions found in those, mostly in the wastewater conveyance systems and septic tanks.
Q Okay. And, again, those things, while typical, could vary from place to place?
A Correct.
Q No. 5, "Testing alternatives," you said you didn't know what that was a reference to, correct?
A Correct.
Q Okay. No. 6, "The performance of the wipes under the current GD3 testing guidelines and the testing alternatives versus nonflushable wipes and toilet paper."
Do you have an understanding of what that refers to, Doctor?
A Yeah, I don't know about the testing alternatives, but I would say performance of the wipes under the current GD3 testing guidelines versus nonflushable wipes -- you know, of so-called flushable wipes, nonflushable wipes and toilet paper, yes.
Q Okay. So have you seen results for

Kimberly-Clark flushable wipes for the GD3 testing guidelines?
A No.
Q Have you seen results for Kirkland Signature wipes under the current GD3 testing guidelines?
A No.
Q Have you seen results for Proctor & Gamble's wipes under those guidelines?
A No.
Q Have you seen results -- the GD3 testing guideline results for nonflushable wipes?
A No.
Q Have you seen GD3 testing guidelines results for toilet paper?
A No.
Q Doctor, are you aware that the technology in Kimberly-Clark's wipes has changed -- has evolved over the last several years?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. MIZGALA:
Q Okay.
(Exhibit 6 marked for identification.)
BY MR. MIZGALA:

Q Doctor, have you ever seen Exhibit 6 before?
A Yes.
Q And when did you first see it?
A When I prepared it to submit for the subpoena.
Q Okay. So this is something you prepared?
A Yes.
Q Okay. And it says, "List of material that may be reviewed as of June 3, 2015 for Kurtz v. Kimberly-Clark, et al. and Belfiore v. Proctor & Gamble Company," correct?
A Yes.
Q And why does it say "may be reviewed"?
A Because I may look at them and may not. I wanted to provide you, at the time of presenting this material, with what I might look at in the future, to be fair. I don't -- so I couldn't -- I don't know if I'll look at them or not. Some of them I have. I've definitely looked at the American -- the No. 2, Item 2.
Q Okay. Well, let's go through these one at a time. The first one, those are the INDA/EDANA guidelines, right?
A Right.
Q And you said you just reviewed those recently,

correct?
A Correct. I just started reviewing them. They're very in-depth. It takes some time.
Q Okay. So when you put that list together, you hadn't reviewed those yet, right?
A Just the public part that you can get for free online I had looked at.
Q Okay. And you said that didn't deal with specific methodologies, right?
A Correct.
Q And we've talked about those guidelines. Is there anything else about those guidelines that you plan to rely on for your testimony in this case?
A Probably, yeah.
Q Probably?
A Yeah.
Q What do you mean?
A I would like to review them fully, read through them and think about them more. They're very in-depth.
Q Let's go ahead and mark this as Exhibit 7.
(Exhibit 7 marked for identification.)
BY MR. MIZGALA:
Q Doctor, can you identify Exhibit 7 for the

record, please.
A Exhibit 7 is some part or all of the guidelines for assessing the flushability of disposable nonwoven products, 2013 edition, by INDA, I-N-D-A, and EDANA, E-D-A-N-A.
Q Okay. And have you reviewed this document before? And I will represent that this is what we pulled up when we went to the website that you have listed in Exhibit 6.
A I didn't look at Appendix 2 yet, but the rest of the document I looked at, yes.
Q Okay. And this is what you were referring to when you were talking about inadequate -- inadequate representation of what goes on in the conveyance system in the real world, correct?
A Partially. I also have now looked at the -- you know, started to review the testing methodology that is attached with it.
Q Okay. And when did you start reviewing that?
A This week.
Q Okay. When this week?
A I think yesterday.
Q Have you ever conducted -- using those methodologies, have you ever conducted any

tests of flushable wipes?
A No.
Q Have you ever supervised the conduct of any flushable wipes using those methodologies?
A No.
Q Okay. Doctor, No. 2 on Exhibit 6, the list of materials you may review is an American Society of Civil Engineers (1982) "Gravity Sanitary Sewer Design and Construction."
And you said you have reviewed that?
A I've started to look at that, yes.
Q Okay. That's a book, right?
A Correct.
Q Okay. Why are you looking at that book, Doctor?
A To review gravity sanitary sewer design and construction.
Q 1982. Nowhere in that book are flushable wipes mentioned, right?
A Correct.
Q And what is it about the design of gravity sanitary sewer, the design and construction, that's relevant to your opinions in this case?
A They're the materials, the slopes, the flows, the float, the overall design.

Q Well, first of all, since 1982, those materials have changed greatly; haven't they?
A Somewhat, yes.
Q Come to my street and I can show you. They're putting in a new sewer line right now.
And they're using a lot more plastic these days, right?
A Correct.
Q And the flows tend to be different these days, too, correct?
MR. REICH: Objection.
THE WITNESS: It depends. It varies.
BY MR. MIZGALA:
Q Okay. Well, how does that impact the flushability of a wipe?
A How does what? I'm sorry.
Q The design and construction of a sanitary sewer.
A I think the size -- actually, I reviewed it because I wanted to make sure that if anyone asked me questions about sewer design, I would remember, because it's not something I do every day but something I certainly do -- I have done in the past, so...

Q This gravity sanitary sewer design and construction, does this have anything to with residences?
A Yes.
Q In what way?
A Lateral design.
Q Okay. So the conveyance from the house into the sanitary sewer system?
A Correct.
Q And how does that -- how can that vary from house to house?
A By size of pipe, material of pipe, slope of pipe.
Q You could get the impact of tree roots, things like that, too?
A Correct. I don't believe that's included in this book.
Q Another variable, right?
A Yes.
Q No. 3, a letter from Cynthia Finley at NACWA to David Rousse.
What is it about that letter -- have you reviewed that?
A No.
Q Do you plan on reviewing it?

A I may review it.
Q No. 4, Cynthia Finley PowerPoint presentation: "Wastewater and Wipes, Adversaries or Allies."
Have you reviewed that?
A No.
Q Do you plan on reviewing it?
A I may review that.
Q You know, you've mentioned NACWA a couple times. Are your opinions in this case consistent with what you understand NACWA's positions to be?
A I have to review some more, but I certainly take NACWA's positions into consideration.
Q Okay. Have you talked with Cynthia Finley -- I think you said you spoke to her when you were doing that project --
A Correct.
Q -- for that company, right?
A Yes.
Q Have you spoken to her since then?
A No.
Q Okay. And where did you -- when did you get these? Have you gotten these materials?
MR. REICH: Objection.
BY MR. MIZGALA:

Page 94

Q Three and four? Do you have them?
A I may have three; I have to check. Four is online, I believe.
Q Okay. So you're not sure you printed that off; is that right?
A Did I print it off? Which one?
Q Four.
A I did not print that off.
Q Okay. And where did you get the letter to David Rousse?
A I believe I got that letter from Cynthia for the work I did for the other company previously.
Q Okay. Did you review it back at that time?
A I looked at it back in that time, yeah.
Q The fifth entry there -- well, why did you include those, those Nos. 3 and 4? Why did you include those on this list?
A Because I may review them in association with these two cases, and I wanted to provide you with that information.
Q The presentation, the "Adversaries or Allies," that's from the perspective of wastewater collection and conveyance -- collection and treatment facilities, correct?

Page 95

A Yes.
Q The fifth one, Hwang and Hita, why did you include that on this list?
A Because I may review it in association with these two cases, and I wanted to provide you with that information.
Q Okay. And this is a book entitled: "Hydraulic Engineering Systems," right?
A Correct.
Q Do you know -- do you have this in your office?
A Yes.
Q Do you know which edition you have?
A No, but the ISBN number would be specific to edition.
Q Okay. I looked at Editions 2 and 3, and I didn't see flushable moist wipes mentioned anywhere in that book.
Does that surprise you?
A No.
Q This memo from Jamie Malpede dated May 30th, Orange County Sanitation District, "Dispersion of Flushable Wipes," have you reviewed that?
A No.
Q Okay. Why did you include that on your list?

Page 96

A Because I may review it for -- in association with the two cases.
Q Do you have the document?
A There's a URL for it. It's online.
Q But did you print it off? Do you have a physical copy?
A No, I did not.
Q And how did you identify that document to include on your list?
A During the previous work I did for the other company, I -- that was something I looked at.
Q Other company or companies?
A Other company.
Q This Consumer Reports article, "Think Twice About Flushing Wet Wipes," have you reviewed that?
A No.
Q Have you printed it off?
A No.
Q How did you identify it?
A During my work previously for the company, other company, I identified it through a literature search.
Q Okay. And then there's -- I think the next one, the eighth entry, is the same thing as

Page 97

No. 4 -- or the fourth one, correct? It's a duplicate?
A Yes.
Q Okay. And the last entry, Viessman and Hammer, "Water Supply and Pollution Control," that's another book, right?
A Yes.
Q From 2005?
A Yes.
Q And why did you list that?
A Because I may review material in there as part of the work I do on these two cases.
Q Okay. Have you reviewed that book before?
A I've used it in class.
Q The book doesn't mention flushable wipes anywhere, does it?
A Not to my knowledge.
Q Counsel recently provided us with some PDFs related to the methodologies for the INDA/EDANA tests from the third edition, specifically for the FG501.
Do you know which test that is?
A I believe that's the clearance of the toilet and piping system.
Q Okay. Have you reviewed all that?

A I've started to review it.
Q FG502, slosh box, have you reviewed that?
A Started to review that.
Q FG503, household pump test?
A I have not reviewed that.
Q FG504, settling test?
A I have not reviewed that.
Q Is the settling test relevant to residential settings?
A Yes.
Q In what way?
A The settling test measures the rate of settleability, and there might be settling in residential systems.
Q In what context?
A In the context of the material passing through the system that might settle.
Q And where would it settle?
A It could settle in the piping system, in the bends, in the pump, in the pump well, in the septic tank, in the septic field.
Q Did Mr. Kurtz have a septic field in either of his properties?
MR. REICH: Objection.
THE WITNESS: Not that I'm aware of.

BY MR. MIZGALA:
Q Did Mr. Belfiore?
MR. REICH: Same objection.
THE WITNESS: Not that I'm aware of.
BY MR. MIZGALA:
Q Did either of them have a household pump at any of their residences or --
A Not that I'm aware of.
MR. REICH: Objection.
BY MR. MIZGALA:
Q Aerobic biodisintegration, FG505, have you reviewed that?
A No.
Q FG506, anaerobic biodisintegration?
A No.
Q And FG507, municipal sewerage pump tests, have you reviewed that?
A No.
Q Are there any -- besides the documents listed on Exhibit 6, are there any other documents you're relying on for your opinions in this case.
MR. REICH: Objection.
THE WITNESS: I may.
BY MR. MIZGALA:

Q May what?
A Rely on other documents for this case.
Q But you haven't identified those yet?
A Correct.
Q Are you relying on the results of Mr. Villee's testing of flushable wipes for your opinions?
A Partially, yes.
Q And what part?
A In the results that we observed during the testing at PARSA.
Q Okay. And how do those inform your opinions?
A The observations that we made there would form opinions of how -- so-called flushable wipes and nonflushable wipes and toilet paper behave in the testing.
Q Have you seen results from other tests run by Mr. Villee other than that one day you were there?
A No.
Q Do you know anybody who works at Kimberly-Clark?
A Not that I'm aware of.
Q Do you know a gentleman named David Powling?
A No.
Q Nathan Vogel?

A I'm sorry?
Q Nathan Vogel?
A Vogel, V?
Q Yeah.
A No.
Q I'm going to pass the witness.
MR. SADEGHI: If we could go off the record for a minute, try to make this efficient.
(A break was taken at 12:06 p.m.)
(Back on the record at 12:17 p.m.)
EXAMINATION
BY MR. SADEGHI:
Q Good morning, Doctor. My name is Kayvan Sadeghi. I represent Costco Wholesale Corporation. If there are any questions I ask that you don't understand, please just let me know. I'm going to try to avoid asking anything that you've already been asked. As a result, I may jump around a little bit. You'll probably see me trying to skip things that have already been covered, so sorry if this seems a little disjointed.
Other than the tests that you observed at PARSA last week, have you seen or been

Page 102

involved in any testing of Kirkland Signature flushable wipes at any time?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. SADEGHI:
Q Do you know what any version of Kirkland Signature wipes that has ever been sold is made of?
A No. I know that they're cellulosic or paper based, but I don't know all the constituents.
Q Do you know how they're designed to disperse?
A No.
MR. REICH: Objection.
BY MR. SADEGHI:
Q You don't know anything about the technology, whether they're designed to disperse based on chemical action or mechanical action, for example?
MR. REICH: Objection.
THE WITNESS: Correct.
BY MR. SADEGHI:
Q You don't know anything about the difference in the construction between Kirkland Signature flushable wipes and Kirkland Signature baby wipes; is that right?

Page 103

A Yes.
Q Do you know whether Kirkland Signature flushable wipes are more or less dispersible than Kirkland Signature baby wipes?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. SADEGHI:
Q Do you know how Kirkland Signature flushable wipes compare in dispersibility to any other flushable product other than the Costco product.
MR. REICH: Objection.
THE WITNESS: No.
BY MR. SADEGHI:
Q Do you have personal knowledge of any clog of any residential plumbing caused by Kirkland Signature flushable wipes?
A No. I only know, you know, of clogs happening. And read the complaint, and quite frankly, I don't remember what the products were exactly that they had the complaint against.
Q And you don't know if the allegations in that complaint are true or not, do you?
A I assume they're true. I don't know for sure.

Page 104

They could be lying.
Q Why do you assume they're true?
A Because it's in a court document and -- I'm an engineer, not a lawyer, but I just assume that that complaint is true, that there were clogs caused.
And I did see that both the -- in both cases they had to get the sewer unclogged, and there were -- I believe there were exact damage -- you know, costs to that from a plumber, so it made me believe that they were clogged and had to be unclogged.
Q Does that belief in any way impact your opinions that you intend to express on science day?
A Yes.
Q How so?
A You know, all these are instances, whether it's recorded in the complaints or referred to in the complaints or observed by wastewater professionals that I talk to, all make a case.
You know, one individual clog or event doesn't make a pattern, but I think each individual experience where there's a clog and the possibility of proof that it's a nonwoven

Page 105

fabric or so-called flushable wipe is just one more piece of evidence to build the case.
Q If you learned that the allegations in the complaint were not accurate, were not true, with respect to whether or not there was a clog caused by Kirkland Signature flushable wipes, would that impact your opinion that you intend to express on science day in any way?
MR. REICH: Objection.
THE WITNESS: Probably not, because there's enough other pieces of evidence.
BY MR. SADEGHI:
Q Are there any clogs of residential or municipal systems for which you have any direct knowledge of the cause?
A Yes.
Q And what are those?
A Causes of clogs by grease; causes of clogs by broken pipes; causes of clogs by tree roots; causes of clogs by nonwoven wipes.
Q Have you personally observed any clogs caused by grease?
A I have seen photographs. I haven't seen them in person.
Q Have you personally observed any clogs caused

by broken pipes?
A Yes.
Q Have you personally observed any clogs caused by tree roots?
A Yes.
Q Have you personally observed any clogs caused by nonwoven products?
A Just photographs, not in person.
Q What photographs of clogs have you seen related to nonwoven products?
A Yeah, the one that comes to mind is the one from Maine. So in the state of Maine they have a procedure to assess clogging, and online they have photographs of the clogging of pipes by nonwoven wipes.
Q Where did you see those photographs?
A They're online.
Q That's the only place you've seen those photographs?
A Correct.
Q And have you seen any other pictures or other documentation of any other clogs that you associate with nonwoven products?
A Yes. I can't recall the individual ones, but online there are some pictures.

Q And where online did you see these pictures?
A I don't recall.
Q How recently did you see these pictures?
A Within the last year.
Q Turning to the Maine photographs that you mentioned, do you know if -- do you have any basis to assess whether the clogs that you saw photographed were associated with nonwoven products labeled as flushable as opposed to nonwoven products that are not labeled as flushable?
A No.
MR. REICH: Objection.
MS. HENN: Your answer was? I'm sorry.
THE WITNESS: No.
BY MR. SADEGHI:
Q Do you know if it would be possible to assess that?
A It's possible to assess that.
Q How would you assess that?
A Well, it would take some time to develop the methodology, but you would look at -- you know, you could mark -- one of the simplest ways I could think of would be to mark a

so-called flushable wipes or number of wipes and dispose of them in a sewerage system and then go to the pump station that might be clogged, take the clogs apart, and see if there's marked flushable wipes -- so-called flushable wipes in that clog.
Q That would be a methodology to assess the cause of a clog if you intentionally caused the clog; is that correct?
MR. REICH: Objection.
THE WITNESS: No. If there was no clog, then there wouldn't be one to observe.
BY MR. SADEGHI:
Q Well, if there is already a clog before you mark the wipes that you're placing in it, then you're not assessing the cause of the clog, are you?
A Right. So that's why I said you need to take some time to develop these methods. But, of course, before you did it, you would have to verify that there was no clog there before you dropped the marked wipe into the system, yes.
Q To assess a clog that you were not evaluating prior to the development of the clog, where you're not placing marked wipes in, if you

come upon an existing clog, do you know if it's even possible to assess whether that existing clog was caused in any part by flushable wipes?
A Yeah, I don't know.
MR. REICH: Objection. Go ahead.
THE WITNESS: It would be interesting to look into that.
BY MR. SADEGHI:
Q You've never developed a methodology to assess the cause of municipal clogs, are you?
A Correct. I have not.
Q You're not aware, based on your expertise, of any methodology to assess the cause of the clogs in municipal systems, are you?
A Not yet, no.
Q And you've never seen any evidence that any clog in a municipal system was, in fact, caused by nonwoven products labeled as "flushable" as opposed to any other cause, have you?
MR. REICH: Objection.
THE WITNESS: I have not.
BY MR. SADEGHI:
Q You mentioned at the outset of the deposition

Page 110

that there were a number of different types of treatment systems. I believe you referred to three; one that -- I'm going to try to paraphrase. The record is what it is, but just to try to reorient you, one is one that included a primary system followed by activated sludge; one that was directly activated sludge; and then one that was a primary system followed by trickling filters followed by activated sludge.

Does that sound familiar?

MR. REICH: Objection.

THE WITNESS: No.

BY MR. SADEGHI:

Q How would you describe the different types of treatment systems?

A Well, there's numerous different treatment systems. I believe previously in the record I gave as examples three.

One was primary treatment followed by activated sludge; the second one was activated sludge itself with no primary treatment; and the third one was activated sludge followed by a trickling filter.

Q Are those the only three types of treatment?

Page 111

A No.

Q How many types are there in use in the United States would you say?

A Oh, there's numerous different combinations. There's not just one treatment system. Depending on your goals and -- and what you're comfortable with, you put together numerous individual systems in a train to make up an overall treatment system.

So there's potentially an infinite number of combinations. I guess not an infinite, but a very high number of combinations. There's many types of different treatment systems.

Q In the United States can you give me any sort of ballpark of how many different distinct types of systems are in operation today?

A No.

Q More than a hundred?

A I can't give a ballpark number on that.

Q You have no idea whether there are more or less than a hundred different types of municipal treatment systems?

A Correct. Each one is -- each one is -- can be unique, depending on the combination of liquid processing, solids processing, gas handling,

Page 112

biosolids disposal, effluent disposal.

Q Where in the processes -- which -- strike that.

Which of the processes you just described could be impaired by a nonwoven product?

A All of them. Any process for the liquid stream -- probably any process the wastewater enters.

Q How would a nonwoven product impair water treatment in any of -- if there are multiple --

A Wastewater treatment.

Q Wastewater treatment. Are there multiple ways it could impair treatment?

A As examples?

MR. REICH: Object.

THE WITNESS: As examples?

BY MR. SADEGHI:

Q Yes, that would be good.

A Because there's many different ways. As an example, typically wastewater could clog a sewer, wastewater could clog the pumping station and the pump with these nonwoven materials. Preliminary treatment often has either screening or coarse screens that could

Page 113

clog and cause problems. Primary treatment and sedimentation could cause clogs to the pipes in the sedimentation tank; could cause floating debris in excess, floatables that have to be disposed of; clogs could get to the aeration tank and tangle on aerators, tangle on mixers and clog pipes.

Q I think that will --

MR. REICH: Let him finish the answer, please.

MR. SADEGHI: Sure.

THE WITNESS: Nonwoven wipes could go to secondary clarifiers, clog weirs, clog pipes. Nonwoven wipes could be pumped to the digester, anaerobic digester, clog pumps, clog mixers, clog gas-release systems. Nonwoven wipes could go to chlorine contact tanks and interfere with chlorine contact for disinfection, clog the piping there. Nonwoven wipes could become a nuisance in the effluent, clog effluent piping and screens. Nonwoven wipes could get into the digester and get to the digested sludge and not be digested and be in the sludge for either -- land application and cause problems with land application.

There's probably some other things too.
BY MR. SADEGHI:
Q Do you have any basis to determine how long a wipe is in the residential plumbing and sewer system before it reaches a treatment facility?
MR. REICH: Objection.
BY MR. SADEGHI:
Q On average?
A Do -- yeah, there certainly could be a method to do that.
Q Are you aware of any information about that?
A No.
Q You don't know whether, on average, it takes more or less than three hours?
A Every system is different. It could take more than three hours, and it could take less, depending on the system.
Q You've never conducted any analysis of the time it takes matter to travel from flushing to -- through a sewer system to a treatment facility, have you?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. SADEGHI:
Q Have you reviewed any data on that?

MR. REICH: Same objection.
THE WITNESS: From a toilet? It has to be from a toilet to a treatment system?
BY MR. SADEGHI:
Q That's my question.
A No.
Q Have you reviewed any items other than a toilet to a treatment system?
A Yes.
Q From where?
A From industrial treatment facilities into a sewer to a treatment plant.
Q How long does that take?
A Depends on the system configuration. It varies greatly.
Q It varies greatly?
A Yes.
Q You mentioned earlier that there are different kinds of pumps used in municipal systems, too; is that correct?
A Yes.
Q How many different types of pumps are there?
A Oh, each vendor -- there are different vendors, and there are different types of pumps. I don't know the number of different

ones.
Q More than ten?
A I don't know the number.
Q Do they vary by power as well?
A Yes.
Q How significantly do they vary by power?
A Very significantly.
Q Would the power of the pump in any given system impact whether or not a particular product would impair the pump?
A It may.
Q Have you done any analysis of the -- what might impair a pump?
A No.
Q You noted earlier that toilet paper varies in dispersibility; is that right?
A Yes.
MR. REICH: Objection.
BY MR. SADEGHI:
Q Do you have any idea how much it varies in dispersibility?
MR. REICH: Same objection.
THE WITNESS: No.
BY MR. SADEGHI:
Q Do you think it's possible that a product

could disperse less quickly than toilet paper but still not impair a plumbing conveyance or sewer system?
MR. REICH: Objection.
THE WITNESS: Right now, no.
MS. HENN: Sorry, could you reread the question for me?
(Previous question read back.)
BY MR. SADEGHI:
Q On what do you base that upon?
A On my discussions with other professionals in the wastewater industry, on the position of NACWA as a group that represents the wastewater industry, and as is evidenced by operating systems over years when there were -- you know, when there was just toilet paper and -- when they didn't manufacture nonwoven things that got flushed.
Q I would like to focus first on that last item you mentioned, evidence of operations. What do you mean by that?
A So operations -- so the amount of manpower time it takes to clean pumps at pump stations; the amount of time it takes to unclog sewers in the civil systems; the evidence from

Page 118

various homeowners that their septic tanks and laterals have been clogged.
Q What evidence of these operations are you referring to?
A To my discussions with professionals at the -- you know, Green Bay, Fond du Lac, Madison wastewater treatment plants; from my understanding of the positions that is -- by NACWA that represents the wastewater industry.
Q Other than discussions, do you have any basis for that opinion?
A Just things I've reviewed so far that show clogs in pump stations. So photographs, other than just opinions, but that's it, I think.
Q Turn your attention back to Exhibit 5. Starting with Item No. 1 which addresses "Whether the current GD3 testing guidelines adequately replicate conditions experienced by nonwoven wipe products," I would like to start by discussing the slosh box test.
You're familiar with that test?
A Yes.
Q I believe you testified you thought the three-hour duration of the slosh box test as called for in GD3 was too long; is that right?

Page 119

A Correct.
Q Do you have any basis to assess what percentage of wastewater conveyance systems -- in what percentage of wastewater conveyance systems wipe products would spend more than three hours between the toilet and the -- before it reaches any pump or other treatment facility?
MR. REICH: Objection.
THE WITNESS: Yeah, that's difficult, because each system is different, and there's influent from different parts of the system. So in any one system there would be -- very possibly be material that spent less than three hours and greater than three hours.
So I think it could be assessed for an individual system given its parameters, but...
BY MR. SADEGHI:
Q But that would be an individual assessment based on each system?
A Yes.
Q There would be no way to discuss a representative system?
A No.

Page 120

Q And you've never done that sort of assessment for any system, have you?
A No.
Q Do you know whether the testing that you observed in New Jersey followed the INDA guideline methodologies for the slosh box other than duration?
MR. REICH: Objection.
THE WITNESS: Yes.
BY MR. SADEGHI:
Q Yes, you do know whether it followed the guidelines?
A Yes.
Q Did it follow the guidelines?
A No.
Q What else was not in accordance with the INDA guidelines for the slosh box test?
A Well, from where I stand with reviewing the guidelines, the clearance of the toilet and the flow through the pipes, there wasn't -- the pipe length was not correct, the number of bends was not correct.
Q Specifically focused on the slosh box --
A Oh, I'm sorry. The slosh box test. It wasn't run for three hours; the material wasn't

Page 121

removed at the end of three hours; that removed material was not passed through a half-inch screen; the material that was retained on the screen was not dried and weighed.
Q Do you know whether the guidelines specify a particular amount of water to use in the slosh box?
A Yes.
Q Do you know if that amount of water was used in the tests that you observed?
A Yes.
Q Was that amount of water used in all the tests that you observed, or did that vary?
MR. REICH: Objection.
THE WITNESS: It was used in most of the tests, and it was recorded and pointed out that that was the volume.
There was one test that more water was used.
BY MR. SADEGHI:
Q There were a series of tests that were five minutes in duration per test; is that right?
A Yes.
Q And there was one test that was a half an hour

in duration?
A Yes.
Q Were there any other tests besides those two categories?
A Not to my knowledge.
Q Do you know if the half-hour test used the level of water specified in the INDA guidelines?
A There was some discussion of that. I don't recall. I know that there was some discussion that it used more water. I believe it used more water than the standard, but I would have to view the -- I would have to view the video to refresh my memory.
Q Do you have any basis, based on your expertise, to assess whether more or less water is more reflective of conditions in the real world in wastewater conveyance systems?
MR. REICH: Objection.
THE WITNESS: Yes.
BY MR. SADEGHI:
Q What basis do you have to assess the proper level of water for a slosh box test to approximate --
A That would -- that would take a considerable

amount of study and time.
Q That study you have not done?
A Correct.
Q So you don't know what level of water would best replicate real world conditions?
A Correct.
Q Do you know whether that half-hour test that you observed was conducted in accordance with the speed settings used -- specified in the INDA guidelines?
A It's my recollection that it was, that it was a 26 RPM.
Q Do you have any basis, sitting here today, to assess what speed best replicates conditions in any given wastewater conveyance system?
A No, not sitting here today.
Q Have you ever done any work to assess what speed would best replicate conditions in any wastewater system?
A No.
Q And would that also vary system by system?
A Yes.
Q Would that vary greatly?
A It would vary.
Q Do you intend, between today and science day

next Friday, to do any work in developing any alternative tests to the INDA guideline tests?
A No.
Q And you haven't done any work of that sort yet, have you?
A Correct.
Q Do you intend to do any work between today and science day to assess whether the INDA guideline specifications replicate real world conditions of any wastewater conveyance system?
A I don't have any plans to do that.
Q Have you been asked to do that by anyone?
A No.
Q Generally speaking, what's your understanding of the purpose of science day?
MR. REICH: Objection.
THE WITNESS: It's my understanding to help inform the Court on sewage systems, sewerage systems. Oh, for the total science day or just for my part?
BY MR. SADEGHI:
Q Let's start with total science day.
A Oh, just to inform the Court.
Q About what?

A About information about -- I don't know who's going to attend, so I don't know the extent of about what, but at least I know I'll be there to inform the Court about sewerage systems, their construction, operation. And I can also present, you know, opinions on problems that sewerage systems have with nonwoven wipes or nonwoven materials.
Q The problems with nonwoven wipes or materials that you just mentioned, is your knowledge of those problems based entirely on discussions with other people?
A And observations of the testing at PARSA and industry, you know, positions of NACWA. So they're written, not --
Q You haven't directly observed any of the so-called problems yourself?
A Correct.
Q You haven't conducted any studies or analysis of any of those problems?
A Correct.
Q You haven't reviewed -- strike that.
Other than the information with respect to the main clog that you discussed earlier, have you reviewed any analysis or studies of

Page 126

the cause of any other problem that you associate with flushable wipes?
MR. REICH: Objection.
THE WITNESS: Not yet.
BY MR. SADEGHI:
Q Are you aware of any other such information that you intend to review?
A No.
Q And the information you reviewed about the main clog that you referred to is exclusively what's available online?
A Correct.
Q You don't consider yourself an expert on nonwovens?
A Correct.
Q You don't consider yourself an expert in flushable wipes as a subcategory of nonwovens?
A Correct.
Q I know you mentioned you have some familiarity with home plumbing systems.
Do you consider yourself an expert in home plumbing systems?
A Probably anything up to the lateral, no. I probably haven't spent 10,000 hours studying those. But after that, yes.

Page 127

Q Putting aside 10,000 hours, do you consider yourself an expert in home plumbing systems?
A No, because I haven't spent -- isn't that the definition of an expert; it takes 10,000 hours?
Q You wouldn't represent yourself -- hold yourself out to the Court to be an expert in home plumbing systems?
A Correct.
Q Have you been specifically asked to address any particular topics on science day?
MR. REICH: Objection.
THE WITNESS: Just general discussions that we were to inform -- you know, that my purpose was to inform the Court of, you know, the wastewater industry and operation standards, but nothing specific.
BY MR. SADEGHI:
Q And have you taken any measures to prepare for that testimony other than the trip to PARSA, the discussions with counsel, and review of the materials we've discussed today?
A No, not to my knowledge. That's everything.
Q Have you prepared any sort of documentation, notes, or any summary of what you intend to

Page 128

present on science day?
A No.
Q Have you considered whether you will use a PowerPoint deck or other presentation material or demonstrative of any kind?
A No.
Q Sitting here today, you don't know whether you will or not?
A Correct.
Q Just give me a minute. Trying to cut things out.
Are you aware of any contrary evidence that would suggest certain flushable wipes are flushable that you considered and rejected?
MR. REICH: Objection.
THE WITNESS: That I considered and rejected. Do I have evidence that there are some flushable wipes that appear to be safe and do not impair plumbing or sewer systems or treatment systems? I don't think I followed your question.
BY MR. SADEGHI:
Q Other than your review of the INDA guidelines, have you reviewed any information from the perspective of the nonwoven industry as to

Page 129

whether any nonwoven products are safe for sewer and septic systems?
MR. REICH: Objection.
THE WITNESS: Yes.
BY MR. SADEGHI:
Q What information have you reviewed?
A Their public web page on flushability.
Q Which public web page? The INDA web page?
A Yes.
Q Anything else?
A Not that I recall.
Q And other than the complaint, you haven't reviewed anything filed in either the Kurtz or Belfiore litigations?
A Just I had to sign a nondisclosure -- it was like a nondisclosure agreement to receive some information, and that looked like an official court document. But just that and the complaints.
Q You haven't reviewed anything submitted by any of the defendants; is that right?
A Just the complaint.
MR. SADEGHI: Go off the record for two minutes.
(A break was taken at 12:59 p.m.)

(Back on the record at 1:06 p.m.)
BY MR. SADEGHI:
Q Dr. Zitomer, you haven't done anything to assess the municipal pump test, have you?
A No.
Q So you have no opinion about its parameters sitting here today?
MR. REICH: Objection.
THE WITNESS: Correct.
BY MR. SADEGHI:
Q Just to clarify, you understand the term "nonwoven" that's been used throughout the testimony refers to both flushable and nonflushable wipes, correct?
A Yes.
Q Turning to Dr. Kurtz specifically, you said you reviewed the complaint and saw that he alleged that he used two different products, a Cottonelle product as well as a Kirkland Signature product?
A Yeah, I didn't say that, but --
Q Do you recall that?
A No, but I believe you.
Q Do you have any -- strike that.
Were you aware that he testified that

prior to his first clog alleged in the complaint, he was also flushing baby wipes?
MR. REICH: Objection.
THE WITNESS: No.
BY MR. SADEGHI:
Q Do you have any basis to assess what the cause of his clogs were?
A Just the information in the complaint.
Q And were you aware that he retracted some of the allegations in the complaint or testified that they were inaccurate?
A No.
MR. REICH: Objection.
BY MR. SADEGHI:
Q You wouldn't form an opinion -- strike that.
You haven't formed an opinion as to what the actual cause of Dr. Kurtz's clogs were based only on the complaint, have you?
A Correct.
Q So you have no opinion on what actually caused his clogs?
A Right now, no, other than what's in the complaint.
Q I have no further questions.
EXAMINATION

BY MS. HENN:
Q Good afternoon, Dr. Zitomer.
A Hi.
Q My name is Emily Henn. I'm from the law firm of Covington & Burling, and I represent the Proctor & Gamble Company in the Belfiore case.
Thank you for your patience today. I have just a few additional questions for you.
Could you pull up Exhibit 1, which is your CV?
A Sure.
Q The first page describes your fields of specialization; is that correct?
A Yes.
Q I just wanted to talk about those for a moment. There are four fields of specialization listed. The first is anaerobic biotechnology.
What is anaerobic biotechnology?
A That's the use of microbes in the absence of oxygen to treat wastes.
Q Where does anaerobic biotechnology typically occur when we talk about a sewerage system or sewerage treatment?
A So for a municipal sewerage treatment system,

it occurs to stabilize the solids that settle out of the wastewater.
Q And where does that occur?
A At the treatment plant.
Q The next field you list on your CV is renewable energy.
Can you describe what your specialization is in renewable energy?
A It relates to anaerobic biotechnology. Anaerobic microbes produce biogas that contains methane, and that methane can be used as a renewable energy source.
So we do work to look at maximizing that biogas production and how -- the best condition you can utilize it for energy.
Q And those processes that you look at, do those also occur typically at the treatment plant?
MR. PLOSKY: Objection.
THE WITNESS: Yes.
BY MS. HENN:
Q The next area -- field of specialization that you list on your CV is biological wastewater treatment.
What is biological wastewater treatment?
A It's the use of microbes in contact with

wastewater to remove pollutants.
Q It sounds similar to anaerobic biotechnology. Is that --
A Yes, anaerobic biotechnology is a subset of biological wastewater treatment.
Q Where does biological wastewater treatment take place?
A At the treatment plant.
Q And the last field of specialization looks perhaps less relevant to the case, but what -- can you just describe your specialization in international development, slash, service learning and engineering?
MR. PLOSKY: Objection.
THE WITNESS: Yeah, I work on different projects internationally for people in need, with students, to develop public systems for their use. Within that there is a learning component for the domestic students to learn about other cultures and situations around the world.
BY MS. HENN:
Q Dr. Zitomer, other than the testing that you described occurred at the PARSA facility, have you been involved in any testing of Proctor &

Gamble's Freshmates product?
A No.
Q Have you seen any such testing other than at the PARSA facility?
A No.
Q Are you familiar with how Proctor & Gamble's Freshmates product is constructed?
A No.
Q Are you familiar with the components of Proctor & Gamble's Freshmates?
A No.
Q In your prior testimony you used the word "cellulosic"?
A Cellulosic.
Q Cellulosic. Thank you. Can you describe what that word refers to?
A Paper.
Q What is a cellulosic material made out of?
A Cellulose.
Q What is cellulose?
A Cellulose is a carbohydrate that's a constituent in plants.
Q Are you familiar with how Proctor & Gamble's Freshmates product is designed to disperse?
A No.

Q The mechanism by which it's designed to disperse?
A No.
Q Are you familiar with the difference between the construction of Proctor & Gamble's Freshmates and Proctor & Gamble's baby wipes?
A No.
Q Are you aware whether or not Proctor & Gamble's Freshmates are more or less dispersible than baby wipes?
MR. PLOSKY: Objection.
THE WITNESS: I'm sorry, could you repeat that?
BY MS. HENN:
Q Do you know whether Proctor & Gamble's Freshmates are more or less dispersible than baby wipes?
MR. PLOSKY: Objection.
THE WITNESS: Yeah, I would have to assume they are, but I don't have any direct proof. I haven't witnessed it, but...
BY MS. HENN:
Q And just to clarify, you would have to assume that they are what?
A That there's a difference in their

dispersibility.
Q And do you know which -- whether Proctor & Gamble's Freshmates would be more or less dispersible than baby wipes?
A I would assume if they're marketed as flushable wipes that they would be more dispersible than baby wipes, which are not marketed as flushable.
Q Do you have any basis, other than the one you've just given, for assuming that they're more dispersible?
A No.
Q Are you aware of how the Proctor & Gamble's Freshmates product performed under the GD3 tests we've been discussing today?
MR. PLOSKY: Objection.
THE WITNESS: It may be one of the wipes that we tested in Plainfield. So I would have to review that video and see.
BY MS. HENN:
Q And other than the testing in Plainfield, are you aware of how Proctor & Gamble's Freshmates performed under GD3 tests?
A No.
Q And as you've described, the full panoply of

Page 138

GD3 tests were not performed at PARSA; is that correct?
A Correct.
Q And the tests that were performed were not performed to the specifications of the GD3 tests?
A Correct.
Q Are you aware of any incident in which Proctor & Gamble's Freshmates product caused a clog in a household plumbing system?
A I would have to review the complaints and see if that was one of the ones cited. It may have been.
Q Other than the complaints, other than what you've read in the complaints, do you have any information about Proctor & Gamble's Freshmates having caused a clog in a household plumbing system?
A No. Not right now, no.
Q And Mr. Belfiore is the individual who has brought claims against Proctor & Gamble.
Are you aware of that?
A Yes.
Q Are you offering an opinion on the cause of any clogs experienced by Mr. Belfiore?

Page 139

A That's not my plan, no.
Q And you wouldn't offer an opinion based on what you read in the complaint, would you?
A No, not a professional opinion based on -- in that context, no.
Q Would you provide any opinion to the Court? You said, "not a professional opinion," but would you provide any opinion to the Court, based on what you read in the complaint, about the cause of Mr. Belfiore's clog?
A I would have to review the complaint. I'm not sure. Probably not.
Q You've testified today about information you have heard about clogs or other problems caused by nonwovens; is that correct?
A Yes.
Q And you also testified that you're not aware of a methodology for determining whether a clog associated with nonwovens was caused by flushable -- wipes labeled "flushable" or wipes not labeled "flushable"; is that correct?
MR. PLOSKY: Objection.
THE WITNESS: I believe when we had that question come up, I said a methodology

Page 140

could be developed, and it would take some time, such as marking a so-called flushable wipe and seeing if a clog developed and if it was in there. But existing right now, no, I can't give you an exact methodology to do that.
BY MS. HENN:
Q And so sitting here today, you don't know whether the clogs that you've heard about were caused by nonwovens labeled "flushable" or labeled non --
A Correct.
Q -- or not labeled "flushable"?
A Correct.
Q Have you ever been involved in any field tests related to nonwoven wipes?
A Just the testing I observed at Plainfield.
Q And how do you understand the term "field tests"? I just want to make sure we're talking about the same thing.
A Yeah, I was going to ask you, what do you mean by field tests? Let me just say the only testing that I observed of so-called flushable wipes was what I observed at Plainfield.
Q Okay. I do not have any further questions.

Page 141

Thank you very much, Dr. Zitomer.
A Thank you.
EXAMINATION
BY MR. MIZGALA:
Q I do have just a few based upon that. Doctor, on science day are you going to testify as to how Kimberly-Clark flushable moist wipes are designed, constructed, or manufactured?
A No.
Q Are you going to testify as to the technology used in the design for dispersibility of Kimberly-Clark flushable moist wipes?
MR. REICH: Objection.
THE WITNESS: I'm sorry, could you repeat that?
BY MR. MIZGALA:
Q So are you going to testify as to how Kimberly-Clark flushable moist wipes are designed to disperse?
A No.
Q Okay. And besides Mr. Kurtz's complaint, are you aware of any other claims from a residential user that Kimberly-Clark flushable moist wipes caused a clog?
A I would have to look back at the web page and

then the information I looked at. I don't recall the exact brand that was talked about.
Q Can you think of any while you're sitting here?
A No.
Q And are you going to testify as to the cause of -- on science day as to the cause of Mr. Kurtz's alleged clogs?
A No.
Q Okay. Done.
MR. REICH: No questions on plaintiffs' side.
(Deposition concluded at 1:21 p.m.)

I, Sarah A. Hart, RPR/RMR/CRR and Notary Public, do hereby certify that the preceding deposition was recorded by me and reduced to writing under my personal direction.

I further certify that said deposition was taken at Peterson, Johnson & Murray, 788 North Jefferson Street, Suite 500, Milwaukee, Wisconsin, on the 10th day of June, 2015, commencing at 9:47 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office on this 14th day of June, 2015.

______________________________

SARAH A. HART, RPR/RMR/CRR
Notary Public

My commission expires September 27, 2015.

**A**
**able** 41:15
**absence** 132:20
**academic** 13:10
**acceptable** 77:6
**accepted** 16:2 56:19,23 57:14 76:8 77:9,11
**accessible** 62:24
**accurate** 82:19,20 82:21 105:4
**achieve** 8:21
**action** 1:4,9 3:11 3:12 102:17,17 143:15
**actions** 28:19
**activated** 9:2,3 110:7,8,10,21,21 110:23
**actual** 131:17
**add** 53:22
**added** 37:20
**addition** 51:14 69:8
**additional** 132:8
**address** 34:16 73:16 78:14 127:10
**addresses** 77:3 118:16
**adequately** 73:21 74:9,18,25 75:4 75:10,20,25 77:2 81:10 82:11 118:18
**adjustments** 83:19 84:3,5
**Adversaries** 93:3 94:22
**aeration** 113:6
**aerators** 113:6
**aerobic** 76:22 99:11
**affect** 53:25 81:3
**affixed** 143:17
**afraid** 23:24
**afternoon** 132:2
**Agencies** 31:3 58:14
**agitation** 56:20,22
**ago** 27:22 42:23 48:22
**agree** 17:9,21 19:4 26:21 35:5 44:3 84:7
**agreed** 79:23
**agreement** 38:6 44:12,14,15 45:14 45:15 66:19 68:9 73:8,9,10 129:16
**ahead** 5:15 27:25 31:25 64:19 88:22 109:6
**air** 14:13
**al** 1:6 87:9
**allegations** 103:23 105:3 131:10
**alleged** 130:18 131:1 142:8
**Allies** 93:3 94:22
**alternative** 124:2
**alternatives** 83:20 84:12 85:9,15,20
**American** 58:14 87:19 90:7
**amount** 7:18,19 17:7 56:22 59:25 117:22,24 121:7 121:10,13 123:1
**anaerobic** 63:24 76:21 99:14 113:15 132:17,19 132:22 133:9,10 134:2,4
**analysis** 114:18 116:12 125:19,25
**annual** 21:4
**anonymous** 48:4
**answer** 5:14 9:23 9:23 107:14 113:10
**answered** 22:7
**Anthony** 1:8 2:7 11:17
**anybody** 100:20
**apart** 108:4
**apparatus** 50:4 70:2
**appear** 128:18
**appears** 17:23
**Appendix** 89:10
**application** 113:24 113:25
**applications** 82:24
**approached** 27:17
**appropriately** 18:18 57:1
**approximate** 122:24
**approximately** 40:4 47:23 82:17
**April** 29:4,8,9,10 36:25 41:15,18
**APWA** 58:14
**arbitrary** 54:6
**arbitration** 72:2,4
**area** 14:7 15:8 64:6 133:21
**areas** 14:25 40:17
**article** 96:14
**articulated** 57:12
**aside** 127:1
**asked** 17:25 18:9 28:10 29:14 30:4 40:24 48:18 56:15 91:22 101:19 124:13 127:10
**asking** 72:22 101:18
**asks** 66:1
**assess** 27:11 80:25 106:13 107:7,18 107:20,21 108:7 108:23 109:2,10 109:14 119:2 122:16,22 123:14 123:17 124:8 130:4 131:6
**assessed** 56:3 119:17
**assesses** 81:1
**assessing** 3:15 89:3 108:16
**assessment** 119:20 120:1
**assist** 27:18
**assisted** 51:9
**associate** 21:14 106:23 126:2
**associated** 107:8 139:19
**association** 13:19 31:2 34:3 48:3 58:13,15 94:19 95:4 96:1
**assume** 24:6 48:16 103:25 104:2,4 136:20,23 137:5
**assuming** 67:19 137:10
**attached** 89:19
**attend** 125:2
**attended** 58:1
**attention** 118:15
**attorney** 143:11,13
**attorneys** 38:19,22 38:22 39:10,12
**attributed** 49:12
**audio** 70:6
**AUSTIN** 2:12
**availability** 44:23
**available** 18:23,24 43:23 73:2 126:11
**Avenue** 2:8
**average** 114:8,13
**avoid** 101:18
**award** 13:18,20
**aware** 24:1 26:25 27:5 80:6 86:17 98:25 99:4,8 100:22 109:13 114:11 126:6 128:12 130:25 131:9 136:8 137:13,22 138:8 138:22 139:17 141:22
**a.m** 1:20 63:11,12 143:9

**B**
**B** 2:17 3:7 83:16,22
**baby** 10:12 12:7 25:7 36:18 60:22 102:24 103:4 131:2 136:6,10,17 137:4,7
**back** 10:10 14:4 20:22 22:7 27:21 36:21 59:4 63:12 66:9 71:19 72:22 81:9 94:14,15 101:11 117:8 118:15 130:1 141:25
**background** 30:1 30:19 42:4,9
**ballpark** 37:21,24 111:15,19
**base** 117:10
**based** 15:20,21 52:9,9,11 74:11 75:12 102:10,16 109:13 119:21 122:15 125:11 131:18 139:2,4,9 141:5
**basis** 68:23 107:7 114:3 118:10 119:2 122:15,22 123:13 131:6 137:9
**bathroom** 36:9
**Bay** 31:10 33:25 118:6
**behave** 9:7,16 10:5 79:4 100:14
**behavior** 15:17
**Belfiore** 1:8 2:7 3:12 11:17 28:18 38:15 39:10 67:23 67:24,25 68:8 69:20 87:9 99:2 129:14 132:6 138:20,25

**Belfiore's** 139:10
**belief** 104:13
**believe** 17:15 18:3 31:16 40:24 41:21 41:22,24 44:6,6 44:11 49:6 50:10 51:6,19 65:2,11 65:22 69:5 79:5 92:16 94:3,11 97:23 104:9,11 110:2,18 118:23 122:11 130:23 139:24
**believes** 48:13
**bends** 82:23 98:20 120:22
**best** 42:3 123:5,14 123:18 133:14
**big** 52:2
**bill** 69:2
**billed** 38:12,20 39:16
**billing** 38:3 39:15
**bills** 68:25
**biodisintegration** 99:11,14
**biogas** 133:10,14
**biological** 6:25 15:14 133:22,24 134:5,6
**biosolids** 112:1
**biotechnology** 132:18,19,22 133:9 134:2,4
**bit** 16:23 24:17 46:8,25 101:20
**blanket** 32:20
**Bob** 47:15
**book** 90:12,14,18 92:17 95:7,18 97:6,13,15
**bottom** 28:12 45:16
**bowl** 55:12 82:10
**box** 52:10 53:4,6 59:15 60:1 75:10 75:16,17,20 76:20 81:14 82:5 98:2 118:20,24 120:6 120:17,23,24 121:8 122:23
**brand** 27:3 142:2
**break** 38:7,10 63:10,11 101:10 129:25
**breaks** 39:6 75:15
**briefly** 36:24 42:5
**broken** 105:19 106:1
**Brooklyn** 10:17 70:18
**brought** 42:10 138:21
**brown** 36:9,13
**build** 105:2
**Burling** 2:21 132:5

**C**

**C** 2:1
**calculate** 53:23
**California** 2:22
**call** 6:16 41:9,15,17 41:20,21,23,23,24 42:2 43:14 44:2,5 44:7,10,11 45:2,5 47:1
**called** 4:2 47:7 118:25
**calls** 39:12,15 45:9
**camera** 55:24
**caps** 47:10 52:21
**carbohydrate** 135:21
**carries** 45:17
**carryover** 29:2
**case** 3:23,23 37:3 37:19 38:15,16 39:10 42:5 62:12 69:1 71:14 88:14 90:23 93:9 99:22 100:2 104:21 105:2 132:6 134:10
**cases** 38:8,11 39:13 66:16,22 94:20 95:5 96:2 97:12 104:8
**catch** 56:5
**categories** 122:4
**category** 70:8
**caught** 56:13
**cause** 14:25 18:19 79:8 105:15 108:8 108:16 109:11,14 109:20 113:1,2,3 113:25 126:1 131:6,17 138:24 139:10 142:6,7
**caused** 103:16 104:6 105:6,21,25 106:3,6 108:8 109:3,19 131:20 138:9,17 139:15 139:19 140:10 141:24
**causes** 6:5 32:22 57:2 80:8 105:18 105:18,19,20
**causing** 22:23 32:4 34:13,14 48:11
**cellulose** 135:19,20 135:21
**cellulosic** 102:9 135:13,14,15,18
**Central** 13:18 34:2
**centroid** 53:24
**certain** 9:22 83:18 84:2 128:13
**certainly** 91:24 93:12 114:9
**Certified** 1:22
**certify** 143:2,5,10
**cetera** 75:22
**chair** 13:16 21:2,12 21:13,13,14
**chance** 36:23 49:15
**change** 64:7
**changed** 86:18 91:2
**characteristic** 9:22
**characteristics** 8:20,21
**check** 41:22 44:9 45:7 94:2
**chemical** 7:1 15:14 102:17
**chemistry** 25:12,14
**Chicago** 2:13 31:8 33:25
**chlorine** 113:17,18
**choice** 40:12
**cited** 138:12
**civil** 1:4,9 4:13 90:8 117:25
**claims** 138:21 141:22
**clarifiers** 113:13
**clarify** 130:11 136:23
**CLARK** 1:6
**class** 97:14
**classes** 22:14,16
**clean** 31:3 58:14 117:23
**cleaning** 36:17
**clear** 49:14 52:1 53:21 54:22 76:18 82:16
**clearance** 52:7 53:4 53:9 55:13 82:10 97:23 120:19
**cleared** 54:11,15,20
**client** 19:11,13,15 20:3,8,15 30:7 42:14,17 48:4
**clog** 17:5,10 23:24 79:24 81:4 103:15 104:22,24 105:6 108:6,8,9,12,14 108:16,21,23,24 109:1,3,18 112:21 112:22 113:1,7,13 113:13,15,15,16 113:19,21 125:24 126:10 131:1 138:9,17 139:10 139:19 140:3 141:24
**clogged** 5:17 104:12 108:4 118:2
**clogging** 22:23 34:14 49:7,7 76:25 106:13,14
**clogs** 10:25 12:18 24:4 35:20 49:25 79:8 80:8 103:18 104:5 105:13,18 105:18,19,20,21 105:25 106:3,6,9 106:22 107:7 108:4 109:11,15 113:2,5 118:13 131:7,17,21 138:25 139:14 140:9 142:8
**coarse** 112:25
**cognizant** 15:13
**colleagues** 21:19
**collect** 46:14,20
**collection** 35:14 50:10,11,18 55:3 80:18 94:24,24
**combination** 111:24
**combinations** 111:4,11,12
**Combined** 28:18
**come** 15:23 50:14 50:17 82:25 91:4 109:1 139:25
**comes** 35:16 106:11
**comfortable** 111:7
**commencing** 1:19 143:9
**comment** 64:11,14 64:18 72:5
**comments** 73:4
**commission** 143:23
**committee** 21:3,13 21:15 22:20 48:8 48:8 58:4,6,8,10 58:12
**committees** 57:23
**committee's** 58:18
**communicated**

32:17
**communications** 69:12,16,22,23
**community** 56:24
**companies** 96:12
**company** 1:11 2:20 63:15,18 87:10 93:18 94:12 96:11 96:12,13,21,22 132:6
**compare** 103:9
**compared** 75:1
**compensated** 43:2
**compensation** 68:22,24
**complaint** 4:21 5:7 11:2 12:5,19 67:23,24,25 68:1 68:8 69:21 103:19 103:21,24 104:5 105:4 129:12,22 130:17 131:2,8,10 131:18,23 139:3,9 139:11 141:21
**complaints** 39:17 66:24 104:19,20 129:19 138:11,14 138:15
**compliance** 64:16
**complies** 44:21,25
**component** 35:13 134:19
**components** 135:9
**concern** 22:22 23:3
**concerning** 66:2,15 66:21 69:12,15
**concerns** 23:2 32:1
**concluded** 142:13
**concluding** 1:20
**conclusions** 71:4
**concurred** 60:12
**condition** 56:7 133:15
**conditions** 73:22 74:9,19,25 75:5 75:11,20 81:11,18 82:12 83:22 84:15
85:3 118:18 122:17 123:5,14 123:18 124:10
**conduct** 90:3
**conducted** 89:24 89:25 114:18 123:8 125:19
**conferences** 21:22
**confidential** 19:17 20:9 64:12
**confidentiality** 68:9
**configuration** 115:14
**connection** 66:4,18 70:2,3
**connections** 73:24 75:22 84:17,22
**consensus** 77:13
**consider** 8:2 126:13,16,21 127:1
**considerable** 122:25
**consideration** 93:13
**considered** 71:3 128:3,14,16
**considering** 16:5
**consistent** 29:6 55:14 93:10
**constituent** 135:22
**constituents** 15:14 102:10
**constraint** 60:11
**constructed** 135:7 141:8
**construction** 4:13 7:14,16 90:9,17 90:22 91:18 92:2 102:23 125:5 136:5
**consultant** 4:15
**consulting** 19:18 20:5 63:14
**consumer** 33:9,10 33:18 96:14
**consumers** 23:10 23:11 33:3,13,17
**contact** 113:17,18 133:25
**containing** 15:25
**contains** 133:11
**contaminated** 14:13
**context** 98:15,16 139:5
**contracts** 66:3,17
**contrary** 128:12
**Control** 97:5
**convenient** 29:14
**conversation** 38:18 48:20,22
**conversations** 38:21 39:9 78:21
**conveyance** 73:25 73:25 84:17,20,22 85:4 89:15 92:7 94:24 117:2 119:3 119:4 122:18 123:15 124:10
**copies** 28:3 65:9
**copy** 14:2 37:9 65:8 96:6
**corollary** 78:9
**Corporation** 1:6 2:11,16 101:16
**correct** 6:20 7:22 8:6,7 11:12,16 12:22,25 13:5 14:18 17:14 20:18 22:2 23:11,22 29:13,19 30:12,13 32:10 33:21,23 35:23 38:2,5 39:1 39:8 41:7 42:15 44:18 45:3 46:1 47:5,6,11,12,13 48:15 49:21 50:20 50:22 51:11,16 52:19,22 53:11,12 54:15 55:5 57:6 62:2,3,5 64:6 65:13 68:3,18
70:23 73:11 77:23 77:24 79:25 80:1 83:12,17 85:8,11 85:12 87:10 88:1 88:2,10 89:16 90:13,20 91:8,10 92:9,16 93:17 94:25 95:9 97:1 100:4 102:20 106:20 108:9 109:12 111:23 115:20 119:1 120:21,22 123:3,6 124:6 125:18,21 126:12,15,18 127:9 128:9 130:9 130:14 131:19 132:13 138:2,3,7 139:15,22 140:12 140:14
**correctly** 74:2
**corresponded** 60:24
**correspondence** 61:11
**Costco** 2:16 19:21 25:1,18 101:15 103:10
**costing** 22:23,24
**costs** 32:4 34:15 104:10
**Cottonelle** 10:3 130:19
**counsel** 3:10 27:18 28:8 38:3 45:3 46:18 65:15,21 67:17 68:5,14,15 69:14,17 72:12 97:18 127:21 143:11,13
**country** 31:4 35:7
**County** 95:22
**couple** 69:18 72:23 93:8
**course** 108:20
**court** 1:1 20:12 70:23 73:16 74:4
78:14,15 104:3 124:19,24 125:4 127:7,15 129:18 139:6,8
**cover** 22:25
**covered** 101:22
**covers** 15:9
**Covington** 2:21 132:5
**created** 48:14
**criteria** 18:13,15
**cultures** 134:20
**current** 13:11 14:6 73:17 78:4,16 79:6 82:8 83:19 85:14,21 86:5 118:17
**currently** 17:20 18:23
**curriculum** 3:9 13:10
**cut** 128:10
**CV** 3:22 13:22 19:1 19:5 132:10 133:5 133:22
**Cynthia** 31:16,20 92:20 93:2,14 94:11

**D**

**D** 1:3 2:2 3:1
**damage** 6:6,8 14:25 15:15 18:19 57:2 104:10
**Daniel** 1:16 4:2,10
**data** 80:18,21 114:25
**date** 37:18
**dated** 29:4 36:24 95:21
**David** 4:19,20 10:11 92:21 94:10 100:23
**day** 1:21 3:13 29:21 45:12 49:17 52:6 67:15 70:11,17 72:14 91:24

105:8 123:25 124:8,16,21,23 127:11 128:1 141:6 142:7 143:8 143:18
**days** 41:2,5 69:5 91:7,9
**deal** 57:15 63:21,24 64:2,8,13,15 88:8
**Dearborn** 2:13
**debris** 113:4
**decided** 65:12 79:9
**decision** 60:7
**deck** 128:4
**Defendant** 1:7,12 2:11,16,20
**defendants** 1:17 129:21
**define** 6:1 14:9 84:4
**defined** 15:19 44:18
**definitely** 87:19
**definition** 15:20,24 16:6,7,13,15,24 40:24 41:1,3 56:23 57:5,9 127:4
**definitions** 16:11
**degradability** 76:21,23
**degradation** 63:25
**demonstrative** 128:5
**depending** 111:6 111:24 114:17
**depends** 6:11 38:18 54:23 91:12 115:14
**deposition** 1:15 5:1 12:1 14:3 37:13 37:25 40:1,15 71:12,18 109:25 142:13 143:3,5
**describe** 20:4 110:15 133:7 134:11 135:15
**described** 112:4 134:24 137:25
**describes** 132:12
**design** 7:18 8:22 14:12 15:10,11 90:9,16,21,22,25 91:18,22 92:1,6 141:11
**designated** 49:16
**designed** 25:11 76:5 102:11,16 135:24 136:1 141:8,19
**deterioration** 56:9
**determine** 5:23 60:15 74:25 78:5 78:17 80:5 83:23 114:3
**determining** 139:18
**develop** 107:22 108:19 134:17
**developed** 16:13,16 109:10 140:1,3
**developing** 124:1
**development** 108:24 134:12
**deviate** 59:21
**differ** 8:14 25:6 79:14
**difference** 102:22 136:4,25
**differences** 25:16 25:23 26:9,22,25 27:5 56:12 79:15 81:2
**different** 7:12,12 7:13,13,15,17,22 8:15,23,24 9:6,8 9:12,17,20 10:4 16:11,25 18:7 26:10,23 38:12 56:17 57:11,24 78:10 79:1 91:9 110:1,15,17 111:4 111:13,15,21 112:20 114:15
115:18,22,23,24 115:25 119:11,12 130:18 134:16
**difficult** 119:11
**digested** 113:23,23
**digester** 113:15,15 113:22
**direct** 105:15 136:20
**direction** 143:4
**directly** 48:18 110:7 125:16 143:14
**disagree** 48:23
**discharged** 7:2
**discuss** 20:17 22:15 29:23 30:9 34:3 40:14,17,22 45:22 46:9,13,17 47:24 49:19 57:20 58:25 60:10 119:23
**discussed** 42:2,4 44:10 45:11 46:25 48:17 125:24 127:22
**discussing** 44:23 48:1 118:20 137:15
**discussion** 20:15 45:15 52:4 57:21 59:5 74:12 122:9 122:10
**discussions** 20:7 21:7,10,18 22:18 22:21 31:14,20 34:8,11 57:17 117:11 118:5,10 125:11 127:14,21
**disinfection** 113:19
**disjointed** 101:23
**disperse** 17:6,7 25:11 102:11,16 117:1 135:24 136:2 141:19
**dispersed** 18:1
**dispersibility** 26:22 27:12 56:3,16,18
60:16 64:13 75:19 76:19 103:9 116:16,21 137:1 141:11
**dispersible** 17:1,4 18:6,11 26:16,18 26:20 103:3 136:10,16 137:4,7 137:11
**dispersion** 54:13 59:10 76:1 81:15 81:16 95:22
**display** 56:6
**disposable** 3:15 29:25 30:2 89:4
**disposal** 112:1,1
**dispose** 108:2
**disposed** 113:5
**dispute** 48:24
**distinct** 111:15
**District** 1:1,2 31:6 31:8,9,10 33:7 95:22
**district's** 33:7
**doc** 27:23
**Doctor** 4:8 6:2 13:8 14:6 17:9 18:5 19:1 20:19 23:13 24:8 26:9 27:9,17 28:7 35:5 41:9 63:14 64:23 72:11 81:9 83:18 84:7 85:1,18 86:17 87:1 88:25 90:6 90:15 101:14 141:5
**document** 61:22 89:6,11 96:3,8 104:3 129:18
**documentation** 106:22 127:24
**documents** 3:9 28:2,7 46:13,20 64:24 65:2 66:2 66:15,21 68:4,21 69:6,12,15,25 70:1 71:3 99:19
99:20 100:2
**doing** 54:1 57:23 58:18 93:16
**Dolphin** 2:22
**domestic** 134:19
**DOWD** 2:3
**Dr** 2:2 3:10,11,13 130:3,16 131:17 132:2 134:23 141:1
**draft** 44:15 73:4
**drain** 12:24 53:4,9 55:12 82:10
**dried** 121:4
**Drive** 2:22
**drop** 82:20
**dropped** 108:22
**du** 118:6
**duly** 4:3
**duplicate** 97:2
**duration** 118:24 120:7 121:23 122:1

**E**

**E** 2:1,1 3:1,3,7,20 3:20 71:6
**earlier** 14:23 15:19 16:15 33:12 41:4 47:3 51:15 56:15 65:11 79:23 115:18 116:15 125:24
**easier** 52:5
**EASTERN** 1:2
**EDANA** 52:20 89:5
**edition** 3:16 52:18 53:14 89:4 95:13 95:15 97:20
**Editions** 95:16
**education** 13:21,21
**efficient** 101:9
**effluent** 7:1 8:20 112:1 113:20,21
**ehenn@cov.com** 2:23
**eighth** 96:25

**either** 10:23 11:1,4 11:6 20:12 22:3 24:9 29:21 80:14 84:8 98:22 99:6 112:25 113:24 129:13
**Elberon** 10:20
**elbows** 82:22
**electronic** 67:1,6 67:10
**email** 3:12 27:24 29:2,5 36:22 43:15 45:17 61:15 67:17,19 72:11
**emailed** 61:5 73:3
**emails** 69:19 72:24
**Emily** 2:21 132:4
**employee** 143:11 143:12
**energy** 133:6,8,12 133:15
**engaged** 48:7
**engineer** 4:16 15:22 104:4
**engineering** 4:14 4:15 14:8,10,11 42:12 95:8 134:13
**engineers** 33:17 90:8
**entails** 71:1
**entered** 66:3,17
**enters** 112:8
**entire** 77:11
**entirely** 125:11
**entitled** 95:7
**entry** 94:16 96:25 97:4
**Environment** 13:17,19 21:3 34:2 58:12
**environmental** 4:14 14:8,9,11 42:12
**equal** 48:14
**error** 73:8
**ESQUIRE** 2:3,8,12 2:17,21
**essentially** 57:13
**et** 1:6 75:22 87:9
**evaluating** 108:23
**event** 104:22
**events** 57:24
**Eventually** 54:23
**evidence** 105:2,11 109:17 117:20,25 118:3 128:12,17
**evidenced** 117:14
**evolved** 86:19
**exact** 62:25 84:4 104:9 140:5 142:2
**exactly** 30:18 60:20 103:21
**EXAMINATION** 4:6 101:12 131:25 141:3
**examined** 4:4
**example** 75:8 84:18 102:18 112:21
**examples** 8:24 26:17 110:19 112:15,17
**excess** 113:4
**exclusively** 126:10
**Excuse** 30:3
**exemplar** 17:13
**Exhibit** 3:8,9,9,10 3:11,12,14,15 13:6,8 27:25 28:5 64:20 65:1,19 66:1,5,20,21 68:6 72:9,11,23 73:12 86:24 87:1 88:22 88:23,25 89:2,9 90:6 99:20 118:15 132:9
**Exhibits** 64:21,23
**existing** 109:1,3 140:4
**exited** 54:12
**expect** 70:15
**expected** 40:16 72:13
**experience** 19:7 23:20 24:9,13,18 24:21 42:4,13 55:8 83:14 104:24
**experienced** 73:22 74:19 75:5,11,21 81:18 82:12 83:22 118:18 138:25
**experiences** 34:19
**experiencing** 49:4
**expert** 25:13 71:21 79:16 126:13,16 126:21 127:2,4,7
**expertise** 8:18 14:7 15:7 42:11 109:13 122:16
**expires** 143:23
**exposure** 75:9
**express** 60:10 104:14 105:8
**extends** 15:17
**extensive** 42:18
**extent** 33:16 125:2
**extra** 22:24 32:4 34:15,15,15
**E-D-A-N-A** 52:20 89:5

**F**

**fabric** 105:1
**facilities** 50:2,5,7 94:25 115:11
**facility** 50:3,8,19 114:5,21 119:8 134:24 135:4
**fact** 63:22 109:18
**fair** 87:16
**falls** 70:7
**familiar** 110:11 118:21 135:6,9,23 136:4
**familiarity** 126:19
**family's** 10:12,14 12:6,9
**far** 57:9 118:12
**fax** 37:15
**feces** 17:19 78:24
**Federation** 13:17 21:4 58:13
**feed** 63:9
**feel** 33:8
**Feminine** 36:15
**FG501** 97:21
**FG502** 98:2
**FG503** 98:4
**FG504** 98:6
**FG505** 99:11
**FG506** 99:14
**FG507** 99:16
**field** 98:21,22 133:5,21 134:9 140:15,18,22
**fields** 132:12,16
**fifth** 94:16 95:2
**filed** 4:20 129:13
**fill** 44:15
**filter** 110:24
**filters** 9:5 110:9
**finalized** 45:14
**finally** 41:14
**financially** 143:13
**fine** 60:13
**finish** 113:9
**Finley** 31:16,18,21 92:20 93:2,14
**Finley's** 32:16,18
**firm** 38:19,20 132:4
**firms** 46:12 69:3
**first** 4:3 27:17,24 29:5 40:12 49:22 74:15 87:3,22 91:1 117:19 131:1 132:12,17
**five** 51:18 60:6,7 121:22
**flip** 28:24
**float** 90:25
**floatables** 113:4
**floating** 113:4
**flow** 7:19,19,19,20 84:23 120:20
**flows** 50:12 90:24 91:9
**flush** 54:25 76:17 82:17
**flushability** 3:15 16:10,12 17:13 19:12 20:5 26:9 26:25 27:11,12 39:20,21,22 48:9 52:8,17 56:16 57:10,24 58:5,21 61:4 64:5,7,9 73:20 75:12 76:1 76:15 83:4 89:3 91:16 129:7
**flushable** 5:6,9,16 5:17,21,24,25 6:1 6:3 9:7,12,16,21 9:24 12:4 14:15 14:24 15:19 16:3 16:4,7,23 17:8,16 17:21,22 18:4,6 18:10,22 19:2,8 20:19 21:7,18 22:4,9,15,19 23:13 24:10,14,19 24:22 25:1,3,17 26:10,23 27:12 30:2,3,7 31:13,15 31:21,22 32:2,3,9 32:14,14 34:1,3 35:1,4,6,13,22 36:2 40:22,25 47:25 48:10,14,19 49:12 53:21,24 56:24 60:18,19 63:16,22 64:4 72:6 74:24 75:1 78:6,18,25 79:10 79:21 80:8 81:2 83:13,23 85:23 86:1 90:1,4,18 95:17,23 97:15 100:6,13 102:2,24 103:3,8,10,17 105:1,6 107:9,11 108:1,5,6 109:4 109:20 126:2,17 128:13,14,18 130:13 137:6,8 139:20,20,21

140:2,10,13,23 141:7,12,18,23
**flushed** 6:4 18:17 18:18 35:7,9 57:1 78:2 117:18
**flushes** 54:23
**flushing** 96:15 114:19 131:2
**focus** 10:2 117:19
**focused** 120:23
**FOERSTER** 2:16
**folks** 22:18 57:15
**follow** 120:14
**followed** 9:2,4 52:13,14,23 110:6 110:9,10,20,23 120:5,11 128:20
**following** 55:11
**follows** 4:5 53:13
**Fond** 118:6
**food** 40:13
**forces** 84:21
**forgot** 68:17
**form** 100:12 131:15
**format** 40:15,19
**formed** 131:16
**forming** 71:3
**formulated** 41:2,4
**forth** 59:4
**forwarding** 69:20
**found** 36:10,14,15 84:15,21 85:3
**four** 21:15,17 94:1 94:2,7 132:16
**fourth** 97:1
**fraction** 59:23
**framework** 72:13
**frankly** 103:20
**free** 88:6
**frequent** 21:7
**Freshmates** 135:1 135:7,10,24 136:6 136:9,16 137:3,14 137:22 138:9,17
**Friday** 45:3 70:17 72:24 124:1
**full** 7:19 137:25
**fully** 88:19
**function** 6:5 18:19 57:2
**funds** 22:24
**further** 20:13 131:24 140:25 143:5,10
**future** 82:8 87:16

**G**

**Gamble** 1:11 2:20 19:25 25:25 26:5 27:7 87:10 132:6 138:21
**Gamble's** 24:22 86:8 135:1,6,10 135:23 136:5,6,9 136:15 137:3,13 137:22 138:9,16
**garage** 50:3
**gas** 111:25
**gas-release** 113:16
**GD3** 73:17,18 74:8 78:5,16 79:6 83:19 85:14,21 86:1,5,11,14 118:17,25 137:14 137:23 138:1,5
**GELLER** 2:3
**general** 22:21 40:15,19 54:19 82:3 127:13
**generally** 20:4 29:24 40:20 56:23 57:14 84:19 124:15
**gentleman** 100:23
**gentleman's** 51:13
**give** 8:24 21:25 26:17 37:21 40:18 42:18 111:14,19 128:10 140:5
**given** 10:3 22:1,3 71:13,18 116:8 119:18 123:15 137:10
**giving** 81:15
**glanced** 62:5
**go** 5:15 11:17 15:2 21:6 27:25 28:22 31:25 36:21,22 41:13 44:1,24 46:24 61:20 63:9 64:19 65:25 66:9 68:14 72:22 87:21 88:22 101:7 108:3 109:6 113:13,17 129:23
**goals** 111:6
**goes** 62:1 89:14
**going** 5:13 9:7,16 10:5,10 20:21 22:7 46:7 49:15 49:17 52:4 58:18 64:11,14,18 70:25 71:19 72:5 74:4 76:12 78:14 81:9 83:15 101:6,18 110:3 125:2 140:21 141:6,10 141:17 142:6
**good** 27:22 40:10 43:22 79:22 101:14 112:19 132:2
**gotten** 93:23
**gravity** 90:8,16,21 92:1
**gray** 64:6
**grease** 105:18,22
**Great** 12:12,21
**greater** 119:15
**greatly** 91:2 115:15 115:16 123:23
**Green** 31:10 33:25 118:6
**group** 33:12,14,15 117:13
**groups** 52:2
**guess** 26:21 71:9 79:15 111:11
**guidance** 65:16
**guide** 75:2
**guideline** 86:12 120:6 124:2,9
**guidelines** 3:15 16:10,22 39:22 48:9 52:8,13,14 52:15,17,23 53:14 53:23 54:4,6 55:11,15,17 57:10 57:24 58:5,21 59:17 60:1 61:4 62:22 63:4,7 64:17 68:12 69:20 73:18,19,20 74:8 74:12,16,17,24 75:3,4,7,8,9 76:7 78:5,16 79:6 81:19,22 82:3,6,9 83:20 85:14,22 86:2,6,9,14 87:23 88:11,12 89:3 118:17 120:12,14 120:17,19 121:6 122:8 123:10 128:23

**H**

**H** 1:16 3:7 4:2,10
**half** 7:19 121:25
**half-hour** 122:6 123:7
**half-inch** 121:3
**Hammer** 97:5
**hand** 36:9,14 143:17
**handling** 111:25
**happen** 44:5 75:6
**happening** 103:19
**happens** 75:25
**hard** 9:23
**Hart** 1:21 143:1,21
**Haso** 18:3 26:19 60:21
**health** 15:22
**heard** 139:14 140:9
**held** 1:17 51:7 56:13 59:8
**help** 51:8 124:19
**Henn** 2:21 3:5 107:14 117:6 132:1,4 133:20 134:22 136:14,22 137:20 140:7
**hereunto** 143:16
**Hi** 132:3
**high** 111:12
**history** 10:25 12:18
**Hita** 95:2
**hold** 56:6 127:6
**home** 5:18,19 10:17 10:19 12:12 54:25 77:20 126:20,22 127:2,8
**homeowner** 6:12 6:13
**homeowners** 118:1
**hookups** 7:18
**hope** 54:9
**hopefully** 25:11 28:17 48:8
**hour** 38:4 43:4 44:17 121:25
**hourly** 44:16
**hours** 37:21,22,23 40:4 42:24 59:24 75:9,13,18 81:15 114:14,16 119:6 119:15,16 120:25 121:1 126:24 127:1,5
**house** 12:16,21 83:10,10,14,16 92:7,11,11
**household** 12:24 23:16 84:15,16 98:4 99:6 138:10 138:17
**human** 17:19 74:23
**hundred** 111:18,21
**hung** 54:18
**Hwang** 95:2
**Hydraulic** 95:8
**hygiene** 36:15

**I**

**idea** 111:20 116:20
**identically** 9:8,17 10:6
**identification** 13:6 28:5 64:21 72:9 86:24 88:23
**identified** 3:8 51:15 77:16,19 96:22 100:3
**identify** 13:8 68:22 88:25 96:8,20
**Illinois** 2:13
**impact** 21:8 83:3 91:15 92:14 104:13 105:7 116:9
**impair** 112:9,14 116:10,13 117:2 128:19
**impaired** 112:5
**impairment** 6:5 18:19 57:2
**important** 8:19 76:18,20,22,23,24 77:1,22
**inaccurate** 131:11
**inadequate** 81:20 89:13,14
**incident** 138:8
**include** 84:19 94:17,18 95:3,25 96:9
**included** 92:16 110:6
**including** 36:2 66:2 66:16 70:4 71:5
**INDA** 16:10,22 39:20 52:20 57:10 58:15 59:16 64:16 73:20 89:5 120:5 120:16 122:7 123:10 124:2,8 128:23 129:8
**INDA/EDANA** 68:12 87:22 97:20
**independently** 16:14,16
**indicated** 46:11
**indirectly** 143:14
**individual** 33:13 104:22,24 106:24 111:8 119:18,20 138:20
**individually** 58:11
**industrial** 21:2 115:11
**industry** 16:2 21:9 22:22 23:4,5 32:20 34:13 74:13 74:22 76:8 77:10 77:11 78:22,23 117:12,14 118:9 125:14 127:16 128:25
**INDY** 68:12
**infinite** 111:10,11
**influent** 8:20 35:16 35:17 119:12
**inform** 100:11 124:19,24 125:4 127:14,15
**information** 31:12 45:12 61:14,16,23 84:2,19 94:21 95:6 114:11 125:1 125:23 126:6,9 128:24 129:6,17 131:8 138:16 139:13 142:1
**informed** 19:16 20:8 75:3
**inside** 12:24
**Insley-Pruitt** 44:8 47:15 60:9
**inspected** 11:3,7 12:20 13:2
**inspections** 11:10 11:15
**instance** 1:17
**instances** 104:18
**insufficient** 78:17 82:9
**intact** 59:10
**intend** 104:14
105:8 123:25 124:7 126:7 127:25
**intended** 77:4
**intentionally** 108:8
**interact** 15:15
**interested** 69:13 143:14
**interesting** 25:10 25:12 109:8
**Interestingly** 16:9
**interfere** 113:18
**international** 134:12
**internationally** 134:16
**interpretation** 32:18
**interrupt** 65:7
**introduction** 62:23
**invited** 58:8
**invoices** 3:23 68:25 69:9
**involve** 34:1
**involved** 21:9 34:7 82:2 102:1 134:25 140:15
**in-depth** 88:3,21
**ISBN** 95:14
**issue** 34:17
**issues** 21:5 44:13
**Italian** 40:11,13
**item** 3:21 87:20 117:19 118:16
**items** 13:25 115:7
**I-N-D-A** 52:20 89:5

**J**

**JAMES** 2:12
**Jamie** 95:21
**JBW-RML** 1:5
**Jefferson** 1:18 40:9 143:7
**Jersey** 5:20 10:20 24:16 47:4 120:5
**jmizgala@sidley....** 2:14
**jog** 27:23
**Johnson** 1:18 2:21 143:6
**joint** 48:8
**JOSEPH** 1:3 2:2
**judge** 75:11 76:1 78:1
**judged** 79:19
**jump** 101:20
**June** 1:21 3:16 47:12 87:8 143:8 143:18

**K**

**Kayvan** 2:17 101:14
**keep** 31:12 37:2 45:8
**Kimberly** 1:6 24:9
**Kimberly-Clark** 2:11 19:19 24:16 25:17,24 27:1,6 86:1 87:9 100:21 141:7,12,18,23
**Kimberly-Clark's** 24:10,14 86:18
**kind** 36:7 128:5
**kinds** 115:19
**kinetics** 17:5
**Kirkland** 24:19,25 25:18 26:4 27:2 86:4 102:1,6,23 102:24 103:2,4,8 103:16 105:6 130:19
**knock** 61:20
**know** 5:5 10:10,11 10:14,22,25 11:2 11:6,18 12:3,6,9 12:15,18 13:1,3 15:24 16:3 20:14 22:7 24:25 25:3,6 25:16 30:18,25 32:12 33:11 35:14 35:15 38:25 39:6 42:24 43:23 46:20 49:16,18 51:13 53:13 56:7 57:15 57:21 58:10,11,22 61:8,17 62:8,15 62:24 63:2,19 67:15,22 70:17 76:9 78:9,21 79:22 80:14,16 84:4 85:10,19,23 87:17 89:18 93:8 95:10,13 97:22 100:20,23 101:18 102:6,9,10,11,15 102:22 103:2,8,18 103:18,23,25 104:10,18,22 107:6,18,24 109:1 109:5 114:13 115:25 116:3 117:16 118:6 120:4,11 121:6,10 122:6,10 123:4,7 125:1,2,3,6,14 126:19 127:15,16 128:7 136:15 137:2 140:8
**knowing** 8:19
**knowledge** 33:1 65:24 66:23 97:17 103:15 105:15 122:5 125:10 127:23
**knows** 30:11
**ksadeghi@mofo....** 2:19
**Kurtz** 1:3 2:2 3:11 4:19,20 5:16 10:11 28:18 38:14 38:23 65:9 67:23 68:1 87:8 98:22 129:13 130:16
**Kurtz's** 131:17 141:21 142:8

**L**

**l** 73:17
**labeled** 5:25 107:9 107:10 109:19

139:20,21 140:10 140:11,13
**Lac** 118:6
**land** 113:24,25
**language** 72:17,20 73:12,13
**larger** 31:4
**lasted** 42:7
**lateral** 6:11 7:17 73:24 75:22 84:16 84:22 92:6 126:23
**laterals** 15:1 118:2
**law** 132:4
**lawyer** 104:4
**lawyers** 51:2
**laying** 51:8
**leads** 50:19
**learn** 134:20
**learned** 105:3
**learning** 134:13,19
**left** 29:16 30:14
**length** 40:16 82:19 82:20 120:21
**Lester** 41:24
**letter** 92:20,22 94:9 94:11
**let's** 10:2 11:17 24:9 27:25 29:20 32:12 44:24 61:20 61:20 63:9 64:19 65:25 73:16 87:21 88:22 124:23
**level** 122:7,23 123:4
**Levy** 41:24
**liberty** 20:16
**lies** 15:7
**limited** 66:3,17 70:5 71:5
**line** 12:24 39:13 53:4,9 55:12 82:10 91:5
**liquid** 111:24 112:6
**list** 3:14 87:7 88:4 90:6 94:18 95:3 95:25 96:9 97:10 133:5,22
**listed** 89:9 99:19 132:17
**listen** 30:15
**literature** 80:15,20 96:23
**liters** 82:17,18
**litigation** 66:2,4,15 66:18 70:3 71:22
**litigations** 129:14
**little** 16:23 24:17 30:11 46:8,24 59:9 101:20,23
**living** 4:12
**LLP** 2:3,7,12,16,21
**location** 11:1,6
**locations** 11:4 53:20
**log** 3:23 37:4,9 38:25 39:4,5,6 41:22 69:9
**logistics** 44:11
**long** 4:17 27:21 40:3,20 60:5 81:16 114:3 115:13 118:25
**look** 20:13 27:21 28:12,12 38:24 39:2,3,11 41:13 45:16 55:16 65:1 65:6 87:13,16,17 89:10 90:11 107:23 109:8 133:13,16 141:25
**looked** 19:1 35:13 59:7 80:7 87:19 88:7 89:11,17 94:15 95:16 96:11 129:17 142:1
**looking** 58:19 78:23 90:14
**looks** 29:4 36:21 41:9,14 43:13 44:1 45:1 134:9
**lot** 9:11 16:6 79:15 79:17 91:6
**lots** 24:1,4 35:9
**Louise's** 40:6
**lying** 104:1

**M**

**M** 3:3
**MADDEN** 35:24
**Madison** 118:6
**main** 39:24 41:25 42:1 81:24 82:25 125:24 126:10
**Maine** 35:20 80:17 106:12,12 107:5
**maintenance** 34:16
**major** 18:13 76:17
**making** 61:10
**Malpede** 95:21
**man** 34:15
**manage** 14:12
**management** 14:11 15:11
**manpower** 117:22
**manufacture** 117:17
**manufactured** 25:4 27:1,6,7 141:8
**manufactures** 24:25 63:18
**manufacturing** 25:13
**mark** 2:3 3:12 27:25 40:2 41:9 41:23 46:7 64:19 88:22 107:24,25 108:15
**marked** 13:6 28:5 64:21 65:18 72:9 86:24 88:23 108:5 108:22,25
**market** 63:19 81:3
**marketed** 17:20 32:13 60:19 137:5 137:8
**marking** 140:2
**Marquette** 4:14,17 22:14
**mass** 53:24
**masses** 52:25 59:23
**Masson** 43:16,17 43:18
**material** 3:14 6:3 54:13 62:10 79:1 79:10 87:7,15 92:12 97:11 98:16 119:14 120:25 121:2,3 128:4 135:18
**materials** 52:25 54:11,14 59:7 68:6,10 70:1,6 71:7 90:7,24 91:2 93:23 112:24 125:8,9 127:22
**Matt** 44:8,8
**matter** 27:19 114:19
**Matthew** 47:15
**maximizing** 133:13
**mean** 7:15,16 30:23 33:4 35:2 36:6,6 42:18 52:12 55:1 88:18 117:21 140:21
**meaning** 16:25
**meant** 18:6 59:13
**measure** 27:11 53:20 56:18,21 81:16
**measurements** 59:22
**measures** 98:12 127:19
**mechanical** 102:17
**mechanism** 136:1
**meet** 40:5
**Melville** 2:4
**member** 30:25 31:6 31:9,11 33:7
**members** 23:11 33:4,13
**memo** 95:21
**memory** 27:23 122:14
**mention** 68:17 97:15
**mentioned** 6:14,22 14:16,16,24 23:6 27:9 33:16,24 34:6 47:3 49:6 50:21 66:24 69:18 74:15 83:10 90:19 93:8 95:17 107:6 109:25 115:18 117:20 125:10 126:19
**met** 4:22 11:22 40:2,6 41:5 47:17 47:19
**meter** 63:9
**methane** 133:11,11
**method** 56:19 114:9
**methodologies** 88:9 89:25 90:4 97:19 120:6
**methodology** 62:25 89:19 107:23 108:7 109:10,14 139:18,25 140:5
**methods** 77:6 82:7 108:19
**Metropolitan** 31:5 31:8 33:6
**microbes** 132:20 133:10,25
**middle** 38:13,17
**Milwaukee** 1:19 31:5,7 33:6,25 143:7
**mind** 83:1 106:11
**minute** 51:20 101:8 128:10
**minutes** 42:8 60:6 60:8 75:17 121:23 129:24
**missing** 65:23
**mixers** 113:7,16
**MIZGALA** 2:12 3:4,5 4:7 5:4,12 7:8 9:14 10:1 11:13 13:7 14:22 16:19 20:10 22:12 24:7 25:15,22

26:3,8,13 27:16 28:1,6 32:6 33:2 34:22 35:21 36:3 37:11 41:8 43:18 43:21 46:6 49:2,9 53:8,18 54:21 55:6 59:20 60:4 62:16 63:8,13 64:22 65:10 69:8 69:11 70:14 72:10 74:10 76:4,11 80:4,11 81:8 86:22,25 88:24 91:14 93:25 99:1 99:5,10,25 141:4 141:16
**moist** 5:6,9 12:4 20:20 21:18 22:4 22:9,15,19 23:13 24:10,14,19,22 25:1,3 26:23 31:22 34:1 72:7 83:13 95:17 141:7 141:12,18,24
**moment** 71:1 132:16
**Monday** 67:13
**money** 22:24
**month** 42:20,21,22 42:25
**morning** 101:14
**MORRISON** 2:16
**mreich@rgrdla...** 2:5
**multiple** 112:11,13
**municipal** 15:2 23:8 33:17 55:2,2 77:21 99:16 105:14 109:11,15 109:18 111:22 115:19 130:4 132:25
**municipalities** 7:13 8:5 23:1 33:5,20
**municipality** 6:19 7:24,25 8:8
**Murray** 1:18 143:6

**N**

**N** 2:1 3:1,3,3
**NACWA** 29:16 30:20,22,23,24 31:1,2,7,9,11,12 31:14 32:19,24 33:3,4,8,8,14,22 39:19 58:13 74:14 77:13 92:20 93:8 117:13 118:9 125:14
**NACWA's** 31:21 93:10,13
**name** 4:8,10 18:1 51:13 101:14 132:4
**named** 100:23
**nameless** 42:14
**Nathan** 100:25 101:2
**National** 31:2 58:13
**nature** 20:4 22:21 30:9 34:10
**necessarily** 83:15
**Neck** 12:12,21
**need** 8:21 34:16 38:25 39:5,6 108:18 134:17
**never** 4:25 41:10 48:17 109:10,17 114:18 120:1
**new** 1:2 2:4,9,9,18 2:18 5:18,19 10:20 12:13,21 24:15 47:4 91:5 120:5
**Nice-Pak** 19:23
**night** 40:2 41:5
**non** 140:11
**nondisclosure** 129:15,16
**nonflushable** 10:15 12:10 25:6 36:17 60:23 85:15,22,24 86:12 100:14 130:14
**nonwoven** 3:16 32:20 73:22 74:19 79:5 89:4 104:25 105:20 106:7,10 106:15,23 107:8 107:10 109:19 112:5,9,23 113:12 113:14,16,19,21 117:18 118:19 125:7,8,9 128:25 129:1 130:12 140:16
**nonwovens** 126:14 126:17 139:15,19 140:10
**North** 1:18 143:7
**Nos** 94:17
**Notary** 143:1,22
**noted** 37:10 116:15
**notes** 127:25
**notice** 22:13
**noticed** 21:21 38:6
**nuisance** 113:20
**number** 15:23 22:13 28:15,20 60:18 66:7 82:22 95:14 108:1 110:1 111:10,12,19 115:25 116:3 120:21
**numerous** 110:17 111:4,7
**N-A-C-W-A** 29:17

**O**

**O** 3:3
**oath** 4:4
**Object** 112:16
**objection** 5:3,10 7:6 9:10,19 11:11 14:19 16:18 20:6 22:10 24:5 25:8 25:20 26:1,6,11 27:14 31:25 32:25 34:20 35:18,24 41:6 46:3 48:25 49:5 53:5,15 54:16 55:4 59:18 60:2 62:13 63:5 70:12 74:6 75:23 76:6 80:2,10 81:7 86:20 91:11 93:24 98:24 99:3,9,23 102:3,13,19 103:5 103:12 105:9 107:13 108:10 109:6,22 110:12 114:6,22 115:1 116:18,22 117:4 119:9 120:8 121:15 122:19 124:17 126:3 127:12 128:15 129:3 130:8 131:3 131:13 133:18 134:14 136:11,18 137:16 139:23 141:13
**observation** 74:22
**observations** 17:23 100:12 125:13
**observe** 60:15 108:12
**observed** 17:24 27:9 35:3 50:21 100:9 101:24 104:20 105:21,25 106:3,6 120:5 121:11,14 123:8 125:16 140:17,23 140:24
**observing** 78:23
**occur** 76:2 132:23 133:3,17
**occurred** 134:24
**occurs** 133:1
**offer** 59:6,12 139:2
**offered** 59:3 61:3
**offering** 138:24
**office** 14:5 37:8,15 43:12 95:11 143:17
**official** 129:17
**Oh** 27:20 28:21 29:1,10 36:11 44:22 111:4 115:23 120:24 124:20,24
**okay** 4:19 5:8 6:8 6:14 7:3,21 8:2 9:15 10:2,10 11:3 11:17,22 12:3,6 13:4,11,15,25 14:2,6,9,14 15:12 16:15,22 17:12,15 18:5 19:7,13,18 20:2,11,16 21:12 21:17,21 22:13,18 23:3,6,10,13 24:1 24:8,17 25:16 28:16 29:1 30:4 30:11,14,20 31:2 31:20 33:11,22,24 34:7 35:5,22 36:4 36:20 37:2,5,18 37:25 38:3,6,12 38:21,25 39:9,12 39:15,25 40:11,14 41:9,16,17 42:2,6 42:9 43:11,13 44:1,5,7,17,20 45:1,5,8,11,20 46:7,24 47:3,17 47:19 48:5 49:10 49:22 50:9,14,19 50:21 51:12,17 52:6,11 53:9,25 56:12 57:5,11 58:22,25 59:6,15 60:5,10,24 62:1 62:10,20 63:9,21 63:24 64:2,19,19 64:23 65:1,6,18 65:25 66:11,14 67:3,8,12,15,19 67:22,25 68:4,10 68:21 69:8,25 70:15,17,20,22 71:9,21 72:11 73:10,12,15,21

74:15 75:2 77:8 77:22 80:25 81:17 81:25 83:9 84:11 85:6,13,25 86:23 87:5,7,21 88:4,8 89:6,12,20,22 90:6,12,14 91:15 92:7 93:14,22 94:4,9,14 95:7,16 95:25 96:24 97:4 97:13,25 100:11 140:25 141:21 142:10
**once** 21:21 54:25 55:18
**ones** 60:20 106:24 116:1 138:12
**online** 62:25 67:4,5 67:9 68:14 88:7 94:3 96:4 106:14 106:17,25 107:1 126:11
**operated** 6:19
**operating** 117:15
**operation** 111:16 125:5 127:17
**operational** 22:24
**operations** 7:1 117:20,22 118:3
**operators** 34:6
**opinion** 19:17 32:16,16,19 33:18 48:21 59:3,9 60:11 74:18 105:7 118:11 130:6 131:15,16,20 138:24 139:2,4,6 139:7,8
**opinions** 54:7 59:1 62:11 71:4 90:23 93:9 99:21 100:6 100:11,13 104:14 118:14 125:6
**opposed** 107:9 109:20
**Oral** 1:15
**Orange** 95:22
**order** 55:14
**organisms** 16:1
**organization** 21:11 21:22 23:12 47:7
**outlined** 46:22
**outset** 109:25
**outstanding** 44:13
**overall** 82:23 90:25 111:9
**owned** 6:12,19
**owns** 6:13
**oxygen** 132:21

**P**

**P** 2:1,1
**packet** 61:19
**page** 3:8,21 28:24 28:25 36:22 39:19 39:21 43:13 44:1 44:20 45:18 66:7 129:7,8,8 132:12 141:25
**pages** 62:18 65:19 66:7
**paid** 43:6
**panoply** 137:25
**paper** 16:2,4 17:9 17:12 18:2 25:13 25:14 36:4,5,6,7,7 36:8,9,13 74:23 75:1,15 76:2 78:25 79:4,8,16 79:19,20,23 80:9 85:16,24 86:15 100:14 102:9 116:15 117:1,17 135:17
**papers** 79:12
**parameter** 76:19 76:20,22,23,25
**parameters** 77:1,7 77:23 119:18 130:6
**paraphrase** 110:4
**Pardon** 23:23
**parentheses** 66:8
**PARSA** 47:7 49:3
49:22 53:11 54:10 56:2 59:1,7 62:20 78:24 100:10 101:25 125:13 127:20 134:24 135:4 138:1
**part** 8:2 66:20 77:16 88:6 89:2 97:11 100:8 109:3 124:21
**partial** 52:8,9,11
**Partially** 89:17 100:7
**participate** 49:17
**particle** 52:25 56:21 59:22,23 75:12
**particular** 8:17 116:9 121:7 127:11
**parties** 143:12
**parts** 119:12
**party** 69:13
**pass** 75:17 79:2 83:7 101:6
**passed** 79:7 121:2
**passing** 64:16 73:23 75:21 98:16
**patent** 25:9
**pathogenic** 15:25
**patience** 132:7
**pattern** 104:23
**payment** 44:18
**PDFs** 97:18
**peer-reviewed** 80:15,20,23
**people** 4:20 21:25 24:2,4 41:25 42:1 52:2 57:16 125:12 134:16
**percent** 52:13
**percentage** 119:3,4
**performance** 50:24 51:3 85:13,20
**performed** 63:3 137:14,23 138:1,4 138:5
**period** 38:11 71:22
**person** 47:18,20 83:13 105:24 106:8
**personal** 24:8,11 24:12 103:15 143:4
**personally** 34:7 105:21,25 106:3,6
**person's** 6:10
**perspective** 94:23 128:25
**pertinences** 6:18
**Peterson** 1:17 143:6
**phone** 38:18 47:21 47:22 48:23
**photographed** 107:8
**photographs** 105:23 106:8,9,14 106:16,19 107:5 118:13
**physical** 6:25 15:13 70:1 96:6
**Ph.D** 1:16 4:2
**pick** 10:2
**pictures** 62:7 106:21,25 107:1,3
**piece** 42:15 105:2
**pieces** 105:11
**pipe** 53:21 54:12,22 56:6 59:11 82:16 82:16,18,19,20 92:12,12,13 120:21
**pipes** 7:21 11:14 12:24 81:4 105:19 106:1,15 113:3,7 113:14 120:20
**piping** 97:24 98:19 113:19,21
**place** 44:2 76:14 85:7,7 106:18 134:7
**places** 10:23
**placing** 108:15,25
**Plainfield** 24:15 47:4 48:11 49:20 57:18 137:18,21 140:17,24
**plaintiff** 1:4,9 2:2,7 11:21
**plaintiffs** 3:9 27:18 28:8 38:3 45:2 46:17 65:15,21 69:14,16 72:12 142:12
**plan** 70:20,22 88:13 92:25 93:6 139:1
**plans** 124:12
**plant** 50:13 115:12 133:4,17 134:8
**plants** 118:7 135:22
**plant's** 35:15
**plastic** 82:16 91:6
**play** 50:15,17,24 51:2
**please** 4:8 13:8 43:22 89:1 101:17 113:10
**Plosky** 2:8 47:15 133:18 134:14 136:11,18 137:16 139:23
**plumber** 15:16 104:11
**plumbing** 6:6,9,9 10:23 11:3,6 12:16,20 13:1 14:17 15:1,15,18 18:20 52:7 57:3 76:18 80:1 81:5 84:16 103:16 114:4 117:2 126:20,22 127:2,8 128:19 138:10,18
**ply** 79:17,18,18,20 79:21
**point** 51:23 77:5
**pointed** 121:17
**points** 76:17 81:14

**pollutants** 134:1
**Pollution** 97:5
**POPPER** 2:7
**portions** 52:14
**position** 31:15,21 31:23 74:14,21 117:12
**positions** 93:11,13 118:8 125:14
**possibility** 104:25
**possible** 14:2 60:16 107:18,20 109:2 116:25
**possibly** 119:14
**potentially** 15:25 83:5 111:10
**potty** 53:11 54:10 56:2 59:2,8
**power** 116:4,6,8
**PowerPoint** 70:10 93:2 128:4
**Powling** 100:23
**preceding** 143:2
**preliminary** 55:23 112:24
**prepare** 39:25 127:19
**prepared** 51:7 73:15 87:4,5 127:24
**preparing** 70:4
**present** 70:10 71:23,25 125:6 128:1
**presentation** 22:3 93:2 94:22 128:4
**presentations** 21:25 22:1 57:23 58:2 70:5
**presented** 80:17
**presenting** 87:15
**pretreatment** 21:5
**previous** 19:15 20:21,22 31:13 96:10 117:8
**previously** 30:6 73:3 94:13 96:21 110:18
**primary** 9:1,4 110:6,9,20,22 113:1
**print** 94:6,8 96:5
**printed** 94:4 96:18
**prior** 108:24 131:1 135:12
**private** 19:14 72:1 72:4
**probably** 44:2 56:1 67:9 88:15,16 101:21 105:10 112:7 114:1 126:23,24 139:12
**problem** 34:12 126:1
**problems** 32:4,23 34:4,18,25,25 35:3 48:11,19 49:3 74:22 113:1 113:25 125:6,9,11 125:17,20 139:14
**procedure** 106:13
**PROCEEDINGS** 4:1
**process** 112:6,7
**processes** 112:2,4 133:16
**processing** 111:25 111:25
**Proctor** 1:11 2:20 19:25 24:22 25:24 26:4 27:7 86:8 87:9 132:6 134:25 135:6,10,23 136:5 136:6,8,15 137:2 137:13,22 138:8 138:16,21
**produce** 46:14,21 46:23 133:10
**produced** 3:9 28:2 28:8 69:6
**producing** 67:7
**product** 6:3 18:3 25:13 26:19 56:5 56:25 79:11 103:10,11 112:5,9 116:10,25 130:19 130:20 135:1,7,24 137:14 138:9
**production** 28:9,18 66:10 68:6 133:14
**products** 3:16 24:16,22 25:14 36:6,15 51:7 60:16,17 73:23 74:20 89:4 103:20 106:7,10,23 107:9 107:10 109:19 118:19 119:5 129:1 130:18
**professional** 4:16 15:21 19:7 20:24 21:10 24:11,13,18 24:21 78:1 139:4 139:7
**professionals** 58:16 104:21 117:11 118:5
**professor** 4:13
**project** 42:25 93:16
**projects** 134:16
**proof** 104:25 136:21
**proper** 122:22
**properly** 6:4
**properties** 18:24 98:23
**proportion** 35:23 36:1
**protect** 15:22
**provide** 61:4 65:16 65:16 84:3,25 85:2 87:14 94:20 95:5 139:6,8
**provided** 61:18 65:21 71:10 97:18
**providing** 72:12
**public** 15:23 58:15 88:6 129:7,8 134:17 143:2,22
**publications** 13:14
**published** 16:20 20:19 22:8 57:7,9 80:15 81:1
**pull** 132:9
**pulled** 89:8
**pump** 34:14 49:7 76:25 77:20 98:4 98:20,20 99:6,16 108:3 112:23 116:8,10,13 117:23 118:13 119:7 130:4
**pumped** 113:14
**pumping** 112:22
**pumps** 8:2,5,8 22:23 23:6,7,8,8,9 49:8,24 50:14,17 113:15 115:19,22 115:25 117:23
**purchased** 5:16
**purpose** 60:14 124:16 127:15
**purposes** 28:9 54:2 69:14
**put** 21:4 88:4 111:7
**puts** 21:22
**putting** 91:5 127:1
**P-A-R-S-A** 47:10
**P.E** 1:16 4:2
**p.m** 1:20 101:10,11 129:25 130:1 142:13

**Q**

**quantified** 56:10
**quantify** 52:24
**question** 14:21 20:21,22 22:8 28:9 30:5,23 79:22 115:5 117:7 117:8 128:21 139:25
**questions** 19:12 40:19 91:22 101:16 131:24 132:8 140:25 142:11
**quicker** 18:2
**quickly** 18:2 117:1
**quite** 103:19

**R**

**R** 2:1 3:20
**rate** 43:4 44:16 53:22 84:23 98:12
**reach** 29:17 30:20
**reaches** 114:5 119:7
**read** 5:1,7 12:1 16:9 25:9 28:17 39:17,20 46:22 61:17 62:4,5,14 62:21,23,25 63:7 65:11 67:5,9 68:1 68:8 73:3 74:2 88:19 103:19 117:8 138:15 139:3,9
**readily** 26:19
**real** 81:18 82:12 83:2 89:15 122:18 123:5 124:9
**really** 41:11 76:9 79:3
**Realtime** 1:22
**reason** 48:23 52:3 72:22
**reasonable** 17:7 79:9,10
**reasonably** 79:19
**reasons** 82:8
**recall** 27:20 35:25 36:5,11,12,13,16 37:20 38:9,24 39:9,11 41:17 43:1,8 47:2 49:11 51:20 55:16 56:14 60:20,21 67:16 68:11,20 69:24 80:24 106:24 107:2 122:10 129:11 130:22 142:2
**receive** 45:24 68:13 129:16

**received** 13:18 44:15 45:19 63:6 65:18 67:1,10 68:5,7,7,10,13,15 68:18,23 69:18 72:12
**receiving** 7:2
**recognize** 64:24
**recollection** 29:7 42:3 123:11
**recommended** 31:17 60:1
**record** 4:9 13:9 43:9 63:12 89:1 101:8,11 110:4,18 129:23 130:1
**recorded** 35:3 104:19 121:17 143:3
**recording** 51:23
**records** 27:21 44:9 45:7,9
**reduced** 143:3
**Redwood** 2:22
**reference** 85:10
**referred** 18:11 104:19 110:2 126:10
**referring** 6:9 23:4 52:16 61:21,24 73:7 77:9 81:12 89:12 118:4
**refers** 53:10 84:13 85:18 130:13 135:16
**reflect** 82:23
**reflective** 122:17
**refresh** 122:14
**regard** 84:1 85:1
**regarding** 73:16
**regional** 50:12
**regions** 7:12
**Reich** 2:3 3:12 5:3 5:10 7:6 9:10,19 11:11 14:19 16:18 20:6 22:10 24:5 25:8,20 26:1,6,11 27:14 28:4 29:11 29:20 30:20 31:25 32:25 34:20 35:18 36:20,23 37:10 41:6,23 43:17,19 46:3 48:25 49:5 53:5,15 54:16 55:4 59:18 60:2 62:13 63:5 65:7 70:12 74:6 75:23 76:6 80:2,10 81:7 86:20 91:11 93:24 98:24 99:3,9,23 102:3,13,19 103:5 103:12 105:9 107:13 108:10 109:6,22 110:12 112:16 113:9 114:6,22 115:1 116:18,22 117:4 119:9 120:8 121:15 122:19 124:17 126:3 127:12 128:15 129:3 130:8 131:3 131:13 141:13 142:11
**rejected** 128:14,17
**related** 38:14,15 44:13 58:4 97:19 106:10 140:16
**relates** 133:9
**relationship** 30:22 31:1
**relative** 79:8 80:8 143:11,12
**relevant** 76:9 90:23 98:8 134:10
**rely** 88:13 100:2
**relying** 62:10 99:21 100:5
**remember** 39:24 43:6 91:23 103:20
**remove** 134:1
**removed** 121:1,2
**renewable** 133:6,8 133:12
**rented** 10:19
**renting** 5:19
**reorient** 110:5
**repair** 10:22 12:15
**repeat** 14:21 136:13 141:15
**replicate** 73:21 74:9,18,25 75:5 75:11,20 81:10 83:21 118:18 123:5,18 124:9
**replicates** 82:11 123:14
**report** 13:4
**Reporter** 1:22
**reports** 11:9 71:12 96:14
**represent** 46:11 75:25 89:7 101:15 127:6 132:5
**representation** 89:14
**representative** 119:24
**representatives** 33:19 74:13
**represented** 33:3
**represents** 33:8 117:13 118:9
**request** 61:10 62:15 65:2 66:1,9 66:14 68:21 69:25 71:2,11
**REQUESTED** 3:21
**requests** 65:25
**require** 75:8,9
**required** 84:20
**reread** 117:6
**residence** 6:10 14:17 15:1 54:24
**residences** 80:12 81:5 92:3 99:7
**residential** 98:8,14 103:16 105:13 114:4 141:23
**respect** 32:19 42:9 45:22 55:11 59:15 63:16 81:25 83:3 105:5 125:23
**response** 46:9,14
**responsive** 65:12
**rest** 89:10
**Restaurant** 40:6
**result** 101:20
**results** 53:25 59:1 78:24 85:25 86:4 86:8,11,12,14 100:5,9,16
**retained** 71:15,21 72:1 121:4
**retention** 38:6 44:14 66:19 73:10
**retracted** 131:9
**review** 11:9 21:5 39:18,19,21 54:17 55:19 74:15,16 75:3,7 88:19 89:18 90:7,16 93:1,7,12 94:14 94:19 95:4 96:1 97:11 98:1,3 126:7 127:21 128:23 137:19 138:11 139:11
**reviewed** 3:14 51:21 87:8,12,25 88:5 89:6 90:10 91:20 92:23 93:4 95:23 96:15 97:13 97:25 98:2,5,7 99:12,17 114:25 115:7 118:12 125:22,25 126:9 128:24 129:6,13 129:20 130:17
**reviewing** 74:12 81:21 82:6 84:2 88:2 89:20 92:25 93:6 120:18
**revise** 48:9
**revisions** 58:20 73:4
**right** 7:25 8:9,18 8:19 15:3,6,7 17:13 20:17,23 21:1,23 22:1 24:2 24:4 28:13,14 29:3,12,12 33:20 35:7,10 36:4,18 36:25 38:1,4 39:5 39:7,13 42:14 44:17 45:19,25 46:2 47:8,9 52:21 54:25 55:1,3,25 57:8,12 62:12,14 67:20 70:18 77:19 81:21 82:5 83:11 83:16 87:23,24 88:5,9 90:12,19 91:5,7 92:18 93:18 94:5 95:8 97:6 102:25 108:18 116:16 117:5 118:25 121:23 129:21 131:22 138:19 140:4
**RMR** 1:22
**Road** 2:4
**Rob** 40:2 47:15
**ROBBINS** 2:3
**ROBERT** 2:8
**role** 50:24 51:3
**room** 52:2
**roots** 92:14 105:19 106:4
**Rousse** 92:21 94:10
**rplosky@wolfpo...** 2:10
**RPM** 123:12
**RPR** 1:22
**RPR/RMR/CRR** 143:1,21
**RUDMAN** 2:3
**run** 52:6 55:7,14 59:24 60:5,7 100:16 120:25

**S**

**S** 2:1,3,8 3:7,20,20

**Sadeghi** 2:17 3:4 101:7,13,15 102:5 102:14,21 103:7 103:14 105:12 107:17 108:13 109:9,24 110:14 112:18 113:11 114:2,7,24 115:4 116:19,24 117:9 119:19 120:10 121:21 122:21 124:22 126:5 127:18 128:22 129:5,23 130:2,10 131:5,14
**safe** 78:6,18 83:24 128:18 129:1
**safety** 15:22
**sanitary** 31:9 90:9 90:16,22 91:18 92:1,8
**Sanitation** 95:22
**Sarah** 1:21 143:1 143:21
**saw** 17:25 26:15 107:7 130:17
**saying** 32:8 57:22
**says** 5:17 36:23 38:7 66:9 71:2,11 73:2,15 83:18 87:7
**schedule** 44:19
**science** 3:13 45:12 49:17 70:11,17 72:14 104:14 105:8 123:25 124:8,16,20,23 127:11 128:1 141:6 142:7
**scope** 73:5
**screen** 121:3,4
**screening** 112:25
**screens** 112:25 113:21
**se** 64:5
**seal** 143:17
**Sean** 43:15
**search** 96:23
**second** 46:5 110:21
**secondary** 113:13
**section** 13:16
**sedimentation** 113:2,3
**see** 19:2 28:13,24 41:14 43:15,22 56:6 66:12 69:9 72:15,17,20,25 83:16 87:3 95:17 101:21 104:7 106:16 107:1,3 108:4 137:19 138:11
**seeing** 140:3
**seen** 11:14 12:23 13:4 35:12,19 55:7 57:9 73:13 78:11 80:16,18,20 80:22 81:1 84:9 85:25 86:4,8,11 86:14 87:1 100:16 101:25 105:23,23 106:9,18,21 109:17 135:3
**sells** 63:18
**seminar** 21:4 23:1
**send** 14:4
**sent** 29:5 61:14
**September** 143:23
**septic** 74:1 78:7,19 83:24 84:18 85:4 98:21,21,22 118:1 129:2
**series** 121:22
**Serra** 45:6 47:16 72:25
**serve** 31:5 77:5
**served** 45:25
**service** 2:4 134:12
**serviced** 33:6
**set** 41:10,11,15 43:14 54:3 143:16
**settings** 98:9 123:9
**settle** 98:17,18,19 133:1
**settleability** 76:24 98:13
**settling** 98:6,8,12 98:13
**seven** 77:18
**sewage** 6:15 124:19
**sewer** 7:18 15:10 53:21 54:12,13 55:2 56:24 57:1 75:25 78:6,18 83:7 90:9,16,22 91:5,19,22 92:1,8 104:8 112:22 114:4,20 115:12 117:3 128:19 129:2
**sewerage** 6:6,16,17 7:3 8:3 9:15,17 10:4,6 14:17 15:4 15:11,25 18:20 23:9 31:4,6,8,10 32:5 33:6,7,9 34:13 39:18 48:11 50:11,18 55:3 57:3 99:16 108:2 124:20 125:4,7 132:23,24,25
**sewers** 6:17 21:6 83:24 117:24
**share** 28:4
**shearing** 84:21
**Shores** 2:22
**short** 63:10
**show** 49:24 50:2 54:9,11 91:4 118:12
**shredding** 56:8
**side** 142:12
**SIDLEY** 2:12
**sign** 68:8 129:15
**Signature** 24:19 25:1,19 27:2 86:4 102:1,7,23,24 103:2,4,8,17 105:6 130:20
**significantly** 116:6 116:7
**similar** 16:12 57:11 134:2
**similarly** 76:2 79:4
**simplest** 107:24
**sir** 4:12 13:11
**sitting** 29:11 123:13,16 128:7 130:7 140:8 142:3
**situations** 7:21 134:20
**six** 37:22,23 77:16 77:19
**size** 56:21 59:22,23 75:12 91:20 92:12
**sizes** 7:18,22 52:25
**skip** 101:21
**slash** 52:20 134:12
**slope** 82:18 92:12
**slopes** 84:20 90:24
**slosh** 52:10 53:4,6 59:15 60:1 75:10 75:16,17,20 76:20 81:14 82:5 98:2 118:20,24 120:6 120:17,23,24 121:7 122:23
**sludge** 9:2,3 110:7 110:8,10,21,22,23 113:23,24
**small** 35:22
**Society** 90:8
**soil** 14:13
**sold** 25:18 27:2 102:7
**solely** 49:12
**solids** 111:25 133:1
**somebody** 49:16
**somewhat** 54:6 91:3
**sorry** 20:21 28:3 44:22 65:7 71:24 91:17 101:1,22 107:15 117:6 120:24 136:12 141:14
**sort** 17:12 22:20 60:11 78:8 82:1 111:14 120:1 124:4 127:24
**sorting** 35:12,19
**sorts** 55:7
**sound** 51:24 52:3,5 110:11
**sounds** 43:19 134:2
**source** 133:12
**South** 2:4,13
**so-called** 5:16,21 9:24 21:7 29:25 32:2 35:1 47:25 48:10 60:18 81:16 85:23 100:13 105:1 108:1,5 125:17 140:2,23
**speak** 29:15,20 43:23
**speaking** 124:15
**specialization** 132:13,17 133:7 133:21 134:9,11
**specific** 39:25 40:17 80:13 82:2 82:2,5 88:9 95:14 127:17
**specifically** 81:11 81:13 97:21 120:23 127:10 130:16
**specifications** 7:17 124:9 138:5
**specifics** 40:22 71:10
**specified** 9:22 122:7 123:9
**specify** 121:6
**speed** 123:9,14,18
**spend** 119:5
**spent** 3:23,23 37:18 119:14 126:24 127:3
**split** 38:13,17
**spoke** 93:15
**spoken** 47:21,22 93:20
**spot** 55:25

**stabilize** 133:1
**stand** 120:18
**standard** 7:17 16:3 56:21 79:3 122:12
**standards** 7:14,15 127:17
**standing** 78:22
**start** 29:20 41:13 73:16 76:14 77:3 89:20 118:19 124:23
**started** 88:2 89:18 90:11 98:1,3
**starting** 77:5 118:16
**state** 4:8 10:22 12:15 106:12
**statement** 32:21 82:4 84:6
**States** 1:1 7:4,7 8:12 10:5 13:18 32:13 34:2 35:10 111:3,14
**station** 34:14 108:3 112:23
**stations** 49:7 117:23 118:13
**stop** 51:23
**stopped** 51:19
**stream** 7:2 112:7
**street** 1:18 2:13,17 6:12 40:8 91:4 143:7
**strike** 112:2 125:22 130:24 131:15
**students** 134:17,19
**studies** 35:12,20 80:5,6,13 125:19 125:25
**study** 80:17,18 123:1,2
**studying** 126:24
**stuff** 35:15 62:4
**subcategory** 126:17
**subject** 48:7
**submit** 87:4
**submitted** 69:2 71:8 129:20
**submitting** 67:2
**subpoena** 3:10,11 45:18,21,23,24,25 46:12,15,22 69:7 87:4
**subpoenas** 46:2 64:24
**subsequent** 68:5
**subset** 134:4
**sufficient** 68:22 79:6
**sufficiently** 78:5
**suggest** 128:13
**suggested** 29:17 30:20
**Suite** 1:19 2:4,22 143:7
**sum** 65:20
**summaries** 71:13
**summary** 127:25
**supervised** 90:3
**Supply** 97:5
**support** 74:17
**supposed** 38:7,10 53:2 55:14
**sure** 32:7 55:24 77:3 91:21 94:4 103:25 113:11 132:11 139:12 140:19
**surprise** 95:19
**sworn** 1:15 4:3
**system** 5:18 6:7,7 6:15,17 8:3,22 10:6 15:2,4,11 18:20,20,21 33:9 48:12 50:11,18 55:3 57:3,4 83:8 89:15 92:8 97:24 98:17,19 108:2,22 109:18 110:6,9 111:5,9 114:5,15 114:17,20 115:3,8 115:14 116:9 117:3 119:11,13 119:13,18,21,24 120:2 123:15,19 123:21,21 124:11 132:23,25 138:10 138:18
**systems** 7:3 8:11,23 8:25 9:1,3,4,9,15 9:18 10:4,8 14:12 14:17 15:18 32:5 39:18 73:25 74:1 78:7,18 84:17,20 84:23,24 85:4 95:8 98:14 105:14 109:15 110:2,16 110:18 111:8,13 111:16,22 113:16 115:19 117:15,25 119:3,5 122:18 124:19,20 125:4,7 126:20,22 127:2,8 128:19,20 129:2 134:18
**S-E-W-E-R-A-G...** 6:16

**T**

**T** 3:3,7,20
**take** 40:21 63:10 93:13 107:22 108:4,18 114:15 114:16 115:13 122:25 134:7 140:1
**taken** 1:16 12:23 63:11 101:10 127:19 129:25 143:6
**takes** 17:6 88:3 114:13,19 117:23 117:24 127:4
**talk** 20:11 30:18,19 36:24 76:12 78:11 84:5 104:21 132:15,23
**talked** 4:24 11:24 19:15 33:11 34:24 36:20 40:25 42:11 42:15 45:20 49:4 57:16 88:11 93:14 142:2
**talking** 14:14,23 89:13 140:20
**talks** 45:18
**tangle** 113:6,6
**tank** 98:21 113:3,6
**tanks** 74:1 78:7,19 83:24 84:18 85:5 113:17 118:1
**tape** 54:18 55:19,24
**tasks** 38:14,15
**teach** 22:13,16
**teaching** 15:10
**technology** 25:17 25:23 86:17 102:15 141:10
**tell** 19:13 30:4,8 39:2 48:5 64:2 74:4
**tells** 5:14
**ten** 116:2
**tend** 91:9
**term** 6:1 130:11 140:18
**terms** 7:19
**test** 32:24 52:7,10 52:24 53:7,10,11 53:16 54:10 55:13 56:3 59:2,8,15 60:5 75:16,18 76:2,3,5,10,10,17 76:20 77:2,6,20 77:21 78:16 81:13 81:15 82:5,7,10 97:22 98:4,6,8,12 118:20,21,24 120:17,24 121:19 121:23,25 122:6 122:23 123:7 130:4
**tested** 18:22 32:21 137:18
**testified** 4:4 71:14 118:23 130:25 131:10 139:13,17
**testify** 3:13 71:5,15 141:6,10,17 142:6
**testifying** 70:22
**testimony** 40:17 70:3,4 71:1,12,13 72:13 83:25 84:25 85:2 88:13 127:20 130:13 135:12
**testing** 24:15 47:25 48:6 50:4 52:8,9 52:11 57:25 62:21 73:17,18 74:8,12 78:5 79:6 82:9 83:19,20 84:12 85:9,14,15,19,21 86:2,5,11,14 89:18 100:6,10,15 102:1 118:17 120:4 125:13 134:23,25 135:3 137:21 140:17,23
**tests** 26:15 27:9,10 50:22,25 51:3,10 52:6 53:3 54:1,3 55:7,18,23 63:1,3 63:3 77:15,20 79:1 82:2 90:1 97:20 99:16 100:16 101:24 121:11,13,17,22 122:3 124:2,2 137:15,23 138:1,4 138:6 140:15,19 140:22
**Thank** 132:7 135:15 141:1,2
**thing** 8:19 14:16 16:1 61:19 62:6 81:23,24 96:25 140:20
**things** 16:5 17:15 18:7 23:24 35:6,9 36:1 39:18,23,24 54:1 79:7 81:22 82:25 85:6 92:14 101:21 114:1 117:18 118:12

128:10
**think** 5:23,24 32:19 42:7 45:12,14 48:18 49:15 53:2 60:9 61:18,21 76:14,17,19,21,22 76:24,25 77:4,5,6 77:13 79:7,9 81:19 82:11 88:20 89:23 91:20 93:15 96:14,24 104:23 107:25 113:8 116:25 118:14 119:17 128:20 142:3
**third** 2:8 3:16 14:15 52:18 53:14 58:20 64:16 97:20 110:23
**thought** 16:6 60:12 118:23
**three** 14:25 15:9 28:2 59:24 75:9 75:13,16,18 79:18 79:21 81:15 94:1 94:2 110:3,19,25 114:14,16 119:6 119:15,15 120:25 121:1
**three-hour** 81:13 118:24
**three-quarters** 7:20
**till** 41:11
**time** 3:23,23 5:13 5:13 17:6,7 29:15 34:15 36:21 37:3 37:18 38:8,10,19 39:17,17,19,20,21 40:16 46:4 60:11 69:10 71:8,22 72:20 73:7 81:23 87:14,22 88:3 94:14,15 102:2 107:22 108:19 114:19 117:23,24 123:1 140:2
**timeline** 58:22
**times** 55:13 73:2 93:9
**timing** 44:11
**today** 20:16 29:15 40:18 71:19 73:2 111:16 123:13,16 123:25 124:7 127:22 128:7 130:7 132:7 137:15 139:13 140:8
**today's** 40:1
**toilet** 6:5 16:1,4 17:5,9,10,12 18:2 52:7 53:3,9 54:11 54:15,19,20 55:12 55:12 74:23 75:1 75:15 76:2 78:3 78:25 79:4,8,12 79:16,19,20,23 80:9 82:10,21 85:16,24 86:15 97:23 100:14 115:2,3,8 116:15 117:1,16 119:6 120:19
**toilets** 35:10 73:24 75:22 80:1 81:4 84:16
**told** 16:8 18:5 48:24 71:1 78:13
**tomorrow** 14:4 29:15 36:24
**top** 66:8
**topic** 22:25
**topics** 127:11
**topographies** 7:12
**total** 43:7 65:20 124:20,23
**touch** 31:17
**towels** 36:14
**track** 37:2 45:8
**train** 111:8
**training** 15:9
**transcript** 4:1 43:20
**transmitting** 69:19
**travel** 114:19
**treat** 8:15 14:12 132:21
**treatment** 6:7,22 6:25 8:11 9:2,4,9 10:8 14:18 15:5 18:21 50:5,7,12 55:2 57:3 94:25 110:2,16,17,20,22 110:25 111:5,9,13 111:22 112:10,12 112:13,14,24 113:1 114:5,20 115:3,8,11,12 118:7 119:7 128:20 132:24,25 133:4,17,23,24 134:5,6,8
**tree** 92:14 105:19 106:4
**trial** 71:12
**trickling** 9:5 110:9 110:24
**tried** 41:10
**trip** 127:20
**true** 33:14 54:24 103:24,25 104:2,5 105:4
**truly** 32:3
**try** 101:8,18 110:3 110:5
**trying** 18:14 43:14 78:1 101:21 128:10
**Tuesday** 67:13
**turbulence** 84:21
**turn** 41:12 44:20 118:15
**turned** 52:5
**Turning** 107:5 130:16
**Twenty** 4:18
**twice** 56:1 96:14
**Twin** 2:22
**two** 10:23 16:5 18:6 29:23 38:11 40:4 42:1,19 46:2,12 63:3 64:23 65:8 75:16 77:20 79:18 79:20 94:20 95:5 96:2 97:12 122:3 129:24 130:18
**types** 8:23,25 9:6,8 9:12,21 110:1,15 110:25 111:2,13 111:16,21 115:22 115:24
**typical** 78:25 79:18 79:20 85:2,7
**typically** 6:20,21 23:11 112:21 132:22 133:17

**U**

**U** 3:20
**Um-hmm** 28:23 30:8
**unclog** 117:24
**unclogged** 104:8,12
**understand** 14:21 18:14,15 32:7 84:11 93:10 101:17 130:11 140:18
**understanding** 5:8 11:20 48:20 51:24 54:8 58:17,19 62:17 65:4 73:6 74:7,11 84:12 85:17 118:8 124:15,18
**unique** 111:24
**United** 1:1 7:4,7 8:12 10:5 32:13 35:10 111:2,14
**University** 4:15
**unnamed** 20:3 63:15
**updated** 3:22 13:22
**updates** 13:12
**urine** 17:19 74:23 78:24
**URL** 96:4
**use** 5:5,9 10:12,14 12:3,7,9 23:13,16 23:20,25 24:2 59:25 70:2 74:17 79:3,17 80:7 111:2 121:7 128:3 132:20 133:25 134:18
**user** 141:23
**utilities** 31:4 34:24 77:14
**utility** 23:8 34:6
**utilize** 133:15
**U.S** 82:17

**V**

**v** 1:5,10 87:8,9 101:3
**vague** 84:3,6
**variable** 92:18
**variables** 83:3,9
**varies** 91:13 115:15 115:16 116:15,20
**various** 77:15 81:2 118:1
**vary** 7:11 8:8 34:19 34:21 83:10 85:7 92:10 116:4,6 121:14 123:21,23 123:24
**vendor** 115:23
**vendors** 115:24
**verify** 108:21
**version** 39:22 58:20 60:3 62:21 62:24 102:6
**versus** 81:19 85:15 85:22
**video** 11:14 12:23 51:12,23 52:1 54:14 122:13 137:19
**videoed** 51:10
**videographer** 51:18
**videos** 51:21 70:5
**videotaping** 51:6

54:9
**Viessman** 97:4
**view** 50:5 62:20 122:13,13
**Villee** 47:15,17,24 48:2,5,13 49:3 51:8,9 53:10 56:5 57:17,20,22 58:16 58:25 60:10,24 100:17
**Villee's** 58:1 100:5
**Vince** 45:6,17 72:25
**visit** 49:22 60:25
**visited** 10:17,19 12:12 47:4,8
**visual** 54:8 70:6
**visually** 56:8 60:15
**vitae** 3:9 13:10
**Vogel** 100:25 101:2 101:3
**voicemail** 29:16 30:14,15
**volume** 121:18

**W**

**W** 2:12
**want** 14:25 22:25 23:25 30:25 32:7 40:13 78:12 140:19
**wanted** 54:7 87:14 91:21 94:20 95:5 132:15
**wants** 32:19
**wasn't** 27:21 49:14 53:1 59:23 120:20 120:24,25
**waste** 21:3,5 74:23
**wastes** 132:21
**wastewater** 8:16 15:17 16:2 21:8 23:5 34:12 50:12 57:15 58:16 73:24 73:25 74:13,21 76:8 77:8,10,11 78:23 84:17,22 85:4 93:3 94:23 104:20 112:7,12 112:13,21,22 117:12,14 118:7,9 119:3,4 122:18 123:15,19 124:10 127:16 133:2,22 133:24 134:1,5,6
**water** 13:17,18,21 14:13 21:3 31:3 34:2 58:12,14 97:5 112:9 121:7 121:10,13,19 122:7,11,12,17,23 123:4
**waters** 15:15
**water/liquid** 59:25
**way** 17:3 26:14 33:9 34:23 37:2 52:23 53:19 56:10 56:19 64:8,10 83:6 92:5 98:11 104:13 105:8 119:23
**ways** 8:15 107:25 112:13,20
**web** 39:19,20 129:7 129:8,8 141:25
**website** 89:8
**Wednesday** 67:13
**week** 14:1 47:13 67:10,11,12 68:1 68:2,17 89:21,22 101:25
**WEF** 58:12
**weighed** 121:5
**weirs** 113:13
**went** 62:20 89:8
**weren't** 52:13 54:2 63:4
**West** 2:17
**Wet** 96:15
**we'll** 16:22 24:17 46:24 71:9
**we're** 46:7 49:15 66:14 70:25 78:13 140:19
**we've** 21:6 70:25 88:11 127:22 137:15
**whereof** 143:16
**Wholesale** 2:16 101:15
**wipe** 9:24 10:3,3 17:24 18:11 32:22 32:22 36:13 40:25 55:20 60:21,22 63:16,22 64:5 73:22 74:19 75:17 79:5 83:7,13 91:16 105:1 108:22 114:4 118:19 119:5 140:3
**wipes** 5:6,9,17,22 9:7,12,16,21 10:12,15 12:4,7 12:10 14:15,24 17:20,25 18:10,22 19:2,8,12 20:20 20:25 21:8,18 22:5,9,15,19 23:14,21 24:2,10 24:14,19,23 25:1 25:3,7,7,18,19,24 25:25 26:4,5,10 26:23 27:1,2,5,13 29:25 30:2,2,7 31:14,15,22,22 32:2,13,24 34:1,3 35:1,4,6,14,22 36:2,8,9,17,17,18 40:23 47:25 48:10 48:14,19 49:13 53:21,22,24 56:13 60:19 64:4,7,9 72:7 73:23 75:5 75:21 78:6,17 80:8 81:3 82:12 83:22,23 85:13,16 85:21,22,23,24 86:1,5,9,12,18 90:1,4,19 93:3 95:17,23 96:15 97:15 100:6,13,14 102:2,7,24,25 103:3,4,9,17 105:7,20 106:15 108:1,1,5,6,15,25 109:4 113:12,14 113:17,20,22 125:7,9 126:2,17 128:13,18 130:14 131:2 136:6,10,17 137:4,6,7,18 139:20,21 140:16 140:24 141:7,12 141:18,24
**Wisconsin** 1:19 13:16 21:2,19 22:19 33:12,15 143:8
**witness** 4:3 5:11 7:7 9:11,20 11:12 14:20 20:7 22:11 24:6,15 25:9,21 26:2,7,12 27:15 32:1 33:1 34:21 35:19,25 41:7 44:21,25 46:4 49:1,6 53:6,16 54:17 55:5 59:19 60:3 62:14 63:6 70:13 74:7 75:24 76:7 80:3 86:21 91:12 98:25 99:4 99:24 101:6 102:4 102:20 103:6,13 105:10 107:16 108:11 109:7,23 110:13 112:17 113:12 114:23 115:2 116:23 117:5 119:10 120:9 121:16 122:20 124:18 126:4 127:13 128:16 129:4 130:9 131:4 133:19 134:15 136:12,19 137:17 139:24 141:14 143:16
**witnessed** 53:17 136:21
**witnessing** 26:15
**WOLF** 2:7
**word** 15:19 16:25 19:2 135:12,16
**work** 15:10,17 19:11,14,16,17,18 19:19 20:2,24 29:25 30:6 31:7 31:10,11,13 33:24 42:17,19 43:2 48:3 63:14 69:1 73:5 94:12 96:10 96:21 97:12 123:17 124:1,4,7 133:13 134:15
**worked** 29:24 42:24
**workers** 33:17
**working** 42:13
**works** 58:15 100:20
**world** 81:18 82:13 83:2 89:15 122:18 123:5 124:9 134:21
**wouldn't** 23:22 59:4 108:12 127:6 131:15 139:2
**write** 84:8,9
**writing** 36:7 143:4
**written** 11:2 69:23 125:15

**X**

**X** 3:1,3,7

**Y**

**yeah** 7:9 9:1 13:10 18:12,15,15 24:6 26:19 28:11 29:1 33:15 42:7 55:21 56:25 59:3 61:20 76:15 77:13 81:21

84:9 85:19 88:15 88:17 94:15 101:4 106:11 109:5 114:9 119:10 130:21 134:15 136:19 140:21
**year** 21:14,15 42:19,23 47:23 48:22 107:4
**years** 4:18 21:16,17 42:19 86:19 117:15
**yesterday** 63:7 89:23
**York** 1:2 2:4,9,9,18 2:18 5:18 12:13 12:21

**Z**

**Zitomer** 1:16 3:10 3:11,13 4:2,10 28:13 41:12 61:22 62:2,11 72:23 130:3 132:2 134:23 141:1
**Zitomer001** 3:10
**Zitomer078** 3:10
**Z-I-T-O-M-E-R** 4:11

**$**

**$200** 38:4 43:4 44:17

**0**

**007** 28:21,22

**1**

**1** 3:9 13:6,8 66:1,14 66:14 72:17 74:5 78:9 81:9 118:16 132:9
**1st** 44:2
**1:06** 130:1
**1:14-cv-01142** 1:5
**1:14-cv-04090** 1:10
**1:21** 1:20 142:13
**10** 37:21 44:1
**10th** 1:21 143:8
**10,000** 126:24 127:1,4
**100** 52:13
**10019** 2:18
**10022** 2:9
**101** 3:4
**11** 41:12,13 43:13
**11:03** 63:11
**11:14** 63:12
**11747** 2:4
**12** 37:21
**12:06** 101:10
**12:17** 101:11
**12:59** 129:25
**13** 3:9 41:13
**132** 3:5
**14** 3:22
**14th** 143:18
**141** 3:5
**15th** 45:3 72:24
**1982** 90:8,18 91:1

**2**

**2** 3:9 27:25 28:5 65:19 66:5,20,21 68:6,21,21 72:23 78:4,8,12 82:1 87:20,20 89:10 90:6 95:16
**2nd** 29:4,9,10 47:12
**20** 44:20
**200** 2:4
**2005** 97:8
**2011** 71:15,19,25 72:1
**2013** 3:16 89:4
**2015** 1:21 29:4 36:25 87:8 143:8 143:18,23
**212** 2:9,18
**250** 2:17
**26** 123:12
**27** 143:23
**28** 3:9

**3**

**3** 3:10 39:22 59:16 60:3 62:21 64:20 64:23 65:1,6 66:1 83:18 87:8 92:20 94:17 95:16
**3-4** 64:21
**30** 42:8
**30th** 95:21
**312** 2:14
**333** 2:22
**367-7100** 2:5
**37** 3:23

**4**

**4** 3:4,11 64:23 65:8 70:1 84:15 93:2 94:17 97:1
**41** 44:24 72:23
**451-9633** 2:9
**468-8000** 2:18

**5**

**5** 3:12 71:2 72:9,11 73:12 82:17,18 85:9 118:15
**5/18/15** 3:12
**500** 1:19 143:7
**55th** 2:17
**58** 2:4

**6**

**6** 3:14 71:11 72:17 85:13 86:24 87:1 89:9 90:6 99:20
**6/3/15** 3:14
**60603** 2:13
**631** 2:5
**632-4715** 2:23
**64** 3:10,11
**650** 2:23
**68** 61:22 62:11
**69** 3:23

**7**

**7** 3:15 36:22 88:22 88:23,25 89:2
**7th** 29:8 36:25 41:10
**700** 2:22
**72** 3:12
**77** 62:7
**78** 62:2,7,11 65:19
**788** 1:18 143:6

**8**

**8** 28:24,25 71:15,19 71:22,25
**8th** 41:10
**845** 2:8
**853-7000** 2:14
**86** 3:14
**88** 3:15

**9**

**9th** 41:11,15,18
**9:47** 1:20 143:9
**90-degree** 82:22
**94065** 2:22

# <u>EXHIBIT B</u>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| D. Joseph Kurtz, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>Kimberly-Clark Corporation and Costco Wholesale Corporation<br><br>Defendants. | : | No. 1:14-cv-01142-JBW-RML |

**COSTCO WHOLESALE CORPORATION'S WITNESS DISCLOSURE FOR JUNE 19, 2015 HEARING**

Pursuant to the Court's April 3, 2015 Minute Entry, Defendant Costco Wholesale Corporation ("Costco") hereby designates Jeffrey Hurley, Vice President of Nonwovens at Nice-Pak, Inc., to appear at the conference scheduled for June 19, 2015 in the above-captioned action.

Mr. Hurley will address the following issues for Costco's Kirkland Signature Moist Flushable Wipes (the "Kirkland Signature Wipes"):

(a) the structure and composition of the Kirkland Signature Wipes, including for both of the substrate technologies that have been used in the Kirkland Signature Wipes since the product's introduction;

(b) the manner in which each substrate's design enables it to (i) retain an appropriate amount of tensile strength to provide effective cleaning performance, (ii) pass through well-maintained household plumbing systems without incident, and (ii) disperse in the course of its passage through the waste disposal system; and

(c) how the Kirkland Signature Wipes' performance compares with other frequently flushed products – including products intended for flushing (such as toilet paper) and products not designed for flushing (such as baby wipes).

As necessary to respond to Plaintiff's presentation or questions from the Court, Mr. Hurley will also be prepared to discuss (i) the methods used to test the Kirkland Signature Wipes' qualifications as a flushable product and (ii) the specific testing conducted on the Kirkland Signature Moist Flushable Wipes by independent laboratories.

Dated: New York, NY
April 30, 2015

MORRISON & FOERSTER LLP

By: /s/ James M. Bergin

James M. Bergin
Kayvan B. Sadeghi
Adam J. Hunt
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jbergin@mofo.com
ksadeghi@mofo.com
ahunt@mofo.com

*Attorneys for Defendant*
*Costco Wholesale Corporation*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| D. Joseph Kurtz, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>Kimberly-Clark Corporation and Costco Wholesale Corporation<br><br>Defendants. | : | No. 1:14-cv-01142-JBW-RML |

**KIMBERLY-CLARK CORPORATION'S WITNESS DISCLOSURES FOR JUNE 19, 2015 HEARING**

Pursuant to the Court's instructions during the March 31, 2015 hearing, its April 1, 2015 Order, and its April 3, 2015 Minute Entry, Defendant Kimberly-Clark Corporation ("Kimberly-Clark") hereby designates the following witnesses to appear on June 19, 2015 at 10:00 am in Courtroom 10B South to present evidence regarding the subjects described below.

1. David Powling
   Research & Engineering Technical Leader, Kimberly-Clark Corporation
   Neenah, Wisconsin

2. Nathan Vogel
   Process Project Engineer, Kimberly-Clark Corporation
   Neenah, Wisconsin

Mr. Powling and/or Mr. Vogel will present evidence related to the following subjects:

1. The different technologies used in Kimberly-Clark flushable wipes sold to consumers during various time periods;
2. Differences between the technologies used in Kimberly-Clark flushable wipes, those sold by other manufacturers, and products not labeled as flushable;
3. The flushability of Kimberly-Clark's flushable wipes, as determined by various testing methods (including the bases for use of those testing methods), and as compared to products not labeled as flushable.

Dated: April 30 , 2014

*/s/ Eamon P. Joyce*
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

James W. Mizgala (*pro hac vice*)
Kara L. McCall (*pro hac vice*)
Daniel A. Spira (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Kimberly-Clark Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2015, I caused a true and correct copy of the foregoing Defendant Kimberly-Clark Corporation's Witness Disclosures to be served on the following counsel of record via electronic mail:

Mark S. Reich
Sean Masson
Samuel H. Rudman
Lauren E. Karalis
Edward Y. Kroub
Robbins Geller Rudman & Dowd, LLP
58 South Service Road, Suite 200
Melville, NY 11747
mreich@csgrr.com
smasson@rgrdlaw.com
srudman@rgrdlaw.com
lkaralis@rgrdlaw.com
ekroub@rgrdlaw.com

Mark J. Dearman
Stuart A. Davidson
Robbins Geller Rudman & Dowd, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com

*Counsel for Plaintiff*

James M. Bergin
Adam J. Hunt
Kayvan B. Sadeghi
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
jbergin@mofo.com
adamhunt@mofo.com
ksadeghi@mofo.com

*Counsel for Defendant Costco Wholesale Corporation*

*/s/ Daniel A. Spira*
Daniel A. Spira

**From:** Lannin, Cortlin [clannin@cov.com]
**Sent:** Thursday, April 30, 2015 4:39 PM
**To:** Sochynsky, Michael
**Subject:** FW: Belfiore v. P&G, No. 14-cv-4090
**Attachments:** image001.png; Belfiore v. P&G, No. 14-CV-4090

From: Lannin, Cortlin
Sent: Thursday, April 30, 2015 2:37 PM
To: 'Robert Plosky'; Lester L. Levy; Michele F. Raphael; Matthew Insley-Pruitt
Cc: Henn, Emily; Schau, Andrew D.; Dean, Claire Catalano
Subject: Belfiore v. P&G, No. 14-cv-4090

Counsel,

Pursuant to the schedule ordered by Magistrate Judge Levy on March 31, 2015, we are writing to disclose that P&G intends to call Dr. Darius Sabaliunas, Ph.D. as a witness at "Science Day" on June 19, 2015. As you may recall, we previously disclosed Dr. Sabaliunas as an expert in this litigation on February 18, 2015, along with a description of his credentials. A copy of that email is attached for your records. Please note that Dr. Sabaliunas now holds the title of Associate Director, Global Product Stewardship. In that capacity, Dr. Sabaliunas continues to manage the Environmental Stewardship and Sustainability organization and to oversee P&G's Flushability Lab.

At Science Day, we expect Dr. Sabaliunas will testify about the following topics:

* Freshmates and their composition;
* P&G's approach to developing and testing Freshmates;
* INDA's Guidance Document for Assessing the Flushability of Nonwoven Disposable Products and the testing regime described in those guidelines;
* The testing of Freshmates; and
* The performance of Freshmates.

Regards,

Cort


Cortlin Lannin

Covington & Burling LLP
One Front Street, San Francisco, CA 94111-5356
T +1 415 591 7078 | clannin@cov.com<mailto:clannin@cov.com>
www.cov.com<http://www.cov.com/>


Covington<http://www.cov.com/>