# Exhibit B

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

**FEDERAL JUDICIAL CENTER**

**NATIONAL RESEARCH COUNCIL**
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

THE NATIONAL ACADEMIES PRESS  500 Fifth Street, N.W.  Washington, DC 20001

The Federal Judicial Center contributed to this publication in furtherance of the Center's statutory mission to develop and conduct educational programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

The development of the third edition of the *Reference Manual on Scientific Evidence* was supported by Contract No. B5727.R02 between the National Academy of Sciences and the Carnegie Corporation of New York and a grant from the Starr Foundation. The views expressed in this publication are those of the authors and do not necessarily reflect those of the National Academies or the organizations that provided support for the project.

International Standard Book Number-13: 978-0-309-21421-6
International Standard Book Number-10: 0-309-21421-1

Library of Congress Cataloging-in-Publication Data

Reference manual on scientific evidence. — 3rd ed.
    p. cm.
  Includes bibliographical references and index.
  ISBN-13: 978-0-309-21421-6 (pbk.)
  ISBN-10: 0-309-21421-1 (pbk.)
 1.  Evidence, Expert—United States.  I. Federal Judicial Center.
  KF8961.R44 2011
  347.73′67—dc23
                                        2011031458

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Copyright 2011 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

# Summary Table of Contents

A detailed Table of Contents appears at the front of each chapter.

Introduction, 1
    Stephen Breyer

The Admissibility of Expert Testimony, 11
    Margaret A. Berger

How Science Works, 37
    David Goodstein

Reference Guide on Forensic Identification Expertise, 55
    Paul C. Giannelli, Edward J. Imwinkelried, & Joseph L. Peterson

Reference Guide on DNA Identification Evidence, 129
    David H. Kaye & George Sensabaugh

Reference Guide on Statistics, 211
    David H. Kaye & David A. Freedman

Reference Guide on Multiple Regression, 303
    Daniel L. Rubinfeld

Reference Guide on Survey Research, 359
    Shari Seidman Diamond

Reference Guide on Estimation of Economic Damages, 425
    Mark A. Allen, Robert E. Hall, & Victoria A. Lazear

Reference Guide on Exposure Science, 503
    Joseph V. Rodricks

Reference Guide on Epidemiology, 549
    Michael D. Green, D. Michal Freedman, & Leon Gordis

Reference Guide on Toxicology, 633
    Bernard D. Goldstein & Mary Sue Henifin

Reference Guide on Medical Testimony, 687
    John B. Wong, Lawrence O. Gostin, & Oscar A. Cabrera

Reference Guide on Neuroscience, 747
    Henry T. Greely & Anthony D. Wagner

Reference Guide on Mental Health Evidence, 813
    Paul S. Appelbaum

Reference Guide on Engineering, 897
    Channing R. Robertson, John E. Moalli, & David L. Black

Appendix A. Biographical Information of Committee and Staff, 961

# Reference Guide on Statistics

DAVID H. KAYE AND DAVID A. FREEDMAN

*David H. Kaye, M.A., J.D., is Distinguished Professor of Law and Weiss Family Scholar, The Pennsylvania State University, University Park, and Regents' Professor Emeritus, Arizona State University Sandra Day O'Connor College of Law and School of Life Sciences, Tempe.*

*David A. Freedman, Ph.D., was Professor of Statistics, University of California, Berkeley.*

[Editor's Note: Sadly, Professor Freedman passed away during the production of this manual.]

CONTENTS

I. Introduction, 213
    A. Admissibility and Weight of Statistical Studies, 214
    B. Varieties and Limits of Statistical Expertise, 214
    C. Procedures That Enhance Statistical Testimony, 215
        1. Maintaining professional autonomy, 215
        2. Disclosing other analyses, 216
        3. Disclosing data and analytical methods before trial, 216
II. How Have the Data Been Collected? 216
    A. Is the Study Designed to Investigate Causation? 217
        1. Types of studies, 217
        2. Randomized controlled experiments, 220
        3. Observational studies, 220
        4. Can the results be generalized? 222
    B. Descriptive Surveys and Censuses, 223
        1. What method is used to select the units? 223
        2. Of the units selected, which are measured? 226
    C. Individual Measurements, 227
        1. Is the measurement process reliable? 227
        2. Is the measurement process valid? 228
        3. Are the measurements recorded correctly? 229
    D. What Is Random? 230
III. How Have the Data Been Presented? 230
    A. Are Rates or Percentages Properly Interpreted? 230
        1. Have appropriate benchmarks been provided? 230
        2. Have the data collection procedures changed? 231
        3. Are the categories appropriate? 231
        4. How big is the base of a percentage? 233
        5. What comparisons are made? 233
    B. Is an Appropriate Measure of Association Used? 233

    C. Does a Graph Portray Data Fairly? 236  
        1. How are trends displayed? 236  
        2. How are distributions displayed? 236  
    D. Is an Appropriate Measure Used for the Center of a Distribution? 238  
    E. Is an Appropriate Measure of Variability Used? 239  
IV. What Inferences Can Be Drawn from the Data? 240  
    A. Estimation, 242  
        1. What estimator should be used? 242  
        2. What is the standard error? The confidence interval? 243  
        3. How big should the sample be? 246  
        4. What are the technical difficulties? 247  
    B. Significance Levels and Hypothesis Tests, 249  
        1. What is the $p$-value? 249  
        2. Is a difference statistically significant? 251  
        3. Tests or interval estimates? 252  
        4. Is the sample statistically significant? 253  
    C. Evaluating Hypothesis Tests, 253  
        1. What is the power of the test? 253  
        2. What about small samples? 254  
        3. One tail or two? 255  
        4. How many tests have been done? 256  
        5. What are the rival hypotheses? 257  
    D. Posterior Probabilities, 258  
V. Correlation and Regression, 260  
    A. Scatter Diagrams, 260  
    B. Correlation Coefficients, 261  
        1. Is the association linear? 262  
        2. Do outliers influence the correlation coefficient? 262  
        3. Does a confounding variable influence the coefficient? 262  
    C. Regression Lines, 264  
        1. What are the slope and intercept? 265  
        2. What is the unit of analysis? 266  
    D. Statistical Models, 268  
Appendix, 273  
    A. Frequentists and Bayesians, 273  
    B. The Spock Jury: Technical Details, 275  
    C. The Nixon Papers: Technical Details, 278  
    D. A Social Science Example of Regression: Gender Discrimination in Salaries, 279  
        1. The regression model, 279  
        2. Standard errors, $t$-statistics, and statistical significance, 281  
Glossary of Terms, 283  
References on Statistics, 302

in a securities prospectus cause investors to behave differently? The design of studies to investigate causation is the first topic of this section.[13]

Sample data can be used to describe a population. The population is the whole class of units that are of interest; the sample is the set of units chosen for detailed study. Inferences from the part to the whole are justified when the sample is representative. Sampling is the second topic of this section.

Finally, the accuracy of the data will be considered. Because making and recording measurements is an error-prone activity, error rates should be assessed and the likely impact of errors considered. Data quality is the third topic of this section.

## A. Is the Study Designed to Investigate Causation?

### 1. Types of studies

When causation is the issue, anecdotal evidence can be brought to bear. So can observational studies or controlled experiments. Anecdotal reports may be of value, but they are ordinarily more helpful in generating lines of inquiry than in proving causation.[14] Observational studies can establish that one factor is associ-

---

13. *See also* Michael D. Green et al., Reference Guide on Epidemiology, Section V, in this manual; Joseph Rodricks, Reference Guide on Exposure Science, Section E, in this manual.

14. In medicine, evidence from clinical practice can be the starting point for discovery of cause-and-effect relationships. For examples, see David A. Freedman, *On Types of Scientific Enquiry, in* The Oxford Handbook of Political Methodology 300 (Janet M. Box-Steffensmeier et al. eds., 2008). Anecdotal evidence is rarely definitive, and some courts have suggested that attempts to infer causation from anecdotal reports are inadmissible as unsound methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See, e.g.*, McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1244 (11th Cir. 2005) ("simply because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy."); *In re* Baycol Prods. Litig., 532 F. Supp. 2d 1029, 1039–40 (D. Minn. 2007) (excluding a meta-analysis based on reports to the Food and Drug Administration of adverse events); Leblanc v. Chevron USA Inc., 513 F. Supp. 2d 641, 650 (E.D. La. 2007) (excluding plaintiffs' experts' opinions that benzene causes myelofibrosis because the causal hypothesis "that has been generated by case reports . . . has not been confirmed by the vast majority of epidemiologic studies of workers being exposed to benzene and more generally, petroleum products."), *vacated*, 275 Fed. App'x. 319 (5th Cir. 2008) (remanding for consideration of newer government report on health effects of benzene); *cf.* Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) (concluding that adverse event reports combined with other information could be of concern to a reasonable investor and therefore subject to a requirement of disclosure under SEC Rule 10b-5, but stating that "the mere existence of reports of adverse events . . . says nothing in and of itself about whether the drug is causing the adverse events"). Other courts are more open to "differential diagnoses" based primarily on timing. *E.g.*, Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171 (6th Cir. 2009) (reversing the exclusion of a physician's opinion that exposure to propenyl chloride caused a man to lose his sense of smell because of the timing in this one case and the physician's inability to attribute the change to anything else); Kaye et al., *supra* note 7, §§ 8.7.2 & 12.5.1. *See also Matrixx Initiatives, supra*, at 1322 (listing "a temporal relationship" in a single patient as one indication of "a reliable causal link").