UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

D. JOSEPH KURTZ, individually and on
behalf of all others similarly situated,

                               Plaintiff,

    – against –

KIMBERLY-CLARK CORPORATION &
COSTCO WHOLESALE CORPORATION,

                      Defendants.

**MEMORANDUM & ORDER ON
REMAND**

14-CV-1142

---

ANTHONY BELFIORE, individually and on
behalf of all others similarly situated,

                               Plaintiff,

    – against –

THE PROCTER & GAMBLE COMPANY,

                      Defendant.

14-CV-4090

**Parties:**

For Plaintiff D. Joseph Kurtz

For Plaintiff Anthony Belfiore

**Appearances:**

Mark S. Reich
Vincent Serra
Magdalene Economou
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747

Lester L. Levy
Matthew Insley-Pruitt
Sean M. Zaroogian
Wolf Popper LLP
845 Third Avenue
New York, NY 10022

For Defendant Kimberly-Clark Corporation

Eamon Paul Joyce
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Kara L. McCall
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

For Defendant Costco Wholesale Corporation

James M. Bergin
Adam J. Hunt
Morison & Foerster LLP
250 West 55th Street
New York, NY 10019

Brian R. Matsui
Morrison & Foerster LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006

For Defendant The Procter & Gamble Company

Harold P. Weinberger
Eileen M. Patt
Ryan Gander
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Cortlin H. Lannin
Covington & Burling LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105

**JACK B. WEINSTEIN, Senior United States District Judge:**

I. Introduction ............................................................................................................... 1

II. Background ............................................................................................................... 3

    A.        Plaintiffs and Their Claims................................................................... 3

    B.        March 2017 Class Certification Decision and Subsequent Appeal........... 4

    C.        Remand to District Court; Subsequent Proceedings; Experts ................. 5

      1.      Colin B. Weir..................................................................................... 6

      2.      Dr. Keith R. Ugone ......................................................................... 14

      3.      Dr. Denise Martin............................................................................ 16

      4.      Dr. Carol A. Scott............................................................................ 17

III. Admissibility of Expert Testimony....................................................................... 18

    A.        Colin B. Weir..................................................................................... 19

    B.        Dr. Keith Ugone ............................................................................... 22

IV. Predominance ....................................................................................................... 22

V. Conclusion ............................................................................................................. 27

## I. Introduction

Widely scattered about the country, individual consumers and other actors, including municipalities, have sued the retailers and manufacturers of "flushable" toilet wipes—moist towelettes intended for use in place of, or in addition to, toilet paper. They allege that the toilet wipes are not flushable as advertised.

In the present litigation, plaintiffs are consumers. Plaintiff Kurtz and Plaintiff Belfiore (collectively, "Plaintiffs") brought suit against Kimberly-Clark Corporation ("Kimberly-Clark"), Costco Wholesale Corporation ("Costco"), and The Procter & Gamble Company ("Procter & Gamble," and collectively with Kimberly-Clark and Costco, "Defendants") in 2014, alleging a host of causes of action.

In December 2017, this court certified injunctive relief and damages classes of New York consumers who alleged a violation of New York State consumer law. Defendants appealed.

After briefing and oral argument, the Court of Appeals for the Second Circuit remanded a critical damages issue to this court:

> In particular, we note our specific concern with the Plaintiffs' proof that they can establish the injury and causation elements of their claims at trial with common evidence. . . . On remand, the district court should offer the parties the opportunity to submit additional evidence and should then assess whether the Plaintiffs have 'affirmatively demonstrated [their] compliance' with Rule 23(b)(3)'s predominance requirement. . . . After further review of the record, the district court should choose whether to decertify the damages classes or maintain the current certification orders.

*Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39, 41 (2d Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (alteration in original)).

This court, having held substantial post-mandate evidentiary hearings with extensive evidence and briefs, concludes that its current certification orders are appropriate.

Plaintiffs prepared and provided to this court expert reports opining that there is a marketwide price premium for wipes labeled as flushable. Their expert developed and performed hedonic regression analyses to arrive at this conclusion. Each of Defendants' experts has advanced a litany of alleged problems with Plaintiffs' expert's regression theory and his actual computation, including his attempts to meet Defendants' experts' criticisms.

The post-mandate evidentiary hearing was conducted over four days, during which four experts testified. Plaintiffs' expert was credible and demonstrated his methodology to be reliable. Defendants' experts' criticisms were unpersuasive as to the issue before the court—whether Plaintiffs can demonstrate causation and injury by common evidence.

Following post-hearing briefing and oral argument, the parties' motions to exclude opponents' experts are rejected under the Federal Rules of Evidence. As to the class certification issue, Plaintiffs have met their burden and demonstrated that the injury and causation elements of their claims can be proven with common evidence.

Individual issues are not a basis for denying certification. Common issues predominate. This court renews its prior certification of the classes under Federal Rule of Civil Procedure 23(b)(3) for the reasons set out below.

## II. Background

### A. Plaintiffs and Their Claims

The facts underlying these litigations are discussed at length in the court's decision certifying the classes. *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 508–20 (E.D.N.Y. 2017). In sum, Plaintiffs Belfiore and Kurtz allege that they purchased flushable toilet wipes manufactured or sold by Defendants that are not flushable even though they are advertised and labeled as having the characteristic of flushability. *Id.* at 493. Plaintiff Belfiore purchased Charmin Freshmates, manufactured by Defendant Procter & Gamble. *Id.* at 508. Plaintiff Kurtz purchased Defendant Kimberly-Clark's Cottonelle wipes and Defendant Costco's Kirkland flushable wipes. *Id.* Plaintiffs claim that they paid more than they should have for the wipes because they were advertised as being flushable and are not. *Id.* at 493.

At this juncture of the litigation, at issue are claims brought under New York's consumer protection statutes, General Business Law Sections 349 and 350. *Id.* at 525–26. New York General Business Law Section 349 prohibits deceptive acts in the conduct of any business, trade, or commerce. N.Y. Gen. Bus. Law § 349(a). New York General Business Law Section 350 prohibits false advertising in the conduct of any business, trade, or commerce. *Id.* § 350. For their claims to succeed, Plaintiffs must prove that each defendant has engaged in consumer-oriented conduct that is materially misleading and that they suffered an injury as a result. *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012); *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009); *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015). Conduct is materially misleading if it makes representations

or omissions that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 604 (N.Y. 1999) (internal quotation marks and citations omitted); *see also Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

Suit was also brought under New York State common law. These claims are irrelevant for purposes of class certification.

### B. March 2017 Class Certification Decision and Subsequent Appeal

Following extensive briefing and multiple hearings, in 2017, this court certified three classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3):

1. "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and March 1, 2017." *Kurtz*, 321 F.R.D. at 554–55.

2. "All persons and entities who purchased Kimberly-Clark Flushable Products in the State of New York between February 21, 2008 and March 1, 2017." *Id.* at 555. "Kimberly-Clark Flushable Wipes" are flushable, moist wipe products sold under the Cottonelle, Scott, Huggies, PullUps, U by Kotex, and Poise brands. *Id.* at 527.

3. "All persons and entities who purchased Kirkland Signature Flushable Wipes in the State of New York between July 1, 2011 and March 1, 2017." *Id.* at 555.

This court concluded that the requirements of Rules 23(b)(2) and 23(b)(3) were met. *Id.* at 527–54. The decision was made, in part, in reliance on Plaintiffs' expert Colin B. Weir's reports explaining his price premium damages model, which relied on a hedonic regression analysis. *Id.* at 550 ("The defendants challenge Mr. Weir's premium damages model as insufficient to establish classwide injury or causation. . . . The model is sufficient for certification." (internal citations omitted)).

An interlocutory appeal was filed. Defendants argued, among other matters, that Plaintiffs had not met their burden of showing that common issues will predominate because they had not demonstrated that they can establish injury and causation by common proof. *Kurtz*, 768 F. App'x at 40. In particular, Defendants contended that Plaintiffs' allegation that Weir could prove causation and injury using a hedonic regression analysis—common evidence—was not sufficient proof of compliance with Rule 23(b)(3)'s predominance requirement that questions of law or fact common to class members predominate over any questions affecting only individual class members. *Id.*

Concluding that the record at that time did not allow the Court of Appeals to determine whether Defendants' predominance argument had merit, the case was remanded to the district court to "offer the parties the opportunity to submit additional evidence and . . . then assess whether Plaintiffs have 'affirmatively demonstrated [their] compliance' with Rule 23(b)(3)'s predominance requirement." *Id.* at 41 (quoting *Wal-Mart*, 564 U.S. at 350 (alteration in original)).

### C. Remand to District Court; Subsequent Proceedings; Experts

Upon remand, this court scheduled an evidentiary hearing. *See* Order, 14-cv-1142, ECF No. 311. The hearing was adjourned to allow the parties time to conduct discovery and obtain expert analyses. *See* Order, 14-cv-1142, ECF No. 325. Discovery on the issues was allowed. *See* Scheduling Order, 14-cv-1142 (July 8, 2019).

Plaintiffs submitted to the court three expert reports from Weir, one for each defendant. *See* Suppl. Decl. Kimberly-Clark Colin B. Weir, 14-cv-1142, ECF No. 377 ("Weir Suppl. Decl. Kimberly-Clark") (filed under seal as Suppl. Decl. Kimberly-Clark Colin B. Weir, 14-cv-1142, ECF No. 337); Suppl. Decl. Costco Colin B. Weir, 14-cv-1142, ECF No. 378 ("Weir Suppl. Decl. Costco") (filed under seal as Suppl. Decl. Costco Colin B. Weir, 14-cv-1142, ECF No.

339-1); Suppl. Decl. Procter & Gamble Colin B. Weir, 14-cv-4090, ECF No. 329 ("Weir Suppl. Decl. Procter & Gamble") (filed under seal as Suppl. Decl. Procter & Gamble Colin B. Weir, 14-cv-4090, ECF No. 295-1).

Defendants submitted rebuttal reports. Suppl. Rebuttal Decl. Keith R. Ugone, Ph.D., 14-cv-1142, ECF No. 376 ("Kimberly-Clark Ugone Suppl. Decl.") (filed under seal as Suppl. Rebuttal Decl. Keith R. Ugone, Ph.D., 14-cv-1142, ECF No. 344); Suppl. Expert Report Denise Martin, Ph.D., 14-cv-1142, ECF No. 380 ("Costco Martin Suppl. Decl.") (filed under seal as Suppl. Expert Report Denise Martin, Ph.D., 14-cv-1142, ECF No. 342-1); Expert Report Carol A. Scott, Ph.D., No. 14-cv-4090, ECF No. 328 ("Procter & Gamble Scott Suppl. Decl.") (filed under seal as Expert Report Carol A. Scott, Ph.D., No. 14-cv-4090, ECF No. 301); Errata to Expert Report Carol A. Scott, Ph.D., dated July 26, 2019, ECF No. 300-1.

A full evidentiary hearing was conducted beginning on August 6, 2019. *See* Evid. Hr'g Tr. Each expert testified, as did a fact witness for Defendant Kimberly-Clark, Ken Champa. Champa is senior brand manager for Kimberly-Clark's Cottonelle brand; he testified about Kimberly-Clark third party data usage, pricing of Kimberly-Clark flushable wipes products, competition for those products, consumer purchase motivations, and product and packaging changes. *See id.* 238:16–330:20. The experts' reports and their testimony is described below.

### 1. Colin B. Weir

Weir is Vice President at Economics and Technology, Inc. ("ETI"), "a research and consulting firm specializing in economics, statistics, regulation and public policy." Weir Suppl. Decl. Kimberly-Clark 1; Weir Suppl. Decl. Costco 1; Weir Suppl. Decl. Procter & Gamble 1. He holds an M.B.A., with honors, from the High Technology Program at Northeastern University and a B.A. cum laude in business economics from The College of Wooster. *Id.* Prior to joining ETI, he worked at Stop and Shop Supermarkets for seven years, as head of a cash

department, grocery/receiving clerk, and price-file maintenance head. *Id.* Since joining ETI, he

has consulted on a number of consumer and wholesale products matters. *Id.* Weir has provided

expert testimony before federal and state courts, the Federal Communications Commission, and

state regulatory commissions. *Id.*

During the pre-remand class certification proceedings, Weir submitted expert reports

proposing three damages models: (1) full compensatory damages, (2) statutory price premium

damages, and (3) statutory damages. *Kurtz*, 321 F.R.D. at 523. In those reports, Weir

"propose[d] using hedonic regression analysis, a tool that purports to measure the value of

various product attributes in order to demonstrate the existence of, and to isolate the amount of, a

price premium attributable to [D]efendants' use of 'flushable' in merchandising." *Id.* At that

time, Weir proposed relying on evidence from Defendants, industry resources, and independent

market research data; he provided a preliminary list of product attributes on which he would rely

to run his analysis. *Id.*

Weir carried out his proposed hedonic regression analysis after remand. As detailed in

his reports and during the evidentiary hearing, this entailed several steps.

*First*, Weir collected two types of data: sales data and product attribute data. Sales data

was gathered from several sources. Weir obtained from IRI weekly sales of flushable wipes,

other wipes, and toilet tissue from February 2010 through May 2019 in New York State. Weir

Suppl. Decl. Kimberly-Clark ¶ 46; Weir Suppl. Decl. Costco ¶ 47; Weir Suppl. Decl. Procter &

Gamble ¶ 44. IRI is a market research company that collects sales data from retailers and makes

that data available to companies and market researchers. *See* Evid. Hr'g Tr. 15:13–21; *see also*

About Us, *IRI*, https://www.iriworldwide.com/en-US/Company/About-Us (last visited Oct. 24,

2019) ("IRI integrates the world's largest set of otherwise disconnected purchase, media, social,

causal and loyalty data to help [consumer packaged goods], retail, over-the-counter health care and media companies grow their businesses."). Another company, Nielsen, operates in the market research business and competes with IRI. *See* Evid. Hr'g Tr. 17:17–25. Third party market research of this kind is generally relied on by Defendants. *Id.* 16:10–23; Weir Suppl. Decl. Kimberly-Clark ¶ 47; Weir Suppl. Decl. Costco ¶ 48; Weir Suppl. Decl. Procter & Gamble ¶ 45. In Weir's extensive experience "major businesses in the United States either use Nielsen or IRI data on a routine basis." Evid. Hr'g Tr. 18:1–12.

Weir obtained data from IRI for nationwide products after conducting product research, including a review of top selling brands of wipes and of product labels with label claims useful for a comparison. *Id.* 31:4–32:17, 33:18–34:12. He chose the same products as he did for the hedonic regression analysis he had performed in a flushable wipes consumer action brought against Defendant Procter & Gamble in the United States District Court for the Northern District of California, *Pettit v. Procter & Gamble Company*, No. 15-cv-2150, since the products used in that analysis were sold nationwide. Evid. Hr'g Tr. 31:4–32:17. He received statistical results that satisfied him as an expert that the data was appropriate for use in New York. *Id.* Weir noted that his statistical analysis does not require the inclusion of data for every product to arrive at "a statistically reliable result[.]" *Id.* 20:16–21. Most IRI sales data is at the level of actual, individual transactions obtained from retailers, while about 15% of the sales is estimated by IRI. *Id.* 18:13–25. The identity of private label products is generally masked. *Id.* 19:1–15. Weir properly confirmed the accuracy of the IRI data prior to using it:

> Q What did you do to confirm that the IRI data was accurate?
>
> A I looked at a number of indicia of the IRI data including its use by companies generally and defendants in this case. I looked at information provided by IRI to understand their data collection methods. There are other data sources, I think this is now going back five years so I apologize that my memory may not be perfect, but

> there were other sources of data against which I was able to compare
> the IRI data to determine that they were in agreement across multiple
> sources.
>
> Q So what sources of data did you compare [with] the IRI data you
> used?
>
> A There were, and I haven't looked at them recently, but there were
> other sales data that were provided to me back in 2015 against which
> I was able to compare the then current IRI data.

*Id.* 147:25–148:15.

Also obtained by Weir was sales data from online retailers Amazon.com and Drugstore.com and internal transaction-level data and coupon discount data from Defendant Costco. Weir Suppl. Decl. Kimberly-Clark ¶ 48; Weir Suppl. Decl. Costco ¶¶ 49, 51; Weir Suppl. Decl. Procter & Gamble ¶ 46. Weir explained in his reports that he obtained Nielsen market research data from Kimberly-Clark and Procter & Gamble; this material was not challenged at the hearing. Kimberly-Clark Weir Suppl. Decl. ¶ 49; Weir Suppl. Decl. Procter & Gamble ¶ 47.

The second type of data Weir obtained was product attribute data—information about what characteristics products claim, *e.g.*, flushability and number of sheets per package. Weir obtained and reviewed product labels in gathering this data. Evid. Hr'g Tr. 15:22–16:4. He did not obtain all historic label data, because, in his experience as an expert, that is not necessary when the attribute of interest is constant; he determined the flushable label is constant here. *Id.* 28:2–23, 38:5–12. He also obtained product attribute data from IRI. *Id.* 15:22–16:4.

*Second*, Weir prepared the data for use in a hedonic regression analysis. For Defendants Kimberly-Clark and Procter & Gamble, he used information from IRI for the necessary sales data. *Id.* 22:7–15. Although other data was available and it is "technically possible that it could be incorporated into the analysis," he claimed, the litigation schedule did not afford him the time

to include the additional data. *Id.* 22:13–15. For Defendant Costco, Weir used IRI and Costco sales data. Weir Suppl. Decl. Costco ¶ 57. These decisions by him had the effect of excluding all private label products for Defendants Kimberly-Clark and Procter & Gamble and private label products other than Costco's for Defendant Costco. Weir testified that this does not affect the robustness of the methodology, "[b]oth because of [his] past experience showing that inclusion of such products does not have a material result when they are included, but also because if you look at peer-reviewed literature you will see many people studying products but that don't include private label brands." Evid. Hr'g Tr. 762:1–6.

For each defendant, Weir integrated the sales data with product attribute information. Weir Suppl. Decl. Kimberly-Clark ¶ 55; Weir Suppl. Decl. Costco ¶ 57; Weir Suppl. Decl. Procter & Gamble ¶ 53. He identified "top-selling products representing a majority of the sales identified by IRI," obtained labels for those products, and generated a spreadsheet of manufacturer claims on the product labels and other product claimed attributes. *Id.* Weir had engaged in essentially the same analysis in *Pettit v. Procter & Gamble Company*. *Id.* He utilized in the instant litigation the data set of product attributes he prepared in that Northern District of California case. *Id.* For Defendant Costco, product label and attribute information from products sold at Costco were added to this data set. Weir Suppl. Decl. Costco ¶ 57.

He identified the following product attributes as variables to be used in the hedonic regression analysis: (1) "flushable" claims, (2) brand, (3) number of sheets, (4) number of packs, (5) wipe area, (6) package type, (7) baby & toddler/adult, (8) travel pack, (9) alcohol free, (10) hypoallergenic, (11) aloe & vitamin E, (12) fragrance/scent, (13) natural claims, and (14) sensitive/gentle claims. Weir Suppl. Decl. Kimberly-Clark ¶ 56; Weir Suppl. Decl. Costco ¶ 58; Weir Suppl. Decl. Procter & Gamble ¶ 54.

For Defendant Costco, whether the products were sold at Costco was also a variable.

Weir Suppl. Decl. Costco ¶ 58.

Weir explained in his reports and during the evidentiary hearing the variables and how he decided upon them:

> I had gone through a process of examining the underlying sales data, understanding which products were large sellers in the marketplace, reviewing the labels, reviewing the deposition testimony of corporate executives that work with these products to get an understanding of the likely product attributes for inclusion in the model and then running a number of regressions to test the specification of the model to find the specification that, in tandem with economic theory, the facts of the case and the statistics . . . for evaluating regression, appeared to produce a reliable result.

Evid. Hr'g Tr. 23:21–24:6. He explained that he took adequate steps to ensure he had all appropriate variables:

> . . . [T]hat's done through a combination of analysis of the facts at hand, looking at the nature of the products, looking at the statistics of the regression. There's no rule that says these are the attributes that you need to look at. It's basically something where you need to apply some amount of judgment based on the facts and circumstances of your research objective and the nature of what it is that you're studying.

*Id.* 25:19–26:1; *see also* Weir Suppl. Decl. Kimberly-Clark ¶¶ 57–70; Weir Suppl. Decl. Costco ¶¶ 59–73; Weir Suppl. Decl. Procter & Gamble ¶¶ 55–68.

After completing steps one and two, *third*, Weir performed the hedonic regression analysis with "Stata," a commercially available program that is widely used by economists; he found a price premium attributable to the flushable claim. Weir Suppl. Decl. Kimberly-Clark ¶¶ 71–72; Weir Suppl. Decl. Costco ¶¶ 74–75; Weir Suppl. Decl. Procter & Gamble ¶¶ 69–70. In reliance on econometric literature, he converted the sales data into quarterly data and analyzed product attributes and control variables as potential explanations of price. Weir Suppl. Decl. Kimberly-Clark ¶¶ 76–77; Weir Suppl. Decl. Costco ¶¶ 79–80; Weir Suppl. Decl. Procter &

Gamble ¶¶ 74–75.  After testing several different specifications, he concluded that the model is reliable in demonstrating whether there is a price premium associated with the flushable claim. Weir Suppl. Decl. Kimberly-Clark ¶ 78; Weir Suppl. Decl. Costco ¶ 81; Weir Suppl. Decl. Procter & Gamble ¶ 76.

Weir's results indicate that there is a marketwide percentage price premium for a wipe with a flushable claim:  The hedonic regression model developed for the Kimberly-Clark class demonstrates that consumers paid 6.215% more for a wipe advertised as flushable than they would have for a wipe not labeled as flushable; the hedonic regression model developed for the Costco class demonstrates that consumers paid 8.5619% more for a wipe advertised as flushable; and the hedonic regression model developed for the Procter & Gamble class demonstrates that consumers paid 7.95% more for a wipe advertised as flushable.  Weir Suppl. Decl. Kimberly-Clark ¶ 79; Weir Suppl. Decl. Costco ¶ 82; Weir Suppl. Decl. Procter & Gamble ¶ 77.

Various metrics confirm the reliability of the results, according to Weir.  The R-squared and the adjusted R-squared are widely used indicators of the explanatory power of a regression model; they demonstrate the percent variation in a dependent variable that can be explained by independent variables.  Weir Suppl. Decl. Kimberly-Clark ¶ 42; Weir Suppl. Decl. Costco ¶ 43; Weir Suppl. Decl. Procter & Gamble ¶ 40.  For each defendant, relatively high adjusted R-squared values indicate that the hedonic regression model explains the variation in the dependent variable to a high degree.  Weir Suppl. Decl. Kimberly-Clark ¶ 81 ("the model is explaining 92.7% of the variation of the dependent variable"); Weir Suppl. Decl. Costco ¶ 84 ("the model is explaining 94.9% of the variation of the dependent variable"); Weir Suppl. Decl. Procter & Gamble ¶ 79 ("the model is explaining 92.8% of the variation of the dependent variable").

Weir also explained that the F-statistic, an indicator of explanatory power which helps determine whether the model makes statistical sense, confirms that the model has "strong explanatory power." Weir Suppl. Decl. Kimberly-Clark ¶¶ 43, 81; Weir Suppl. Decl. Costco ¶¶ 44, 84; Weir Suppl. Decl. Procter & Gamble ¶¶ 41, 79.

A third metric, the T-statistic is used to evaluate whether a result is statistically significant. Weir Suppl. Decl. Kimberly-Clark ¶ 44; Weir Suppl. Decl. Costco ¶ 45; Weir Suppl. Decl. Procter & Gamble ¶ 42. It indicates that the result for each defendant is statistically significant at the 99% confidence level. Weir Suppl. Decl. Kimberly-Clark ¶ 82; Weir Suppl. Decl. Costco ¶ 85; Weir Suppl. Decl. Procter & Gamble ¶ 80.

In sum, Weir concluded that there is a strong likelihood that each member of the three classes paid a percentage amount more for a wipe with a flushable claim than they would have if the wipe did not have a flushable claim. Evid. Hr'g Tr. 759:8–10 ("[I]f we observe a marketwide price premium, then all consumers universally are impacted by that marketwide price premium."). Weir explained that the marketwide premium is unaffected by discounts, promotions, or special offers, because "[b]y lowering the product's overall price, you will lower the cash amount that people have paid in premium but not the change in value for that product." *Id.* 759:21–23.

The apparent mismatch between the time periods of the certified classes and the models was addressed by Weir. To the extent that the model does not include data from 2008 and 2009, years which are part of the Kimberly-Clark class period, Weir stated that "it would be . . . reasonable . . . to apply the premium for the longer period for which we have data to" 2008 and 2009, "based on what [he has] seen from [his] regression results." *Id.* 141:20–24, 143:21–23. Weir also testified that using his model on various date ranges ending in 2017, when the class

periods currently end, also results in a calculable price premium. *See id.* 765:10–767:21, 773:20–775:18, 776:18–24.

Overall, Weir presented his analysis clearly and precisely during the hearings on remand. This court found him qualified, reasoned, deliberate, and credible. His regression calculations took into account the relevant objections of Defendants' experts, and he responded at length, and convincingly, to the criticisms of Defendants' experts, *see infra*, Sections II.C.2, II.C.3, II.C.4. *See generally* Evid. Hr'g Tr. 10:18–227:7, 233:6–235:11, 758:12–789:5. He explained the reasoning for various judgments he, as an expert, made and described how changing the model to account for "mistakes" or "problems" raised by Defendants did not change the accuracy of his model. *See id.* 758:12–768:3, 773:12–779:5.

Defendants moved to exclude Weir's report and testimony. *See* Kimberly-Clark Corp.'s Post-Hr'g Br. Supp. Oral Mot. Exclude Test. Colin Weir & Opp'n Class Cert. 14–40, No. 14-cv-1142, ECF No. 362; Def. Costco Wholesale Corp.'s Post-Hr'g Br. Supp. Decert. Class 25–31, No. 14-cv-1142, ECF No. 379 (filed under seal as Def. Costco Wholesale Corp.'s Post-Hr'g Br. Supp. Decert. Class, No. 14-cv-1142, ECF No. 358-1); Def. Procter & Gamble Co.'s Mem. L. Supp. Decert. Damages Class Pursuant Mandate Ct. Appeals 2d Cir. 2 n.2, No. 14-cv-4090, ECF No. 322. Those motions are discussed *infra*, in Section III.A, and are denied.

### 2. Dr. Keith R. Ugone

Kimberly-Clark's expert rebutting Weir is Dr. Keith R. Ugone, a Managing Principle at Analysis Group. Kimberly-Clark Ugone Suppl. Decl. ¶ 13. Dr. Ugone has a B.A. from the University of Notre Dame, an M.A. from the University of Southern California, and a Ph.D. from Arizona State University—all in economics. *Id.* ¶ 16. In his current position, he provides economic, financial, and damages-related consulting services to clients, and has done so in many litigations, including consumer actions. *Id.* ¶ 14. Although Dr. Ugone has performed economic

analyses of various types, he has never developed and performed a hedonic regression analysis from start to finish. Evid. Hr'g Tr. 403:16–404:7. He noted during the hearing that "it's very much an art in terms of putting [a hedonic regression analysis] together." *Id.* 406:4–5.

During prior class certification proceedings, Dr. Ugone raised a number of criticisms about Weir's proposed hedonic regression analysis, *see Kurtz*, 321 F.R.D. at 525, which he largely repeated in his post-mandate report and during the post-mandate hearing. Dr. Ugone's criticisms fall into three categories.

*First*, hedonic regression analysis is inappropriate in this case since evaluating the alleged economic injury requires individualized inquiry because consumers (1) vary in their reasons for purchasing flushable wipes, (2) have different knowledge, perception, and behavior as to the flushable claim, (3) have different post-purchase experiences, and (4) paid different prices for wipes. Kimberly-Clark Ugone Suppl. Decl. ¶¶ 26–61.

*Second*, Weir's analysis is flawed because (1) the challenged products' consistency in price over time suggests the lack of a causal link between the alleged misrepresentations and any price premium; and (2) inappropriate product categories are compared, attributes affecting price are ignored, and Weir's dataset is incorrectly and inappropriately composed. *Id.* ¶¶ 62–96. Dr. Ugone attempted to support his objection by having his staff run Weir's model for alternate time periods and to control for other attributes, resulting in significant variation in result as to the price premium, including results showing price premiums that are allegedly not statistically significant. *Id.* ¶¶ 76–96; Evid. Hr'g Tr. 420:5–18.

And, *third*, Weir's methodology would not result in a reliable measure of damages if a "full refund" was used to calculate damages. Kimberly-Clark Ugone Suppl. Decl. ¶¶ 97–102.

In coming to these conclusions, Dr. Ugone reviewed depositions, documentary evidence, Weir's reports, and the data underlying Weir's reports. Evid. Hr'g Tr. 335:22–336:7; Kimberly-Clark Ugone Suppl. Decl. ¶ 18.

Dr. Ugone was qualified and systematic in his approach to his rebuttal exercise.

Plaintiff Kurtz moved to exclude Dr. Ugone's testimony. Pl.'s Omnibus Mem. L. Further Supp. Pl. Kurtz's Mot. Class Cert. & Opp'n Defs' Mots Deny Class Cert., & Supp. Pl.'s Mot. Strike Opinions Kimberly-Clark's Expert Witness 47–56, No. 14-cv-1142, ECF No. 360. That motion is discussed *infra*, in Section III.B, and it is denied.

### 3. Dr. Denise Martin

Costco's rebuttal expert is Dr. Denise Martin, a Managing Director at NERA Economic Consulting. Costco Martin Suppl. Decl. ¶ 4. She has been retained as an economic expert in more than 200 class actions. *Id.* ¶ 5. During her undergraduate economics studies at Wellesley College and her graduate economics studies at Harvard University, from which she obtained a Ph.D., Dr. Martin was trained in economic methods, including hedonic regression analysis. *Id.* ¶ 4. But, like Dr. Ugone, Dr. Martin has never developed and performed a hedonic regression analysis from start to finish. Evid. Hr'g Tr. 715:23–716:7.

Dr. Martin submitted expert reports criticizing Weir's proposed methodology during the prior class certification proceedings, *see Kurtz*, 321 F.R.D. at 524–25. Post-remand, she criticizes Weir on five principle grounds. *First*, assuming that using only Costco data for the hedonic regression analysis would be appropriate, doing so would be impossible because all of Costco's wipes with a flushable claim are for adults, resulting in collinearity and an inability to separate any effect of the flushable claim on price from an effect of the adult claim on price. Costco Martin Suppl. Decl. ¶¶ 7–18. *Second*, by relying on data for non-Costco products, Weir provides a premium that is not specific to Costco and, "at best" estimates an average relationship

across all retailers and brands. *Id.* ¶¶ 19–21. *Third*, Weir ignores evidence that (1) prices at Costco are deliberately low and set by adding to costs a fixed amount, and (2) the price premium for flushable wipes at Costco, as compared to non-flushable Costco brand wipes, could be because of volume discounting. *Id.* ¶¶ 22–24. *Fourth*, because the market for wipes is not perfectly competitive, the coefficient measuring the relationship between the flushable claim and price Weir calculates is not equivalent to a price premium. *Id.* ¶ 25a. Dr. Martin noted, however, that this criticism does not mean that "you can't run a hedonic regression analysis in a market that's not perfectly competitive[,]" clarifying that she disagreed with Weir "interpret[ing] the coefficient on the flushable attribute . . . as the difference in price." Evid. Hr'g Tr. 651:19–652:3. *Fifth*, even assuming that hedonic regression could calculate a price premium, Weir's definition of flushable is overbroad and wipes offer other benefits, which Weir omitted as variables. Costco Martin Suppl. Decl. ¶ 25b. Dr. Martin also concludes that Weir incorrectly defined the market of products and inappropriately chose product data for his analysis. *Id.* at 3 n.10; *id.* at 8 n.20.

The court found Dr. Martin qualified, forthcoming, and deliberate in her approach to rebutting Weir.

### 4. Dr. Carol A. Scott

Procter & Gamble's rebuttal expert, Dr. Carol A. Scott, was part of prior proceedings. *See Kurtz*, 321 F.R.D. at 524. Dr. Scott obtained her B.S. in business and history education from the University of Texas at Austin, and has an M.S. in management and a Ph.D. in marketing from Northwestern University. Procter & Gamble Scott Suppl. Decl. Ex. A, at 2. She is a Professor Emeritus of marketing at the Anderson Graduate School of Management, University of California, Los Angeles. Procter & Gamble Scott Suppl. Decl. ¶ 2. She has taught a number of

marketing courses and her marketing research has been published widely. *Id.* ¶ 3. Dr. Scott has provided expert analysis and testimony in litigation. *Id.* ¶ 2.

Dr. Scott criticizes Weir's approach and methodology as follows: *First*, the data underlying Weir's analysis is insufficient because (1) price was not available for private label products, (2) Weir used inaccurate product characteristics and package claims, particularly when package claims changed, (3) he included in the market products that are not direct competitors to flushable wipes, and (4) his decision as to what products to include was arbitrary. *Id.* ¶¶ 15–36. *Second*, the hedonic regression Weir performed cannot calculate the price premium for the flushable claim because Weir made no effort to account for any correlation between "superior cleaning capability" and flushability, and Weir's definition of flushable fails to account for the potential value of individual benefits. *Id.* ¶¶ 37–50. *Third*, Weir made statistical mistakes in his analysis; he used a time period longer than the proposed class period and incorrectly coded brands of wipes, correction of which resulted in there being no statistically significant price premium. *Id.* ¶¶ 52–63. Dr. Scott explained that Weir's analysis also runs counter to real world evidence demonstrating that Procter & Gamble did not decrease the price of its Always feminine hygiene wipe when the flushable label was removed. Evid. Hr'g Tr. 509:5–513:2.

Dr. Scott was credible and deliberate, but not convincing, in her attack on Weir's results.

### III. Admissibility of Expert Testimony

Expert testimony is admissible when the witness is "qualified as an expert by knowledge, skill, experience, training or education" and the proposed "testimony is based upon sufficient facts or data" and "is the product of reliable principles and methods" "reliably applied to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms*, 509 U.S. 579 (1993). District courts act as gatekeepers with respect to expert evidence and have "broad discretion" to determine whether such evidence should be admitted or excluded. *Amorgianos v. Nat'l R.R.*

*Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). Important to this inquiry is that a district court "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266.

The testimony of Dr. Martin and Dr. Scott is admissible. At issue are motions to exclude the testimony of Weir and Dr. Ugone. As indicated on the record, both motions are rejected. *See* Tr. 6:11–17, Oct. 8, 2019. Though the experts disagree, they were highly qualified in fields relevant to inquiries made here. That the court found Weir more reliable than Dr. Ugone is not a basis for striking the latter's opinion.

### A. Colin B. Weir

Weir is qualified by education and experience to conduct hedonic regression analyses. *See supra*, Section II.C.1. He worked for several years in the consumer retail field and has conducted many hedonic regression analyses. Other courts have concluded that he is qualified to render such opinions. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, No. 16-CV-04955-LHK, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019); *Pettit v. Procter & Gamble Co.*, No. 15-CV-02150-RS, 2017 WL 3310692, at *4 (N.D. Cal. Aug. 3, 2017); *Scotts EZ Seed*, 304 F.R.D. at 413–14.

Weir's analysis is based upon sufficient data. Reliable methods were properly applied to that data. Hedonic regression analyses are widely accepted as sound statistical models of proof in consumer actions of this nature. *See, e.g.*, *Hadley*, 2019 WL 3804661, at *24; *Schmitt v. Younique LLC*, No. SACV171397JVSJDEX, 2019 WL 1431906, at *9–10 (C.D. Cal. Jan. 10, 2019); *Pettit*, 2017 WL 3310692, at *4; *Langan v. Johnson & Johnson Consumer Companies, Inc.*, No. 3:13-CV-1470 (JAM), 2017 WL 985640, at *5–8 (D. Conn. Mar. 13, 2017), *vacated and remanded on other grounds*, 897 F.3d 88 (2d Cir. 2018); *Kumar v. Salov N. Am. Corp.*,

No. 14-CV-2411-YGR, 2016 WL 3844334, at *10 n.10 (N.D. Cal. July 15, 2016); *Scotts EZ Seed*, 304 F.R.D. at 413–14.

Lack of perfect competition in the flushable toilet wipes market, assuming that is the case, does not mean that hedonic regression analysis is inadmissible as evidence of a price premium. The competitive status of the market can be properly considered in assigning weight to the statistical evidence. Defendants' resort to cases discussing fraud-on-the-market and claims arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, offer no support for rejecting a commonly accepted statistical method of proof.

*In re NJOY, Inc. Consumer Class Action Litigation*, a case from the United States District Court for the Central District of California which is not binding on this court, similarly offers no support for exclusion. *See In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428-JFW (JEMX), 2016 WL 787415 (C.D. Cal. Feb. 2, 2016). There, the court declined to exclude a hedonic regression analysis but later concluded that lack of perfect competition in the market, in addition to other issues specific to the particular model, made the model an insufficient basis for class certification. *Id.* at *9.

Regressions should not be excluded on the ground that they fail to meet arbitrary thresholds of statistical significance. In the current case, there are high degrees of statistical significance and any dispute about economic conclusions goes to weight not admissibility. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362–63 (7th Cir. 2001) ("The question whether a study is responsible and therefore admissible under the *Daubert* standard is different from the weight to be accorded to the significance of a particular correlation found by the study. It is for the judge to say, on the basis of the evidence of a trained statistician, whether a particular significance level, in the context of a particular study in a particular case, is too low to make the

study worth the consideration of judge or jury."); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *15 (N.D. Cal. Apr. 4, 2014) ("The Court finds that the fact that these two variables are not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of [the] model.").

Nor does Weir's use of IRI data render his testimony inadmissible as based on unreliable data. In *In re Amla Litigation*, the court decertified a class of consumers on the basis that use of IRI projections was unreliable without additional inquiry into the methodology by which those projections were made. *See In re Amla Litig.*, 16-cv-6593, ECF No. 332 (S.D.N.Y. Aug. 7, 2019). Here, Weir obtained transaction-level data directly from IRI and reviewed the company's methods of data collection to test reliability.

Weir carefully developed and executed his hedonic regression model and actually produced it. He identified his research objective, studied the products and the market, carefully collected and analyzed data, used a widely-accepted analytical model, and tested his results. During the evidentiary hearing, he described this process at length, including how and why he made judgments as to what product data to collect and use, attribute selection and definition, and extrapolation of results to time periods and products not included in the data.

Any objections to Weir's specific hedonic regression analyses go to weight rather than admissibility. The development of a hedonic regression is, as Dr. Ugone said, "an art." None of Defendants' experts developed a hedonic regression from scratch as Weir did; their second-guessing of his choices in attempting to demonstrate that the methodology is unreliable is unpersuasive. To the extent that Defendants contend that individual issues undermine the reliability of Weir's analysis, such as the inability to define "flushable," these arguments have already been considered and rejected by this court. *See generally Kurtz*, 321 F.R.D. 482.

Plaintiffs have demonstrated that Weir's opinions are based on sufficient, reliable facts and data and that their expert applied an accepted, deliberately designed methodology reliably to form his opinions. Weir's opinions are admissible.

## B. Dr. Keith Ugone

The court rejects Plaintiff Kurtz's motion to exclude Dr. Ugone's testimony. As already described, he is qualified by education and experience to offer his opinions. *See supra*, Section II.C.2. He offered a well-reasoned explanation of why he opined that hedonic regression analysis, and common economic proofs more generally, are insufficient in this case as a matter of economics, not as a matter of law. Though the fact that he has not developed and performed a hedonic regression analysis is important in assigning weight to his testimony, it does not require exclusion of his opinions. *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial."). Nor does his work with a team of individuals require exclusion, when he reviewed depositions, documents, Weir's report, and the data underlying Weir's report. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) ("An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify.").

Dr. Ugone's opinions are admissible.

## IV. Predominance

To certify a damages class under Federal Rule of Civil Procedure 23(b)(3), "a plaintiff . . . must establish [, *inter alia*,] predominance—that questions of law or fact common to class members predominate over any questions affecting only individual class members." *Johnson v.*

*Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). "The . . . predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). At issue is whether questions common to the class "can be answered . . . as a whole through generalized proof and that those common issues are more substantial than individual ones." *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) (citation omitted). Predominance "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Sykes v. Mel S. Harris and Assocs LLC*, 780 F.3d 70, 81 (2d Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 469 (2013) (emphasis in original)). And plaintiffs need not be prepared at the certification stage "to demonstrate through common evidence the precise amount of damages incurred by each class member." *Sykes*, 780 F.3d at 82 (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)).

The Court of Appeals for the Second Circuit has asked this court to review the record and conclude whether Plaintiffs have demonstrated that they can prove "injury and causation . . . at trial with common evidence" so that they "have affirmatively demonstrated [their] compliance with Rule 23(b)(3)'s predominance requirement." *Kurtz*, 768 F. App'x at 41 (internal quotation marks and citation omitted). Before appeal, this court concluded that Plaintiffs had met this burden. The same conclusion is reached on remand.

Plaintiffs introduced evidence—the analysis and testimony of Weir—supporting the contention that there is a marketwide price premium attributable to the flushable label on toilet wipes, and that every New York consumer paid a percentage amount more for flushable toilet wipes as a result of this characterization. *See supra*, Sections II.C.1, III.A. The evidence sufficiently demonstrates that common evidence can prove causation and injury. Other courts

have certified classes of consumers with similar evidence.  *See, e.g.*, *Hadley*, 2019 WL 3804661, at \*24; *Schmitt*, 2019 WL 1431906, at \*9–10; *Pettit*, 2017 WL 3310692, at \*4; *Kumar*, 2016 WL 3844334, at \*10; *Scotts EZ Seed*, 304 F.R.D. at 413–14; *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571–72 (S.D.N.Y. 2014).

Defendants argue that Weir's hedonic regression analysis fails to comply with rules articulated in *Comcast Corporation v. Behrend*, in which the Supreme Court reversed certification of a Rule 23(b)(3) class because the regression model in question accounted for four theories of antitrust injury, rather than the one antitrust injury still at issue in the class litigation. 569 U.S. 27, 31–36 (2013).  Defendants contend that everything from Weir's product attribute choices to his data selection fail *Comcast*.  This is a misreading of that case.  "*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury . . . ." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citing *Comcast*, 569 U.S. at 34–35).

Weir's model and testimony match Plaintiffs' *single* theory of the case that consumers paid more for flushable toilet wipes because of the flushable label on Defendants' products. Disagreement about Weir's judgments in developing and performing the model, as well as disagreement about whether Weir's judgment about extrapolation of the results of his model to certain time periods or products, are questions answerable by admitted evidence.  Weir made reasoned decisions about how to actually construct and run a model testing Plaintiffs' theory of liability.  The model fits the theory of Plaintiffs' case.  *See Scotts EZ Seed*, 304 F.R.D. at 414 ("In sum, plaintiffs' full compensatory damages and price premium damages models satisfy *Comcast* because they match plaintiffs' theories of liability.").

Defendants raise a number of arguments opposing predominance. They claim that predominance is defeated by the plethora of individualized issues. Individual issues do not predominate for the reasons already explained. *See Kurtz*, 321 F.R.D. at 547–52. Plaintiffs allege that they were injured at the time of purchase of Defendants' products when they paid a marketwide inflated price because of the flushable label. Individual understanding of the term "flushable," experiences of flushability after purchase, or even motivations for purchase do not affect the price paid at the cash register. *See Ebin*, 297 F.R.D. at 568–69 (explaining that whether or not a class member wanted to purchase a product with a misleading label, "they nevertheless paid too much for it"). Of no consequence are arguments that Plaintiffs have not demonstrated that any single consumer was injured. Plaintiffs have submitted proof that every consumer paid a percentage amount more for wipes labeled flushable, regardless of what price was actually paid or the subsequent use of the wipes, because of a marketwide price premium caused by the flushable label.

No field work demonstrates, at this point in the litigation, what percentage of consumers who buy Defendants' wipes use them for something other than toileting purposes or use the wipes for toileting purposes but do not flush them. Such evidence might be useful, but the lack of it, at this stage of the litigation before discovery is completed, does not weigh against concluding that Plaintiffs have met their burden on predominance for certification purposes.

A related criticism is that Weir generated an average relationship between price and the flushable label across the market, unrelated to any particular defendant's product or conduct. This ignores Plaintiffs' contention that there is a *marketwide inflation of price by a particular calculable percentage*. For *every* flushable wipe product purchased, the consumer paid more

because of the flushable misrepresentation. There is no need for individualized inquiry as to causation or injury.

To the extent that Defendants have raised concerns about Weir's model and its ability to calculate damages, notably their arguments that there are individualized issues of when or where a consumer made her purchase, these arguments are rejected. "Plaintiffs need not prove exactly what their damages will be." *Kurtz*, 321 F.R.D. at 450; *see also Roach*, 778 F.3d at 407 ("*Comcast* . . . did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance.").

In the instant case, if liability is found, precise statutory damages may be requested on a classwide basis. N.Y. Gen. Bus. Law § 349(h) (providing for statutory damages of $50 to each class member for each time defendant violated the statute by a sale). "The single question of whether plaintiffs paid more than they would have for the good because of the deceptive practices of the defendants-sellers in labeling their products as 'flushable' predominates over any individualized damages inquiries." *Kurtz*, 321 F.R.D. at 550–51.

Finally, Defendants contend that market evidence, such as Defendants' pricing policies and the stability of flushable toilet wipe prices over the time in which alleged misrepresentations have been covered by the media, contradict Plaintiffs' evidence of a marketwide price premium. This argument does not negate the force of the regression as the court considers predominance.

Plaintiffs have met their burden and produced common proof of causation and injury. Individualized issues do not predominate. In Weir's expert declarations supporting class certification submitted pre-remand, he raised two other alternative methods for determining a price premium:

> It would also be possible to evaluate the difference in price attributable to the "flushable" label ... using statistical survey techniques such as contingent valuation (a representative survey technique that asks people to directly report their willingness to pay to obtain a specific good or product attribute, or willingness to accept to give up a good or product attribute) or conjoint analysis (a representative survey technique where survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof) the results of which permits an economist to analyze the value of various product attributes.

*Kurtz*, 321 F.R.D. at 524.  Neither type of analysis has been covered during the remand period.  They are not needed since the regression used was sufficient to show unity of class.  The district court's current certification orders are maintained.

## V. Conclusion

Plaintiffs' claims—also raised by consumers in other states and by municipalities—would best be resolved on a national basis.  Coordinated resolution by the appropriate federal administrative authorities may need to be considered.  *See Kurtz*, 321 F.R.D. at 495–96; *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 79 (E.D.N.Y. 2015) ("Whether wipes should be labeled 'flushable' is a national issue that requires a single national resolution.").  In the absence of such appropriate action, a global settlement through which manufacturers and retailers such as Defendants are subject to a single set of rules governing flushability and packaging might be preferable and a basis for a simple national settlement.

After remand, Defendant Procter & Gamble advised this court of its resolution of consumer litigation concerning claims similar to Plaintiffs' covering wipes labeled as flushable purchased in all United States jurisdictions outside of New York State.  *See* Letter from C. Lannin, No. 14-cv-4090, ECF No. 277; Order Granting Final Approval Class Action Settlement

& J., No. 15-cv-2150 (N.D. Cal. Mar. 28, 2019), ECF No. 135.  New York consumers were not included in the settlement.

The economic strength of the United States can be attributed, in part, to its single common market with uniform products sold throughout the country.  *Cf. Granholm v. Heald*, 544 U.S. 460, 472 (2005) ("States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses.  This mandate 'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979)); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976) ("[T]his Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods in response to the economic laws of supply and demand.").

The desirability of a single common market with uniform products is enhanced by the New York State damages provision applicable in this class action.  Plaintiffs seek $50 for each purchase during the class period, pursuant to New York General Business Law Section 349, which permits a plaintiff "to recover his actual damages *or fifty dollars, whichever is greater*." N.Y. Gen. Bus. Law § 349(h) (emphasis added); *see Kurtz*, 321 F.R.D. at 500–02.

A recovery of this nature in a class action—potentially a total of many tens of millions of dollars— is permitted in federal court by Supreme Court precedent, but would arguably be prohibited were the class action brought in a New York State court.  *Compare* N.Y. CPLR § 901(b) ("Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or

minimum measure of recovery created or imposed by statute may not be maintained as a class action."), *with Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–416 (2010) (concluding that N.Y. CPLR Section 901(b) did not preclude federal class actions seeking statutory damages under New York State law); *see also Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1014–16 (N.Y. 2007) (evaluating the application of CPLR Section 901(b) and whether treble antitrust damages are a "penalty" not recoverable in a class action, while explaining that "the determination of whether a certain provision constitutes a penalty may vary depending on the context.").

Complex *Erie* problems raising and intermingling substantive and procedural issues will need thorough consideration as this class action proceeds. *Compare Shady Grove*, 559 U.S. at 398–416, *with id.* at 436–59 (Ginsburg, J., dissenting); *see also Kurtz*, 321 F.R.D. at 501–02 (citing New York academics and caselaw in support of the contention that the dissenting opinion in *Shady Grove* would be operative in the present case); *Belfiore*, 311 F.R.D. at 54–59 (discussing New York State law's limits on predetermined damages and the Supreme Court's opinion in *Shady Grove*).

It should be noted that New York State policy supports denying Plaintiffs the right to seek the statutory penalty of $50 per purchase here. *See Kurtz*, 321 F.R.D. at 501–02; *Belfiore*, 311 F.R.D. at 54–59. CPLR Section 901(b) represents a policy decision of the New York State legislature. Historically, New York's use of "§," rather than "Rule," "section" being used for CPLR Section 901(b), denoted that only the New York State legislature had power to approve changes in the provision—as compared with federal civil rules developed essentially under Supreme Court control. *See* Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 102.01 (David L. Ferstendig ed., 2019) ("Originally, the Judicial Conference [of New York]

29

was authorized to adopt, amend or rescind rules of civil practice in the CPLR, subject to legislative approval. This power was limited to the rules of the CPLR and did not extend to the sections of the CPLR. The State Legislature also had the power to amend, repeal or add to the rules or sections by legislative act."). The distinction between sections and rules was eliminated in 1978 without any change in the policy underlying governance of CPLR Section 901(b). *Id.*

The damages issue, in light of the settlement of all but claims by New Yorkers, presents serious substantive legal questions controlling the litigation.

Should the parties begin settlement discussions again, they should consider doing so in a manner that would harmonize any relief granted by this court with that afforded by the geographically expansive Procter & Gamble settlement so that national uniform products can be produced by each defendant.

The parties' motions to exclude the testimony of Weir and Dr. Ugone are rejected. The decision certifying a Rule 23(b)(3) class is reasserted. Common issues predominate over individual issues.

SO ORDERED.

 s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated: October 25, 2019
         Brooklyn, New York