**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

ANTHONY BELFIORE, on behalf of himself
and all others similarly situated,

Plaintiff,

                vs.

THE PROCTER & GAMBLE COMPANY,

Defendant.

14 Civ. 4090 (PKC)(RML)

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION**
**FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 2

INTRODUCTION ............................................................................................................... 1

BACKGROUND FACTS AND DETAILS OF SETTLEMENT ........................................ 5

    Litigation History ........................................................................................................ 5

        Belfiore Action ........................................................................................................ 5

        *Pettit* Action .......................................................................................................... 7

    The Pettit Settlement .................................................................................................. 8

        Monetary Relief .................................................................................................... 8

        Changed Practices ................................................................................................ 8

    The Settlement of This Action ................................................................................. 10

        Monetary Relief .................................................................................................. 10

        Changed Practices .............................................................................................. 11

        Administrative Expenses, Attorneys' Fees and Costs, and Class Representative
           Payment ....................................................................................................... 12

        Notice Plan ......................................................................................................... 13

    Plaintiff's Analysis of the Settlement ...................................................................... 14

ARGUMENT ..................................................................................................................... 15

I.        PRELIMINARY APPROVAL IS WARRANTED .............................................. 15

    A.     The Settlement Class Should Be Certified.................................................... 17

    B.     The Court Will More Likely Find That the Settlement Is Fair, Reasonable, and
        Adequate ........................................................................................................ 18

        1.     The Settlement Is the Result of a Fair, Reasonable, and Adequate
           Process ................................................................................................... 18

        2.     The Settlement Provides Fair, Reasonable, and Adequate Substance for
           Settlement Class Members.................................................................... 20

II.       DATES FOR THE FINAL APPROVAL PROCESS .................................................... 28

CONCLUSION .................................................................................................................. 29

# **TABLE OF AUTHORITIES**

**Cases**

*Belfiore v. P&G*,
    140 F. Supp. 3d 241 (E.D.N.Y. 2015) .................................................................... 6

*Berkson v. Gogo LLC*,
    147 F. Supp. 3d 123 (E.D.N.Y. 2015) .................................................................. 17

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ............................................................................. 15

*Chavarria v. New York Airport Service, LLC*,
    875 F. Supp. 2d 164 (E.D.N.Y. 2012) ........................................................ 4, 20, 23

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ............................................................................ 4, 16

*Eisen v. Carlisle and Jacquelin*,
    417 U.S. 156 (1974) ............................................................................................ 24

*Gonzalez v. City of New York*,
    396 F. Supp. 2d 411 (S.D.N.Y. 2005) ................................................................. 26

*Hecht v. United Collection Bureau, Inc.*,
    691 F.3d 218 (2d Cir. 2012) ................................................................................ 25

*In re Agent Orange*,
    818 F.2d 145 (2d Cir. 1987) ................................................................................ 25

*In re Citigroup Inc. Securities Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................................. 20

*In re MetLife Demutualization Litig.*,
    262 F.R.D. 205 (E.D.N.Y. 2009) ......................................................................... 25

*In re Michael Milken and Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) ..................................................................... 4, 20

*In re Netflix Privacy Litig.*,
    Case No. 5:11-CV-00379 EJD, 2012 U.S. Dist. LEXIS 93284 (N.D. Cal. July 5, 2012) .......... 25

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................... 16, 17, 23

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................... 26

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) ......................................................................... 4

*Kurtz v. Kimberly-Clark Corp., et al.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) ............................................................................... 5, 6

*Kurtz v. Kimberly-Clark Corp.*,
    No. 14-CV-1142, 2019 U.S. Dist. LEXIS 185334 (E.D.N.Y. Oct. 25, 2019)............... 6, 21, 22

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ..................................................................................... 23

*Padovano v. FedEx Ground Package Sys.*,
    No. 16-CV-17-FPG, 2019 U.S. Dist. LEXIS 107092 (W.D.N.Y. June 10, 2019) .................. 17

*Pettit v. Procter & Gamble Co.*,
    Case No. 15-cv-02150-RS, 2017 U.S. Dist. LEXIS 122668 (N.D. Cal. Aug. 3, 2017) ............ 7

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)................................................................................................. 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................................... 4, 15, 19, 24

*Zink v. First Niagara Bank, N.A.*,
    155 F. Supp. 3d 297 (W.D.N.Y. 2016)......................................................................... 25

**Statutes**

N.Y. G.B.L. § 349 ............................................................................................................ 22

New York G.B.L. § 349 ....................................................................................................... 5

**Other Authorities**

Manual for Complex Litigation, Third, §30.42 (1995).................................................................. 4

**Rules**

Fed. R. Civ. P. 23(c) ...................................................................................................... 24, 26

Fed. R. Civ. P. 23(e) ...................................................................................................... 16, 17

**INTRODUCTION**

Plaintiff Anthony Belfiore respectfully moves for preliminary approval of a proposed class action settlement (the "Settlement") with Defendant The Procter & Gamble Company ("P&G"), the terms and conditions of which are set forth in the Settlement Agreement.[1] P&G does not oppose this motion and has approved the form of the proposed Order of Preliminary Approval submitted herewith.

This case concerns Charmin Freshmates Flushable Wipes and any other pre-moistened wipes sold under the Charmin brand name bearing the word "flushable" on the package label (the "Product"). Plaintiff Anthony Belfiore filed a complaint alleging that P&G marketed and sold the Product with the representations "flushable," "septic safe," and "safe for sewer and septic systems," although the wipes are not suitable for disposal by flushing down a toilet, are not regarded as flushable by municipal sewage system operators, do not disperse upon flushing, and routinely damage or clog plumbing pipes, septic systems, and sewage lines and pumps. P&G denies these allegations and maintains that the Product performs as advertised.

Judge Weinstein certified a class of New York consumers on March 27, 2017, and renewed its prior certification order after remand by the Second Circuit Court of Appeals, on October 25, 2019, with Belfiore as the named plaintiff. After protracted discovery and investigation by Plaintiff's Counsel (or "Class Counsel"), the Parties participated in a mediation with Magistrate Judge Gold on November 25, 2019 after a previous session with a different mediator, which failed to result in a resolution of the matter. However, negotiations between the

---

[1]     The Settlement Agreement dated February 10, 2020 (the "Settlement Agreement"), is attached as Exhibit 1 to the Declaration of Matthew Insley-Pruitt filed contemporaneously ("Insley-Pruitt Declaration"). The notices, claim form, and proposed orders are also attached to the Settlement Agreement. Unless otherwise indicated, capitalized terms are defined in the Settlement Agreement and all emphasis is added.

Parties' Counsel in the months thereafter ultimately resulted in the proposed Settlement memorialized in the Settlement Agreement.  This proposed Settlement comes more than a year after the settlement in *Pettit v. The Proctor & Gamble Company*, Case No. 3:15-cv-2150 RS (the "*Pettit* Action"), a settlement on behalf of consumers of the Product in all 49 states other than New York alleging similar claims as in this Action.[2]

As recognized in the Settlement Agreement, due in part to the *Pettit* Action and in part to this Action, P&G has already stopped manufacturing the Product in the formulation(s) in use at the time the Action commenced.  P&G also agreed that versions of the Product manufactured after January 2016 do not, and will not, contain bicomponent (polyester/polyolefin) fibers.  P&G also agreed to be subject to an injunction order by the Court in the *Pettit* Action further modifying the marketing of the Product and setting forth testing protocols with which the Product must comply, for which Plaintiff in this Action was partially responsible.  Indeed, pursuant to the proposed Settlement, P&G has agreed to a further extension of the injunction for a period that extends two years from the Effective Date of the Settlement.

As was the case in the settlement of the *Pettit* Action (the "*Pettit* Settlement"), the Parties in this Action have agreed to a claims-made settlement.  Each Settlement Class Member, upon submission of a Valid Claim, shall receive a refund that is approximately two to three times their actual damages, according to Plaintiff's own expert's calculations.  In the *Pettit* Settlement, each *Pettit* Class member (defined below) had the right to receive a refund of sixty cents ($0.60) for each package of the Product they purchased outside of New York during the Class Period, regardless of the price the *Pettit* Class member paid for the package or the number of wipes contained in each package.  Pursuant to the Settlement Agreement in this Action, Settlement Class Members,

---

[2] The *Pettit* Settlement expressly did not affect claims for purchases of the Product made in New York.

without proof of purchase, have the right to receive a refund of seventy cents ($0.70) (an 11.7% improvement over the *Pettit* Settlement). Settlement Class Members who have Proof of Purchase receive a refund of one dollar and twenty cents ($1.20) for the first package they have proof for and one-dollar ($1.00) per each package with proof thereafter toward a maximum (a 100% and 50% improvement over the *Pettit* Settlement, respectively). Additionally, the *Pettit* Settlement provided that Claims without Proof of Purchase are limited to seven (7) packages ($4.20) per Household, and Claims with Proof of Purchase are limited to fifty (50) packages ($30.00) per Household. In the Settlement here, Claims without Proof of Purchase can get a refund for up to nine (9) packages ($6.30 per Household, a 50% increase over the *Pettit* Settlement), and packages for Settlement Class Members with Proof of Purchase can get a refund for up to $50.20 per Household (a 67.3% increase over the *Pettit* Settlement).

Moreover, while the allegations brought in both this Action and the *Pettit* Action claimed that the Product label said that it was "septic safe" and "safe for sewer and septic systems" when it was not (*see, e.g.*, Dkt. No. 1 at ¶ 1 (*Belfiore* complaint); Insley-Pruitt Decl. Ex. 2 at ¶ 20 (*Pettit* complaint)), the *Pettit* Settlement did not address that concern. However, pursuant to the Settlement Agreement in this Action, P&G has agreed to remove that part of the current Product label that says "septic safe" and "safe for sewers and septic systems," a major concession.

As set forth in the Settlement Agreement, notice of the Settlement is to be provided to the Settlement Class Members via several methods, including (1) advertisements in *People Magazine*, (2) more than 12 million impressions of online advertising targeted to likely users of the Product, and (3) a press release through a national wire service, a notice program substantially similar to the one approved by the Court in connection with the *Pettit* Settlement. A well-known third-party claim administrator had designed the notice plan and has attested that notice will reach a

substantial majority of likely Settlement Class Members.  *See generally* Insley-Pruitt Decl. Ex. 3 (Declaration of Jeanne C. Finegan ("Finegan Decl.")).

The Settlement falls within the standard for preliminary approval because it is within "the range of reasonableness." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). There is a presumption of fairness because the Settlement was reached after substantial discovery and arms-length negotiations. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting the Manual for Complex Litigation, Third, §30.42 (1995); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000) (internal citations omitted).  Numerous other factors also strongly favor preliminary approval of the Settlement, including the risks of further litigation and the informed opinion of experienced counsel on all sides who have negotiated and approved it based upon their views of the strengths and weaknesses of the claims and defenses. *See Chavarria v. New York Airport Service, LLC*, 875 F. Supp. 2d 164, 172 (E.D.N.Y. 2012) (noting that "in appraising the fairness of a proposed settlement, the view of experienced counsel favoring the settlement is 'entitled to great weight'…") (quoting *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993)).  Moreover, the fairness of the Settlement is supported by the fact that it provides significant benefits to Settlement Class Members which go beyond the benefits received by the *Pettit* Class members pursuant to the court-approved *Pettit* Settlement.

Accordingly, Plaintiff requests that the Court preliminarily approve the Settlement, order that the proposed notice program be implemented, and schedule a final approval hearing.

## BACKGROUND FACTS AND DETAILS OF SETTLEMENT

### Litigation History

#### Belfiore Action

In 2014, Plaintiff filed a suit against P&G in N.Y. Supreme Court, Nassau County, alleging, among other things, that the Product was falsely advertised as "flushable" in violation of New York G.B.L. § 349.  Thereafter, Defendants removed the Action to the Eastern District of New York.[3]

P&G denies all Plaintiff's allegations in this Action and maintains that the Product performs as advertised.

Pursuant to the Court's order, the parties conducted discovery and submitted briefing on class certification, along with the plaintiff in an action challenging the "flushability" of wipes created by the Kimberly-Clark Corp. in early 2015.  Following the submission of briefing, the Court held two days of evidentiary hearings (the "Science Days") regarding the flushability of the Product, as well as Kimberly Clark's "flushable" wipe product, where "[e]xtensive scientific testimony and demonstrations were introduced, showing advantages of the products and potential difficulties and concerns relied upon by the plaintiffs; enough evidence was produced to warrant consideration of certification issues." *Kurtz v. Kimberly-Clark Corp., et al.*, 321 F.R.D. 482, 494 (E.D.N.Y. 2017).  Judge Weinstein then stayed the Action in part to allow the Federal Trade Commission ("FTC") to consider an appropriate definition of the term "flushable." *Id.* at 494. After it became clear that the FTC would not take further action on this issue, the Court granted class certification for both an injunctive and damages class.  *See generally id.*

---

[3]     This Action was coordinated before Judge Weinstein with a similar litigation (*Kurtz v. Kimberly-Clark Corp., et al.*, 1:14-cv-01142) that alleges that flushable wipes manufactured by Kimberly-Clark Corp. and Costco Wholesale Corp. also violate, *inter alia*, N.Y. G.B.L. § 349.

Specifically, on March 27, 2017, the Court certified the following class: "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and March 1, 2017" (the "Class"). P&G filed an interlocutory appeal (the "Appeal"), and, on May 14, 2019, the Court of Appeals for the Second Circuit remanded the Action to allow the parties to submit additional evidence sufficient to determine whether Plaintiff satisfied Rule 23(b)(3)'s predominance requirement and whether to decertify the damages classes or maintain the current certification orders. Dkt. No. 274. The Court then held four days of evidentiary hearings where expert testimony was presented regarding the ability to determine damages class-wide using regression analyses. After the parties submitted post-hearing briefing, on October 25, 2019, the Court renewed its prior certification order. *Kurtz v. Kimberly-Clark Corp.*, No. 14-CV-1142, 2019 U.S. Dist. LEXIS 185334 (E.D.N.Y. Oct. 25, 2019). Pursuant to the Mandate, P&G's latest appeal of the certification of the Class has returned to the same panel on the Second Circuit. P&G submitted its appellate brief on January 10, 2020.

Soon after this case was filed, Judge Weinstein encouraged the Parties to discuss a settlement that would involve a claims-made structure and changed practices. *Belfiore v. P&G*, 140 F. Supp. 3d 241, 248 (E.D.N.Y. 2015); *see also Kurtz*, 321 F.R.D. 482 (reviewing continued efforts by the Court to encourage settlement); *Kurtz*, 2019 U.S. Dist. LEXIS 185334, at *46 (continuing to encourage settlement). Per the Court's suggestion, Plaintiff, through his counsel, participated in numerous settlement discussions with P&G, including in-person discussions before Magistrate Judge Robert M. Levy starting in August 2015 and continuing with multiple in-person and telephonic meetings through the end of May 2016. *See, e.g.*, Docket Minute Entries for August 12, 2015; November 24, 2015; January 13, 2016; January 21, 2016; February 24, 2016; March 28, 2016; April 25, 2016; May 18, 2016.

### *Pettit* Action

On April 6, 2015, Jamie Pettit filed a class action complaint against P&G in the Superior Court of the State of California, County of San Francisco, Case No. CGC-15-545175. On May 13, 2015, P&G removed the *Pettit* Action to the United States District Court, Northern District of California, where it was assigned Case No. 3:15-cv-02150-RS. In her complaint, Pettit alleges that P&G manufactures and markets the Product and that, although the Product's packaging states that the wipes are "flushable," "septic safe", and "safe for sewer and septic systems," the wipes are not suitable for disposal by flushing down a toilet, are not regarded as flushable by municipal sewage system operators, do not disperse upon flushing, and routinely damage or clog plumbing pipes, septic systems, and sewage lines and pumps. Pettit's original complaint alleged that P&G is liable for violations of California State law, but otherwise was substantially similar to the *Belfiore* complaint.  P&G denies the allegations contained in the *Pettit* complaint and maintains that the product performs as advertised.

On February 4, 2017, Plaintiff Pettit moved for a class certification, which P&G opposed. On August 3, 2017, the court certified the following class in the *Pettit* Action (the "*Pettit* Class"):

> All persons who, between April 6, 2011 and August 3, 2017 purchased in California the Charmin Freshmates Flushable Wipes (excluding purchases for purpose of resale).

*Pettit v. Procter & Gamble Co.*, Case No. 15-cv-02150-RS, 2017 U.S. Dist. LEXIS 122668, at *4 (N.D. Cal. Aug. 3, 2017).  The *Pettit* decision relied in part on the prior decisions of Judge Weinstein certifying the Class.  This is not surprising, given that the cases addressed the same product from the same defendant, and plaintiff's counsel in the *Pettit* Action relied on the same expert (Colin Weir) for damages calculations as the Plaintiff's Counsel in this Action.  In fact, Mr. Weir testified that the work performed in *Pettit* continued the prior work he performed in *Belfiore*.

7

**The Pettit Settlement**

The *Pettit* Settlement was reached following a mediation before Robert A. Meyer of JAMS ADR, Inc. ("JAMS") in Chicago, Illinois on April 17, 2018.  (*Pettit* Action, Dkt. No. 117 at 5.)[4]  The *Pettit* Settlement was finally approved by Judge Richard Seeborg of the U.S. District Court for the Northern District of California on April 2, 2019, on behalf of a national class of purchasers of the Product, excluding purchases made in New York.  Specifically, the *Pettit* Settlement provided the following benefits to *Pettit* Class members in 49 states:

**Monetary Relief**

*Pettit* Class members could file a claim for a cash payment of sixty cents ($0.60) for each package of the Product purchased in the United States (except in New York) during the Class Period (i.e., between April 6, 2011 and the date of preliminary approval of the *Pettit* Settlement), regardless of the price the *Pettit* Class member paid for the package or the number of wipes contained in each package, subject to the following limitations: (a) a maximum of four dollars and twenty cents ($4.20) shall be paid on the combined claims submitted by any Household for claimed purchases that are not corroborated by Proof of Purchase, and (b) a maximum of thirty dollars ($30.00) shall be paid on the combined claims submitted by any Household for claimed purchases that are corroborated by Proof of Purchase.  Therefore, the maximum payment to any Household could not exceed thirty dollars ($30.00) under the *Pettit* Settlement.

**Changed Practices**

The *Pettit* Settlement contemplated changed practices, some of which had already occurred, as well as injunctive relief.  Partly as a result of the *Pettit* Action and this Action, P&G

---

[4]     Counsel for Plaintiffs in the *Pettit* Action also participated alongside Plaintiff's counsel in *Belfiore* in the prior discussions before Magistrate Judge Levy in the Eastern District of New York.

has stopped manufacturing the Product in the formulation(s) that it used at the time the cases were commenced. (*See, e.g.*, Gutride Decl., Ex. 1 at § 3.10, cited in *Pettit* Action, Dkt. No. 117 at 6, Insley-Pruitt Decl. Ex. 4 at ¶ 3.1.) P&G also agreed that versions of the Product manufactured after January 2016 do not and will not contain bicomponent (polyester/polyolefin) fibers. (*Id.*) Further, P&G agreed that, for a period ending two years after the effective date (as defined in the *Pettit* Settlement), it shall be enjoined by the court in the *Pettit* Action as follows:

a) As of the effective date, Product marketed by P&G will not contain bicomponent (polyester/polyolefin) fibers;

b) On or before 90 days after the effective date, P&G will modify the packaging of the Product to include a statement that "Your satisfaction is guaranteed. For details of our refund program go to our website at www._____.com/_____." P&G will provide details regarding the satisfaction guarantee on the Charmin website, including reasonable purchase price refunds to consumers who are dissatisfied with the product;

c) On or before 90 days after the effective date, P&G will modify the packaging of the Product to include the statement: "Use only in well-maintained plumbing systems";

d) As of the effective date, the Product will comply with current and future versions of the INDA Guidelines, including the slosh box test, provided P&G is a member of INDA and the organization maintains the same purpose and mission, with a similar membership composition, as of the date of the Agreement;

e) The Product marketed by P&G on or after June 13, 2018, will comply with the May 2018 more stringent INDA GD4 test protocols which among other things (1) decrease the slosh box test duration from 180 minutes to 60 minutes, (2) increase the slosh box text pass-through percentage requirement from 25% to 60%, and (3) decrease the municipal pump test average power increase over baseline from 15% to 5%.

P&G's consent to adoption of the GD4 protocols, and its further consent to compliance with the more stringent GD4 protocols from June 13, 2018 forward (and before industry-wide compliance to GD4), was made in part due to the pendency of the *Pettit* Action and this Action. Indeed, pursuant to the Settlement of this Action, P&G has agreed to be enjoined by the Court

regarding items (a)-(e) above for an extended period now ending two years after the Effective Date of the Settlement.  *See* Settlement Agreement, Section 3.2. [5]

**The Settlement of This Action**

The proposed Settlement of this Action was reached following more than 5 years of intense, hard-fought litigation before the Court and in the Second Circuit Court of Appeals, which included several rounds of arm's-length settlement discussions between experienced counsel and before experienced mediators, most recently before Chief Magistrate Judge Gold of this Court on November 25, 2019.

The Settlement of this Action is on behalf of purchasers of the Product in New York. Specifically, the proposed Settlement provides for the following benefits, each of which goes beyond the benefits received by the *Pettit* Class members, although the Settlement Agreement expressly concedes that this Action contributed to the benefits obtained for the *Pettit* Class and future Product purchasers:

**Monetary Relief**

This Settlement provides that Settlement Class Members can receive $0.70 per package if they do not have Proof of Purchase, or, if they do have Proof of Purchase, they can receive $1.20 for the first package and $1.00 for each subsequent package.  The Settlement Agreement details how the claims will be paid:

> 4.4     Each Settlement Class Member who submits a Valid Claim without Proof of Purchase shall receive a refund of seventy cents ($0.70) for each Product package purchased in New York during the Class Period, regardless of the price the Settlement Class Member paid for the package or the number of wipes contained in each package, subject to the following

---

[5]     As in *Pettit*, the distribution or sales by P&G or by third parties of Product manufactured prior the implementation of the labeling changes described in the *Pettit* Settlement do not constitute a violation of the Settlement Agreement or the injunction under the Settlement Agreement in this Action.

limitations: A maximum of six dollars and thirty cents ($6.30) shall be paid on the combined claims submitted by any Household for claimed purchases that are not corroborated by Proof of Purchase. Each Settlement Class Member who submits a Valid Claim corroborated by Proof of Purchase shall receive a refund of one dollar and twenty cents ($1.20) for the first Product package purchased in New York during the Class Period, and one dollar ($1.00) for any additional Product packages purchased in New York during the Class Period, regardless of the price the Settlement Class Member paid for the package or the number of wipes contained in each package, subject to the following limitation: A maximum of fifty dollars and twenty cents ($50.20) shall be paid on the combined claims submitted by any Household for claimed purchases that are corroborated by Proof of Purchase. In no event shall (i) the maximum payment to any Household exceed fifty dollars and twenty cents ($50.20), or (ii) a Settlement Class Member receive a payment for a purchase of the Product they did not affirmatively claim on the Claim Form.

Insley-Pruitt Decl. Ex. 1, at ¶ 4.4. For Settlement Class Members without Proof of Purchase, this represents an increase over the *Pettit* Settlement of 11% for each package and, since nine packages are allowed instead of seven, a 50% increase in maximum payment. For Settlement Class Members with Proof of Purchase, this represents an increase over the *Pettit* Settlement of up to 100% for the first package, and a $20.20 (or 67%) increase in maximum payment.

The claim form is a simple one-page form that can be completed in a few minutes. It can be completed online or submitted by mail. Proof of Purchase can also be submitted electronically (unless it is in the form of the actual label or bar code portion of the product package) or in hard copy.

**Changed Practices**

In addition to the changed practices achieved in the *Pettit* Settlement described above, of which the Settlement Agreement makes clear was partially caused by the litigation efforts in this Action, as well as the injunction that will be extended for two years from the Effective Date of the Settlement here (*see supra* at 9), the proposed Settlement goes further. Significantly, pursuant to the Settlement Agreement, P&G has agreed to remove that part of the current Product label that

11

says "septic safe" and "safe for sewers and septic systems."  Notwithstanding that the allegations by plaintiffs in the *Pettit* Action strongly criticized the fact that the Product label falsely stated that the Product was "septic safe" and "safe for sewers and septic systems," the *Pettit* Settlement failed to have that portion of the Product label removed.  The proposed Settlement remedies this concern.

### Administrative Expenses, Attorneys' Fees and Costs, and Class Representative Payment

All costs of notice and administration of the proposed Settlement will be paid by P&G. Plaintiff will apply to the Court for a Class Representative Payment from P&G of $10,000.[6] Plaintiff Belfiore aided Plaintiff's Counsel in successfully prosecuting this litigation and reaching a settlement, including locating and forwarding responsive documents and information and providing discovery.  Mr. Belfiore also sat for a full-day deposition and his wife and plumber (who removed wipes that got stuck in the pipes of Belfiore's home, for which Belfiore incurred a $526 plumbing bill) both sat for half-day depositions.  Further, Mr. Belfiore, with his counsel, stayed at Plaintiff's home on a weekday to allow P&G's plumbing expert and one of its attorneys to inspect the toilet and pipes in his home in which the Product got stuck.  The on-premises inspection included P&G's plumbing expert snaking a camera through the pipes in Plaintiff's home and opening up a part of his basement floor.  Declaration of Terence O'Shea, Dkt. No. 65, ¶¶ 7-10.  The requested payment for Mr. Belfiore is designed to compensate him for (1) the time and effort undertaken by him and his wife in pursuing this Action (including the risk of liability for the costs of suit); and (2) Plaintiff's agreeing to a release broader than the one that will bind other Settlement Class Members (compare Settlement Agreement ¶¶ 9.1 & 9.2).

---

[6]       Class representative payments were approved for all seventeen (17) *Pettit* Class representatives.

Plaintiff's Counsel will also apply to the Court for an award from P&G of attorneys' fees and costs in a total amount not to exceed $3,200,000.00, which is more than two million dollars ($2,000,000.00) less than their actual lodestar and costs incurred to-date.  The motion for attorneys' fees/costs, and Class Representative Payment, along with supporting declarations, will be filed, and Plaintiff will post copies on the Settlement Website, at least forty-two (42) days before the final approval hearing, which is proposed for two weeks before the deadline for Settlement Class Member objections.

**Notice Plan**

The proposed Claim Administrator (Heffler Claims Group), which was the claim administrator used in connection with the *Pettit* Settlement (and thus has experience in a substantially similar settlement administration), will establish a Settlement Website, which shall contain the Settlement notices, a contact information page that includes at least address and telephone numbers for the Claim Administrator and Plaintiff's Counsel, the Settlement Agreement, the signed order of preliminary approval, online and printable versions of the claim form and the opt out forms, answers to frequently asked questions, and (when it becomes available) Plaintiff Counsel's motion for attorneys' fees, costs, expenses and Class Representative Payment to Plaintiff, and the motion for final approval.  Insley-Pruitt Decl. Ex. 1 at ¶ 5.1.

Notice will be published in several places, all of which will refer Settlement Class Members to the Settlement Website.  *Id.*, Exhibit A.  The Published Notice will appear in *People Magazine*, there will be a nationwide press release, and more than 12 million impressions of online advertising will be targeted to reach likely consumers of the Product. (*Id.*)  Finally, the Claims Administrator will operate a toll-free information line to provide information about the case and Settlement. (*Id.*)

13

**Plaintiff's Analysis of the Settlement**

Based on their reasoned judgment, Plaintiff's Counsel believe the proposed Settlement is fair and reasonable. Insley-Pruitt Decl. at ¶ 2.  Plaintiff's Counsel believe that the evidence obtained in discovery showed that the Product's labels were likely to (and did) deceive consumers and that P&G knew of the deceptive nature of the packaging.  *Id.* at ¶ 3.  P&G, in turn, denies Plaintiff's characterization of the evidence and maintains that the Product performs as advertised, and believes that the evidence produced in discovery supports that conclusion. Even if Plaintiff obtained a judgment in his favor, that judgment would likely be appealed, so even in the best case, it could take years for Plaintiff to obtain relief for the Class of Product consumers. *Id.* ¶ 4.

Plaintiff's Counsel believe that a refund to Settlement Class Members without Proof of Purchase of $0.70 per package up to 9 packages and $1.20 for the first package purchased with Proof of Purchase and $1.00 for the next, up to 49, packages with Proof of Purchase is an excellent result.  *Id.* at ¶ 7.  Indeed, the refund amounts per package are between 11.7%-100% better than those achieved for *Pettit* Class members (depending on whether the Settlement Class Member had Proof of Purchase or not), further evidencing the fairness of the proposed Settlement.  Moreover, there is the possibility that either the Second Circuit will overturn the Court's recent decision to certify the Class on P&G's pending appeal or, thereafter, the Supreme Court, on certiorari, will do so; that Defendant will be successful in renewing its motion to de-certify the Class; that summary judgment could be entered against Plaintiff; and/or that Plaintiff will be unable to prove liability, damages or entitlement to injunctive relief at trial on a class-wide or individual basis. *Id.* at ¶ 8.

In addition, the Settlement provides for a greater monetary benefit for actual damages than may be achieved at trial even under Plaintiff's "best case" scenario.  Plaintiff's expert Colin Weir has performed a detailed regression analysis to calculate the price premium attributable to the challenged "flushability" representations on the Product and concluded that the premium is 7.95%

of the purchase price of each package. Supplemental Declaration of Colin Weir July 9, 2019 ("Weir Decl.") Dkt. No. 329 at ¶ 78.  The average price per package sold was $4.67 during the Class Period, and thus, at trial, consumers might not receive more than 37 cents per package in restitution.  The Settlement payment of between $0.70-$1.20 per package (depending on the level of Proof of Purchase) is approximately 189% to 324% of the best-case recovery of actual damages on a per-package basis.  And, in a contested proceeding, Settlement Class Members who lacked proof of purchase—which may be the majority of Settlement Class Members—might get nothing at all. *See, e.g.*, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017), *cert. denied sub nom. ConAgra Brands, Inc. v. Briseno*, 138 S. Ct. 313 (2017) (explaining that the post-trial claims process by which each consumers' affidavits would "force a liability determination" as to that consumer).  Further, in addition to the monetary relief, the changed practices will benefit Settlement Class Members and other consumers in the future.

P&G, while continuing to deny all allegations raised in the complaint and maintaining that its Product performs as advertised, also believes the Settlement is fair, reasonable, and in P&G's interest to avoid further expense, inconvenience, and interference with its ongoing business operations.

## ARGUMENT

## I.   PRELIMINARY APPROVAL IS WARRANTED

Although Rule 23(e) requires court approval of a class settlement, there is a "strong judicial policy in favor of settlements, particularly in the class action context." *See Wal-Mart Stores, Inc.*, 396 F.3d at 116.

Recent amendments to Rule 23(e) went into effect on December 1, 2018.  "Under the new Rule 23(e), in weighing a grant of preliminary approval, district courts must determine whether

"giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i–ii); *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

The amended Rule 23(e)(2) requires courts to consider whether:

> (A)   the class representatives and class counsel have adequately represented the class;
>
> (B)   the proposal was negotiated at arm's length;
>
> (C)   the relief provided for the class is adequate, taking into account:
>
> > (i)   the costs, risks, and delay of trial and appeal;
> >
> > (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
> >
> > (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and
> >
> > (iv)   any agreement required to be identified under Rule 23(e)(3); and
>
> (D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  The Advisory Committee Notes recognize that the first two requirements (paragraphs A and B) constitute the procedural aspects of the proposed settlement while the last two (paragraphs C and D) constitute the substantive aspects of the proposed settlement.  Fed. R. Civ. P. 23, Advisory Committee Notes to 2018 Amendment ("Committee Notes");

"The Court first considers the Rules 23(e)(2) factors, and then considers additional *Grinnell* factors not otherwise addressed by the Rule 23(e)(2) factors." *In re Payment Card*, 330 F.R.D. at 29 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).  As the Committee Notes explain, the factors listed in the new Rule 23(e)(2) are intended to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Judge Brodie therefore recognized that there is

16

substantial overlap between the new factors and the nine *Grinnell* factors, and that only three *Grinnell* factors were unique:  "the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."  *In re Payment Card*, 330 F.R.D. at 29 n.22.  *But see Padovano v. FedEx Ground Package Sys.*, No. 16-CV-17-FPG, 2019 U.S. Dist. LEXIS 107092, at *7 n.2 (W.D.N.Y. June 10, 2019) (recognizing the new Rule 23(e)(2) factors are so similar to the *Grinnell* factors that no separate analysis is necessary).

In sum, "[c]ourts must assess at the preliminary approval stage whether the parties have shown that the court will likely find that the factors weigh in favor of final settlement approval."  *See In re Payment Card*, 330 F.R.D. at 28.  "Preliminary approval of a proposed settlement is appropriate where it is the result of serious, informed, non-collusive ('arm's length') negotiations, where there are no grounds to doubt its fairness and no other obvious deficiencies (such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys), and where the settlement appears to fall within the range of possible approval."  *See Berkson v. Gogo LLC*, 147 F. Supp. 3d 123, 130-31 (E.D.N.Y. 2015) (to determine "whether a class settlement is fair, a district court examines (1) the negotiations that led up to the settlement, and (2) the substantive terms of the settlement.").

### A.      The Settlement Class Should Be Certified

The requirement of Rule 23(e)(1)(B)(ii) is easily met here because Judge Weinstein has already certified the Class after years of motion practice, evidentiary hearings, and multiple opinions.  *See* Committee Notes ("[The] procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court.").

Because of this, "the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted."  Committee Notes.

The Settlement Class proposed for the Settlement is almost exactly the same as the Class, except for two differences.  *First*, the "Class Period" has been extended so that it covers purchases from May 23, 2011 through the date of Preliminary Approval, instead of the Court's prior order that ended the class period on March 1, 2017.  This extension is reasonable.  *See* Plaintiff's Motion to Extend the Certified Class Period and to Amend the Class Definition (Dkt. No. 307); Order, Aug. 27, 2019 (Dkt. No. 316) (denying motion to extend the class period as beyond the scope of jurisdiction pursuant to the Second Circuit Mandate, but noting that the motion may be renewed after the conclusion of proceedings in the Second Circuit).

*Second*, certain individuals and entities are considered Excluded Persons and are not members of the Settlement Class.  Settlement Agreement ¶ 2.11 (listing the Court, "any government entity," Defendant and any of its subsidiaries or agents, opt outs from the Settlement Class, and non-consumer purchasers as Excluded Persons).  These exclusions are reasonable since each category either will be fully aware of (or even a party to) the Settlement or do not meet the requirements of G.B.L. § 349 and should not be a member of the Class.

B.    **The Court Will More Likely Find That the Settlement Is Fair, Reasonable, and Adequate**

The Court can easily assure itself that the Settlement will likely satisfy both the procedural and substantive requirements of Rule 23(e)(2), as well as the non-duplicative *Grinnell* factors.

1.    The Settlement Is the Result of a Fair, Reasonable, and Adequate Process

Plaintiff Belfiore and Class Counsel have more than adequately represented the Settlement Class through years of hard fought litigation against Defendant, which has culminated in a

18

Settlement that was negotiated at arm's length.  *See Wal-Mart Stores, Inc.*, 396 F.3d at 116

(internal citation omitted) ("A presumption of fairness, adequacy, and reasonableness may attach

to a class settlement reached in arm's-length negotiations between experienced, capable counsel

after meaningful discovery.").

Class Counsel has vigorously litigated this Action since 2014.  In that time, counsel have

had more than thirty appearances before Judge Weinstein and the Magistrate Judges, including

oral arguments, evidentiary hearings, settlement conferences, and status conferences.  Class

Counsel has opposed Defendant's plethora of substantive motions, including its original motion to

dismiss (Dkt. No. 17), a renewed motion to dismiss (Dkt. No. 222), a motion to deny class

certification (Dkt. No. 59), two motions to decertify the class (Dkt. Nos. 222, 294), and a motion

for summary judgment (Dkt. No. 222).  Class Counsel has also litigated its own motions, such as

the motion to certify the class (Dkt. No. 58), a motion to compel production from third parties

(Dkt. No. 123), a motion to reconsider the order of October 5, 2015 (Dkt. No. 157), responses to

the Court's request for additional briefing on several topics (*e.g.*, Dkt. Nos. 129, 139), a motion to

extend and amend the class definition (Dkt. No. 307), and post-evidentiary hearing briefing (Dkt.

No. 330).  Class Counsel also litigated the interlocutory appeal to the Second Circuit pursuant to

Rule 23(f).  On the balance, Plaintiff has been very successful by maintaining the Action,

certifying a heavily-litigated Class, and sustaining that decision after four days of expert

testimony on remand from the Second Circuit.

The Parties have also conducted discovery of both Defendant and third parties leading up

to this point, including defending the deposition of Plaintiff, Plaintiff's wife, Plaintiff's plumber,

and two of Plaintiff's experts.  Insley-Pruitt Decl. ¶ 9.  Meanwhile, Class Counsel deposed four of

Defendant's witnesses pursuant to Rule 30(b)(6).  *Id.*  In addition, Class Counsel has reviewed

thousands of pages of documents produced by Defendant and presented the testimony of three witnesses over multiple days of hearings.  This record makes it clear that Class Counsel was fully informed as to the viability of the claims and the risks to both sides if the case did not settle. *Id.*

The Parties negotiated the proposed Settlement in good faith over years.  *Id.* at ¶ 11. Settlement discussions first began in 2015 under the supervision of Magistrate Judge Levy, and renewed recently with mediation before Magistrate Judge Gold.  *Id.*  With a framework established by these discussions, the *Pettit* Settlement, and Judge Weintsein's instructions, Counsel for both Parties continued their settlement negotiations over the past few months.  *Id.* Counsel for both sides are experienced class action attorneys and have fully evaluated the strengths, weaknesses, and equities of their positions.  *Id.*.  Plaintiff's Counsel believes the Settlement to be in the best interests of the Settlement Class, considering the costs and risks of continued litigation. *Id.* ¶ 5.  The opinion of experienced counsel supporting the Settlement is entitled to considerable weight. *See, e.g.*, *Chavarria*, 875 F. Supp. 2d at 172; *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. at 66.

       2.    <u>The Settlement Provides Fair, Reasonable, and Adequate Substance for Settlement Class Members</u>

In line with the instructions of Rule 23(e)(2)(B), Courts have long recognized that "[e]ssential to analyzing a settlement's fairness is 'the need to compare the terms of the compromise with the likely rewards of litigation.'"  *See In re Citigroup Inc. Securities Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013).  The question for the Court is not whether the Settlement represents the highest recovery possible, but whether it represents a reasonable one in light of the many uncertainties the class faces.  *Id.*

The Court made clear over the years that it believed that the Class is best served by a meaningful settlement instead of continued litigation.  Almost five years ago, Judge Weinstein

instructed that "the easiest way to settle this—because the damages don't seem to be to me to be very easily ascertained—is through the injunction without damages and just put in a plain forthright statement . . . . Flush after putting one in the toilet and make sure your toilets are in good shape[.]"  Hearing Tr. March 31, 2015 at 22:16–:23 (Insley-Pruitt Decl., Exhibit 5).  This Settlement does much more than that, since it provides real financial recovery as well as improved disclosures on the Product.

Similarly, the Court recently requested the Parties to explore a settlement that "would harmonize any relief granted by this court with that afforded by the geographically expansive Procter & Gamble settlement so that national uniform products can be produced by each defendant."  *Kurtz*, 2019 U.S. Dist. LEXIS 185334, at *46.  This Settlement is in line with that instruction, and materially improves on the foundation of the *Pettit* Settlement in several ways, as described above.[7]

> a.      The Relief Provided In the Settlement Is Fair, Adequate, and Reasonable

While Plaintiff has been successful so far, the future is far from certain, as the Court has continuously indicated.  Against that background, the relief in the Settlement is very fair, especially in light of the unique *Grinnell* factors.

**First**, while the *Pettit* Settlement awarded $0.60 per purchase for a maximum recovery of $4.20 (or seven packages), the Settlement provides $0.70 per purchase for a maximum recovery of $6.30 (or nine packages) for those Settlement Class Members **without** a Proof of Purchase. This is an 11% improvement on a per-package basis and—due also to the increased number of

---

[7]      There are no agreements that are required to be identified under Rule 23(e)(3).

allowed purchases—a 50% improvement on a maximum recovery basis over the *Pettit* Settlement.

 **Second**, Settlement Class Members **with** Proof of Purchase are receiving an even greater amount of the Pettit Settlement.  Instead of only $0.60 per package with a maximum recovery of $30.00, purchasers in New York with Proof of Purchase will receive $1.20 for the first package and $1.00 for each additional package, for a maximum recovery of $50.20 (or 50 packages).  This is an increase of up to $20 per Household over the *Pettit* Settlement.

 Even considered independently from the *Pettit* Settlement, the cash recovery provided in the Settlement is still very reasonable considering the likely recovery in this Action.  Plaintiff's recovery based on the average price "premium," as calculated by a regression analysis, that the Product commands because it is labeled as "flushable" as opposed to a comparable product that is not labeled as "flushable" is approximately $0.37 per package.  Insley-Pruitt Decl. ¶ 13.  The minimum cash recovery in the Settlement is almost twice the actual damages provable at trial.

 Furthermore, the availability of statutory damages has been heavily litigated in this case. Most recently, Judge Weinstein indicated that statutory damages "presents serious substantive legal questions," *Kurtz*, 2019 U.S. Dist. LEXIS 185334 at *46, indicating that statutory damages in their full amount are far from certain.  However, given that the language of N.Y. G.B.L. § 349 provides that "any person . . . may bring an action in his own name . . . to recover his actual damages or fifty dollars, whichever is greater," another possible outcome is that the Court will limit the maximum statutory recovery to $50 per Class Member and may require proof of purchase.  In that scenario, the maximum recovery of $50.20 for Settlement Class Members with proof of purchase **exceeds** their maximum recovery after years of litigation.  The Settlement is well within the range of reasonableness, "given the risks and delay of continued litigation

measured against the value of obtaining certain compensation more quickly." *See Chavarria*, 875 F. Supp. 2d at 175 (internal citation omitted).

*Third*, P&G's changed label practices are also likely to benefit Settlement Class Members. Defendant has continuously argued that "flushable" has different meanings for different people, particularly with respect to whether or not it includes the performance of the wipe after it goes down the toilet. *See, e.g.*, Dkt. No. 81 at 8-11 (arguing that the various definitions of flushability destroys the commonality of the class); Dkt. No. 322 at 18-19 (arguing that Mr. Weir was unable to isolate the impact of different definitions of flushable). By removing the representations that Freshmates are "septic safe" and "safe for sewer and septic systems" the Product package will no longer make one of the core claims that Plaintiff alleges are misleading. The value of such relief—including the benefit to consumers in the form of an improved marketplace—can properly be considered when evaluating a settlement's fairness. *See, e.g., Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) (noting that a "judicially-enforceable agreement" to maintain changed practices may be considered in a fairness inquiry).

*Finally*, the ability of the Defendant to withstand a greater judgment does not play a large role here. This is a substantial recovery that is fair to Settlement Class Members. *See In re Payment Card*, 330 F.R.D. at 47 ("Although the Court finds that this factor weighs against a grant of final approval, it does not necessarily preclude a finding that the settlement is fair.").

### b.      *The Claims Process Is Reasonable*

The proposed notice plan and claim form comport with the procedural and substantive requirements of Rule 23. Indeed, the nearly identical notice plan and claim form were approved by the court in the *Pettit* Action. Under Rule 23, due process requires that class members receive notice of the settlement and an opportunity to be heard and participate in the litigation. *See* Fed. R.

23

Civ. P. 23(c)(2)(B); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985); *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 175-76 (1974) ("individual notice must be provided to those class members who are identifiable through reasonable effort"). The Federal Rules require that this Court "direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2). The mechanics of the notice process are left to the discretion of the Court, subject only to the broad reasonableness standards imposed by due process. *Wal-Mart Stores, Inc.*, 396 F.3d at 113-14 ("The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."). "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding." *Id.* at 114 (citation and internal quotation marks omitted). The recent amendments to Rule 23 clarify that electronic means may be used.

The notice plan is designed to reach an estimated 72% percent of the Settlement Class Members, on average notice of 2.8 times each. Insley-Pruitt Decl. Ex. 1, Ex. A. Notice is to be provided to the Settlement Class as follows: (1) print publication in *People Magazine*; (2) online advertising designed to reach consumers of the Product, including targeted display advertising to followers of Charmin's Facebook page, to individuals in New York State where research identifies the greatest use of the Product, and to individuals who conduct searches of keywords, such as "Freshmates;" and (3) a nationwide press release. Insley-Pruitt Decl. Ex. 1, Ex. A. All of these notices will refer Settlement Class Members to the Settlement Website, which shall contain the Long Form Notice in both downloadable PDF format and HTML format with a clickable table of contents; answers to frequently asked questions; a Contact Information page that includes the address for the Claim Administrator and Class Counsel; the Settlement Agreement; the signed

24

order of Preliminary Approval and the publicly filed motion papers and declarations in support thereof; a downloadable and online version of the Claim Form; a downloadable and online version of the form by which putative Settlement Class Members may exclude themselves from the Settlement Class; and (when they become available) the publicly filed motion for final approval and Plaintiff's application for attorneys' fees, costs and a Class Representative Payment, with supporting declarations.  Insley-Pruitt Decl. Ex. 1, Ex. A.

The proposed notice plan is reasonable and comports with due process.  As explained in the declaration from the proposed Claim Administrator (the same one used to administer the *Pettit* Settlement), this multi-communication method is the best notice practicable and is reasonably designed to reach Settlement Class Members.  Insley-Pruitt Ex. 3 (Finegan Decl. ¶ 4); *see* 2018 Advisory Comm. Note, Amended Rules, p. 16 ("courts and counsel have begun to employ new technology to make notice more effective"); *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 224 (2d Cir. 2012) ("Constructive notice by publication may be sufficient to satisfy due process 'as to persons whose whereabouts or interests c[an] not be determined through due diligence'" (citing *In re Agent Orange,* 818 F.2d 145, 168 (2d Cir. 1987)); *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 314 (W.D.N.Y. 2016) ("To the extent . . . that individual members cannot be identified, notice by publication is sufficient."); *see also In re Netflix Privacy Litig.*, Case No. 5:11-CV-00379 EJD, 2012 U.S. Dist. LEXIS 93284, at *13-14 (N.D. Cal. July 5, 2012) (approving notice procedure that included emailing customers at last known email address, publication in *People Magazine*, and advertising on Facebook).

Direct notice to the Settlement Class is not a reasonable method of notice, as the products are sold through third-party retailers, and P&G does not have records of purchaser identities.  *See In re MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009) ("The best practicable

notice under the circumstances is notice by publication in newspapers. In view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances."); *Gonzalez v. City of New York*, 396 F. Supp. 2d 411, 416 (S.D.N.Y. 2005) (Though publication notice is not sufficient when the names and addresses of potential class members can be ascertained… "[i]t is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected."); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) ("Because defendants do not have a list of potential class members, the court agrees with plaintiffs that notice by publication is the only reasonable method of informing class members of the pending class action").

Moreover, the proposed notices provide all the requisite information:  they inform Settlement Class Members about the proposed Settlement; their right to opt out or object; the need to file a claim; a summary of settlement benefits; the prospective request for attorneys' fees, costs and payments to the Plaintiff; and the fact that they will be bound by the judgment if they do not opt out.[8]  The notices also refer Settlement Class Members to the Settlement Website where they can obtain the long- form notice, which provides more details about the case and the Settlement, the procedures for opting out or objecting, and methods to obtain additional information.  The Settlement Website will also contain a copy of the full Settlement Agreement and will contain

---

[8]     Pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), a notice must concisely and clearly state in plain, easily understood language the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

Plaintiff's motion for fees and costs and the Class Representative Payment when filed.  Insley-Pruitt Decl. Ex. 1, Ex. A.

Settlement Class Members who seek benefits under the Settlement need to fill out a simple Claim Form online unless they are submitting the actual label or bar code portion of the Product as Proof of Purchase.  They also have the option to print copies and mail the Claim Form to the Claim Administrator.  The Claim Form requires them to certify under the penalty of perjury (1) their name and address and (2) basic information about the Products purchased for which they are claiming a refund, including the quantity, where the Product was purchased, and that the purchases were not made for purposes of resale.  Insley-Pruitt Decl. Ex. 1, ¶ 4.3.  The Claim Form can be completed in a few minutes.

> ### c.      *The Terms of the Proposed Attorney's Fees Are Reasonable*

In a separate motion to be filed with the motion for final approval and posted on the Settlement Website, Plaintiff's counsel will ask the Court to approve payment from P&G of their reasonable attorneys' fees, costs, and expenses in a total amount not to exceed $3.2 million, which is more than $2 million *less* than the actual lodestar and costs incurred to date of Plaintiff's Counsel.  Specifically, as of the filing of this motion, Plaintiff's Counsel has spent in excess of 8,000 hours working on this litigation, and its lodestar is greater than $5 million.  In addition, Plaintiff's Counsel has additionally incurred in excess of $200,000 in expenses for which it has not yet sought reimbursement.  (Insley-Pruitt Decl. at ¶ 14.)  Further, Plaintiff will ask the Court to approve a payment to him from P&G, as discussed above.  The Court need not consider these issues at present; rather it is appropriate to defer them until the final approval hearing, after Settlement Class Members have had an opportunity to comment.

## II.   <u>DATES FOR THE FINAL APPROVAL PROCESS</u>

Plaintiff requests that, in connection with preliminary approval, this Court set a date for a final approval hearing to consider the fairness of the Settlement and to hear any comments from the Settlement Class Members, as well as dates for publishing Notice and deadlines for objections and opting out of the Settlement Class.  Plaintiff proposes the following schedule:

| <u>Item</u> | <u>Proposed Due Date</u> |
|---|---|
| Initiate Notice | As set forth in Notice Plan |
| Motion for final approval; Plaintiff's motion for attorneys' fees, costs and Class Representative Payment | 42 days before final approval hearing |
| Deadline for objections, requests to appear, and requests to opt out | 28 days before final approval hearing |
| Replies in support of final approval and motion for attorneys' fees, costs and Class Representative Payment; response to any objections | 14 days before final approval hearing |
| Final approval hearing | At least 100 days after filing of Preliminary Approval Motion pursuant to 28 U.S.C. § 1715 |
| End of Claim Period | 30 days after final approval |

28

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff respectfully requests that this Court grant preliminary approval to the proposed class action Settlement.

DATED:  March 5, 2020

**WOLF POPPER LLP**


*/s/ Chet B. Waldman*
Chet B. Waldman
Matthew Insley-Pruitt
845 Third Avenue, 12th Floor
New York, NY 10022
Tel: (212) 759-4600

*Attorneys for Plaintiff*