**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANTHONY BELFIORE, on behalf of himself and all others similarly situated, | |
| Plaintiff, | 14 Civ. 4090 (PKC)(RML) |
| v. | |
| THE PROCTER & GAMBLE COMPANY, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF OUT-OF-POCKET EXPENSES, AND CLASS REPRESENTATIVE PAYMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND FACTS AND DETAILS OF SETTLEMENT ................................................... 2

    Litigation History ................................................................................................................... 2

    The Pettit Settlement ............................................................................................................. 4

    The Settlement of This Action ............................................................................................... 6

        Monetary Relief ............................................................................................................. 7

        Changed Practices ......................................................................................................... 8

        Notice Plan ..................................................................................................................... 8

    Class Reaction to the Settlement ........................................................................................... 9

ARGUMENT ................................................................................................................................ 10

I.      FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED ................................. 10

    A.      The Settlement Class Should Be Certified ................................................................. 12

    B.      The Settlement Is Fair, Reasonable, and Adequate .................................................... 12

        1.      The Settlement Is the Result of a Fair, Reasonable, and Adequate Process ........................................................................................................ 13

        2.      The Settlement Provides Fair, Reasonable, and Adequate Substance for Settlement Class Members .................................................................... 16

II.     THE REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND CLASS REPRESENTATIVE PAYMENT, SHOULD BE GRANTED .................................................................................................................... 23

    A.      The Request for Attorneys' Fees Should Be Granted ................................................ 23

        1.      The Fee Is Reasonable Under the Lodestar Method ....................................... 24

        2.      The Goldberger Factors Confirm that the Requested Fee Is Reasonable ....... 26

    B.      The Request for Reimbursement of Litigation Expenses Should Be Granted ........... 30

    C.      The Lead Plaintiff Award Should be Granted ........................................................... 30

CONCLUSION ............................................................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*In re Agent Orange*,
818 F.2d 145 (2d Cir. 1987) ................................................................................................. 21

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
522 F.3d 182 (2d Cir. 2007) ................................................................................................. 25

*Belfiore v. Procter & Gamble Co.*,
140 F. Supp. 3d 241 (E.D.N.Y. 2015) .................................................................................... 3

*Berni v. Barilla G. e R. Fratelli, S.p.A.*,
332 F.R.D. 14 (E.D.N.Y. June 3, 2019)........................................................................... 24, 31

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) .............................................................................................. 18

*Chavarria v. N.Y. Airport Serv., LLC*,
875 F. Supp. 2d 164 (E.D.N.Y. 2012) ............................................................................. 15, 19

*Chen v. Select Income REIT*,
No. 18-CV-10418 (GBD) (KNF), 2019 U.S. Dist. LEXIS 177687
(S.D.N.Y. Oct. 11, 2019) ...................................................................................................... 23

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013) .................................................................................. 16

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ............................................................................................. 2, 11

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)......................... 28

*In re Credit Default Swaps Antitrust Litig.*,
No. 13md2476, 2016 U.S. Dist. LEXIS 54587 (S.D.N.Y. Apr. 25, 2016)............................. 25

*Eisen v. Carlisle and Jacquelin*,
417 U.S. 156 (1974)............................................................................................................. 20

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
No. MDL No. 12-2389, 2015 U.S. Dist. LEXIS 152668 (S.D.N.Y. Nov. 9, 2015) ............... 27

*Goldberger v. Integrated Res.*,
209 F.3d 43 (2d Cir. 2000) ........................................................................................... *passim*

*Gonzalez v. City of New York*,
396 F. Supp. 2d 411 (S.D.N.Y. 2005) .................................................................................. 22

*Hecht v. United Collection Bureau, Inc.*,
  691 F.3d 218 (2d Cir. 2012) ........................................................................ 21

*Kurtz v. Kimberly-Clark Corp.*,
  414 F. Supp. 3d 317 (E.D.N.Y. 2019) ................................................ 3, 16, 18

*Kurtz v. Kimberly-Clark Corp.*,
  321 F.R.D. 482 (E.D.N.Y. 2017) ................................................................... 3

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ...................................................................... 19

*LeBlanc-Sternberg v. Fletcher*,
  143 F.3d 748 (2d Cir. 1998) ........................................................................ 24

*Luciano v. Olsten Corp.*,
  109 F.3d 111 (2d Cir. 1997) ........................................................................ 25

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................... 24, 28

*McLaughlin v. IDT Energy*,
  No. 14 CV 4107 (ENV)(RML), 2018 U.S. Dist. LEXIS 128347
  (E.D.N.Y. July 30, 2018) ............................................... 23, 25, 30, 31

*In re MetLife Demutualization Litig.*,
  262 F.R.D. 205 (E.D.N.Y. 2009) ................................................................. 22

*In re Michael Milken & Assocs. Sec. Litig.*,
  150 F.R.D. 46 (S.D.N.Y. 1993) ................................................................... 15

*Missouri v. Jenkins by Agyei*,
  491 U.S. 274 (1989) .................................................................................... 24

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012) .......................................................... 26

*In re Netflix Privacy Litig.*,
  No. 5:11-CV-00379 EJD, 2012 U.S. Dist. LEXIS 93284 (N.D. Cal. July 5, 2012)................ 21

*Padovano v. FedEx Ground Package Sys.*,
  No. 16-CV-17-FPG, 2019 U.S. Dist. LEXIS 107092 (W.D.N.Y. June 10, 2019) .................. 12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................. 11, 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720 (MKB) (JO), 2019 U.S. Dist. LEXIS 217583
(E.D.N.Y. Dec. 16, 2019) ................................................................... 10, 11, 12, 13

*Pearlman v. Cablevision Sys. Corp.*,
CV 10-4992 (JS) (AKT), 2019 U.S. Dist. LEXIS 142222
(E.D.N.Y. Aug. 20, 2019) .................................................................... 24, 26, 30

*Pettit v. Procter & Gamble Co.*,
No. 15-cv-02150-RS, 2017 U.S. Dist. LEXIS 122668 (N.D. Cal. Aug. 3, 2017) ..................... 4

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ............................................................................ 20

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v.
J.P. Morgan Acceptance Corp. I*,
No. 08 Civ. 1713 (PKC) (E.D.N.Y. July 24, 2014) ................................................ 15

*Seekamp v. It's Huge, Inc.*,
No. 1:09-CV-0018 (LEK/CFH), 2014 U.S. Dist. LEXIS 174657
(N.D.N.Y. Dec. 18, 2014) .................................................................... 26, 29

*Simerlein v. Toyota Motor Corp.*,
No. 3:17-cv-1091 (VAB), 2019 U.S. Dist. LEXIS 96742 (D. Conn. June 10, 2019) ............. 24

*In re Virtus Inv. Partners, Inc.*,
No. 15cv1249, 2018 U.S. Dist. LEXIS 205304 (S.D.N.Y. Dec. 4, 2018) ............................... 30

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ................................................................ 10, 13, 20, 24

*Zink v. First Niagara Bank, N.A.*,
155 F. Supp. 3d 297 (W.D.N.Y. 2016) .......................................................... 21

**Statutes**

N.Y. G.B.L. § 349 ................................................................................ 2, 18

**Other Authorities**

5 *Newberg On Class Actions* §16:5 (5th ed.) ................................................... 30

**Rules**

Fed. R. Civ. P. 23(c) ............................................................................ 20, 22

Fed. R. Civ. P. 23(e)(2) .................................................................... 2, 10, 11, 16

Fed. R. Civ. P. 23(h) .............................................................................. 30

## INTRODUCTION

Plaintiff Anthony Belfiore respectfully submits this memorandum in support of his motion for final approval of a proposed class action settlement (the "Settlement") with Defendant The Procter & Gamble Company ("P&G"), the terms and conditions of which are set forth in the "Settlement Agreement" (Dkt. No. 351-3), as well as for an award of attorneys' fees, reimbursement of out-of-pocket expenses, and a Class Representative Payment.[1]  P&G does not oppose this motion and has approved the form of the proposed Order of Final Approval submitted herewith.

This memorandum reincorporates and supplements the arguments made in Plaintiff's previous application for preliminary approval of the Settlement, which the Court approved by order dated March 6, 2020 (Dkt. No. 352) (the "Preliminary Approval Order").  To promote judicial efficiency, this memorandum also incorporates and assumes familiarity with the Court's recitals and findings in the Preliminary Approval Order.  *See generally id.*

The Settlement Agreement dated February 10, 2020 was presented to the Court as Exhibit 1 to the Declaration of Matthew Insley-Pruitt dated March 5, 2020 filed in support of Plaintiff's motion for preliminary approval ("MIP Prelim. Decl.") (Dkt. No. 351-2).  Since the Court granted preliminary approval of the Settlement, Settlement Class Members have made 39,238 total claims, with only five (5) requests for exclusion and zero (0) objections to any part of the Settlement or the fee and expense application.  *See* Declaration of Matthew Insley-Pruitt dated June 11, 2020, filed in support of the instant motion ("MIP Final Decl."), ¶ 36.  This overwhelmingly positive reaction by the Class weighs in the strongest terms in favor of final approval.

---

[1] The notices, claim form, and proposed orders are also attached as exhibits to the Settlement Agreement.  Unless otherwise indicated, capitalized terms are defined in the Settlement Agreement and all emphasis is added.

1

As set forth in further detail below, this Settlement easily meets the criteria set forth in Fed. R. Civ. P. 23(e)(2) and *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). Moreover, Plaintiff's request for attorneys' fees also satisfies *Goldberger v. Integrated Res.*, 209 F.3d 43, 44 (2d Cir. 2000). Accordingly, Plaintiff requests that the Court approve the Settlement and his request for attorneys' fees (in the amount of $2,997,161.93), costs and expenses (in the amount of $202,838.07), and a Class Representative Payment (in the amount of $10,000).

## BACKGROUND FACTS AND DETAILS OF SETTLEMENT

### Litigation History

In 2014, Plaintiff filed a suit against P&G in N.Y. Supreme Court, Nassau County, alleging, among other things, that Charmin Freshmates Flushable Wipes and any other pre-moistened wipes sold under the Charmin brand name bearing the word "flushable" on the package label (the "Product") were falsely advertised as "flushable" in violation of New York G.B.L. § 349.[2]  *See* MIP Final Decl. ¶ 3.  Thereafter, Defendants removed the Action to the Eastern District of New York. *See id.*

Pursuant to the Court's order, the Parties conducted discovery and submitted briefing on class certification, along with the plaintiff in *Kurtz v. Kimberly-Clark*, No. 14 Civ. 1142 (E.D.N.Y.) (the "*Kimberly-Clark* Action").[3]  Following the submission of briefing, the Court held two days of evidentiary hearings regarding the flushability of the Product, as well as the similar products in the *Kimberly-Clark* Action, where "[e]xtensive scientific testimony and demonstrations were introduced, showing advantages of the products and potential difficulties and concerns relied upon

---

[2] P&G denies Plaintiff's allegations in this Action and maintains that the Product performs as advertised.

[3] This Action was coordinated before Judge Weinstein with the *Kimberly-Clark* Action for pre-trial purposes, which  alleges that flushable wipes manufactured by Kimberly-Clark Corp. and Costco Wholesale Corp. also violate, *inter alia*, N.Y. G.B.L. § 349.

by the plaintiffs; enough evidence was produced to warrant consideration of certification issues." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 494 (E.D.N.Y. 2017).  On March 27, 2017, the Court certified the following class: "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and March 1, 2017" (the "Class").  *Id.* at 554-55.

P&G filed an interlocutory appeal (the "Appeal"), and, on May 14, 2019, the Court of Appeals for the Second Circuit remanded the Action to allow the Parties to submit additional evidence sufficient to determine whether Plaintiff satisfied Rule 23(b)(3)'s predominance requirement and whether to decertify the damages classes or maintain the current certification orders.  Dkt. No. 274.  The Court then held four days of evidentiary hearings where expert testimony was presented regarding the ability to determine damages class-wide using regression analyses. MIP Final Decl. ¶ 12.  After the Parties submitted post-hearing briefing, on October 25, 2019, the Court renewed its prior certification order.  *Kurtz v. Kimberly-Clark Corp.*, 414 F. Supp. 3d 317 (E.D.N.Y. 2019).

P&G continued its appeal, and pursuant to the Second Circuit's mandate, this latest appeal of the certification of the Class has returned to the same panel on the Second Circuit.  P&G submitted its appellate brief on January 10, 2020.  Plaintiff filed its opposition to P&G's appellate brief on March 10, 2020.  *See* MIP Final Decl. ¶ 26.

Soon after this case was filed, Judge Weinstein encouraged the Parties to discuss a settlement that would involve a claims-made structure and changed practices. *Belfiore v. Procter & Gamble Co.*, 140 F. Supp. 3d 241, 248 (E.D.N.Y. 2015); *see also Kurtz*, 321 F.R.D. 482 (reviewing continued efforts by the Court to encourage settlement); *Kurtz*, 414 F. Supp. 3d at 336 (continuing to encourage settlement).  Per the Court's suggestion, Plaintiff, through his counsel, participated in numerous settlement discussions with P&G, including in-person discussions before Magistrate

Judge Robert M. Levy starting in August 2015 and continuing with multiple in-person and telephonic meetings through the end of May 2016. *See, e.g.*, Docket Minute Entries for August 12, 2015; November 24, 2015; January 13, 2016; January 21, 2016; February 24, 2016; March 28, 2016; April 25, 2016; May 18, 2016.

**The Pettit Settlement**

On August 3, 2017, the Northern District of California certified the following class in *Pettit v. Procter & Gamble Co.*, No. 15-cv-02150-RS (the "*Pettit* Action"), a case addressing the same Product from the same defendant (*i.e.* P&G's Freshmates):

> All persons who, between April 6, 2011 and August 3, 2017 purchased in California the Charmin Freshmates Flushable Wipes (excluding purchases for purpose of resale).

2017 U.S. Dist. LEXIS 122668, at *4 (N.D. Cal. Aug. 3, 2017) (the "*Pettit* Class"). The *Pettit* decision relied in part on the prior decisions of Judge Weinstein certifying the Class in this Action. *See id.*

The *Pettit* Action settled following a mediation before Robert A. Meyer of JAMS ADR, Inc. in Chicago, Illinois on April 17, 2018. *Pettit* Action, Dkt. No. 117 at 5.[4] The "*Pettit* Settlement" was finally approved by Judge Richard Seeborg of the U.S. District Court for the Northern District of California on April 2, 2019, on behalf of a national class of purchasers of the Product, excluding purchases made in New York. Specifically, the *Pettit* Settlement (Dkt. No. 351-6) provided the following benefits to *Pettit* Class members in 49 states:

**Monetary relief**: *Pettit* Class members could file a claim for a cash payment of sixty cents ($0.60) for each package of the Product purchased in the United States (except in New York) during the Class Period (i.e., between April 6, 2011 and the date of preliminary approval of the *Pettit*

---

[4] Counsel for plaintiffs in the *Pettit* Action also participated alongside Plaintiff's Counsel in *Belfiore* in the prior discussions before Magistrate Judge Levy in the Eastern District of New York.

Settlement), regardless of the price the *Pettit* Class member paid for the package or the number of wipes contained in each package, subject to the following limitations: (a) a maximum of four dollars and twenty cents ($4.20) shall be paid on the combined claims submitted by any Household for claimed purchases that are not corroborated by Proof of Purchase, and (b) a maximum of thirty dollars ($30.00) shall be paid on the combined claims submitted by any Household for claimed purchases that are corroborated by Proof of Purchase. Therefore, the maximum payment to any Household could not exceed thirty dollars ($30.00) under the *Pettit* Settlement.

**Changed practices**:  The *Pettit* Settlement contemplated changed practices, some of which had already occurred, as well as injunctive relief.  Partly as a result of the *Pettit* Action and this Action, P&G has stopped manufacturing the Product in the formulation(s) that it used at the time the cases were commenced.  *See, e.g.*, Gutride Decl., Ex. 1 at § 3.10, cited in *Pettit* Action, Dkt. No. 117 at 6; MIP Prelim. Decl. Ex. 4 at ¶ 3.1. P&G also agreed that versions of the Product manufactured after January 2016 do not and will not contain bicomponent (polyester/polyolefin) fibers.  *See id.*  Further, P&G agreed that, for a period ending two years after the effective date (as defined in the *Pettit* Settlement), it shall be enjoined by the court in the *Pettit* Action as follows:

    a)  As of the effective date, Product marketed by P&G will not contain bicomponent (polyester/polyolefin) fibers;

    b)  On or before 90 days after the effective date, P&G will modify the packaging of the Product to include a statement that "Your satisfaction is guaranteed. For details of our refund program go to our website at www._____.com/_____." P&G will provide details regarding the satisfaction guarantee on the Charmin website, including reasonable purchase price refunds to consumers who are dissatisfied with the Product;

    c)  On or before 90 days after the effective date, P&G will modify the packaging of the Product to include the statement: "Use only in well-maintained plumbing systems";

    d)  As of the effective date, the Product will comply with current and future versions of the INDA Guidelines, including the slosh box test, provided P&G

5

is a member of INDA and the organization maintains the same purpose and mission, with a similar membership composition, as of the date of the Agreement;

e) The Product marketed by P&G on or after June 13, 2018, will comply with the May 2018 more stringent INDA GD4 test protocols which among other things (1) decrease the slosh box test duration from 180 minutes to 60 minutes, (2) increase the slosh box text pass-through percentage requirement from 25% to 60%, and (3) decrease the municipal pump test average power increase over baseline from 15% to 5%.

P&G's consent to adoption of the GD4 protocols, and its further consent to compliance with the more stringent GD4 protocols from June 13, 2018 forward (and before industry-wide compliance to GD4), was made in part due to the pendency of the *Pettit* Action and this Action. Indeed, pursuant to the Settlement of this Action, P&G has agreed to be enjoined by the Court regarding items (a)-(e) above for an extended period now ending two years after the Effective Date of the Settlement. *See* Settlement Agreement, Section 3.2.[5]

**The Settlement of This Action**

The proposed Settlement of this Action was reached following more than 6 years of intense, hard-fought litigation before the Court and in the Second Circuit Court of Appeals, which included several rounds of arm's-length settlement discussions between experienced counsel and before experienced mediators, most recently before Chief Magistrate Judge Gold of this Court on November 25, 2019. *See generally* MIP Final Decl.

The Settlement of this Action is on behalf of purchasers of the Product in New York. Specifically, the proposed Settlement provides for significant monetary and other benefits, each of which goes beyond the benefits received by the *Pettit* Class members. Notably, the Settlement

---

[5] As in *Pettit*, the distribution or sales by P&G or by third parties of Product manufactured prior the implementation of the labeling changes described in the *Pettit* Settlement do not constitute a violation of the Settlement Agreement or the injunction under the Settlement Agreement in this Action.

Agreement expressly concedes that this Action contributed to the benefits obtained for the *Pettit* Class and future Product purchasers. Settlement Agreement ¶ 3.2; Preliminary Approval Order at 3 ("P&G agreed to the terms of the *Pettit* settlement partly as a result of this Action and has agreed to continue the injunction in the *Pettit* action for a period of two years from the Effective Date of the settlement.").

**Monetary Relief**

This Settlement provides that Settlement Class Members can receive $0.70 per package if they do not have Proof of Purchase, or, if they do have Proof of Purchase, they can receive $1.20 for the first package and $1.00 for each subsequent package.  The Settlement Agreement details how the claims will be paid:

> 4.4    Each Settlement Class Member who submits a Valid Claim without Proof of Purchase shall receive a refund of seventy cents ($0.70) for each Product package purchased in New York during the Class Period, regardless of the price the Settlement Class Member paid for the package or the number of wipes contained in each package, subject to the following limitations: A maximum of six dollars and thirty cents ($6.30) shall be paid on the combined claims submitted by any Household for claimed purchases that are not corroborated by Proof of Purchase.  Each Settlement Class Member who submits a Valid Claim corroborated by Proof of Purchase shall receive a refund of one dollar and twenty cents ($1.20) for the first Product package purchased in New York during the Class Period, and one dollar ($1.00) for any additional Product packages purchased in New York during the Class Period, regardless of the price the Settlement Class Member paid for the package or the number of wipes contained in each package, subject to the following limitation: A maximum of fifty dollars and twenty cents ($50.20) shall be paid on the combined claims submitted by any Household for claimed purchases that are corroborated by Proof of Purchase.  In no event shall (i) the maximum payment to any Household exceed fifty dollars and twenty cents ($50.20), or (ii) a Settlement Class Member receive a payment for a purchase of the Product they did not affirmatively claim on the Claim Form.

Settlement Agreement ¶ 4.4.  The claim form is a simple one-page form that can be completed in a few minutes.  It can be completed online or submitted by mail.  Proof of Purchase can also be

submitted electronically (unless it is in the form of the actual label or bar code portion of the product package) or in hard copy. *See generally id.*

**Changed Practices**

In addition to the changed practices achieved in the *Pettit* Settlement described above, as well as the injunction that will be extended for two years from the Effective Date of the Settlement here, the proposed Settlement goes further. Significantly, pursuant to the Settlement Agreement, P&G has agreed to remove that part of the current Product label that says "septic safe" and "safe for sewers and septic systems." Settlement Agreement ¶ 3.3(a). Notwithstanding that the allegations by plaintiffs in the *Pettit* Action strongly criticized these statements, the *Pettit* Settlement failed to have that portion of the Product label removed. The proposed Settlement remedies this concern.

**Notice Plan**

Final details relating to the implementation of the Notice Program will be set forth in the declaration by the Claim Administrator (Heffler Claims Group, or "Heffler"), to be filed on July 9, 2020. In the meantime, Heffler has been providing Plaintiff's Counsel with updates on the claims administration and notice process. MIP Final Decl. ¶ 36.

As required by the Settlement Agreement, notice of the Settlement was provided to the Settlement Class Members via several methods, including (1) advertisements in *People Magazine*, (2) more than 12 million impressions of online advertising targeted to likely users of the Product, and (3) a press release through a national wire service, a notice program substantially similar to the one approved by the Court in connection with the *Pettit* Settlement. All costs of notice and administration of the proposed Settlement will be paid by P&G.

In accordance with paragraph 6 of the Preliminary Approval Order, Heffler, which was the claim administrator used in connection with the *Pettit* Settlement (and thus has experience in a

substantially similar settlement administration), had designed the notice plan and has attested that notice will reach a substantial majority of likely Settlement Class Members.  *See generally* MIP Prelim. Decl. Ex. 3 (Declaration of Jeanne C. Finegan ("Finegan Decl.")).  Heffler has established a Settlement Website (https://www.belfiorewipesettlement.com/), which contains the Settlement notices, a contact information page that includes the address and telephone numbers for the Claim Administrator and Plaintiff's Counsel, the Settlement Agreement, the signed Preliminary Approval Order, online and printable versions of the claim form and the opt out forms, answers to frequently asked questions, and (after today) Plaintiff Counsel's motion for final approval of the Settlement and for an award of attorneys' fees, costs, expenses and Class Representative Payment (*i.e.* this Memorandum).  *See* Settlement Agreement ¶ 5.1.

The Notice, published in several places, all refer Settlement Class Members to the Settlement Website.  Settlement Agreement, Ex. A.  As will be described in the Heffler Declaration, the Published Notice appeared in *People Magazine* in the April 20, 2020 issue, a nationwide press release was issued, and more than 12 million impressions of online advertising were targeted to reach likely consumers of the Product.  *Id.*; *see also* MIP Final Decl. ¶ 36.  Finally, the Claims Administrator has been operating a toll-free information line to provide information about the case and Settlement.  Settlement Agreement, Ex. A.

The Court previously found upon preliminary approval of the Settlement that this Notice plan is sufficient as to form and substance.  Preliminary Approval Order ¶¶ 8, 9.

**Class Reaction to the Settlement**

As of June 5, 2020, Heffler reports 39,238 total claims, with five (5) requests for exclusion and zero (0) objections to the Settlement, fee and expense application or the Class Representative Payment.  The number of claims filed to date is approximately 20.9% of the claims filed in the

*Pettit* Settlement,[6] despite the current Settlement Class comprising only 6% of the population of the *Pettit* Class and significant time remaining for claims to be filed,[7] suggesting that this Settlement is appealing to the Class.

## ARGUMENT

## I.      FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED

Although Rule 23(e) requires court approval of a class settlement, there is a "strong judicial policy in favor of settlements, particularly in the class action context." *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citation omitted). "A class action settlement approval procedure typically occurs in two stages: (1) preliminary approval—where prior to notice to the class, a court makes a preliminary evaluation of fairness, and (2) final approval—where notice of a hearing is given to the class members, and class members and settling parties are provided the opportunity to be heard on the question of final court approval." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JO), 2019 U.S. Dist. LEXIS 217583, at *180 (E.D.N.Y. Dec. 16, 2019) ("*Payment Card II*") (formatting and internal quotations omitted). This Court completed the first stage by granting preliminary approval of the Settlement by order dated March 6, 2020 (Dkt. No. 352, the Preliminary Approval Order). The Court should now complete the second stage by considering the factors set forth in Fed. R. Civ. P. 23(e)(2), i.e., whether:

> (A)      the class representatives and class counsel have adequately represented the class;
>
> (B)      the proposal was negotiated at arm's length;

---

[6] The *Pettit* Settlement had a final total of 187,860 claims filed.  No. 15 Civ. 2150, Dkt. No. 139 (N.D. Cal. July 17, 2019).

[7] The deadline for Settlement Class Members to file a claim is August 22, 2020.

(C)     the relief provided for the class is adequate, taking into account:

    (i)     the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;

    (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  The first two requirements (paragraphs A and B) constitute the procedural aspects of the proposed Settlement while the last two (paragraphs C and D) constitute the substantive aspects of the proposed Settlement.  *Payment Card II*, 2019 U.S. Dist. LEXIS 217583, at *180.  The Court also concurrently considers the nine factors listed in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ("*Grinnell*"),[8] which "significant[ly] overlap" with Rule 23(e)(2).  *Payment Card II*, 2019 U.S. Dist. LEXIS 217583, at *180.  Recognizing this substantial overlap, Judge Brodie commented that only three *Grinnell* factors are unique:  "the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 n.22 (E.D.N.Y. 2019) ("*Payment Card I*");

---

[8] Those factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Payment Card II*, 2019 U.S. Dist. LEXIS 217583, at *181 (citing, e.g., *Grinnell*, 495 F.2d at 463) (other citations omitted).

*but see Padovano v. FedEx Ground Package Sys.*, No. 16-CV-17-FPG, 2019 U.S. Dist. LEXIS 107092, at *7 n.2 (W.D.N.Y. June 10, 2019) (recognizing the new Rule 23(e)(2) factors are so similar to the *Grinnell* factors that no separate analysis is necessary).

Since the recent amendments to Rule 23 created a "more exacting" standard for preliminary approval than was previously required, on final approval, the Court may properly "refer[] to its reasoning as set forth in the Preliminary Approval Order where it finds that the reasoning still stands after having considered the motions papers and objections." *Payment Card II*, 2019 U.S. Dist. LEXIS 217583, at *180.

## A.     The Settlement Class Should Be Certified

"The ultimate decision to certify the class for purposes of settlement" is easy here because Judge Weinstein already certified the Class after years of motion practice, evidentiary hearings, and multiple opinions.  *See* Fed. R. Civ. P. 23; *id.*, Committee Notes ("[The] procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court.").   Indeed, the Court in its Preliminary Approval Order certified a Settlement Class consisting of "all Persons who purchased the Product in the United States between May 24, 2011 and the date of Preliminary Approval, excluding purchases made outside the State of New York and purchases made for purposes of resale," and appropriately excluding certain persons. Preliminary Approval Order ¶ 3.  For the same reasons the Court preliminarily found that the Settlement Class should be certified (*id.* ¶ 4), the Settlement Class should be finally certified.

## B.     The Settlement Is Fair, Reasonable, and Adequate

"[P]erhaps the most significant factor to be weighed in considering [the] adequacy" of a settlement is the "reaction of the class"; "a favorable reception by the class constitutes strong evidence that a proposed settlement is fair." *Payment Card II*, 2019 U.S. Dist. LEXIS 217583, at

12

*186-87 (internal citations and quotations omitted). While "a certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members . . . [,] [i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Id.* (citing, e.g., *Visa, U.S.A.*, 396 F.3d at 118).

To date, with nearly 40,000 claims already made, there have been only five (5) requests for exclusion and ***no objections*** to the Settlement, which weighs in the strongest terms in favor of final approval. *See id.*; MIP Final Decl. ¶ 36. Additionally, the number of claims to date is equal to 20.9% (39,238/187,860) of the total claims filed in the *Pettit* Settlement, despite the current New York only Settlement Class comprising only 6% of the population of the 49-state *Pettit* Class, and despite more than two months remaining for additional claims to be made, further indicating that this Settlement is appealing to the Settlement Class Members. Accordingly, for this reason and those set forth below, the Court can assure itself that the Settlement satisfies both the procedural and substantive requirements of Rule 23(e)(2), as well as the non-duplicative *Grinnell* factors.[9]

1.   The Settlement Is the Result of a Fair, Reasonable, and Adequate Process

Plaintiff Belfiore and Class Counsel have more than adequately represented the Settlement Class through years of hard fought litigation against Defendant, which has culminated in a Settlement that was negotiated at arm's length. MIP Final Decl. ¶ 3; *see Visa, U.S.A.*, 396 F.3d at 116 (internal citation omitted) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.").

---

[9] P&G, while continuing to deny all allegations raised in the Complaint and maintaining that its Product performs as advertised, also believes the Settlement is fair, reasonable, and in P&G's interest to avoid further expense, inconvenience, and interference with its ongoing business operations. Settlement Agreement ¶ 1.9.

13

Class Counsel has vigorously litigated this Action since 2014. *See* MIP Final Decl. ¶ 3. In that time, counsel have had more than thirty appearances before Judge Weinstein and the Magistrate Judges, including oral arguments, evidentiary hearings, settlement conferences, and status conferences. *See generally id.* Class Counsel has opposed Defendant's plethora of substantive motions, including its original motion to dismiss (Dkt. No. 17), a renewed motion to dismiss (Dkt. No. 222), a motion to deny class certification (Dkt. No. 59), two motions to decertify the class (Dkt. Nos. 222, 294), and a motion for summary judgment (Dkt. No. 222). Class Counsel has also litigated its own motions, such as the motion to certify the Class (Dkt. No. 58), a motion to compel production from third parties (Dkt. No. 123), a motion to reconsider the order of October 5, 2015 temporarily staying the case (Dkt. No. 157), responses to the Court's request for additional briefing on several topics (*e.g.*, Dkt. Nos. 129, 139), a motion to extend and amend the class definition (Dkt. No. 307), and post-evidentiary hearing briefing (Dkt. No. 330). Class Counsel also litigated the interlocutory appeal to the Second Circuit pursuant to Rule 23(f). MIP Final Decl. ¶¶ 19, 26. On balance, Plaintiff has been very successful by, among many other things, maintaining the Action, obtaining class certification despite vigorous opposition, and sustaining that decision after four days of expert testimony on remand from the Second Circuit. *See generally id.*

Plaintiff's Counsel have also conducted discovery of both Defendant and third parties leading up to this point. MIP Final Decl. ¶¶ 6, 10. In this regard, Plaintiff's Counsel deposed four of Defendant's witnesses pursuant to Rule 30(b)(6). *Id.* ¶ 9. In addition, Plaintiff's Counsel has reviewed over 80,000 pages of documents produced by Defendant and presented the testimony of three witnesses over multiple days of in-Court hearings. *Id.* ¶¶ 6, 12, 15, 23. Moreover, Plaintiff's Counsel defended the deposition of Plaintiff, Plaintiff's wife, Plaintiff's plumber, and two of Plaintiff's experts. *Id.* ¶ 8. This record makes it clear that Plaintiff's Counsel was fully informed

14

as to the viability of the claims and the risks to both sides if the case did not settle. *See generally id.*; *see also* Preliminary Approval Order at 3 ("Substantial discovery was taken by the parties."); *id.*at 4 ("Plaintiff and his counsel had sufficient information to evaluate the strengths and weaknesses of the case and to conduct informed settlement discussions.").

The Parties negotiated the proposed Settlement in good faith over years.  MIP Final Decl. ¶ 27.  Settlement discussions first began in 2015 under the supervision of Magistrate Judge Levy, and renewed recently with mediation before Magistrate Judge Gold.  *Id.*  With a framework established by these discussions, the *Pettit* Settlement, and Judge Weinstein's instructions, Counsel for both Parties continued their settlement negotiations over several months leading to the execution of the Settlement Agreement.  *See id.*  Counsel for both sides are experienced class action attorneys and have fully evaluated the strengths, weaknesses, and equities of their positions.  *See generally id.* Plaintiff's Counsel believes the Settlement to be in the best interests of the Settlement Class, considering the costs and risks of continued litigation. *Id.* ¶ 2.  The opinion of experienced counsel supporting the Settlement is entitled to considerable weight. *See, e.g.*, *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 172 (E.D.N.Y. 2012); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 56 (S.D.N.Y. 1993).  For all these reasons, the Court should find that the Settlement is the result of a fair, reasonable, and adequate process. *See Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713 (PKC), Slip Op. at 4 ¶ 6 (E.D.N.Y. July 24, 2014) (Chen, J.) (finding "that the Settlement is, in all respects, fair, reasonable, and adequate, and in the best interests of the Class" where "the Settlement set forth in the Stipulation is the result of arm's-length negotiations between experienced counsel representing the interests of the Settling Parties" and "the record is sufficiently developed and complete to have

enabled Lead Plaintiff and Defendants to have adequately evaluated and considered their positions").

  2. <u>The Settlement Provides Fair, Reasonable, and Adequate Substance for Settlement Class Members</u>

In line with the instructions of Rule 23(e)(2)(B), Courts have long recognized that "[e]ssential to analyzing a settlement's fairness is 'the need to compare the terms of the compromise with the likely rewards of litigation.'" *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013). The question for the Court is not whether the Settlement represents the highest recovery possible, but whether it represents a reasonable one in light of the many uncertainties the Class faces. *Id.*

The Court made clear over the years that it believed that the Class is best served by a meaningful settlement instead of continued litigation. Almost five years ago, Judge Weinstein instructed that "the easiest way to settle this—because the damages don't seem to be to me very easily ascertained—is through the injunction without damages and just put in a plain forthright statement . . . . Flush after putting one in the toilet and make sure your toilets are in good shape[.]" Hearing Tr. March 31, 2015 at 22:16–:23 (MIP Prelim. Approval Decl., Exhibit 5). This Settlement does much more than that, since it provides a real financial recovery as well as improved disclosures on the Product and injunction-like relief. *Supra* pp. 6-9.

Similarly, Judge Weinstein more recently requested the Parties to explore a settlement that "would harmonize any relief granted by this court with that afforded by the geographically expansive Procter & Gamble settlement [*i.e.* the *Pettit* Settlement] so that national uniform products can be produced by each defendant." *Kurtz*, 414 F. Supp. 3d 317 at 336. This Settlement is in line

with that instruction, and materially improves on the foundation of the *Pettit* Settlement in several ways.[10]

> a.  The Relief Provided in the Settlement Is Fair, Adequate, and Reasonable

While Plaintiff has been successful so far, the future is far from certain, as the Court has continuously indicated.  Against that background, the relief in the Settlement is very fair, especially in light of the unique *Grinnell* factors.

**First**, while the *Pettit* Settlement awarded $0.60 per purchase for a maximum recovery of $4.20 (or seven packages), this Settlement provides $0.70 per purchase for a maximum recovery of $6.30 (or nine packages) for those Settlement Class Members **without** a Proof of Purchase. Settlement Agreement ¶ 4.4.  This is an 11% improvement on a per-package basis and—due also to the increased number of allowed purchases—a 50% improvement on a maximum recovery basis over the *Pettit* Settlement.  *Cf.* Dkt. No. 351-6.

**Second**, Settlement Class Members **with** Proof of Purchase are receiving an even greater amount beyond that provided to *Pettit* Class members.  Instead of only $0.60 per package with a maximum recovery of $30.00, purchasers in New York with Proof of Purchase will receive $1.20 for the first package and $1.00 for each additional package, for a maximum recovery of $50.20 (or 50 packages).  Settlement Agreement ¶ 4.4.  This is an increase of up to $20 per Household (66.7%) over the *Pettit* Settlement.  *Cf.* Dkt. No. 351-6.

Indeed, the Settlement provides for a greater monetary benefit for actual damages than may be achieved at trial.  Plaintiff's expert—Colin Weir—has performed a detailed regression analysis to calculate the price premium attributable to the challenged "flushability" representations on the

---

[10]     There are no agreements pertaining to the Settlement Agreement that are required to be identified under Rule 23(e)(3).

Product and concluded that the premium is 7.95% of the purchase price of each package. Supplemental Declaration of Colin Weir dated July 9, 2019 ("Weir Decl."), Dkt. No. 329 at ¶ 78. The average price per package sold was $4.67 during the relevant period, and thus, at trial, consumers might not receive more than 37 cents per package in restitution.  The Settlement payment of between $0.70-$1.20 per package (depending on the level of Proof of Purchase) is approximately 189% to 324% of the best-case recovery of actual damages on a per-package basis as per Weir's regression analysis.  And, in a contested proceeding, Settlement Class Members who lacked proof of purchase—which may be the majority of Settlement Class Members—might get nothing at all. *See, e.g.*, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017), *cert. denied sub nom. ConAgra Brands, Inc. v. Briseno*, 138 S. Ct. 313 (2017) (explaining that the post-trial claims process by which each consumers' affidavits would "force a liability determination" as to that consumer).

Furthermore, the availability of statutory damages has been heavily litigated in this case. Most recently, Judge Weinstein indicated that statutory damages "presents serious substantive legal questions," *Kurtz*, 414 F. Supp. 3d at 336, indicating that statutory damages in their full amount are far from certain.  However, given that the language of N.Y. G.B.L. § 349(h) provides that "any person . . . may bring an action in his own name . . . to recover his actual damages or fifty dollars, whichever is greater," another possible outcome is that the Court will limit the maximum statutory recovery to $50 per Class Member and may require proof of purchase.  In that scenario, the maximum recovery of $50.20 for Settlement Class Members with proof of purchase *exceeds* their maximum recovery after years of litigation.  The Settlement is thus well within the range of reasonableness, "given the risks and delay of continued litigation measured against the value of

obtaining certain compensation more quickly." *See Chavarria,* 875 F. Supp. 2d at 175 (internal citation omitted).

 **Third**, P&G's changed label practices are also likely to benefit Settlement Class Members. Defendant has continuously argued that "flushable" has different meanings for different people, particularly with respect to whether or not it includes the performance of the wipe after it goes down the toilet. *See, e.g.*, Dkt. No. 81 at 8-11 (arguing that the various definitions of flushability destroys the commonality of the class); Dkt. No. 322 at 18-19 (arguing that Mr. Weir was unable to isolate the impact of different definitions of flushable). By removing the representations that Freshmates are "septic safe" and "safe for sewer and septic systems" the Product package will no longer make one of the core claims that Plaintiff alleges is misleading. The value of such relief—including the benefit to consumers in the form of an improved marketplace—can properly be considered when evaluating a settlement's fairness. *See, e.g., Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) (noting that a "judicially-enforceable agreement" to maintain changed practices may be considered in a fairness inquiry). Thus, in addition to the monetary relief, the changed practices will benefit Settlement Class Members and other consumers in the future.

 **Finally**, the ability of the Defendant to withstand a greater judgment does not play a large role here. This is a substantial recovery that is fair to Settlement Class Members. *See Payment Card I*, 330 F.R.D. at 47 ("Although the Court finds that this factor weighs against a grant of final approval, it does not necessarily preclude a finding that the settlement is fair.").

### b.    *The Claims Process Is Reasonable*

 The notice plan and claim form comport with the procedural and substantive requirements of Rule 23 as this Court found in its Preliminary Approval Order (¶¶ 8-9). Indeed, the nearly identical notice plan and claim form were approved by the court in the *Pettit* Action. Under Rule

23, due process requires that class members receive notice of the settlement and an opportunity to be heard and participate in the litigation. *See* Fed. R. Civ. P. 23(c)(2)(B); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985); *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 175-76 (1974) ("individual notice must be provided to those class members who are identifiable through reasonable effort"). The Rules require that this Court "direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). The mechanics of the notice process are left to the discretion of the Court, subject only to the broad reasonableness standards imposed by due process. *Visa, U.S.A.*, 396 F.3d at 113-14 ("The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."). "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding." *Id.* at 114 (citation and internal quotation marks omitted). The recent amendments to Rule 23 clarify that electronic means may be used. Fed. R. Civ. P. 23(c)(2).

The notice plan was designed to reach an estimated 72% percent of the Settlement Class Members, on average notice of 2.8 times each. Settlement Agreement, Ex. A. Notice has been provided to the Settlement Class as follows: (1) print publication in *People Magazine* in the April 20, 2020 issue; (2) online advertising designed to reach consumers of the Product, including targeted display advertising to followers of Charmin's Facebook page, to individuals in New York State where research identifies the greatest use of the Product, and to individuals who conduct searches of keywords, such as "Freshmates"; and (3) a nationwide press release. *See id.* All of these notices were designed to refer Settlement Class Members to the Settlement Website (https://www.belfiorewipesettlement.com/), which contained the Long Form Notice in both downloadable PDF format and HTML format with a clickable table of contents; answers to

frequently asked questions; a Contact Information page that includes the address for the Claim Administrator and Class Counsel; the Settlement Agreement; the signed order of Preliminary Approval and the publicly filed motion papers and declarations in support thereof; a downloadable and online version of the Claim Form; a downloadable and online version of the form by which putative Settlement Class Members may exclude themselves from the Settlement Class; and (in the next few days) the publicly filed motion for final approval and Plaintiff's application for attorneys' fees, costs and a Class Representative Payment, with supporting declarations. *See id.*

The notice plan is reasonable and comports with due process. As explained in the declaration from the proposed Claim Administrator (the same one used to administer the *Pettit* Settlement), this multi-communication method is the best notice practicable and is reasonably designed to reach Settlement Class Members. MIP Prelim. Decl. Ex. 3 (Finegan Decl. ¶ 4); *see* 2018 Advisory Comm. Note, Amended Rules, p. 16 ("courts and counsel have begun to employ new technology to make notice more effective"); *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 224 (2d Cir. 2012) ("Constructive notice by publication may be sufficient to satisfy due process 'as to persons whose whereabouts or interests c[an] not be determined through due diligence'" (citing *In re Agent Orange*, 818 F.2d 145, 168 (2d Cir. 1987)); *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 314 (W.D.N.Y. 2016) ("To the extent . . . that individual members cannot be identified, notice by publication is sufficient."); *see also In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2012 U.S. Dist. LEXIS 93284, at *13-14 (N.D. Cal. July 5, 2012) (approving notice procedure that included emailing customers at last known email address, publication in *People Magazine*, and advertising on Facebook).

Direct notice to the Settlement Class is not a reasonable method of notice, as the Product is sold through third-party retailers, and P&G does not have records of purchaser identities. *See In re*

*MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009) ("The best practicable notice under the circumstances is notice by publication in newspapers. In view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances."); *Gonzalez v. City of New York*, 396 F. Supp. 2d 411, 416 (S.D.N.Y. 2005) ("Though publication notice is not sufficient when the names and addresses of potential class members can be ascertained . . . [i]t is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected." (citation omitted)).

Moreover, the notices provide all the requisite information:  they inform Settlement Class Members about the proposed Settlement; their right to opt out or object; the need to file a claim; a summary of settlement benefits; the prospective request for attorneys' fees, costs and payments to the Plaintiff; and the fact that they will be bound by the judgment if they do not opt out.[11]  The notices also refer Settlement Class Members to the Settlement Website where they can obtain the detailed long- form notice.

Settlement Class Members who seek benefits under the Settlement need to fill out a simple Claim Form online unless they are submitting the actual label or bar code portion of the Product as Proof of Purchase.  They also have the option to print copies and mail the Claim Form to the Claim Administrator.  The Claim Form can be completed in a few minutes.

---

[11] Pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), a notice must concisely and clearly state in plain, easily understood language the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

The fact that nearly **40,000** claim forms have already been submitted, and Settlement Class Members have been communicating with the Claims Administrator and/or Plaintiff's Counsel, demonstrates that the Notice Program has been effective.  MIP Final Decl. ¶ 36.

## II.   THE REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND CLASS REPRESENTATIVE PAYMENT, SHOULD BE GRANTED

Plaintiff now applies to the Court for a modest Class Representative Payment from P&G of $10,000.  Plaintiff's Counsel also applies to the Court to approve payment from P&G of their reasonable attorneys' fees, costs, and expenses in a total amount of $3.2 million, which is more than $2 million *less* than the actual lodestar and costs incurred by Plaintiff's Counsel.  Specifically, as of May 31, 2020, Plaintiff's Counsel has spent in excess of 7,500 hours working on this litigation, and its lodestar is greater than $5 million.  *See* MIP Final Decl., Ex. 1.  In addition, Plaintiff's Counsel has incurred in excess of $200,000 in expenses.  MIP Final Decl. ¶ 33.  Each of these requests is reasonable, has been met with no objection by the Class to date, and should now be approved by the Court.

### A.   The Request for Attorneys' Fees Should Be Granted

Courts increasingly use the lodestar method for calculating attorneys' fees in a claims-made settlement.  *See, e.g.*, *McLaughlin v. IDT Energy*, No. 14 CV 4107 (ENV)(RML), 2018 U.S. Dist. LEXIS 128347, at *47-48 (E.D.N.Y. July 30, 2018) ("the lodestar method better accommodates the policy concerns in settling class actions on a claims-made basis"); *see also Chen v. Select Income REIT*, No. 18-CV-10418 (GBD) (KNF), 2019 U.S. Dist. LEXIS 177687, at *50-51 (S.D.N.Y. Oct. 11, 2019) ("This is not a common fund case, since no common fund exists from which attorneys' fees are sought; thus, the percentage method for calculating reasonable attorneys' fees does not apply.").  However, "[i]rrespective of which method is used, the '*Goldberger* factors' ultimately

23

determine the reasonableness" of an attorney's fee award in a class action settlement. *Simerlein v. Toyota Motor Corp.*, No. 3:17-cv-1091 (VAB), 2019 U.S. Dist. LEXIS 96742, at *69 (D. Conn. June 10, 2019) (citing *Visa, U.S.A.*, 396 F.3d at 121)); *accord Berni v. Barilla G. e R. Fratelli, S.p.A.*, 332 F.R.D. 14, 34 (E.D.N.Y. June 3, 2019) ("Given that the settlement establishes no common fund, the Court will utilize the lodestar method. . . . [but e]ven when relying on the lodestar method in a class action settlement, the Court is 'guided by the traditional criteria in determining a reasonable common fund fee . . . .'" (quoting *Goldberger*, 209 F.3d at 47)).

Further simplifying matters, in a case such as this "where the attorneys' fees are to be paid directly by defendant and, thus, money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members." *Pearlman v. Cablevision Sys. Corp.*, CV 10-4992 (JS) (AKT), 2019 U.S. Dist. LEXIS 142222, at *12 (E.D.N.Y. Aug. 20, 2019) (internal quotation and citation omitted). Application of the *Goldberger* factors under this relaxed standard shows that Plaintiff's attorneys' fee and expense request, amounting to less than 60% of the already reasonable lodestar figure, is appropriate.

1. The Fee Is Reasonable Under the Lodestar Method

Lodestar is calculated by multiplying the number of hours that counsel expended by a reasonable hourly rate. *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002). "[M]arket rates, where available, are the ideal proxy" for an attorney's compensation. *Goldberger*, 209 F.3d at 52. Courts use attorneys' current rates to calculate the lodestar figure to account for the delayed payment and inflation. *See, e.g., Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283-84 (1989); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (noting current rates should be applied to compensate for the delay in payment).

24

Plaintiff's Counsel have spent 7,596 hours prosecuting the Action, producing a total lodestar amount of $5,407,974.50 based on standard hourly rates.  No attorneys are billed in excess of their standard hourly rates, which have been accepted by courts in other contingency cases and are charged to (and paid by) hourly clients.  MIP Final Decl. ¶ 30; *see Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'").  Plaintiffs' Counsel's hourly rates are market rates for lawyers of similar quality litigating matters of similar magnitude in New York City.  *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476, 2016 U.S. Dist. LEXIS 54587, at *17 (S.D.N.Y. Apr. 25, 2016) (approving partner rates of $834 to $1,125 and associate rates of $411 to $714 as requested in Dkt. No. 118 therein); *McLaughlin*, 2018 U.S. Dist. LEXIS 128347, at *49 ("The Second Circuit has also permitted district courts to use higher out-of-district rates, or some rate in between the higher out-of-district rate sought and the rates charged by local attorneys, 'if it is clear that a reasonable, paying client would have paid those higher rates.'" (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 191 (2d Cir. 2007)).  Plaintiff's Counsel's hourly rates are presumptively reasonable here because P&G has agreed not to oppose this fee request, and fees will not be taken from a common fund.  As this court has recently observed in another consumer action:

> The hourly rates Class Counsel generally charge are at the very high end of the range (and in some cases are above the range) of what courts in the Eastern District of New York typically award in complex cases. Yet, courts have approved, in class actions where the defendants have agreed to pay the specific attorneys' fees, a lodestar based on billable rates of between $405 and $790 for partners and $270 to $500 for associates. . . . As in the instant action, the attorneys' fees in [similar cases] were not drawn from the settlement fund, but rather were separate and apart from the settlement payments to class members and were consented to by the defendants in those cases.  Although this feature, namely, separation of fee award from

> class benefits, means that the award does not directly erode the benefits offered to class members, in that same vein, the benefit of a decrease in the award by the Court will inure to the benefit of [the defendant].

*Pearlman*, 2019 U.S. Dist. LEXIS 142222, at *16-17 (collecting cases).  *Pearlman* approved rates in line with those requested here (accounting for multipliers). *See id.*

In this case, Plaintiff's Counsel request a total fee of $2,997,161.93,[12] equating to a $2,410,812.57 **reduction** to their lodestar. *Cf. Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 623-24 (S.D.N.Y. 2012) ("Courts regularly award lodestar **multipliers** from 2 to 6 times lodestar.") (emphasis added) (collecting cases)).[13]   Plaintiff's Counsel's request is especially reasonable in light of this pre-negotiated deep discount to lodestar.

    2.    <u>The Goldberger Factors Confirm that the Requested Fee Is Reasonable</u>

Regardless of fee method, courts examine the reasonableness of a fee request under the following *Goldberger* factors: "'(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'" *Goldberger*, 209 F.3d at 50.  Each confirms the requested fee is reasonable.

    *a.*    *Plaintiff's Counsel's Investment of Time Favors the Request*

Plaintiff's Counsel have devoted 7,596 hours prosecuting the Action.  MIP Final Decl. ¶ 31 and Ex. 1.  The requested fee is $2,410,812.57 (~44%) **less** than the usual market value of their

---

[12]    The Settlement Agreement provides for an application of attorneys' fees, costs, and expenses not to exceed $3,200,000.  Settlement Agreement ¶ 7.1.  Plaintiff's Counsel seeks the reimbursement of costs and expenses of $202,838.07.  The total application less expenses results in $2,997,161.93 in attorneys' fees.

[13]    Even under the percentage method (not applicable here because there is no common fund), Plaintiff's fee request would be appropriate, "because procedurally, it was negotiated separately from the class members' recovery." *Seekamp v. It's Huge, Inc.*, No. 1:09-CV-0018 (LEK/CFH), 2014 U.S. Dist. LEXIS 174657, at *4 (N.D.N.Y. Dec. 18, 2014) (approving fee that amounted to 45% of class recovery).

time. The work done by Plaintiff's Counsel in this case is described above and in the accompanying declaration of Matthew Insley-Pruitt (MIP Final Decl.).  Four attorneys each devoted over one thousand hours to this matter, in addition to the hundreds of hours contributed by other attorneys and support staff.  MIP Final Decl. Ex. 1.  This investment of time spanned six years of litigation through various procedural phases.  MIP Final Decl. ¶ 3.  This enormous amount of time was necessary due to the size and complexity of the case and the many motions and appeals it involved, justifying the requested fee award.  In addition to the time already spent, Plaintiff's Counsel will continue to devote many hours to administering the Settlement; but do not seek fees for any additional hours.  *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. MDL No. 12-2389, 2015 U.S. Dist. LEXIS 152668, at *27 (S.D.N.Y. Nov. 9, 2015) (considering counsel's future efforts to oversee the claims process in awarding fee).

> b.      *The Magnitude and Complexity of the Case Favors the Request*

In cases that require more expertise, a larger award is warranted to the lawyers who can competently bring and prosecute the case. *Goldberger*, 209 F.3d at 55.  This was a case of considerable magnitude and complexity, as already set forth in Part I(B)(1) *supra. See generally* MIP Final Decl.  It involved review of more than 80,000 pages of documents, litigation of class certification, multiple days of evidentiary hearings with testimony of multiple expert witnesses, two trips to the Second Circuit, communication with a Federal agency (the FTC), and coordination with the 49-state *Pettit* Action and its settlement, among other complicating factors. *See id.* ¶¶ 6, 12, 13, 19, 20, 23, 27.  In short, it was challenging, even for counsel highly experienced in some of the largest and most complex consumer class actions.

c.      *The Litigation Risks Favor the Request*

"The Second Circuit has recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award." *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494, at *14 (S.D.N.Y. May 9, 2014). The "litigation risk must be measured as of when the case is filed." *Goldberger*, 209 F.3d at 55. As discussed above, Plaintiff's Counsel faced significant risks in proving liability, class-wide impact, and damages, and actually litigated each of these issues, none of which had a guaranteed outcome. *See* MIP Final Decl. ¶¶ 4 (motions to dismiss and strike class allegations); 11 (opposition to class certification); 14 (statutory damages and primary jurisdiction issues); 17 (renewed motion to dismiss, opposition to class certification, and motion for summary judgment); 19 (Second Circuit appeal); 22 (motion to decertify the class); 24-25 (renewed opposition to class certification); 26 (another Second Circuit appeal). Plaintiff's Counsel represented Plaintiff and the Settlement Class on a purely contingent basis, investing considerable time and money in the prosecution of the Action without any guarantee that the investments would ever be repaid, favoring an enhancement to any fee award. *See Maley*, 186 F. Supp. 2d at 372 ("Class counsel undertook a substantial risk of absolute non-payment in prosecuting this action, for which they should be adequately compensated"); *see also Goldberger*, 209 F.3d at 54 (the risk of the litigation is "perhaps the foremost factor to be considered in determining whether to award an enhancement" (quotation omitted)).

d.      *The Quality of Representation Favors the Request*

"[T]he quality of representation is best measured by results." *Goldberger*, 209 F.3d at 55; *see also Maley*, 186 F. Supp. 2d at 373 ("'The critical element . . . is the result obtained.'"). The excellent results here reflect the quality of the lawyering, and both the Plaintiff and the Settlement

28

Class have indicated their agreement. *E.g.* Declaration of Anthony Belfiore ("Belfiore Decl.")[14] ¶¶ 5 ("I believe that the recovery in this action from the proposed settlement is an excellent result for the Class, given the circumstances."); 6 ("I completely support Class Counsel's requests."); MIP Final Decl. ¶ 36 (no objections to the fee and expense application by Class Members).  Again, this Settlement is considerably more favorable than the 49-State *Pettit* Settlement, and provides for a greater monetary benefit for actual damages than may be achieved at trial even under Plaintiff's "best case" scenario—an excellent result warranting a commensurate fee.  *See* Belfiore Decl. ¶¶ 5-6; Weir Decl. ¶ 78.

> e.      *The Fee Is Reasonable in Relation to the Settlement*

The relation of the fee to the Settlement has been discussed above.  Plaintiff's Counsel's request for attorneys' fees is reasonable and consistent with approved awards by courts in this District and elsewhere in similar cases.  *Supra* Part II(A)(1).

> f.      *The Fee Is Reasonable Given Public Policy Considerations*

This factor also favors Plaintiff's Counsel's fee request.  "[P]ublic policy militates in favor of [a] fee in light of the role that consumer protection class actions play in regulating the marketplace." *Seekamp*, 2014 U.S. Dist. LEXIS 174657, at *5.  This Settlement builds on the *Pettit* Settlement by securing P&G's agreement to remove that part of the current Product label that says "septic safe" and "safe for sewers and septic systems," and extends P&G's obligation under the *Pettit* Settlement for another two years from the Effective Date of this Settlement which will benefit consumers.  Preliminary Approval Order at 3.

---

[14] The Belfiore Decl. is attached as Exhibit 4 to the MIP Final Decl.

**B.     The Request for Reimbursement of Litigation Expenses Should Be Granted**

"Just as attorneys may recover reasonable attorneys' fees in a certified class action, they may also recover 'nontaxable costs.' . . . Costs may include items such as 'photocopying, travel, telephone costs, witness fees, long distance faxes, transcript requests necessary for post-trial motions and costs of necessary depositions.'" *Pearlman*, 2019 U.S. Dist. LEXIS 142222 at *24 (citing Fed. R. Civ. P. 23(h) and collecting cases). Compensable expenses broadly include "reasonable expenses normally charged to a fee paying client." *See generally* 5 *Newberg On Class Actions* §16:5 (5th ed.) (collecting cases).

To date, Plaintiff's Counsel have incurred $202,838.27 in litigation expenses and costs in prosecuting the Action.  MIP Final Decl. ¶¶ 32-34 & Ex. 2 (expense summary by category). This amount primarily includes on-line research costs, expert consultant fees, photocopying and other expenses relating to the claims in this Action.  *Id.*   Such expenses are regularly granted reimbursement by courts.  *See Pearlman*, 2019 U.S. Dist. LEXIS 142222, at *24; *In re Virtus Inv. Partners, Inc.*, No. 15cv1249, 2018 U.S. Dist. LEXIS 205304, at *14 (S.D.N.Y. Dec. 4, 2018). Importantly, the expenses are being paid directly by the Defendants, and not coming from the benefits derived for Settlement Class Members.

**C.     The Lead Plaintiff Award Should be Granted**

"Courts in this circuit regularly approve service awards, ranging from as low as $1,000 to as high as $25,000, in consumer class action settlements; generally, however, awards between $1,000 and $10,000 are more typical." *McLaughlin*, 2018 U.S. Dist. LEXIS 128347, at *20-21. Incentive awards are common and are properly awarded even when the lead plaintiffs "do not appear to have been exposed to any particular risk," because nevertheless "they have taken extra efforts to prosecute the action." *Berni v. Barilla G. e R. Fratelli, S.p.A.*, 332 F.R.D. 14, 37 (E.D.N.Y.

30

June 3, 2019); *see also McLaughlin*, 2018 U.S. Dist. LEXIS 128347, at *45 (awarding $6,000 incentive fee even where lead plaintiff assumed no risk and brought no special expertise).[15]   The amount of $10,000 here is well within the "typical" range of awards to plaintiffs cited above.

Here, Plaintiff Belfiore aided Plaintiff's Counsel in successfully prosecuting this litigation and reaching a settlement, including locating and forwarding responsive documents and information, providing discovery, communicating with counsel, and attending Court hearings. Belfiore Decl. ¶ 4.   Mr. Belfiore also sat for a full-day deposition, and his wife and plumber (who removed wipes that got stuck in the pipes of Belfiore's home, for which Belfiore incurred a $526 plumbing bill) both sat for half-day depositions.   MIP Final Decl. ¶ 8; Belfiore Decl. ¶ 3.   Further, Mr. Belfiore, with his counsel, stayed at Plaintiff's home on a weekday to allow P&G's plumbing expert and one of its attorneys to inspect the toilet and pipes in his home in which the Product got stuck. MIP Final Decl. ¶ 8.   The on-premises inspection included P&G's plumbing expert snaking a camera through the pipes in Plaintiff's home and opening up a part of his basement floor.   *Id.*   The requested payment for Mr. Belfiore is designed to compensate him for (1) the time and effort undertaken by him and his wife in pursuing this Action (including the risk of liability for the costs of suit); and (2) Plaintiff's agreeing to a release broader than the one that will bind other Settlement Class Members (compare Settlement Agreement ¶¶ 9.1 & 9.2).   *See* Belfiore Decl. ¶ 7 (estimating that Mr. Belfiore spent in excess of fifty (50) hours on this matter).

## CONCLUSION

Based on the reasons discussed above, Plaintiff respectfully requests that the Court (1) certify the Settlement Class for settlement purposes; (2) grant final approval of the proposed

---

[15] Class representative payments were approved for all seventeen (17) *Pettit* Class representatives. *Pettit* Action, Dkt. No. 135 ¶ 28.

Settlement; and (3) approve the request for attorneys' fees and reimbursement of expenses, and the

Class Representative Payment.

DATED: June 11, 2020

**WOLF POPPER LLP**

*/s/ Chet B. Waldman*
Chet B. Waldman
Matthew Insley-Pruitt
Philip M. Black
845 Third Avenue, 12th Floor
New York, NY 10022
Tel: (212) 759-4600

*Attorneys for Plaintiff Anthony Belfiore*